**<u>EXHIBIT A</u>**

**4-18-12 Summons & Complaint**

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
COUNTY OF GREENVILLE )

C.A. No. 2012-CP-23-2664

C. Vincent Brown, J. Edward Mixon, Fred B.
Johnston, II, Raymond E. Burns, Michael E.
Munafo, Craig H. Carver, Estate of C. Dan
Joyner, James E. Pittman, John A. Hagins, Jr.,
Ralph S. Crawley, Thomas R. Strange, Dwayne
Bell, Thomas G. Carswell, Susan T. Carswell,
Richard A. Lackey, Lawrence R. Fischer, Dan
A. Collins, R. Charles Eldridge, Jr., Gerald W.
Lenz, Adam Pittman, Gerry Womack, Steven
C. Francis, Frances D. Johnson, B.L. Johnson,
Terry R. Weaver, Martha Sutherland Wright,
Michael Howard, Billie Howard, William R.
Martin, G. Bruce McPherson, John T. Pazdan,
Emilie R. Pazdan, Lewis E. Martin, William E.
Martin, Michael Burns, Glenn Oxner, John
Katilius, John Walker, Frank Washick
Intervivos Trust, Brett Blevins, Jason M. Smith
and Brittnay B. Smith,

                    Plaintiffs,

vs.

Cyril S. Spiro, Pamela Joy Owens, Regent
Bank, Regent Bancorp, Inc., Thomasina
Caporella, G. Jean Cerra, John C. Csapo,
Alfred D. Griffin, Jr., Olin M. Hill, Irving
Rosenbaum, George D. Town, Barry Webber,
Neil LeCorgne, Richard J. Gray, Jim
Afflerback, and David R. Mazza.

                    Defendants.

**SUMMONS**

**(Jury Trial Demanded)**

FILED-CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

2012 APR 18 P 3:18

ENTERED COMPUTER

YOU ARE HEREBY summoned and required to answer the Complaint in this action, of

which a copy is herewith served upon you, and to serve a copy of your answer to the said Complaint

on the subscribers at their offices, 211 Pettigru Street, P.O. Box 2343, Greenville, South Carolina,

within thirty (30) days after the service hereof, exclusive of the day of such service; and if you fail to

1

SCANNED



answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court and judgment by default will be rendered against you for the relief demanded in the Complaint.

Respectfully submitted,

John A. Hagins, Jr., S.C. Bar #2589
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC 29602
(864) 242-9000

Attorney for Plaintiff

April 18, 2012

Greenville, South Carolina



STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS

COUNTY OF GREENVILLE ) C.A. No. 2012-CP-23-2664

)

)

C. Vincent Brown, J. Edward Mixon, Fred B.
Johnston, II, Raymond E. Burns, Michael E.
Munafo, Craig H. Carver, Estate of C. Dan
Joyner, James E. Pittman, John A. Hagins, Jr.,
Ralph S. Crawley, Thomas R. Strange, Dwayne
Bell, Thomas G. Carswell, Susan T. Carswell,
Richard A. Lackey, Lawrence R. Fischer, Dan
A. Collins, R. Charles Eldridge, Jr., Gerald W.
Lenz, Adam Pittman, Gerry Womack, Steven
C. Francis, Frances D. Johnson, B.L. Johnson,
Terry R. Weaver, Martha Sutherland Wright,
Michael Howard, Billie Howard, William R.
Martin, G. Bruce McPherson, John T. Pazdan,
Emilie R. Pazdan, Lewis E. Martin, William E.
Martin, Michael Burns, Glenn Oxner, John
Katilius, John Walker, Frank Washick
Intervivos Trust, Brett Blevins, Jason M. Smith
and Brittnay B. Smith,

Plaintiffs,

vs.

Cyril S. Spiro, Pamela Joy Owens, Regent
Bank, Regent Bancorp, Inc., Thomasina
Caporella, G. Jean Cerra, John C. Csapo,
Alfred D. Griffin, Jr., Olin M. Hill, Irving
Rosenbaum, George D. Town, Barry Webber,
Neil LeCorgne, Richard J. Gray, Jim
Afflerback, and David R. Mazza.

Defendants.

**COMPLAINT**

**(Jury Trial Demanded)**

FILED-CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

2012 APR 18 P 3:18

Plaintiffs above-named respectfully present to this Court the following:

**(PARTIES, JURISDICTION AND VENUE)**

1.  For organization and simplification, the entities discussed are referred to as these:

1

a)    Plaintiffs: "S.C. Plaintiffs" or "S.C. Shareholders" named above which are inclusive of Blevins/Smith family[1] of Canton, Georgia and all other named or appropriately added.

b)    Defendants: "Defendants"; from time to time, principal Defendant Cyril S. Spiro (the Chairman and CEO of Regent Bank, Florida) has different job functions and Defendant Pamela Joy Owens (CFO and Executive Vice President of Regent Bank, Florida) who performs financial accounting services.

c)    Defendant Regent Bank ("the Bank" or 'Florida Bank") is headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware.

d)    Defendant Regent Bancorp, Inc. a/k/a The Holding Company ("Company") is a bank holding company headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware.

e)    Regent Bank of Greenville, South Carolina ("New Bank" or "S.C. Bank") was located in Greenville, South Carolina and was a subsidiary of The Company with Plaintiffs as shareholders until sold out by the Company. Regent Bank of South Carolina (New Bank) was chartered, opened, and began operating in South Carolina with growing success in April 2009.

f)    Board of Directors of "the Company" as "the Company Board" and/or individual names and recovery is sought against them by Plaintiffs, both individually and personally and in their corporate capacity in this Court.

g)    Board of Directors of "the Company" identified by name or "Florida Bank Trustees" as "the Company Board" and/or individual names.

2.    Plaintiffs are citizens and residents of Greenville County, South Carolina, where they invested money at the insistance and promotion of Defendants to organize a new federal savings bank ("New Bank") in Greenville, South Carolina and with the proceeds of this offering of stock ownership by South Carolina Plaintiffs, used to capitalize the New Bank. The proceeds of the offering "will be used to capitalize the New Bank which will be operated as a *wholly owned subsidiary of the company*."[2] The New Bank was, indeed, subscribed to, funds paid into a holding company (the

---

[1] Brett Blevins, Jason M. Smith, and Brittnay B. Smith reside in Canton, Georgia (Blevins-Smith held by Blevins).
[2] See Page 6 of Private Placement Memorandum (Prospectus) which concisely says, "PURPOSE OF OFFERING AND USE OF PROCEEDS: The purpose of the offering is to capitalize the New Bank, a newly chartered federal bank (in organization) to be headquartered in Greenville, South Carolina. The New Bank will be a wholly owned subsidiary of the company".

2

Company) on or about June 2008 and December 2008, prior to 2008 year-end financial report, for the use of keeping the money until appropriate, carefully timed, and wisely used consistent with the market conditions to develop the Regent Bancorp, Inc. in Greenville County, South Carolina, principally for the purposes of transacting business in and around that geographical area. Stock was not, however, issued until February 2009. Those S.C. Shareholders who invested prior to the dismal 2008 year-end report of January 2009, were not allowed to withdraw.

3.      Defendant Regent Bank is an entity in the State of Florida engaged in retail and commercial banking.

4.      Defendant Regent Bancorp, Inc. is the bank holding company's primary and is a Florida chartered commercial bank which is owned 100 percent by the holding company. The "Company" (Regent Bancorp, Inc.) which was the holding company incorporated in Florida, owned 100 percent of the common stock of "The Bank" and "New Bank", Regent Capital Trust II and Regent Capital Trust III. There were other subsidiaries, however, certain of these financing subsidiaries and the Company were organized under Delaware law and are Delaware corporations.

5.      In accordance with the allegations above, the situs of this action to be and this Complaint is in the State of South Carolina, to-wit, Greenville County, South Carolina and in the state courts of that county and state. There is no complete diversity of citizenship of this action as the Plaintiffs who invested money to start the New Bank are residents of the State of South Carolina, for the most part, and Blevins/Smith Group who are residents of the State of Georgia. Defendant Owens is employed by the "Company" and the Bank. However, she is now, and has been, a legal resident of the State of South Carolina. Two principal subsidiaries at the time of the occurrences alleged herein were part of the Company, all of which are Delaware corporations.

3

**(INDIVIDUAL AND CORPORATE DEFENDANTS)**

6.     Principal Defendant Cyril S. Spiro ("Spiro") is, upon information and belief, a resident of Ft. Lauderdale, Florida and/or the Nation of Switzerland and was, at all times herein, the Chairman and CEO of the Bank or Florida Bank and the Company which was the bank holding company, who would hold the proceeds of South Carolina residents at all times and, specifically, until a proper, wise, and financially sound time to invest in constructing and operating the "New Bank" being Regent Bank of Greenville, South Carolina.  Defendant Spiro was, at all times, the "control person" of that company and the principal "architect" of the destruction of the New Bank and dissemination of the shareholders investments made relying upon his deceitful representations, willfully, deceptively, and recklessly keeping audit information of the weak condition of the Florida Bank hidden from S.C. Plaintiffs.

7.     Defendant Pamela Joy Owens ("Owens") was then, and at all times herein, a resident of Greenville County, State of South Carolina, and an employee of "The Company" and working with the bank formation and the timing thereof; monitoring financial matters pertaining to "New Bank" in Greenville, South Carolina for the Company.

8.     The members of the Board of the Defendant "the Company" and the Florida Bank who converted, took for their own personal gain, and looted the Plaintiffs and S.C. Bank are, likewise, named as Defendants both individually and personally and in their official corporate capacity---all of whom, upon information and belief, are citizens and residents of the State of Florida---and are as follows:  Thomasina Caporella, G. Jean Cerra, John C. Csapo, Alfred D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, George D. Town, Barry Webber, and executive management, Neil LeCorgne, Richard J. Gray, Jim Afflerback, and David R. Mazza.

## (GENERAL ALLEGATIONS)

9.    This cause of action is brought against Defendants in their individual and corporate capacity pursuant to the common and statutory law of South Carolina and, specifically, the U.S. Uniform Act adopted by S.C. ("The Act" as referred to as the S.C. Uniform Securities Act of 2005, §35-1-101, et seq.

10.    Specific sections of The Act applicable to Defendants are §35-1-501 General Fraud; §35-1-505 Misleading Filings; §35-1-504 Misleading; §35-1-509 Civil Liability. The provisions of §35-1-508 for criminal activity is not alleged in this complaint.

11.    In order to raise the money, the principal Defendant Spiro of Palm Beach, Florida and Switzerland on behalf of the Defendant corporations be represented and controlled, made certain overtures frequently to people known and active in the banking community of Greenville, South Carolina beginning this "courtship" in 2007. The major undisclosed purpose was to salvage the rapidly declining Florida Bank and was a primarily self-serving venture for Florida Bank and shareholders. Then, potential South Carolina shareholders were solicited. There were a number of such meetings, including one meeting on July 28, 2008, at the Poinsett Club (a private club located in Greenville, South Carolina) in which an invitation was issued for a presentation all the Florida group of corporations by Regent Bank (New Bank) and Regent Bancorp, Inc. (The Company). The major presentation would be by the Defendant Spiro and questions and answers by Defendant Spiro and Pamela Joy Owens, CFO of Greenville, South Carolina (only on financial matters). Further, another and similar presentation was made by those same people at a meeting on September 18, 2008, at the Poinsett Club in Greenville, South Carolina for the same purpose. Further, private conversations and other communications were engaged in by these Defendants for the purpose of soliciting for the funds in order to organize "New Bank" named Regent Bank in Greenville, South Carolina, and for that purpose only which was to own and operate a bank in Greenville County, South Carolina.

At **no time** were any of the following ever discussed in either the presentation or questions and answers or in any later discussions until approximately January of 2012, which includes, but is not limited to, the following:

      a)     That any of the monies, value, funds raised from the sale of stock in New Bank to residents of South Carolina or any other persons would ever be taken and used to enhance the condition of Defendant Regent Bank in Broward County, Florida (in which most of these defendants were personally invested), either directly or through "the Company", which was the holding company at any time whatsoever and undisclosed until a later date.

      b)     No discussion was had regarding diverting, seizing, using, looting, heisting, or stock manipulation of the funds paid by Plaintiffs for purposes as designed by Defendant Spiro and his fellow Defendants to financially support the Bank, which unknown and unrevealed to South Carolina shareholders, was deteriorating, was receiving TARP funds, and was under FICA watch and supervision.

      c)     In later discussion in the "Private Placement Memorandum" (Prospectus), there was no discussion nor presentation by all Defendants that the entire worth of "New Bank" would be sold in its entirety to another Bank outside of South Carolina organization of "the Company" at any time  and the proceeds taken over by "the Company" run principally by Defendant Spiro with the South Carolina bank and its shareholders substantially damaged by the looting by Defendant Spiro as the control person and as the leader of other members of the Board of Directors of Regent Bank, Florida (Bank) in Broward County, Florida, individually and in their corporate capacity for which they are liable and guilty both corporately and individually which occurred to their personal benefit and the detriment of the S.C. Shareholders.

      d)     Dilution of the shares is specifically mentioned, and the shares purchased for $50 per share were expected, initially, to have a tangible book value or $33.60 per common share

(dilution in the amount of $14.45 per share), but this would be unrelated to a sale and transfer for the entire shares of Defendants.

      e)      Defendant the Company of Regent Bancorp, Inc. which was the holding company whose control person was Defendant Spiro and the Defendants Board colleagues acting in their own interest and ignoring their fiduciary duty to South Carolina shareholders did sell the South Carolina Regent Bank to a North Carolina bank by the name of Bank of North Carolina to gather financial proceeds to support "the Bank", which had lost income and net worth, received TARP funds, and was insolvent all of which was undisclosed and maliciously hidden from S.C. Shareholders.

      f)      All of this development was undisclosed by Defendant Spiro and his board individually named as defendants. The South Carolina Regent Bank ("New Bank") was started with an investment of $6.3 Million raised by South Carolina investors (including Plaintiffs Blevins/Smith Group of Georgia, at Old Mill Corporation in the sole name of "Blevins") and the Company borrowed some $3.7 Million for a total of $10 Million as required by regulators to start up the Plaintiff New Bank (South Carolina Regent Bank). It further appears that the sale netted enough that the Defendant Regent Bancorp, Inc. (Company) received back their investment and paid off the loan to start the New Bank. This appears to have manipulated the South Carolina investors to save the Florida Investors with the value of their stock being less than one-half of what was paid to develop the bank and no longer with any Defendant New Bank Regent Bank in South Carolina.

      g)      Prior to beginning complete litigation against Defendant Spiro, the principal and control person, and the control person of the Defendants on the Board of Directors, and other appropriate persons who may have contributed to this looting and charging exorbitant administrative fees conceivably to finance the failing Florida Bank of the South Carolina and Blevins investment; the dilution of their funds; the loss of their funds (often which were the retirement

funds of older persons, people who had worked hard all their life and considered that an investment in a bank was a relatively safe investment and so assured by Defendant Spiro and others) to be bewildered and destroyed by the money they had earned, saved, and invested being marginalized and diluted to rescue a mismanaged pompus Florida Bank.

12.    Regent Bancorp, Inc. offered the shares pursuant to the Private Placement Memorandum (PPM), solicited Subscription Agreements from May through the Fall of 2008, and required the SC Investors to pay the subscription price for the Shares by October 31, 2008. Once received, the funds were held in escrow pending Regent's decision to sell the Shares. Regent decided in February 2009 to sell the Shares, at which time the Shares were sold and issued to S.C. Shareholders.

13.    At the time the Shares were sold to S.C. Shareholders, Regent Defendants knew, or should have known, material facts that had not been disclosed to the SC Investors, in violation of the South Carolina Uniform Securities Act. These material facts include (but are not limited to) the following:

a)    During the period from May 2008 until Regent's decision to sell the Shares in February 2009, the FL Bank's financial condition and prospects had seriously deteriorated.

1)    The PPM included financial information for Regent as of December 31, 2007 and referred the SC Investors to the Regent 2007 Annual Report. In addition, summary Regent financial information as of June 30, 2008 may have been provided to the SC Investors prior to the subscription deadline.

2)    As shown in Regent's 2008 Annual Report, by December 31, 2008, several of Regent's key financial metrics had seriously deteriorated as compared to the figures disclosed to the SC Investors as of December 31, 2007 or June 30, 2008.[3]  For instance, Regent's net investment in impaired loans was $121 as of December 31, 2007. As of December 31, 2008, Regent's net investment in impaired loans had risen to $15,936. Similarly, as of December 31, 2007, Regent's nonaccrual and past due loans were $790. As of one year later, these

---

[3] All balance sheet and income statement numbers are shown in 000's.

nonaccrual and past due loans had increased to $9,499. This deterioration was reflected in significant drops in several key ratios for the FL Bank: Total Capital to Risk-Weighted Assets Ratio (from 12.32 to 10.78) and Tier 1 Capital to Risk-Weighted Assets Ratio (from 11.34 to 9.76).

3) Regent's 2009 Annual Report shows that these and other Regent financial metrics continued to worsen dramatically during 2009. For instance, the allowances for loan losses were $2,864, $3,636 and $10,703 as of December 31, 2007, 2008 and 2009, respectively. Net earnings applicable to common were $2,377, $1,756 and ($4,216) in 2007, 2008 and 2009, respectively. The provisions for possible loan losses in the FL Bank's income statement were $1,016 for 2007, $766 for 2008 and $9,131 for 2009. The net investment in impaired loans rose from $15,936 at December 31, 2008 to $33,473 at December 31, 2009, and nonaccrual and past due loans increased from $9,499 to $33,864 during the same period. Of course, December 31, 2009 was several months after the February 2009 sales of the Shares, but these December 31, 2009 numbers strongly suggest that the financial information contained in Regent's 2008 Annual Report may have been excessively optimistic and unreasonable.

4) We expect that internal Regent records will show that, by the February 2009 date of the sale of the Shares, the FL Bank's top officers were very concerned about the deteriorating financial condition of their bank.

5) As stated above, none of this was disclosed to the SC Investors when Regent took their funds in exchange for the issuance of the Shares in February 2009.

b) Sometime prior to the February 2009 Share sale date, the FL Bank decided to embark on an aggressive growth strategy involving large increases in its portfolio of real estate loans. The FL Bank's net loans were $268,928 as of December 31, 2007 and $281,402 as of June 30, 2008. Sometime after that point, the FL Bank ramped up its investment in loans, for its net loans were $318,670 as of December 31, 2008 and $396,947 by the end of December 2009. This huge increase in loans was primarily in residential and commercial real estate (most likely in South Florida real estate). Residential real estate loans increased from *$55,659* at December 31, 2007, to $94,210 at December 31, 2008 to $145,270 at December 31, 2009.[4] Similarly, commercial real estate loans went from $159,479 at December 31, 2007 to $163,422 at December 31, 2008 to $211,275 at December 31, 2009. These increases in the FL Bank's concentrated exposure to Florida real estate dramatically changed the risk profile of Regent. Regent's intent to take this

---

[4] Inexplicably, mortgage loans were stated to be $32,426 (or $34,239 if combined with 1-4 Residential Construction) at June 30, 2008.

strategic direction was not disclosed to the SC Investors prior to the
February 2009 issuance of the Shares to them.

    c)      Shortly after the February 2009 issuance of the Shares to the SC Investors,
Regent issued 9,982 shares of Fixed-Rate Cumulative Preferred Stock, Series
B ($1,000 liquidation amount per share; 5% dividend rate), and 499 shares of
Fixed-Rate Cumulative Perpetual Preferred Stock, Series C ($1,000
liquidation amount per share; 9% dividend rate), to the U.S. Treasury under
the TARP/CPP program. The Series B and the Series C Preferred Stock
ranked senior, with respect to dividend and liquidation rights, to the Shares.
At the time the Shares were issued, Regent had to have intended to issue, or
knew that there was a high likelihood that it would issue, these preferred
securities. No disclosure was made of this intent or knowledge to the SC
Investors prior to the sale of the Shares.

14.      By the time the Shares were sold to the SC Investors, the significant financial decline
of the FL Bank had depressed the value of those Shares. Moreover, it is likely that disclosure of the
FL Bank's new strategic direction and disclosure of its expected issuance of preferred securities
would have further depressed the value of the Shares. What is clear is that the FL Bank's financial
decline, coupled with its aggressive growth strategy, created the circumstances that ultimately led
Regent to sell the SC Bank.

15.      In all "risks" and personal reassurance, the sale of South Carolina New Bank and the
funds from such sale which were ever raised or even cautioned by Defendant Spiro or his compliant
board of unassertive followers were never disclosed.  Indeed, it was concealed by them.  It now
appears that these monies from a successful sale have been used to support their failed bank in
Florida.  The profit from the sale of the S.C. Bank was $1.933 Million, **_all_** of which proceeds
Defendants have apparently converted and looted as of this date nor have they put forth an
equitable and fair solution.

### FOR A FIRST CAUSE OF ACTION
### (Equitable Rescission)

16.      All prior allegations are incorporated herein by reference.

10

17.     Plaintiffs entered into contractual arrangement with Defendants by and through the principal Defendant Cyril S. Spiro and the named Board of Directors of Regent Bank, Florida and Regent Bancorp by and through their corporate acts and their acts as individuals.

18.     Monies were paid into a holding company managed by the principal Defendant Spiro and his Board of supporters and followers on or about October 31, 2008, when the economy of the United States and specifically and particularly the State of Florida was in poor shape.  However, the severity of deterioration of the Florida company from May 2008 until, not only October 2008 but until February 2009 when the transaction was concluded, the Florida Bank's financial condition had even more seriously deteriorated, virtually until the time of crisis.  All of these facts were fraudulently manipulated and withheld, as will appear in minutes and factual information once obtained, and this deterioration was concealed.   The formal "purchase" of the shares was made at a time of choosing by Defendants who did so to further their own personal and corporate interest.

19.     As a result of the forthcoming allegations, including, but not limited to, breach of contract, constructive fraud, fraud and misrepresentation, concealment, breach of fiduciary duty, unfair trade practices (very likely followed by certain criminal acts in violation of the Uniform Securities Act of 2005 of the United States and enacted by South Carolina known as the Uniform Securities Act, §35-1-101 et seq., and, specifically, the criminal penalties of felony misdemeanor set forth therein in §35-1-508 et seq., which are not now before the Court.

20.     As a result thereof, Plaintiffs pray that this Court rescind the entire fraudulent, illegal transaction and the funds be totally refunded, together with the costs of attorneys' fees, interests, and all expenses arising therefrom with leave of the Court to insert and impose any further personal or corporate penalties as it may find just and proper.

21.    This equitable action for relief, together with civil actions for relief which are forthcoming, are asserted pursuant to Rule 2 of the *S.C. Rules of Civil Procedure* in that actions of a civil nature may be brought in one consolidated proceeding.

## FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

22.    All prior allegations are incorporated herein by reference.

23.    Plaintiffs entered into a contract (and later contracts) with Defendants by and through the principal Defendant Spiro, acting on behalf of other Directors of Regent Bank of Florida and the holding company.

24.    This contract contained terms which, if the parties abided by, were a valid contract and the intent of Plaintiffs was to enter a valid contract.

25.    The contract between the parties was breached by Defendants in one or more specifics as set forth herein in this litigation.  Fundamental breaches of contract are as follows:

a)    The funds invested by the S.C. Investors "will be used to capitalize the New Bank which will be open and operated as a wholly owned subsidiary of the company" as set forth on page 6 of the Private Placement Memorandum (Prospectus).  This portion of the contract was breached inasmuch as certain of these funds were timed in a manner detrimental to the S.C. Investors and, at a later date, the funds were looted from the S.C. Investors for the purpose with which they contracted and were used for other banking purposes of the Defendants contrary to their best interests.

b)    That the fair dealing by Defendants implicit in the contract of sale of the interest in establishing the New Bank in Greenville, South Carolina was violated in its entirety.

## FOR A THIRD CAUSE OF ACTION
### (Constructive Fraud)

26.    All prior allegations are incorporated herein by reference.

12

27.     Representations to the Plaintiffs were as described above which was to establish and operate a new bank in Greenville, South Carolina which would be, for corporate convenience, owned through the holding company to which the funds were paid for the purposes of establishing the Regent Bank in Greenville, South Carolina.

28.     The proposal presented by Defendants was altered to place the money in a "holding company", which gave Defendants control over the money to use (and they did use) it when it suited their best interests, even though it would be to the detriment of Plaintiffs as the financial situation of the Florida bank had dramatically declined.

29.     The representation made in South Carolina by Defendants' representatives was false and dishonest in that in several regards as alleged above, but, principally, the actual financial deterioration of the Florida bank, the timing of the use of the S.C. Investor funds to their detriment, the lack of commitment and placing funds in a position to be controlled by the S.C. Investors which had been paid by the S.C. Investors for the purpose of use in the S.C. Regent Bank and no one else without the consent of the S.C. Investors and/or their representatives as well as exorbitant fees and charges to support the Florida Bank.

30.     These manipulations are believed to have been intentionally done, however, in any event, for the purposes of constructive fraud, neither the intent to deceive nor actual dishonesty is an element of this fraud.

31.     The representations made by the Defendants and/or their representatives were material and have caused extreme and significant damage to the S.C. Investors. Any objective and reasonable person would have viewed these reckless, intentional or dishonest representations as significantly important, and it was very important (and became vitally important) as a role in the decision to enter the transaction. Without an honest commitment lacking in deception,

13

manipulation, and intent to loot and divert the S.C. Investors' funds and charge exorbitant fees to support the failing Florida Bank, a payment of those funds would not have been made.

32.     It was the intention of the Defendants and their representatives, specifically, the principal Defendant Spiro, that the S.C. Investors and the Plaintiffs rely upon these representations when he began his "courtship" of the investors in 2007, continuing until 2008 and then holding their money until February of 2009; deceptive nondisclosure of vital financial information of the deteriorating condition of the Florida bank, from time to time, increasing and becoming more virulent during this long sequence of serial financial fraud.

33.     At all times herein, there was every reason to believe and to rely upon the honesty and the integrity of the Defendants. The Plaintiffs were ignorant of the falsity of Defendants and these continued and serial misrepresentations. Without relying upon the truth of the statements made by Defendants, the contract would not have been entered by the Plaintiffs.

34.     The Plaintiffs had a right to rely upon the misrepresentation and it was reasonable and legitimate that they do so. It was an arms-length transaction between educated and mature individuals. The reliance would not have been made had there not been a good faith intention that they rely upon it, representation that it could be relied upon, and they did so.

35.     The reliance upon the false representations made by Defendants subsequently lead into damages in an amount in excess of some $6 Million but will be supported by more specific evidence thereof.

### FOR A FOURTH CAUSE OF ACTION
**(Fraud and Misrepresentation)**

36.     All prior allegations are incorporated herein by reference.

37.     The Defendants, by and through their agents and employees and, specifically, principal Defendant Spiro, committed the following acts of fraud and misrepresentation to the detriment of the Plaintiff:

14

a)     Made a representation that Plaintiffs' money would be invested in the development, construction, and operation of a South Carolina Regent Bank, which would be an entity of its own.

b)     The representation was false in that the control of the bank ended up in a holding company which was, indeed, controlled, manipulated, and used by Defendants both in support of their own failing banks in Florida.

c)     The representation made was material in that the losses certainly are in the neighborhood of some millions of dollars and as much as over $6 Million.

d)     The Defendants knew this was being done falsely and in 2008, when the subscription and purchase was to be made for the use of constructing the bank, audits were hidden; the financial deterioration of the bank was hidden; the structure and organization that could be manipulated to the detriment of the Plaintiffs and then, for the benefit of the Defendants, was hidden or not made clear and distinct.

e)     The Defendants well knew the representation could be and would be acted upon as written information and material was provided to the Plaintiffs which was false and was false at the time it was made; that important financial material which was then available was hidden or not supplied to Plaintiffs.

f)     Plaintiffs had a right to rely upon the Defendants, who appeared to be honest and forthright business people who supplied certain information which seemed to be reasonable upon which to rely in an honest business relationship and, particularly, one which involved chartered federal banks under the prevue and examination of federal authority.

g)     There was no reason for the Plaintiffs not to rely upon the representations made by the Defendants and that matter would be handled in a proper manner.

15

38.     As a result thereof, Plaintiffs suffered as a proximate cause a loss of several million dollars as will be set forth more precisely, plus a rebate of fees; loss of profit from sale.

## FOR A FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

39.     All prior allegations are incorporated herein by reference.

40.     Plaintiffs and Defendants established a fiduciary relationship in which the Plaintiffs would invest their funds in a holding company which would be used exclusively, or certainly principally, for the development of the S.C. Regent Bank; that these funds would not be manipulated, looted, disbursed, or used to keep up a seriously deteriorating Florida bank which had been mismanaged. This relationship began in 2007 and continued on into 2008 when certain funds were paid and, indeed, until 2009 (all the while knowing and having information that serious financial deterioration was taking place and keeping the information secret).

41.     Plaintiffs have come to know the representative of Defendants; there was every reason to believe that Defendants had the capability of managing, operating, and establishing banks and had done so successfully. Plaintiffs relied upon and placed their special confidence in the Defendants that the Defendants would act in good faith, although they were completely betrayed and swindled, and that this would be done in the best interests of the Plaintiffs and the S.C. Regent Bank, which, in the long run, could cooperate with the Florida bank in establishing a profitable relationship.

42.     Notwithstanding the representations of the Defendants to the Plaintiffs, the Plaintiffs did risk their money and had every reasonable cause to believe it would be handled with special confidence placed in the Defendants. The actions later taken by the Defendants were not in good faith but rather for selfish, false, malicious, and diabolically deceitful reasons. Defendants committed these acts, breaching their fiduciary duty to the Plaintiffs which was to the severe

16

detriment of the Plaintiffs, in order to extricate their own failing bank at the substantial expense and loss of Plaintiffs.

## FOR A SIXTH CAUSE OF ACTION
### (Unfair Trade Practices)

43.     All prior allegations are incorporated herein by reference.

44.     The actions alleged above which were committed by the Defendants are in violation of *S.C. Code* §39-5-10, et seq. known as the "Unfair Trade Practices Act". This was a deceitful, malicious, and manipulative use of a regulated trade, to-wit, the banking system of the United States, both in Florida and in South Carolina. The manner in which these trade practices were handled and managed by the Defendants for the use and benefit of the Plaintiffs was a violation of trade practices and set forth in the Act.

45.     Defendants committed these unfair trade practices by manipulation, looting, and diverting the interest and funds of the S.C. Investors. This was accomplished by selling the bank and taking the Plaintiff's money for their own wrongful and deceitful uses, which were ultimately to financially benefit the Florida Regent Bank which had drastically (but secretly) deteriorated. Thus, the monies of the S.C. Investors which should have accrued to a successful sale of the bank was not given to them or even primarily used by them, but use was made of their lawful monies by the evil and deceitful acts of the Defendants.

46.     These unfair trade practices committed by Defendants resulted in huge losses to the Plaintiffs, far beyond what might be the normal and expected result from the operation of the S.C. Bank as represented to them when they invested in it.

47.     As a result thereof, Plaintiffs have been damaged in an amount of several million dollars, which will be computed more precisely.

48.     As a result thereof, pursuant to *S.C. Code* §39-5-140(a), Plaintiffs are entitled to an award of treble the damages caused by the schemes, mishandling, negligence and reckless

17

management of their funds in breach of the fiduciary duty of the Defendants. These losses due to this method of manipulation and trading in the banking industry was far beyond what could have been reasonably contemplated by the Plaintiffs, and it was willful, wanton, malicious, and reckless in its execution and manner of so doing.

49.    Plaintiffs are further entitled to damage in the amount of reasonable attorneys' fees as determined by the Court but not less than 25 percent of the amount recovered, together with interest on these accounts.

WHEREFORE, Plaintiffs pray as follows:

1.    For a rescission of the entire transaction and repayment of the amount they earned plus interest thereon plus attorneys' fees and costs;

2.    For treble damages as provided for in *S.C. Code* §39-5-10, et seq.;

3.    For attorneys' fees of not less than 25 percent of the amount collected plus all costs;

4.    For the Court to inquire into the matter and determine whether investigation should not be had by other offices in Greenville County, South Carolina pursuant to §35-1-508 in of the detriment to the Plaintiffs and to the benefit of the Defendants who committed these acts; and,

5.    For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

John A. Hagins, Jr., S.C. Bar #2389
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC  29602
(864) 242-9000
Attorney for Plaintiff

April 18, 2012
Greenville, South Carolina

18

**STATE OF SOUTH CAROLINA**

**COUNTY OF GREENVILLE**

C. Vincent Brown, et al.,

Plaintiff(s)

vs.

Cyril S. Spiro, et al.,

Defendant(s)

)
)
)
)
)
)
)
)
)
)
)

**IN THE COURT OF COMMON PLEAS**

FILED-CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

2012 APR 18  P 3: 18

**CIVIL ACTION COVERSHEET**

2012-CP - 23- 2664

(Please Print)
Submitted By: John A. Hagins, Jr.
Address: Covington, Patrick, Hagins, Stern & Lewis,
P.A. 211 Pettigru St., Greenville,
SC  29601

| | |
|---|---|
| SC Bar #: | 2389 |
| Telephone #: | (864) 242-9000 |
| Fax #: | (864) 233-9777 |
| Other: | |
| E-mail: | jhagins@covpatlaw.com |

NOTE: The cover sheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law.  This form is required for the use of the Clerk of Court for the purpose of docketing.  It must be filled out completely, signed, and dated.  A copy of this cover sheet must be served on the defendant(s) along with the Summons and Complaint.

**DOCKETING INFORMATION** (Check all that apply)

*If Action is Judgment/Settlement do not complete*

☒ **JURY TRIAL** demanded in complaint.   ☐ **NON-JURY TRIAL** demanded in complaint.
☐ This case is subject to **ARBITRATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☒ This case is subject to **MEDIATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

**NATURE OF ACTION** (Check One Box Below)

| Contracts | Torts - Professional Malpractice | Torts – Personal Injury | Real Property |
|---|---|---|---|
| ☐ Constructions (100) | ☐ Dental Malpractice (200) | ☐ Assault/Slander/Libel (300) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Conversion (310) | ☐ Condemnation (410) |
| ☐ Employment (120) | ☐ Medical Malpractice (220) | ☐ Motor Vehicle Accident (320) | ☐ Foreclosure (420) |
| ☒ General (130) | Previous Notice of Intent Case # | ☐ Premises Liability (330) | ☐ Mechanic's Lien (430) |
| ☐ Breach of Contract (140) | 20___-CP-___-_____ | ☐ Products Liability (340) | ☐ Partition (440) |
| ☐ Other (199) | ☐ Notice/ File Med Mal (230) | ☐ Personal Injury (350) | ☐ Possession (450) |
| | ☐ Other (299) | ☐ Wrongful Death (360) | ☐ Building Code Violation (460) |
| | | ☐ Other (399) | ☐ Other (499) |

| Inmate Petitions | Judgments/Settlements | Administrative Law/Relief | Appeals |
|---|---|---|---|
| ☐ PCR (500) | ☐ Death Settlement (700) | ☐ Reinstate Driver's License (800) | ☐ Arbitration (900) |
| ☐ Mandamus (520) | ☐ Foreign Judgment (710) | ☐ Judicial Review (810) | ☐ Magistrate-Civil (910) |
| ☐ Habeas Corpus (530) | ☐ Magistrate's Judgment (720) | ☐ Relief (820) | ☐ Magistrate-Criminal (920) |
| ☐ Other (599) | ☐ Minor Settlement (730) | ☐ Permanent Injunction (830) | ☐ Municipal (930) |
| | ☐ Transcript Judgment (740) | ☐ Forfeiture-Petition (840) | ☐ Probate Court (940) |
| | ☐ Lis Pendens (750) | ☐ Forfeiture—Consent Order (850) | ☐ SCDOT (950) |
| | ☐ Transfer of Structured Settlement Payment Rights Application (760) | ☐ Other (899) | ☐ Worker's Comp (960) |
| | | | ☐ Zoning Board (970) |
| | ☐ Other (799) | | ☐ Public Service Commission (990) |
| | | | ☐ Employment Security Comm (991) |

| Special/Complex /Other | | |
|---|---|---|
| ☐ Environmental (600) | ☐ Pharmaceuticals (630) | |
| ☐ Automobile Arb. (610) | ☐ Unfair Trade Practices (640) | |
| ☐ Medical (620) | ☐ Out-of State Depositions (650) | ☐ Other (999) |
| ☐ Other (699) | ☐ Motion to Quash Subpoena in an Out-of-County Action (660) | |
| | ☐ Sexual Predator (510) | |

**Submitting Party Signature:** _(signature)_   **Date:**  **April 18, 2012**

**Note:** Frivolous civil proceedings  may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

SCCA / 234 (01/2011)                                                     Page 1 of 2

**FOR MANDATED ADR COUNTIES ONLY**

Allendale, Anderson, Beaufort, Clarendon, Colleton, Florence, Greenville, Hampton, Horry, Jasper, Lee, Lexington, Pickens (Family Court Only), Richland, Sumter, Union, Williamsburg, and York

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**You are required to take the following action(s):**

1.  The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action. If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2.  The initial ADR conference must be held within 300 days after the filing of the action.

3.  Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs. (Medical malpractice mediation is mandatory statewide.)

4.  Cases are exempt from ADR only upon the following grounds:

    a.  Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

    b.  Requests for temporary relief;

    c.  Appeals

    d.  Post Conviction relief matters;

    e.  Contempt of Court proceedings;

    f.  Forfeiture proceedings brought by governmental entities;

    g.  Mortgage foreclosures; and

    h.  Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute.

5.  In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6.  Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:**      **You must comply with the Supreme Court Rules regarding ADR.**
                      **Failure to do so may affect your case or may result in sanctions.**

**7-24-12 Amended Summons & Complaint**

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

)
)
)
)

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

Michael E. Munafo, J. Edward Mixon, Fred B.
Johnston, II, Raymond E. Burns and Susan E.
Burns JTWROS, Estate of C. Dan Joyner,
James E. Pittman, Jr., John A. Hagins, Jr.,
Crawley Enterprises, Thomas R. Strange, Sr.,
Dwayne M. Bell and Cathy D. Bell JTWROS,
NFS LLC FBO: Thomas G. Carswell, NFS
LLC FBO: Susan T. Carswell, Richard A.
Lackey, Lawrence R. Fischer Trustee under
Elfie Living Trust, NFS LLC FBO: Dan A.
Collins, NFS LLC/FMTC: FBO R. Charles
Eldridge, Jr., Nicholas Franchina, RBS Capital
Markets Corp. Custodian FBO Nicholas
Franchina IRA, RBC Capital Markets Corp
Custodian for Peter C. Kapetanokos, TC
Ameritrade Clearing Inc. Custodian Timothy
Borsum IRA, Thomas D. Bigby, Larry
Blackwell, W. Howard Boyd, Jr., Danny W.
Cisson, Carolyn A. Cisson, CP Enterprises,
Gerald W. Lenz and Alice R. Lenz JTWROS,
Adam Pittman, Gerry Womack, Steven
Charles Francis, Frances D. Johnson, B.L.
Johnson, James D. Miller, FCC Custodian
FBO James D. Miller, Charles Schwab and Co.
Inc. Custodian for Terry R. Weaver IRA,
Martha Sutherland-Wright, E. Michael Howard
and Billie B. Howard JTWROS, Billie Howard,
William R. Martin, G. Bruce McPherson, Jr.,
UBS Financial Custodian for C. Vincent
Brown, NFS LLC FBO: Malinda
Coleman/Fern Moore, John T. Pazdan, Emilie
R. Pazdan, Lewis E. Martin, William E. Martin,
Michael Burns, Glenn R. Oxner, Charles
Schwab and Co. Inc. Custodian for John E.
Katilius IRA, John N. Walker, Frank Washick
Interior Trust Agreement, B. Brett Blevins, C.
Joyce Alexander, Heather Shirley Smith
Custodian for Graham Steven Smith under the
UGMA, Stephanie Shirley Plumley Custodian
for Luke Cameron Lumley under the UGMA,
Lynn C. Faust, Sara E. Foster, Thomas M.
Goforth, II, Joseph E. Mixon Trustee under
Trust and Will of Jan H. Mixon, Robert S.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UN #850
07·24·2012
5·31 pm

**AMENDED SUMMONS**

(Jury Trial Demanded)

FILED CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B WICKENSIMER

2012 JUL 24 A 11:00

1

Latham, Jr., Sage Mill, LLC, Sam B. Phillips,   )
Jr., Donald A. Pihl, James Steven Shirley and   )
Mildred G. Shirty JTWROS, TCG, LLC, Peter   )
B. Waldschmidt, G. Herman Walker, III,   )
Douglas M. Wilson, Alan C. Singleton, Jason   )
M. Smith and Brittnay B. Smith,   )
  )
  )
          Plaintiffs,   )
  )
vs.   )
  )
Cyril S. Spiro, Pamela Joy Owens, Regent   )
Bank, Regent Bancorp, Inc., Thomasina   )
Caporella, G. Jean Cerra, John C. Csapo,   )
Alfred D. Griffin, Jr., Olin M. Hill, Irving   )
Rosenbaum, George D. Town, Barry Webber,   )
Neil LeCorgne, Richard J. Gray, Jim   )
Afflerback, and David R. Mazza.   )
  )
          Defendants.   )

YOU ARE HEREBY summoned and required to answer the Complaint in this action, of

which a copy is herewith served upon you, and to serve a copy of your answer to the said Complaint

on the subscribers at their offices, 211 Pettigru Street, P.O. Box 2343, Greenville, South Carolina,

within thirty (30) days after the service hereof, exclusive of the day of such service; and if you fail to

answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court

and judgment by default will be rendered against you for the relief demanded in the Complaint.

Respectfully submitted,

John A. Hagins, Jr., S.C. Bar #2389
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC 29602
(864) 242-9000
Attorney for Plaintiff

July 24, 2012

Greenville, South Carolina

2

PDF created with pdfFactory trial version www.pdffactory.com

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

)
)
)

IN THE COURT OF COMMON PLEAS
C.A. No.  2012-CP-23-2664

Michael E. Munafo, J. Edward Mixon, Fred B.
Johnston, II, Raymond E. Burns and Susan E.
Burns JTWROS, Estate of C. Dan Joyner,
James E. Pittman, Jr., John A. Hagins, Jr.,
Crawley Enterprises, Thomas R. Strange, Sr.,
Dwayne M. Bell and Cathy D. Bell JTWROS,
NFS LLC FBO: Thomas G. Carswell, NFS
LLC FBO:  Susan T. Carswell, Richard A.
Lackey, Lawrence R. Fischer Trustee under
Elfie Living Trust, NFS LLC FBO:  Dan A.
Collins, NFS LLC/FMTC:  FBO R. Charles
Eldridge, Jr., Nicholas Franchina, RBS Capital
Markets Corp. Custodian FBO Nicholas
Franchina IRA, RBC Capital Markets Corp
Custodian for Peter C. Kapetanokos, TC
Ameritrade Clearing Inc. Custodian Timothy
Borsum IRA, Thomas D. Bigby, Larry
Blackwell, W. Howard Boyd, Jr., Danny W.
Cisson, Carolyn A. Cisson, CP Enterprises,
Gerald W. Lenz and Alice R. Lenz JTWROS,
Adam Pittman, Gerry Womack, Steven
Charles Francis, Frances D. Johnson, B.L.
Johnson, James D. Miller, FCC Custodian
FBO James D. Miller, Charles Schwab and Co.
Inc. Custodian for Terry R. Weaver IRA,
Martha Sutherland-Wright, E. Michael Howard
and Billie B. Howard JTWROS, Billie Howard,
William R. Martin, G. Bruce McPherson, Jr.,
UBS Financial Custodian for C. Vincent
Brown, NFS LLC FBO:  Malinda
Coleman/Fern Moore, John T. Pazdan, Emilie
R. Pazdan, Lewis E. Martin, William E. Martin,
Michael Burns, Glenn R. Oxner, Charles
Schwab and Co. Inc. Custodian for John E.
Katilius IRA, John N. Walker, Frank Washick
Interior Trust Agreement, B. Brett Blevins, C.
Joyce Alexander, Heather Shirley Smith
Custodian for Graham Steven Smith under the
UGMA, Stephanie Shirley Plumley Custodian
for Luke Cameron Lumley under the UGMA,
Lynn C. Faust, Sara E. Foster, Thomas M.
Goforth, II, Joseph E. Mixon Trustee under
Trust and Will of Jan H. Mixon, Robert S.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

AMENDED COMPLAINT

(Jury Trial Demanded)

2012 JUL 24  A 11: 00

FILED CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

1

Latham, Jr., Sage Mill, LLC, Sam B. Phillips, )
Jr., Donald A. Pihl, James Steven Shirley and )
Mildred G. Shirty JTWROS, TCG, LLC, Peter )
B. Waldschmidt, G. Herman Walker, III, )
Douglas M. Wilson, Alan C. Singleton, Jason )
M. Smith and Brittnay B. Smith, )
                                                  )
                              Plaintiffs,         )
                                                  )
vs.                                               )
                                                  )
Cyril S. Spiro, Pamela Joy Owens, Regent )
Bank, Regent Bancorp, Inc., Thomasina )
Caporella, G. Jean Cerra, John C. Csapo, )
Alfred D. Griffin, Jr., Olin M. Hill, Irving )
Rosenbaum, George D. Town, Barry Webber, )
Neil LeCorgne, Richard J. Gray, Jim )
Afflerback, and David R. Mazza. )
                                                  )
                              Defendants.         )

Plaintiffs above-named respectfully present to this Court the following:

## (PARTIES, JURISDICTION AND VENUE)

1.    For organization and simplification, the entities discussed are referred to as these:

    a)    Plaintiffs: "S.C. Plaintiffs" or "S.C. Shareholders" named above which are inclusive of Blevins/Smith family[1] of Canton, Georgia and all other named or appropriately added.

    b)    Defendants: "Defendants"; from time to time, principal Defendant Cyril S. Spiro (the Chairman and CEO of Regent Bank, Florida) has different job functions and Defendant Pamela Joy Owens (CFO and Executive Vice President of Regent Bank, Florida) who performs financial accounting services.

    c)    Defendant Regent Bank ("the Bank" or 'Florida Bank") is headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware.

---

[1] Brett Blevins, Jason M. Smith, and Brittnay B. Smith reside in Canton, Georgia (Blevins-Smith held by Blevins).

2

d)      Defendant Regent Bancorp, Inc. a/k/a The Holding Company ("Company") is a bank holding company headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware.

e)      Regent Bank of Greenville, South Carolina ("New Bank" or "S.C. Bank") was located in Greenville, South Carolina and was a subsidiary of The Company with Plaintiffs as shareholders until sold out by the Company. Regent Bank of South Carolina (New Bank) was chartered, opened, and began operating in South Carolina with growing success in April 2009.

f)      Board of Directors of "the Company" as "the Company Board" and/or individual names and recovery is sought against them by Plaintiffs, both individually and personally and in their corporate capacity in this Court.

g)      Board of Directors of "the Company" identified by name or "Florida Bank Trustees" as "the Company Board" and/or individual names.

2.      Plaintiffs are citizens and residents of Greenville County, South Carolina, where they invested money at the insistance and promotion of Defendants to organize a new federal savings bank ("New Bank") in Greenville, South Carolina and with the proceeds of this offering of stock ownership by South Carolina Plaintiffs, used to capitalize the New Bank. The proceeds of the offering "will be used to capitalize the New Bank which will be operated as a *wholly owned subsidiary of the company*." [2] The New Bank was, indeed, subscribed to, funds paid into a holding company (the Company) on or about June 2008 and December 2008, prior to 2008 year-end financial report, for the use of keeping the money until appropriate, carefully timed, and wisely used consistent with the market conditions to develop the Regent Bancorp, Inc. in Greenville County, South Carolina, principally for the purposes of transacting business in and around that geographical area. Stock was not, however, issued until February 2009. Those S.C. Shareholders who invested prior to the dismal 2008 year-end report of January 2009, were not allowed to withdraw.

---

[2] See Page 6 of Private Placement Memorandum (Prospectus) which concisely says, "PURPOSE OF OFFERING AND USE OF PROCEEDS: The purpose of the offering is to capitalize the New Bank, a newly chartered federal bank (in organization) to be headquartered in Greenville, South Carolina. The New Bank will be a wholly owned subsidiary of the company".

3

PDF created with pdfFactory trial version www.pdffactory.com

3.      Defendant Regent Bank is an entity in the State of Florida engaged in retail and commercial banking.

4.      Defendant Regent Bancorp, Inc. is the bank holding company's primary and is a Florida chartered commercial bank which is owned 100 percent by the holding company. The "Company" (Regent Bancorp, Inc.) which was the holding company incorporated in Florida, owned 100 percent of the common stock of "The Bank" and "New Bank", Regent Capital Trust II and Regent Capital Trust III. There were other subsidiaries, however, certain of these financing subsidiaries and the Company were organized under Delaware law and are Delaware corporations.

5.      In accordance with the allegations above, the situs of this action to be and this Complaint is in the State of South Carolina, to-wit, Greenville County, South Carolina and in the state courts of that county and state. There is no complete diversity of citizenship of this action as the Plaintiffs who invested money to start the New Bank are residents of the State of South Carolina, for the most part, and Blevins/Smith Group who are residents of the State of Georgia. Defendant Owens is employed by the "Company" and the Bank. However, she is now, and has been, a legal resident of the State of South Carolina. Two principal subsidiaries at the time of the occurrences alleged herein were part of the Company, all of which are Delaware corporations.

## (INDIVIDUAL AND CORPORATE DEFENDANTS)

6.      Principal Defendant Cyril S. Spiro ("Spiro") is, upon information and belief, a resident of Ft. Lauderdale, Florida and/or the Nation of Switzerland and was, at all times herein, the Chairman and CEO of the Bank or Florida Bank and the Company which was the bank holding company, who would hold the proceeds of South Carolina residents at all times and, specifically, until a proper, wise, and financially sound time to invest in constructing and operating the "New Bank" being Regent Bank of Greenville, South Carolina. Defendant Spiro was, at all times, the "control person" of that company and the principal "architect" of the destruction of the New Bank

4

PDF created with pdfFactory trial version www.pdffactory.com

and dissemination of the shareholders investments made relying upon his deceitful representations, willfully, deceptively, and recklessly keeping audit information of the weak condition of the Florida Bank hidden from S.C. Plaintiffs.

7.      Defendant Pamela Joy Owens ("Owens") was then, and at all times herein, a resident of Greenville County, State of South Carolina, and an employee of "The Company" and working with the bank formation and the timing thereof; monitoring financial matters pertaining to "New Bank" in Greenville, South Carolina for the Company.

8.      The members of the Board of the Defendant "the Company" and the Florida Bank who converted, took for their own personal gain, and looted the Plaintiffs and S.C. Bank are, likewise, named as Defendants both individually and personally and in their official corporate capacity---all of whom, upon information and belief, are citizens and residents of the State of Florida---and are as follows:  Thomasina Caporella, G. Jean Cerra, John C. Csapo, Alfred D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, George D. Town, Barry Webber, and executive management, Neil LeCorgne, Richard J. Gray, Jim Afflerback, and David R. Mazza.

(GENERAL ALLEGATIONS)

9.      This cause of action is brought against Defendants in their individual and corporate capacity pursuant to the common and statutory law of South Carolina and, specifically, the U.S. Uniform Act adopted by S.C. ("The Act" as referred to as the S.C. Uniform Securities Act of 2005, §35-1-101, et seq.

10.     Specific sections of The Act applicable to Defendants are §35-1-501 General Fraud; §35-1-505 Misleading Filings; §35-1-504 Misleading; §35-1-509 Civil Liability.  The provisions of §35-1-508 for criminal activity is not alleged in this complaint.

11.     In order to raise the money, the principal Defendant Spiro of Palm Beach, Florida and Switzerland on behalf of the Defendant corporations be represented and controlled, made

5

PDF created with pdfFactory trial version www.pdffactory.com

certain overtures frequently to people known and active in the banking community of Greenville, South Carolina beginning this "courtship" in 2007. The major undisclosed purpose was to salvage the rapidly declining Florida Bank and was a primarily self-serving venture for Florida Bank and shareholders. Then, potential South Carolina shareholders were solicited. There were a number of such meetings, including one meeting on July 28, 2008, at the Poinsett Club (a private club located in Greenville, South Carolina) in which an invitation was issued for a presentation all the Florida group of corporations by Regent Bank (New Bank) and Regent Bancorp, Inc. (The Company). The major presentation would be by the Defendant Spiro and questions and answers by Defendant Spiro and Pamela Joy Owens, CFO of Greenville, South Carolina (only on financial matters). Further, another and similar presentation was made by those same people at a meeting on September 18, 2008, at the Poinsett Club in Greenville, South Carolina for the same purpose. Further, private conversations and other communications were engaged in by these Defendants for the purpose of soliciting for the funds in order to organize "New Bank" named Regent Bank in Greenville, South Carolina, and for that purpose only which was to own and operate a bank in Greenville County, South Carolina. At <u>no time</u> were any of the following ever discussed in either the presentation or questions and answers or in any later discussions until approximately January of 2012, which includes, but is not limited to, the following:

a) That any of the monies, value, funds raised from the sale of stock in New Bank to residents of South Carolina or any other persons would ever be taken and used to enhance the condition of Defendant Regent Bank in Broward County, Florida (in which most of these defendants were personally invested), either directly or through "the Company", which was the holding company at any time whatsoever and undisclosed until a later date.

b) No discussion was had regarding diverting, seizing, using, looting, heisting, or stock manipulation of the funds paid by Plaintiffs for purposes as designed by Defendant Spiro and

6

his fellow Defendants to financially support the Bank, which unknown and unrevealed to South Carolina shareholders, was deteriorating, was receiving TARP funds, and was under FICA watch and supervision.

        c)      In later discussion in the "Private Placement Memorandum" (Prospectus), there was no discussion nor presentation by all Defendants that the entire worth of "New Bank" would be sold in its entirety to another Bank outside of South Carolina organization of "the Company" at any time and the proceeds taken over by "the Company" run principally by Defendant Spiro with the South Carolina bank and its shareholders substantially damaged by the looting by Defendant Spiro as the control person and as the leader of other members of the Board of Directors of Regent Bank, Florida (Bank) in Broward County, Florida, individually and in their corporate capacity for which they are liable and guilty both corporately and individually which occurred to their personal benefit and the detriment of the S.C. Shareholders.

        d)      Dilution of the shares is specifically mentioned, and the shares purchased for $50 per share were expected, initially, to have a tangible book value or $33.60 per common share (dilution in the amount of $14.45 per share), but this would be unrelated to a sale and transfer for the entire shares of Defendants.

        e)      Defendant the Company of Regent Bancorp, Inc. which was the holding company whose control person was Defendant Spiro and the Defendants Board colleagues acting in their own interest and ignoring their fiduciary duty to South Carolina shareholders did sell the South Carolina Regent Bank to a North Carolina bank by the name of Bank of North Carolina to gather financial proceeds to support "the Bank", which had lost income and net worth, received TARP funds, and was insolvent all of which was undisclosed and maliciously hidden from S.C. Shareholders.

7

f)    All of this development was undisclosed by Defendant Spiro and his board individually named as defendants. The South Carolina Regent Bank ("New Bank") was started with an investment of $6.3 Million raised by South Carolina investors (including Plaintiffs Blevins/Smith Group of Georgia, at Old Mill Corporation in the sole name of "Blevins") and the Company borrowed some $3.7 Million for a total of $10 Million as required by regulators to start up the Plaintiff New Bank (South Carolina Regent Bank). It further appears that the sale netted enough that the Defendant Regent Bancorp, Inc. (Company) received back their investment and paid off the loan to start the New Bank. This appears to have manipulated the South Carolina investors to save the Florida Investors with the value of their stock being less than one-half of what was paid to develop the bank and no longer with any Defendant New Bank Regent Bank in South Carolina.

g)    Prior to beginning complete litigation against Defendant Spiro, the principal and control person, and the control person of the Defendants on the Board of Directors, and other appropriate persons who may have contributed to this looting and charging exorbitant administrative fees conceivably to finance the failing Florida Bank of the South Carolina and Blevins investment; the dilution of their funds; the loss of their funds (often which were the retirement funds of older persons, people who had worked hard all their life and considered that an investment in a bank was a relatively safe investment and so assured by Defendant Spiro and others) to be bewildered and destroyed by the money they had earned, saved, and invested being marginalized and diluted to rescue a mismanaged pompus Florida Bank.

12.    Regent Bancorp, Inc. offered the shares pursuant to the Private Placement Memorandum (PPM), solicited Subscription Agreements from May through the Fall of 2008, and required the SC Investors to pay the subscription price for the Shares by October 31, 2008. Once received, the funds were held in escrow pending Regent's decision to sell the Shares. Regent decided

8

in February 2009 to sell the Shares, at which time the Shares were sold and issued to S.C. Shareholders.

13.     At the time the Shares were sold to S.C. Shareholders, Regent Defendants knew, or should have known, material facts that had not been disclosed to the SC Investors, in violation of the South Carolina Uniform Securities Act. These material facts include (but are not limited to) the following:

a)     During the period from May 2008 until Regent's decision to sell the Shares in February 2009, the FL Bank's financial condition and prospects had seriously deteriorated.

1)     The PPM included financial information for Regent as of December 31, 2007 and referred the SC Investors to the Regent 2007 Annual Report. In addition, summary Regent financial information as of June 30, 2008 may have been provided to the SC Investors prior to the subscription deadline.

2)     As shown in Regent's 2008 Annual Report, by December 31, 2008, several of Regent's key financial metrics had seriously deteriorated as compared to the figures disclosed to the SC Investors as of December 31, 2007 or June 30, 2008.[5]  For instance, Regent's net investment in impaired loans was $121 as of December 31, 2007. As of December 31, 2008, Regent's net investment in impaired loans had risen to $15,936. Similarly, as of December 31, 2007, Regent's nonaccrual and past due loans were $790. As of one year later, these nonaccrual and past due loans had increased to $9,499. This deterioration was reflected in significant drops in several key ratios for the FL Bank: Total Capital to Risk-Weighted Assets Ratio (from 12.32 to 10.78) and Tier 1 Capital to Risk-Weighted Assets Ratio (from 11.34 to 9.76).

3)     Regent's 2009 Annual Report shows that these and other Regent financial metrics continued to worsen dramatically during 2009. For instance, the allowances for loan losses were $2,864, $3,636 and $10,703 as of December 31, 2007, 2008 and 2009, respectively. Net earnings applicable to common were $2,377, $1,756 and ($4,216) in 2007, 2008 and 2009, respectively. The provisions for possible loan losses in the FL Bank's income statement were $1,016 for 2007, $766 for 2008 and $9,131 for 2009. The net investment in impaired loans rose from $15,936 at December 31, 2008 to $33,473 at December 31, 2009, and nonaccrual and past due loans increased from $9,499 to

---

[5] All balance sheet and income statement numbers are shown in 000's.

PDF created with pdfFactory trial version www.pdffactory.com

$33,864 during the same period. Of course, December 31, 2009 was several months after the February 2009 sales of the Shares, but these December 31, 2009 numbers strongly suggest that the financial information contained in Regent's 2008 Annual Report may have been excessively optimistic and unreasonable.

4)     We expect that internal Regent records will show that, by the February 2009 date of the sale of the Shares, the FL Bank's top officers were very concerned about the deteriorating financial condition of their bank.

5)     As stated above, none of this was disclosed to the SC Investors when Regent took their funds in exchange for the issuance of the Shares in February 2009.

b)     Sometime prior to the February 2009 Share sale date, the FL Bank decided to embark on an aggressive growth strategy involving large increases in its portfolio of real estate loans. The FL Bank's net loans were $268,928 as of December 31, 2007 and $281,402 as of June 30, 2008. Sometime after that point, the FL Bank ramped up its investment in loans, for its net loans were $318,670 as of December 31, 2008 and $396,947 by the end of December 2009. This huge increase in loans was primarily in residential and commercial real estate (most likely in South Florida real estate). Residential real estate loans increased from *$55,659* at December 31, 2007, to $94,210 at December 31, 2008 to $145,270 at December 31, 2009.[4] Similarly, commercial real estate loans went from $159,479 at December 31, 2007 to $163,422 at December 31, 2008 to $211,275 at December 31, 2009. These increases in the FL Bank's concentrated exposure to Florida real estate dramatically changed the risk profile of Regent. Regent's intent to take this strategic direction was not disclosed to the SC Investors prior to the February 2009 issuance of the Shares to them.

c)     Shortly after the February 2009 issuance of the Shares to the SC Investors, Regent issued 9,982 shares of Fixed-Rate Cumulative Preferred Stock, Series B ($1,000 liquidation amount per share; 5% dividend rate), and 499 shares of Fixed-Rate Cumulative Perpetual Preferred Stock, Series C ($1,000 liquidation amount per share; 9% dividend rate), to the U.S. Treasury under the TARP/CPP program. The Series B and the Series C Preferred Stock ranked senior, with respect to dividend and liquidation rights, to the Shares. At the time the Shares were issued, Regent had to have intended to issue, or knew that there was a high likelihood that it would issue, these preferred securities. No disclosure was made of this intent or knowledge to the SC Investors prior to the sale of the Shares.

---

[4] Inexplicably, mortgage loans were stated to be $32,426 (or $34,239 if combined with 1-4 Residential Construction) at June 30, 2008.

10

14.    By the time the Shares were sold to the SC Investors, the significant financial decline of the FL Bank had depressed the value of those Shares. Moreover, it is likely that disclosure of the FL Bank's new strategic direction and disclosure of its expected issuance of preferred securities would have further depressed the value of the Shares. What is clear is that the FL Bank's financial decline, coupled with its aggressive growth strategy, created the circumstances that ultimately led Regent to sell the SC Bank.

15.    In all "risks" and personal reassurance, the sale of South Carolina New Bank and the funds from such sale which were ever raised or even cautioned by Defendant Spiro or his compliant board of unassertive followers were never disclosed. Indeed, it was concealed by them. It now appears that these monies from a successful sale have been used to support their failed bank in Florida. The profit from the sale of the S.C. Bank was $1.933 Million, *all* of which proceeds Defendants have apparently converted and looted as of this date nor have they put forth an equitable and fair solution.

## FOR A FIRST CAUSE OF ACTION
### (Equitable Rescission)

16.    All prior allegations are incorporated herein by reference.

17.    Plaintiffs entered into contractual arrangement with Defendants by and through the principal Defendant Cyril S. Spiro and the named Board of Directors of Regent Bank, Florida and Regent Bancorp by and through their corporate acts and their acts as individuals.

18.    Monies were paid into a holding company managed by the principal Defendant Spiro and his Board of supporters and followers on or about October 31, 2008, when the economy of the United States and specifically and particularly the State of Florida was in poor shape. However, the severity of deterioration of the Florida company from May 2008 until, not only October 2008 but until February 2009 when the transaction was concluded, the Florida Bank's financial condition had even more seriously deteriorated, virtually until the time of crisis. All of these facts were

11

PDF created with pdfFactory trial version www.pdffactory.com

fraudulently manipulated and withheld, as will appear in minutes and factual information once obtained, and this deterioration was concealed.  The formal "purchase" of the shares was made at a time of choosing by Defendants who did so to further their own personal and corporate interest.

19.    As a result of the forthcoming allegations, including, but not limited to, breach of contract, constructive fraud, fraud and misrepresentation, concealment, breach of fiduciary duty, unfair trade practices (very likely followed by certain criminal acts in violation of the Uniform Securities Act of 2005 of the United States and enacted by South Carolina known as the Uniform Securities Act, §35-1-101 et seq., and, specifically, the criminal penalties of felony misdemeanor set forth therein in §35-1-508 et seq., which are not now before the Court.

20.    As a result thereof, Plaintiffs pray that this Court rescind the entire fraudulent, illegal transaction and the funds be totally refunded, together with the costs of attorneys' fees, interests, and all expenses arising therefrom with leave of the Court to insert and impose any further personal or corporate penalties as it may find just and proper.

21.    This equitable action for relief, together with civil actions for relief which are forthcoming, are asserted pursuant to Rule 2 of the *S.C. Rules of Civil Procedure* in that actions of a civil nature may be brought in one consolidated proceeding.

<u>FOR A SECOND CAUSE OF ACTION</u>
(Breach of Contract)

22.    All prior allegations are incorporated herein by reference.

23.    Plaintiffs entered into a contract (and later contracts) with Defendants by and through the principal Defendant Spiro, acting on behalf of other Directors of Regent Bank of Florida and the holding company.

24.    This contract contained terms which, if the parties abided by, were a valid contract and the intent of Plaintiffs was to enter a valid contract.

12

PDF created with pdfFactory trial version www.pdffactory.com

25.    The contract between the parties was breached by Defendants in one or more specifics as set forth herein in this litigation.  Fundamental breaches of contract are as follows:

a)    The funds invested by the S.C. Investors "will be used to capitalize the New Bank which will be open and operated as a wholly owned subsidiary of the company" as set forth on page 6 of the Private Placement Memorandum (Prospectus).  This portion of the contract was breached inasmuch as certain of these funds were timed in a manner detrimental to the S.C. Investors and, at a later date, the funds were looted from the S.C. Investors for the purpose with which they contracted and were used for other banking purposes of the Defendants contrary to their best interests.

b)    That the fair dealing by Defendants implicit in the contract of sale of the interest in establishing the New Bank in Greenville, South Carolina was violated in its entirety.

## FOR A THIRD CAUSE OF ACTION
### (Constructive Fraud)

26.    All prior allegations are incorporated herein by reference.

27.    Representations to the Plaintiffs were as described above which was to establish and operate a new bank in Greenville, South Carolina which would be, for corporate convenience, owned through the holding company to which the funds were paid for the purposes of establishing the Regent Bank in Greenville, South Carolina.

28.    The proposal presented by Defendants was altered to place the money in a "holding company", which gave Defendants control over the money to use (and they did use) it when it suited their best interests, even though it would be to the detriment of Plaintiffs as the financial situation of the Florida bank had dramatically declined.

29.    The representation made in South Carolina by Defendants' representatives was false and dishonest in that in several regards as alleged above, but, principally, the actual financial deterioration of the Florida bank, the timing of the use of the S.C. Investor funds to their detriment,

13

the lack of commitment and placing funds in a position to be controlled by the S.C. Investors which had been paid by the S.C. Investors for the purpose of use in the S.C. Regent Bank and no one else without the consent of the S.C. Investors and/or their representatives as well as exorbitant fees and charges to support the Florida Bank.

30.    These manipulations are believed to have been intentionally done, however, in any event, for the purposes of constructive fraud, neither the intent to deceive nor actual dishonesty is an element of this fraud.

31.    The representations made by the Defendants and/or their representatives were material and have caused extreme and significant damage to the S.C. Investors. Any objective and reasonable person would have viewed these reckless, intentional or dishonest representations as significantly important, and it was very important (and became vitally important) as a role in the decision to enter the transaction. Without an honest commitment lacking in deception, manipulation, and intent to loot and divert the S.C. Investors' funds and charge exorbitant fees to support the failing Florida Bank, a payment of those funds would not have been made.

32.    It was the intention of the Defendants and their representatives, specifically, the principal Defendant Spiro, that the S.C. Investors and the Plaintiffs rely upon these representations when he began his "courtship" of the investors in 2007, continuing until 2008 and then holding their money until February of 2009; deceptive nondisclosure of vital financial information of the deteriorating condition of the Florida bank, from time to time, increasing and becoming more virulent during this long sequence of serial financial fraud.

33.    At all times herein, there was every reason to believe and to rely upon the honesty and the integrity of the Defendants. The Plaintiffs were ignorant of the falsity of Defendants and these continued and serial misrepresentations. Without relying upon the truth of the statements made by Defendants, the contract would not have been entered by the Plaintiffs.

14

PDF created with pdfFactory trial version www.pdffactory.com

34.    The Plaintiffs had a right to rely upon the misrepresentation and it was reasonable and legitimate that they do so. It was an arms-length transaction between educated and mature individuals. The reliance would not have been made had there not been a good faith intention that they rely upon it, representation that it could be relied upon, and they did so.

35.    The reliance upon the false representations made by Defendants subsequently lead into damages in an amount in excess of some $6 Million but will be supported by more specific evidence thereof.

<u>FOR A FOURTH CAUSE OF ACTION</u>
(Fraud and Misrepresentation)

36.    All prior allegations are incorporated herein by reference.

37.    The Defendants, by and through their agents and employees and, specifically, principal Defendant Spiro, committed the following acts of fraud and misrepresentation to the detriment of the Plaintiff:

a)    Made a representation that Plaintiffs' money would be invested in the development, construction, and operation of a South Carolina Regent Bank, which would be an entity of its own.

b)    The representation was false in that the control of the bank ended up in a holding company which was, indeed, controlled, manipulated, and used by Defendants both in support of their own failing banks in Florida.

c)    The representation made was material in that the losses certainly are in the neighborhood of some millions of dollars and as much as over $6 Million.

d)    The Defendants knew this was being done falsely and in 2008, when the subscription and purchase was to be made for the use of constructing the bank, audits were hidden; the financial deterioration of the bank was hidden; the structure and organization that could be

15

manipulated to the detriment of the Plaintiffs and then, for the benefit of the Defendants, was hidden or not made clear and distinct.

e)     The Defendants well knew the representation could be and would be acted upon as written information and material was provided to the Plaintiffs which was false and was false at the time it was made; that important financial material which was then available was hidden or not supplied to Plaintiffs.

f)     Plaintiffs had a right to rely upon the Defendants, who appeared to be honest and forthright business people who supplied certain information which seemed to be reasonable upon which to rely in an honest business relationship and, particularly, one which involved chartered federal banks under the prevue and examination of federal authority.

g)     There was no reason for the Plaintiffs not to rely upon the representations made by the Defendants and that matter would be handled in a proper manner.

38.     As a result thereof, Plaintiffs suffered as a proximate cause a loss of several million dollars as will be set forth more precisely, plus a rebate of fees; loss of profit from sale.

### FOR A FIFTH CAUSE OF ACTION
(Breach of Fiduciary Duty)

39.     All prior allegations are incorporated herein by reference.

40.     Plaintiffs and Defendants established a fiduciary relationship in which the Plaintiffs would invest their funds in a holding company which would be used exclusively, or certainly principally, for the development of the S.C. Regent Bank; that these funds would not be manipulated, looted, disbursed, or used to keep up a seriously deteriorating Florida bank which had been mismanaged. This relationship began in 2007 and continued on into 2008 when certain funds were paid and, indeed, until 2009 (all the while knowing and having information that serious financial deterioration was taking place and keeping the information secret).

16

PDF created with pdfFactory trial version www.pdffactory.com

41.    Plaintiffs have come to know the representative of Defendants; there was every reason to believe that Defendants had the capability of managing, operating, and establishing banks and had done so successfully. Plaintiffs relied upon and placed their special confidence in the Defendants that the Defendants would act in good faith, although they were completely betrayed and swindled, and that this would be done in the best interests of the Plaintiffs and the S.C. Regent Bank, which, in the long run, could cooperate with the Florida bank in establishing a profitable relationship.

42.    Notwithstanding the representations of the Defendants to the Plaintiffs, the Plaintiffs did risk their money and had every reasonable cause to believe it would be handled with special confidence placed in the Defendants. The actions later taken by the Defendants were not in good faith but rather for selfish, false, malicious, and diabolically deceitful reasons. Defendants committed these acts, breaching their fiduciary duty to the Plaintiffs which was to the severe detriment of the Plaintiffs, in order to extricate their own failing bank at the substantial expense and loss of Plaintiffs.

## FOR A SIXTH CAUSE OF ACTION
### (Unfair Trade Practices)

43.    All prior allegations are incorporated herein by reference.

44.    The actions alleged above which were committed by the Defendants are in violation of *S.C. Code* §39-5-10, et seq. known as the "Unfair Trade Practices Act". This was a deceitful, malicious, and manipulative use of a regulated trade, to-wit, the banking system of the United States, both in Florida and in South Carolina. The manner in which these trade practices were handled and managed by the Defendants for the use and benefit of the Plaintiffs was a violation of trade practices and set forth in the Act.

45.    Defendants committed these unfair trade practices by manipulation, looting, and diverting the interest and funds of the S.C. Investors. This was accomplished by selling the bank

17

PDF created with pdfFactory trial version www.pdffactory.com

and taking the Plaintiff's money for their own wrongful and deceitful uses, which were ultimately to financially benefit the Florida Regent Bank which had drastically (but secretly) deteriorated. Thus, the monies of the S.C. Investors which should have accrued to a successful sale of the bank was not given to them or even primarily used by them, but use was made of their lawful monies by the evil and deceitful acts of the Defendants.

46.    These unfair trade practices committed by Defendants resulted in huge losses to the Plaintiffs, far beyond what might be the normal and expected result from the operation of the S.C. Bank as represented to them when they invested in it.

47.    As a result thereof, Plaintiffs have been damaged in an amount of several million dollars, which will be computed more precisely.

48.    As a result thereof, pursuant to *S.C. Code §39-5-140(a)*, Plaintiffs are entitled to an award of treble the damages caused by the schemes, mishandling, negligence and reckless management of their funds in breach of the fiduciary duty of the Defendants. These losses due to this method of manipulation and trading in the banking industry was far beyond what could have been reasonably contemplated by the Plaintiffs, and it was willful, wanton, malicious, and reckless in its execution and manner of so doing.

49.    Plaintiffs are further entitled to damage in the amount of reasonable attorneys' fees as determined by the Court but not less than 25 percent of the amount recovered, together with interest on these accounts.

WHEREFORE, Plaintiffs pray as follows:

1.    For a rescission of the entire transaction and repayment of the amount they earned plus interest thereon plus attorneys' fees and costs;

2.    For treble damages as provided for in *S.C. Code §39-5-10, et seq.*;

3.    For attorneys' fees of not less than 25 percent of the amount collected plus all costs;

18

PDF created with pdfFactory trial version www.pdffactory.com

4.    For the Court to inquire into the matter and determine whether investigation should not be had by other offices in Greenville County, South Carolina pursuant to §35-1-508 in of the detriment to the Plaintiffs and to the benefit of the Defendants who committed these acts; and,

5.    For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

John A. Hagins, Jr., S.C. Bar #2389
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC 29602
(864) 242-9000
Attorney for Plaintiff

July ___ 2012
Greenville, South Carolina

19

PDF created with pdfFactory trial version www.pdffactory.com

**9-24-12 Defendant Regent Bank, Regent Bancorp, Inc., Cyril S. Spiro, Pamela Joy Owens, and Neill Lecorgne's Motion to Dismiss Amended Complaint Pursuant to S.C.R.C.P. Rules 12(b)(6) and 9(b), With Attachments**

STATE OF SOUTH CAROLINA      )        IN THE COURT OF COMMON PLEAS
                             )            C.A. No. 2012-CP-23-2664
COUNTY OF GREENVILLE         )
                             )
Michael E. Munafo, J. Edward Mixon,      )
Fred B. Johnston, II, Raymond E.         )
Burns and Susan E. Burns JTWROS,         )
Estate of C. Dan Joyner, James E.        )
Pittman, Jr., John. A. Hagins, Jr.,      )
Crawley Enterprises, Thomas R.           )
Strange, Sr., Dwayne M. Bell and         )
Carly D. Bell JTWROS, NFS LLC            )
FBO: Thomas G. Carswell, NFS LLC         )
FBO: Susan T. Carswell, Richard A.       )
Lackey, Lawrence R. Fischer Trustee      )
under Elfie Living Trust, NFS LLC        )
FBO: Dan A. Collins, NFS                 )
LLC/FMTC: FBO R. Charles                 )
Eldridge, Jr., Nicholas Franchina, RBS   )
Capital Markets Corp. Custodian FBO      )
Nicholas Franchina IRA, RBC Capital      )
Markets Corp Custodian for Peter C.      )
Kapetanokos, TC Ameritrade Clearing      )
Inc. Custodian Timothy Borsum IRA,       )        DEFENDANTS REGENT BANK, REGENT
Thomas D. Bigby, Larry Blackwell,        )        BANCORP, INC., CYRIL S. SPIRO, PAMELA
W. Howard Boyd, Jr., Danny W.            )        JOY OWENS, AND NEILL LECORGNE'S
Cisson, Carolyn A. Cisson, CP            )        MOTION TO DISMISS AMENDED
Enterprises, Gerald W. Lenz and Alice    )        COMPLAINT PURSUANT TO S.C.R.C.P.
R. Lenz JTWROS, Adam Pittman,            )        RULES 12(b)(6) and 9(b)
Gerry Womack, Steven Charles             )
Francis, Frances D. Johnson, B.L.        )
Johnson, James D. Miller, FCC            )
Custodian FBO James D. Miller,           )
Charles Schwab and Co. Inc.              )
Custodian for Terry R. Weaver IRA,       )
Martha Sutherland-Wright, E. Michael     )
Howard and Billie B. Howard              )
JTWROS, Billie Howard, William R.        )
Martin, G. Bruce McPherson, Jr., UBS     )
Financial Custodian for C. Vincent       )
Brown, NFS LLC FBO: Malinda              )
Coleman/Fern Moore, John T. Pazdan,      )
Emilie R. Pazdan, Lewis E. Martin,       )
William E. Martin, Michael Burns,        )
Glenn. R. Oxner, Charles Schwab and      )
Co. Inc. Custodian for John E. Katilius  )
IRA, John N. Walker, Frank Washick       )
Interior Trust Agreement, B. Brett       )
Blevins, C. Joyce Alexander, Heather     )

PPAB 2004083v1

Shirley Smith Custodian for Graham          )
Steven Smith under the UGMA,                )
Stephanie Shirley Plumley Custodian         )
for Luke Cameron Lumley under the           )
UGMA, Lynn C. Faust, Sara E. Foster,        )
Thomas M. Goforth,II, Joseph E.             )
Mixon Trustee under Trust and Will of       )
Jan H. Mixon, Robert S. Latham, Jr.,        )
Sage Mill, LLC, Sam B. Phillips, Jr.,       )
Donald A. Pihl, James Steven Shirley        )
and Mildred G. Shirty JTWROS,               )
TCG, LLC, Peter B. Waldschmidt, G.          )
Herman Walker, III, Douglas M.              )
Wilson, Alan C. Singleton, Jason M.         )
Smith and Brittnay B. Smith,                )
                                            )
                    Plaintiffs,             )
          vs.                               )
                                            )
Cyril S. Spiro, Pamela Joy Owens,           )
Regent Bank, Regent Bancorp, Inc.,          )
Thomasina Caporella, G. Jean Cerra,         )
John C. Csapo, Alfred D. Griffin, Jr.,      )
Olin M. Hill, Irving Rosenbaum,             )
George D. Town, Barry Webber, Neill         )
LeCorgne, Richard J. Gray, James            )
Afflerback, and David. R. Mazza,            )
                                            )
                    Defendants.             )

TO:    JOHN A. HAGINS, JR., ESQUIRE, ATTORNEY FOR PLAINTIFFS

        PLEASE TAKE NOTICE that the Defendants Regent Bank, Regent Bancorp, Inc., Cyril

S. Spiro, Pamela Joy Owens, and Neill LeCorgne (hereinafter, the "Regent Defendants"), by and

through their undersigned counsel, hereby move the Court, pursuant to Rule 12(b)(6) and Rule

9(b) of the South Carolina Rules of Civil Procedure, for an Order dismissing Plaintiffs'

Amended Complaint with prejudice.   The specific grounds for this Motion include, without

limitation, as follows:

        Under Rule 12(b)(6) and 9(b), S.C.R.C.P., the Amended Complaint should be dismissed

*in its entirety* as to the Regent Defendants because Plaintiffs have not alleged, and cannot allege,

2

the requisite elements of their purported claims against the Regent Defendants for equitable rescission, breach of contract, constructive fraud, fraud and misrepresentation, breach of fiduciary duty and unfair trade practices.  In particular:

A.    The Amended Complaint fails to state a claim upon which relief may be granted as to any of the Defendants, and also contains no well-pleaded factual allegations whatsoever against Defendant Neill LeCorgne.

B.    All of Plaintiffs' claims are barred as a matter of law by the applicable statutes of limitation.

C.    Plaintiffs' cause of action for Equitable Rescission fails because Plaintiffs have pled no valid cause of action that would entitle them to receive the remedy of rescission.

D.    Plaintiffs' cause of action for breach of contract fails because (i) Plaintiffs have alleged no contract with any Defendant other than Regent Bancorp, Inc.; and (ii) Plaintiffs have not alleged any conduct that constitutes a breach of contract.

E.    Plaintiffs' causes of action for constructive fraud and fraud fail for each of the following reasons:  (i) Plaintiffs have not pled these claims with the requisite degree of particularity as required by Rule 9(b) of the South Carolina Rules of Civil Procedure; (ii) Plaintiffs had no right to rely on any statement or omission of Defendants; (iii) Defendants had no duty to disclose to Plaintiffs any additional or supplemental information; (iv) the allegedly undisclosed information was not material; (v) the alleged non-disclosure concerning events that occurred after the alleged representations cannot, as a matter of law, state a claim for fraud; (vi) the alleged representations were accompanied by ample cautionary language and

disclosure of the matters that Plaintiffs claim were misrepresented; and (vii) an alleged non-disclosure cannot support a claim for constructive fraud.

F.   To the extent Plaintiffs attempt to assert a cause of action for negligent misrepresentation, that claim fails because Plaintiffs could not justifiably rely on any alleged statement of omission of Defendants and Plaintiffs have not alleged any misstatement of a present or pre-existing fact.

G.   Plaintiffs' cause of action for breach of fiduciary duty fails because Plaintiffs' allegations establish that the parties did not have a fiduciary or confidential relationship.

H.   Plaintiffs' cause of action for unfair trade practices fails because (i) securities transactions are exempt from the South Carolina Unfair Trade Practices Act; and (ii) Plaintiffs have alleged only a private wrong that does not affect the public interest.

This Motion to Dismiss is based upon the pleadings, the controlling law, a Private Placement Memorandum attached hereto as Exhibit 1,[1] a Memorandum of Law to be filed with the Court, arguments of counsel, and such other and further materials as may be presented to the Court at or before the hearing on this matter.

---

[1] Plaintiffs refer to, quote from, and invite the Court to "see" the Private Placement Memorandum throughout the Amended Complaint. *See* Amended Complaint, ¶¶2 at fn. 2, 11(c), 12, and 25(a). Either inadvertently or intentionally, Plaintiffs did not attach the Private Placement Memorandum to the Amended Complaint. As will be discussed in detail in Defendants' Memorandum of Law, this Court may consider the Private Placement Memorandum without converting this Motion into a Motion for Summary Judgment.

Respectfully submitted,

T. Alexander Evins, III, Esq.
alexevins@parkerpoe.com
Kristina Young, Esq.
kristinayoung@parkerpoe.com
Parker Poe Adams & Bernstein LLP
100 Dunbar Street, Suite 206
Spartanburg, SC  29306
Phone:  (864) 591-2030
Fax:  (864) 591-2050

OF COUNSEL:

Charles E. Raynal, Esq.
charlesraynal@parkerpoe.com
Matthew H. Mall, Esq.
matthewmall@parkerpoe.com
Parker Poe Adams & Bernstein, LLP
Wachovia Capitol Center
150 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Phone: (919) 828-0564
Fax: (919) 834-4564

ATTORNEYS FOR DEFENDANTS

September 24th, 2012

Spartanburg, South Carolina

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **DEFENDANTS REGENT BANK, REGENT BANCORP., INC., CYRIL S. SPIRO, PAMELA JOY OWENS, AND NEILL LECORGNE'S MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO S.C.R.C.P. RULES 12(b)(6) and 9(b)** was served on all parties to this action by depositing a copy of the same in the United States mail, postage prepaid, addressed as follows:

> John A. Hagins, Jr.
> Covington, Patrick, Hagins, Stern & Lewis, PA
> P.O. Box 2343
> Greenville, SC  29602
> (864) 242-9000

This the 24th day of September, 2012.

Felix F. Fricks, Paralegal
Parker Poe Adams & Bernstein LLP
100 Dunbar Street, Ste. 206
Spartanburg, South Carolina  29306

CONFIDENTIAL
COPY NO.:_____

NAME:_____

## PRIVATE PLACEMENT MEMORANDUM

### REGENT BANCORP, INC.
**2205 S. University Drive**
**Davie, Florida 33324**

#### UP TO 150,000 SHARES OF COMMON STOCK OFFERED
#### AT $50.00 PER SHARE
#### (PAR VALUE $.01 PER SHARE)

Regent Bancorp, Inc. (the "Company") is hereby offering for sale (the "Offering") up to 150,000 shares of Common Stock, $.01 par value per share, (the "Shares" or "Securities") of the Company at an Offering price of $50.00 per share. This Offering requires the sale of a minimum of 120,000 Shares and a maximum of 150,000 Shares may be sold. See "THE OFFERING" and "DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK." The Company is the parent bank holding company of Regent Bank, Davie, Florida.

**THE SECURITIES OFFERED HEREBY ARE NOT DEPOSITS AND,**
**THEREFORE, ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION**
**OR ANY OTHER AGENCY, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING**
**THE POSSIBLE LOSS OF PRINCIPAL**

THIS OFFERING IS HIGHLY SPECULATIVE AND INVOLVES A DEGREE OF RISK. THE PURCHASE OF THE SHARES IS SUITABLE ONLY FOR INVESTORS WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT AND ARE ABLE TO AFFORD A LOSS OF THEIR ENTIRE INVESTMENT. SEE "RISK FACTORS."

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED OF BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, THE FEDERAL DEPOSIT INSURANCE CORPORATION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

| Common Stock | Price | Proceeds to Company[1][2] |
|---|---|---|
| 120,000 Shares (Minimum) | $ 50.00 | $ 6,000,000 |
| 150,000 Shares (Maximum) | $ 50.00 | $ 7,500,000 |

[1]Prior to payment of estimated expenses of this Offering of $40,000, which includes legal, printing and accounting costs, but does not include commissions to brokers, if any.
[2]There is no underwriter for this offering. Officers and directors of the Company will sell shares to the public without commissions, but the Company may, in its discretion, retain commission-paid brokers in connection with this offering. Such commissions will not exceed 6%. Expense figures are an estimate only. Actual commission expenses may be higher or lower. All expenses of the offering, including commissions, will be paid by the Company. Actual proceeds to the Company will be net of estimated expenses.

**The date of this Memorandum is May 13, 2008**

## QUESTIONS AND ANSWERS ABOUT THIS DOCUMENT AND THE OFFERING

**WHAT IS THE PURPOSE OF THE OFFERING?**

The Company has applied for regulatory approval to organize a new federal savings bank in Greenville, South Carolina (the "New Bank"). The proceeds of this Offering will be used to capitalize the New Bank which will be operated as a wholly-owned subsidiary of the Company. The shares being offered are shares of the Company. Purchasers of the shares will not have a direct ownership interest in the New Bank, but will have ownership in the Company.

**WHO CAN SUBSCRIBE TO THE OFFERING?**

The offering of the Company's stock is being made to individuals and entities who are "accredited investors" and to a limited number of nonaccredited investors.

**HOW MANY SHARES CAN I BUY?**

There is no predetermined limit on the number of shares you can buy. However, the Board of Directors of the Company, in its sole discretion, can reject or reduce any subscription for any reason.

**WHEN DO I HAVE TO PAY FOR MY SHARES?**

Payment must be made no later than 9:00 a.m. on September 30, 2008. This date may be extended by the Board of Directors.

**CAN I SELL THE STOCK I PURCHASE IN THIS OFFERING?**

You must purchase the shares with investment intent. This means that the shares are being purchased solely for your own account for investment and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and you have no present plans to enter into any such contract, undertaking, agreement or arrangement. The shares will be restricted shares and cannot be sold in any event within the first year from date of issue. Your stock certificate will have a legend stating this restriction.

**IS THERE A MARKET FOR THE STOCK?**

No. There is not a recognized market for the Company's stock. The stock is not listed on any exchange. In order to sell your shares of the Company's stock, you would have to find a purchaser,

and the shares would have to be either registered under the securities laws or exempt from registration.

**WHAT RISKS SHOULD I CONSIDER?**

You should consider carefully the "Risk Factors" beginning on page 4. Also, you should seek any independent investment advice you might need.

**AFTER I SUBSCRIBE CAN I CHANGE MY MIND?**

No. The subscription is your contractual agreement to purchase the Shares.

**ARE THE COMPANY'S SHARES I PURCHASE INSURED BY THE FDIC?**

No. The Shares of stock are not deposits, so they are not insured by the FDIC or any other government agency or in any other way.

**WILL THERE BE CASH DIVIDENDS ON MY STOCK?**

There is no assurance any dividends will be paid in the future.

**WHO CAN HELP ANSWER MY QUESTIONS?**

You can call or write Pamela Joy Owens, Executive Vice President and CFO, Regent Bancorp, Inc., 1200 Woodruff Road, A-3, Suite 144, Greenville, South Carolina 29607 (Telephone: 864/678-4735).

**HOW DO I SUBSCRIBE?**

You may subscribe by completing in full the Purchaser Questionnaire and Subscription Agreement. These are included in Appendix A to the Private Placement Memorandum. You should complete the copy of these documents given to you separately with the Memorandum. The execution copy is on blue paper. Then mail or deliver them to:

Regent Bancorp, Inc.
1200 Woodruff Road, A-3, Suite 144
Greenville, SC 29607
Attn: Pamela Joy Owens
Executive Vice President

## TABLE OF CONTENTS

THE OFFERING ............................................................................................................................ 1

RISK FACTORS ........................................................................................................................... 4

ACCESS TO INFORMATION ..................................................................................................... 6

STEPS TO SUBSCRIBE FOR THE SHARES ............................................................................ 6

PURPOSE OF OFFERING AND USE OF PROCEEDS .............................................................. 6

MARKET FOR COMMON STOCK ............................................................................................. 7

CAPITALIZATION ....................................................................................................................... 7

DILUTION ..................................................................................................................................... 7

DESCRIPTION OF BUSINESS .................................................................................................... 8

PRINCIPAL SECURITYHOLDERS ........................................................................................... 12

SELECTED HISTORICAL FINANCIAL DATA ........................................................................ 14

MANAGEMENT'S DISCUSSION AND ANALYSIS OF THE COMPANY'S

    FINANCIAL STATEMENTS AND RESULTS OF OPERATIONS ................................. 15

DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK ....................................... 18

SUPERVISION AND REGULATION ......................................................................................... 19

GOVERNING LAW ..................................................................................................................... 23

LEGAL MATTERS....................................................................................................................... 23

Appendix A     Subscription Materials

## IMPORTANT INFORMATION FOR INVESTORS

THE PURCHASE OF SHARES IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY OF THEIR INVESTMENT AND UNDERSTAND AND CAN AFFORD THE HIGH FINANCIAL AND OTHER RISKS OF INVESTMENT IN THE COMPANY, INCLUDING THE RISK OF LOSING THEIR ENTIRE INVESTMENT.

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON EXEMPTIONS FROM SUCH FILING AND RELATED REGISTRATION AS SET FORTH IN THE SECURITIES ACT OF 1933, AS AMENDED, NOR HAS IT BEEN REGISTERED WITH OR REVIEWED BY ANY OTHER FEDERAL OR STATE REGULATORY AGENCY.

NO OFFERING LITERATURE IN WHATEVER FORM WILL BE EMPLOYED IN THIS OFFERING EXCEPT FOR THIS PRIVATE PLACEMENT MEMORANDUM. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF.

NO PERSON OTHER THAN THOSE SO DESIGNATED BY THE COMPANY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMPANY AND ITS OPERATIONS NOT CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM. ANY INFORMATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. TO REQUEST ADDITIONAL INFORMATION, CONTACT MS. PAMELA JOY OWENS, EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, REGENT BANCORP, INC., 1200 WOODRUFF ROAD, A-3, SUITE 144, GREENVILLE, SC 29607 (TELEPHONE NO. 864/678-4735).

———————

THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF A NAME APPEARS IN THE APPROPRIATE SPACE PROVIDED ON THE FRONT PAGE OF THIS PRIVATE PLACEMENT MEMORANDUM AND IS AN OFFER ONLY TO THE PERSON WHOSE NAME APPEARS ON THAT PAGE. DELIVERY TO ANY OTHER PERSON IS UNAUTHORIZED, AND ANY REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

———————

ALL PAYMENTS FROM INVESTORS WILL BE DEPOSITED AND HELD BY THE COMPANY PENDING CLOSING OF THE OFFERING. THE COMPANY MAY HAVE INTERIM CLOSINGS DURING THE OFFERING FOR SUBSCRIPTIONS PROPERLY COMPLETED AND ACCEPTED WITH THE RELATED PAYMENTS RECEIVED. FINAL CLOSING WILL BE ON SEPTEMBER 30, 2008, UNLESS THE OFFERING IS EXTENDED BY THE COMPANY IN ITS SOLE DISCRETION.

INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY COMMUNICATION FROM THE COMPANY, WHETHER WRITTEN OR ORAL, AS LEGAL, TAX, ACCOUNTING OR OTHER EXPERT ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL, ACCOUNTANT AND OTHER PROFESSIONAL ADVISORS AS TO ALL MATTERS CONCERNING THIS INVESTMENT.

THIS MEMORANDUM CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF DOCUMENTS RELATING TO THE COMPANY. SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE ORIGINAL DOCUMENTS, SOME OF WHICH ARE INCLUDED HEREIN BY EXHIBITS OR WHICH CAN BE EXAMINED AT THE OFFICE OF THE COMPANY.

THE SHARES ARE BEING OFFERED SUBJECT TO THE CONDITIONS SET FORTH HEREIN.

———————

AN OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM AND ALL ENCLOSED DOCUMENTS TO THE COMPANY IF THE OFFEREE CHOOSES NOT TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THE COMPANY HAS SOLE DISCRETION IN DETERMINING WHETHER TO ACCEPT ANY SUBSCRIPTION.

# THE OFFERING

**General**

Regent Bancorp, Inc. (the "Company"), a Florida corporation, is offering to sell, subject to acceptance or rejection of Subscription Agreements in whole or in part by the Company in its sole discretion, up to 150,000 Shares of Common Stock of the Company at an offering price of $50.00 per Share. When a Subscription Agreement is accepted in whole or in part, the purchase price is payable in cash. In the event of the successful sale of all Shares offered hereby, the amount to be received by the Company before payment of issuance expenses shall be $7,500,000. This Offering requires the sale of a minimum of 120,000 Shares. The Company is the parent bank holding company of Regent Bank, Davie, Florida (the "Bank").

This Offering of the Shares is a private placement by the Company in reliance upon exemptions from the federal registration provisions of the Securities Act of 1933, as amended, as regulated by the Securities and Exchange Commission ("SEC"). There will be no public or general dissemination of this Memorandum or advertising of the Offering.

This Offering is limited to potential investors who are believed to be capable of evaluating the merits and risks of the information contained herein, and the Company may reject any offer on the basis of the unsuitability of the prospective purchaser. This Offering involves certain risks. (See "RISK FACTORS" on page 4.)

In the event that any Shares are not sold pursuant to this Offering, such shares will remain as authorized, unissued shares and may be sold by the Company at its discretion in the future upon such terms and conditions as the Board may deem to be in the best interests of the Company.

The Company through its officers and directors will offer the Shares on a "best efforts" basis, but they will receive no special compensation for their efforts in connection with this Memorandum or the Offering.

**Purpose of the Offering**

The Company has applied for regulatory approval to organize a new federal savings bank in Greenville, South Carolina (the "New Bank"). An application to organize the New Bank was filed with the Office of Thrift Supervision on March 21, 2008, and an application for deposit insurance was filed with the Federal Deposit Insurance Corporation on March 21, 2008. We are unable to predict when final action will be taken on these applications, but it could be as long as six to nine months. The proceeds of this Offering will be used to capitalize the New Bank which will be operated as a wholly-owned subsidiary of the Company. The shares being offered are shares of the Company. Purchasers of the shares will not have a direct ownership interest in the New Bank, but will have ownership in the Company.

The initial capitalization of the New Bank will be $10 million. The Company has obtained a letter of commitment from the Independent Bankers Bank of Florida pursuant to which the Company can borrow up to $4 million, representing the difference between the amount raised by this offering and the $10 million needed to capitalize the New Bank. The loan will be secured by 100% of the stock of Regent Bank and the New Bank. The loan will be at a floating rate equal to the prime rate minus 1%, with a floor rate of 4.5%. Interest only will be payable monthly for the first two years. Then, monthly principal and interest payments will be based on a 10-year fully amortized loan.

The Company's Board of Directors has long considered opening a new financial institution in the Greenville market. There have been several reasons why this market has been attractive to the Company. Currently, the Company and the Bank have their CFO residing in Greenville. Second, the Bank owns and operates in Greenville a mortgage subsidiary, Sterling Lending Group Inc. Third, the Greenville market has seemed attractive given the health and steady growth of this market and the Company has seen a number of the Bank's clients move to and/or invest in the Greenville marketplace. The ability to open the New Bank in the Greenville marketplace should benefit the Company and capture earnings opportunities through the sharing of clients with the Bank.

Further, the two financial institutions, the New Bank and the Bank, plan to provide economic benefits to each other as loans can be participated and sold between the institutions (subject to independent underwriting and approval by each institution). Clients can be referred between organizations. Back office operational costs can be shared.

1

Contracts can be negotiated with dual purchasing power and wholesale funding costs can be reduced through economies of scale.

The New Bank will be managed locally by an independent Board and management team. The New Bank plans to have a ten to fifteen member Board and a local advisory board comprised of approximately forty local business owners, professionals and community leaders. The Board will be chaired by Mr. C. Vincent Brown, a local attorney, who has served as a Director of one independent commercial banking institution and Chairman of the Board of a second in Greenville. Both institutions were successfully managed with the latest institution, Summit National Bank, having been sold in 2005. The New Bank's management team is being led by Mr. R. Charles Eldridge Jr., who will also be a director of the New Bank.  Mr. Eldridge's last employment position was Upstate President and Private Banking Executive for Bank of America in Greenville South Carolina.  He held this position for four years.  Prior to this position, Mr. Eldridge was employed by Wachovia Bank for thirty four years in Greenville. In addition to Mr. Eldridge, the Chief Financial Officer position is to be held by Ms. Pamela Joy Owens. Ms. Owens is currently the Chief Financial Officer of the Company, the Bank and Sterling Lending Group Inc. Ms. Owens has been employed by the Company for eighteen years and has been Chief Financial Officer of the Company since its inception in 2000. Ms. Owens has worked in Greenville for the Company and the Bank for seven years.

The New Bank plans to target small business owners, professionals and wealth management clients. It also plans to market its services to local consumers offering retail banking products and services, as well as residential mortgages.

The delineated market area served will be the City of Greenville. Some loans including residential mortgages will be originated by the Bank.

One of the keys to the New Bank's future success will be the ability to deliver quality products and services to market efficiently. In order to accomplish this, the New Bank plans to utilize many of the existing back office departments and services of the Bank which will be billed to the New Bank at cost. The Bank has negotiated favorable contract terms with vendors the benefits of which, therefore, would be extended on to the New Bank.

The New Bank's loan underwriting and approval will be managed locally and independent of the Company and the Bank. The New Bank plans to have its own Loan Committee of the Board. Plans are to have all residential mortgage loans originated by the New Bank and sold into the secondary market managed by the Bank's underwriting and secondary market team.

Another key to success for the New Bank will be its ability to fund itself with core deposits. As with the Bank, the earnings success for the New Bank is directly connected to its ability to develop operating accounts. The New Bank plans to expect its borrowing clients to maintain primary operating accounts with it. Additionally, the New Bank plans to have its commercial lenders, residential mortgage originators and office managers market the New Bank's depository services.

Plans are for shortfalls to be managed through Fed funds purchased, FHLBA borrowings, brokered deposits and Qwick Rate, as well as the sale of loans to the Bank and into the secondary market.

Finally, the New Bank's plan is predicated on its local Board of Directors, advisory board members, investors and management team providing it a local brand and contacts in the local market to a relatively greater degree than financial institutions not headquartered in the Greenville market.

The following individuals are expected to serve as initial directors of the New Bank.  Discussions are being held with other potential directors.

2

| Name | Title | Company |
|------|-------|---------|
| C. Vincent Brown, Esq. | Senior Member | Brown, Massey, Evans, McLeod & Haynsworth, LLC |
| R. Charles Eldridge, Jr. | President and Chief Executive Officer | Regent Bank |
| James D. Miller | President | Miller/Player Architects |
| J. Edward Mixon | Chairman | Mixon Enterprises, Inc. |
| Thomas R. Strange | Chief Executive Officer | Strange Brothers Grading Co., Inc. |
| B. Brett Blevins | Managing Partner | Old Mill Realty |
| Michael E. Munafo | Vice President of Finance, Chief Financial Officer and CPA | Carolinas Recycling Group, LLC |
| James E. Pittman, Jr. | Owner/Partner | MaintainIt, Ltd, DeWhit, Inc. and Install, Incorporated |
| Boyd Anderson | Chief Executive Officer | Wilbert Vault Company |
| Stephen T. Mack | President | STM Acquisition & Development, Inc. |

**Terms of the Offering**

The Shares of the Company are being offered at a price of $50.00 per Share and there is no minimum subscription. The price of the Shares offered was determined by the Board of Directors.

This Offering will terminate no later than September 30, 2008, unless extended in the sole discretion of the management and Directors of the Company, with notice of such extension to all subscribers. Subscriptions will be accepted until 9:00 a.m. on September 30, 2008, which is the Termination Date.

**THIS OFFERING IS CONTINGENT UPON THE SUBSCRIPTION OF A MINIMUM NUMBER OF SHARES.**

The Company shall have the right to accept subscriptions in any order it shall determine or reject any subscription in whole or in part for any reason. Funds for any rejected subscription will be returned to the subscriber within 30 days of the termination of this Offering. If for any other reason funds are returned to a subscriber, all the cash paid for the Shares will be returned to, or for the account of, the subscriber. Under such circumstances, costs or expenses of this Offering will be borne by the Company. No subscriber will suffer a loss of subscription funds if subscription funds are otherwise returned.

**THE OFFERING WILL BE TERMINATED AND ALL SUBSCRIPTION FUNDS WILL BE RETURNED TO THE SUBSCRIBERS IF LESS THAN 120,000 SHARES ARE SUBSCRIBED FOR.**

Subscription funds will be deposited by the Company into a non-interest bearing account at the Company's Florida subsidiary bank, Regent Bank, until such time as Company shares are issued or the offering is terminated.

## RISK FACTORS

Prospective investors should carefully consider the risk factors below, along with the other information in this Offering Memorandum before purchasing the Securities. This Offering Memorandum contains forward-looking statements, within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. When used in this Offering Memorandum, the words "anticipate," "believe," "estimate," "expect," "intend," and words of similar import identify certain of such forward-looking statements. Actual results, performance or achievements could differ materially from those contemplated, expressed or implied by the forward-looking statements contained herein. The considerations listed below represent certain factors the Company believes could cause results to differ. The risk factors listed below are not intended to represent a complete list of the general or specific risks that may affect the Securities or the Company. There may be other significant risks and there may be other risks in the future that will affect the Securities or the Company to a greater extent than indicated. The factors below are not listed in any particular order.

### Interest Rates/Asset Liability Management

The Company's activities generally involve uncertainties and risks, including those associated with changing interest rates. The Company's assets and liabilities will not necessarily re-price at the same time as interest rates change. Although the Company believes its existing balance sheet structure will allow it to maintain acceptable interest margins in various rate environments, there can be no assurance that fluctuations in interest rates will not negatively impact the financial condition or the results of operations of the Company. In addition, competitive conditions may impact the Company's primary sources of funds requiring access to secondary sources and a commensurate negative impact on the Company's net interest margin.

### Asset Quality/Allowance For Loan And Lease Losses

While the Company strives to maintain a quality loan portfolio, there is no assurance that the quality of the Company's loan and lease portfolio will not deteriorate requiring a higher allowance for losses and resulting in more charge-offs. Regardless of the underwriting criteria of the Company, losses may occur as a result of factors not within the control of the Company, such as general economic conditions, factors affecting specific borrowers or specific industries, fraud by borrowers, a decline in the value of properties and other collateral securing loans and various other factors which could occur from time to time. There can be no assurance that the Company's allowance for loan and lease losses will be adequate to cover losses or that the Company will not experience significant losses which may require significant increases in allowances in the future.

### Loan Concentrations/Real Estate Loans

As of December 31, 2007, the Company's loan portfolio contained residential real estate loans of $55.6 million or 20.4% of total loans and commercial real estate loans of $159.5 million or 58.7% of total loans, which together accounted for approximately 79% of total loans. The substantial downturn in the real estate market currently being experienced could have a significant impact on the quality of those loans.

### Impact Of Monetary Policies

The banking business is that of a financial intermediary which is greatly affected by the level of interest rates paid for deposits and other sources of funds and the rates earned on loans, securities and other assets. The level of interest rates and their fluctuation are subject to influence by factors beyond the control of the Company, such as the monetary and fiscal policy of the United States and actions by the Federal Reserve. The nature and timing of actions of the Federal Reserve and their specific impact on the Company cannot be predicted.

### Competition

The banking business is highly competitive. The Financial Services Modernization Act enacted in 1999 has opened the field to additional competitors and expanded activities. Interstate banking laws have allowed additional competition in the Company's primary market, and the proposed primary market of the New Bank.

4

Many competitors and potential competitors have greater resources and capital than the Company and, in some cases, less stringent regulatory requirements than the Company and may be better able to attract and maintain customers.

### Holding Company Structure

As a bank holding company, the Company is dependent upon funds in the form of dividends from its subsidiary banks to meet its obligations for the payment of principal and interest on indebtedness for borrowed money and other corporate obligations and expenses. The ability of a bank to pay dividends to the Company is limited by statutory and regulatory requirements applicable to the bank, and the bank may not be able to pay dividends when the Company needs them to meet its obligations on indebtedness for borrowed money and other obligations and expenses.

Under Federal Reserve policy, the Company is expected to act as a source of financial strength to its subsidiary banks and to commit resources to support the banks. Such support may be required at a time when the Company may not be inclined to provide it. Any loans made by the Company to its subsidiary banks are subordinate in right of payment to deposits and certain other indebtedness of the bank. In the event of bankruptcy, any commitment by the Company to a federal bank regulatory agency to maintain capital of a subsidiary bank, will be assumed by the trustee in bankruptcy and entitled to priority of payments.

### Regulatory Oversight

The Company and the Bank are subject to extensive laws and regulations concerning their operations. While the Company believes it and the Bank are and that the New Bank will be in substantial compliance with various federal and state laws and regulations, changes in the Company's, the Bank's and the New Bank's operations and in the laws and regulations applicable thereto, create risks of noncompliance and could lead to regulatory scrutiny and/or formal or informal enforcement actions.

### Minimum Investment Requirement

This Offering is contingent upon the subscription for at least 120,000 Shares and there is no assurance that the minimum proceeds of approximately $6,000,000, before deducting expenses of the Offering, will be received. Therefore, the Offering may be terminated by the Board of Directors.

### Determination Of Offering Price

The Offering Price for the Shares was determined by the Board of Directors of the Company. While the Board considered independent valuation advice, no assurance can be given that the Offering Price is commensurate with the value of the Shares. The price should not be deemed to reflect the actual market value of the Shares.

### Lack Of Market For Common Stock

The Company does not have and it is not expected to have in the foreseeable future a market for its Common Stock. There will be no market for the Shares or other Common Stock as a result of this Offering. An investor may not be able to liquidate his investment in the event of an emergency. The certificates evidencing the Shares will contain a legend referring to restrictions on transfer.

### Shares Are Not Insured Deposits

**The Shares offered hereby are securities, not deposits, and therefore are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other agency, and are subject to investment risk, including the possible loss of principal.**

### Dilution

Because the Offering price of the Shares offered hereby is above the book value of the Shares at December 31, 2007, purchasers of the Shares will experience immediate book value dilution. (See "DILUTION" on page 7.) The

book value of Shares offered hereby may be diluted if additional shares of authorized but unissued Common Stock are later issued pursuant to stock options or otherwise.

## ACCESS TO INFORMATION

The purpose of this Memorandum is to provide a prospective purchaser with the information which the Company believes is pertinent in making an informed investment decision. It is recognized that additional information may be needed by the prospective purchaser to make such an investment decision; therefore, each person to whom an offer is made is encouraged to make further inquiry in an effort to answer satisfactorily any questions he or she may have. The request for further information may be made to the Company and such information should only be relied upon when furnished in written form and signed by an officer of the Company.

Additional information about the Company and the Bank may be obtained at www.frb.gov and www.fdic.gov, respectively. The Company's application to organize the New Bank which has been filed with the Office of Thrift Supervision may be inspected by appointment by contacting: Kathryn Haney, Applications Manager Southeast Region, 1475 Peachtree Street NE, Atlanta, GA 30309.

EACH PROSPECTIVE PURCHASER IS ENCOURAGED TO SEEK INDEPENDENT LEGAL, TAX AND ACCOUNTING ADVICE REGARDING HIS OR HER PARTICULAR INVESTMENT SITUATION, AND MORE SPECIFICALLY, ANY INVESTMENT IN THE SHARES OFFERED HEREBY. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE EFFECT OF THE PURCHASE OF THE SHARES DESCRIBED HEREIN ON A PARTICULAR INVESTMENT SITUATION OF ANY PROSPECTIVE PURCHASER.

## STEPS TO SUBSCRIBE FOR THE SHARES

A prospective purchaser desiring to purchase Shares should properly complete and execute the Subscription Materials, a copy of which accompanies this Memorandum. The Subscription Agreement and subscription funds in the form of a check made payable to "Regent Bancorp, Inc. Offering" must be received by the Company at its principal location, no later than 9:00 a.m. on September 30, 2008.

Certificates representing the Shares duly subscribed, accepted and paid for will be issued to the subscribers as soon as practicable after the closing of the Offering on September 30, 2008, or an earlier or extended date set by the Company.

## PURPOSE OF OFFERING AND USE OF PROCEEDS

The purpose of the Offering is to capitalize the New Bank, a newly chartered federal savings bank (in organization) to be headquartered in Greenville, South Carolina. The New Bank will be a wholly-owned subsidiary of the Company.

Total proceeds to be received by the Company if all the Shares offered hereby are sold will be $7,500,000. The expenses of this Offering are estimated to be approximately $40,000 and include legal, printing and accounting costs. After payment of expenses, approximately $7,460,000 will be available for the purpose of the Offering, if all Shares are sold.

The initial capitalization of the New Bank will be $10 million. The Company has obtained a letter of commitment from the Independent Bankers Bank of Florida pursuant to which the Company can borrow up to $4 million, representing the difference between the amount raised by this offering and the $10 million needed to capitalize the New Bank. The loan will be secured by 100% of the stock of Regent Bank and the New Bank. The loan will be at a floating rate equal to the prime rate minus 1%, with a floor rate of 4.5%. Interest only will be payable monthly for the first two years. Then, monthly principal and interest payments will be based on a 10-year fully amortized loan.

## MARKET FOR COMMON STOCK

There is currently no public market for the Shares of the Company's Common Stock and no such market is expected to develop as a result of this Offering or for any other reason in the foreseeable future.

## CAPITALIZATION

The following table sets forth the consolidated capitalization of the Company as of December 31, 2007, and as adjusted to give effect to the Offering and use of proceeds as if such transaction had occurred on December 31, 2007. (See "PURPOSE OF OFFERING AND USE OF PROCEEDS" on page 6.) The table should be read in conjunction with the detailed information and consolidated financial statements of the Company included in the Regent Bancorp, Inc. 2007 Annual Report and does not take into account the costs of the Offering which are estimated to be approximately $40,000. The capitalization, as adjusted, is presented for informational purposes only and is not necessarily indicative of the capitalization that would have occurred if the Shares had been subscribed on December 31, 2007, nor is it indicative of the future capitalization of the Company.

| | December 31, 2007 Actual Historical | As of December 31, 2007 As Adjusted for the Minimum Offering (Dollars in Thousands) | As of December 31, 2007 As Adjusted for the Maximum Offering |
|---|---|---|---|
| Liabilities: | | | |
| Deposits | $245,996 | $245,996 | $245,996 |
| Federal Home Loan Bank Advances | 23,618 | 23,618 | 23,618 |
| Junior Subordinated Debentures | 12,475 | 12,475 | 12,475 |
| Other Liabilities | 5,505 | 5,505 | 5,505 |
| Total Liabilities: | $287,804 | $287,804 | $287,804 |
| Shareholders' Equity: | | | |
| Preferred Stock | 5,000 | 5,000 | 5,000 |
| Common Stock | 6 | 7 | 7 |
| Capital Surplus | 4,290 | 10,289 | 11,789 |
| Retained Earnings | 13,307 | 13,307 | 13,307 |
| Accumulated Other Comprehensive Loss | (6) | (6) | (6) |
| Total Shareholders' Equity | $ 22,597 | $ 28,598 | $ 30,097 |
| Preferred Stock | 5,000 | 5,000 | 5,000 |
| Stockholders' Equity Attributable to Common Shareholders | $ 17,597 | $ 23,598 | $ 25,097 |
| Total Liabilities and Shareholders' Equity | $310,401 | $316,401 | $317,901 |

## DILUTION

Purchasers in the Offering will experience an immediate dilution of their equity interest in the Company's Common Stock. At December 31, 2007, the Company had a net tangible book value attributable to common shareholders of $17,596,175 or $31.66 per common share. If all Shares offered hereby were purchased at the purchase

7

price of $50.00 per share, the Company would have a *pro forma* net tangible book value at December 31, 2007, of $35.55 per common share. This represents an immediate dilution of $14.45 per common share to purchasers in the Offering. "Dilution" means the difference between the Offering price per share and the pro forma net tangible book value per share after giving effect to the Offering and the application of the net proceeds therefrom. The following table illustrates this per share dilution:

|  | Minimum Offering | Maximum Offering |
|---|---|---|
| Offering price per common share | $ 50.00 | $ 50.00 |
| Net tangible book value per common share at December 31, 2007 | 31.66 | 31.66 |
| Increase attributable to new investors | 3.25 | 3.89 |
| Net tangible book value per common share after giving effect to the sale of all shares offered hereby | 34.91 | 35.55 |
| Dilution per common share to purchasers of the shares offered hereby | 15.09 | 14.45 |

## DESCRIPTION OF BUSINESS

**General**

Regent Bancorp, Inc. (the "Company") is a bank holding company, incorporated in Florida and headquartered in Davie, Broward County, Florida. The Company's primary subsidiary is Regent Bank (the "Bank"), a Florida-chartered commercial bank, which is owned 100% by the Company. The Company also owns 100% of the common stock of Regent Capital Trust II, and Regent Capital Trust III, both of which are financing subsidiaries of the Company, organized under Delaware law. The Bank has three wholly-owned subsidiaries: Sterling Lending Group, Inc.; Regent Bank Insurance Services, Inc; and Regent Bank Project Finance, Inc.

Sterling Lending Group, Inc. provides commercial and residential mortgage lending services in South and North Carolina.

Regent Bank Insurance Services, Inc. has had minimal activity in the last two years.

Regent Project Finance, Inc. is inactive.

The Company was formed in July 2000 to become the parent holding company of Regent Bank, which was organized in July 1986.

At December 31, 2007, the Company, on a consolidated basis, had total assets of $310.4 million, net loans of $268.9 million, total deposits of $246.0 million and shareholders' equity of $22.6 million comprised of $5 million in non-convertible preferred stock and $17.6 million in common stock.

The Company had net income applicable to common shareholders of $2,377,386 and $3,358,494 for the years ending December 31, 2007, and 2006, respectively, and net income applicable to common shareholders of $2,707,947 for the year ended December 31, 2005.

The Bank offers a full range of commercial banking services through three full-service banking offices in Broward County and two full-service plus two boutique offices in Palm Beach County, Florida. These services include checking accounts, money market accounts, NOW accounts, savings accounts, health savings accounts and certificates of deposit. Additional deposit products and services include, CDARS, IDC Money Market accounts, lockbox services,

couriers, coin and currency, wire transfer, merchant credit card processing, remote office capture (merchant capture), office capture (branch capture), bank by phone, online bill pay, internet banking and safe deposit boxes. Loan programs offered through the banking offices include commercial loans and lines of credit, small business loans, equipment lease financing, letters of credit, consumer installment loans and lines of credit, home equity loans and lines of credit, commercial and residential mortgages as well as residential and commercial construction loans. Investment advisory services are also offered to wealth management clients. Four of the five full-service banking offices provide drive-through banking facilities and 24-hour automated teller machines, which are integrated into multi-state ATM networks.

The Bank provides internet banking services through its web page at www.regentbank.com.

The Company and the Bank are subject to comprehensive regulation by the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Federal Deposit Insurance corporation (the "FDIC") and the Florida Department of Banking and Finance (the "Florida Department").

The principal executive offices of the Company are located at 2205. S. University Drive, Davie Florida 33324-5813. The Company's telephone number is (954) 474-5000.

**Management**.

The Company's Board of Directors presently consists of nine (9) individuals. The name, age and principal occupation, business and directorships are listed below:

| Name/Year First Elected | Age | Principal Occupation |
|---|---|---|
| Thomasina Caporella 1989 | 70 | Owner, University Centre |
| G. Jean Cerra, Ph.D. 1988 | 62 | Dean of the School of Human Performance & Leisure Science, Barry University |
| John C. Csapo 1999 | 58 | Senior Vice President, Kolter Property Company |
| Alfred D. Griffin, Jr. 1989 | 60 | President, Grifs Western, Inc. |
| Olin M. Hill 1992 | 58 | President, In-Con Construction Consultants, Inc. |
| Irving Rosenbaum 1995 | 59 | Vice Chancellor and Provost for the Health Professions Division, Nova Southeastern University |
| Cyril S. Spiro 1986 | 65 | Chairman and Chief Executive Officer of the Company |
| George D. Town, D.P.A. 1986 | 66 | Vice President, Advanced Insurance Underwriters |
| Barry Webber, Esq. 1992 | 64 | President, Webber, Hinden, McLean & Arbeiter, P.A. |

***The following additional directors will be added to the Company's Board upon completion of the organization of the New Bank:***

| | | |
|---|---|---|
| C. Vincent Brown, Esq. | 68 | Attorney – Brown, Massey, Evans, McLeod & Haynsworth, LLC |
| R. Charles Eldridge, Jr. | 59 | Employee of the Company and proposed Chief Executive Officer of the New Bank |

In addition to the nine (9) current directors listed above, the Company's executive management team also includes the following:

| Name | Age | Office(s) Held |
|------|-----|----------------|
| Neill LeCorgne | 47 | President and Chief Operating Officer |
| Richard J. Gray | 76 | Senior Executive Vice President, Senior Lender |
| Jim Afflerback | 44 | Executive Vice President, Banking Operations |
| David R. Mazza | 61 | Executive Vice President, Construction Lending |
| Pamela Joy Owens | 47 | Executive Vice President, Chief Financial Officer |

## Compensation

Directors of the Company, except Chairman Spiro, receive $500 per Board meeting attended. Members of the Board of Directors are also compensated for attending Audit, Compensation, Loan and Marketing committee meetings. Members of the Board of Directors receive $200 for Audit, $200 for Compensation, $100 for Loan and $200 for Marketing Committee meetings. In 2007, total fees paid to directors was $39,100.

The compensation of the Company's Chief Executive Officer, Chief Financial Officer and the four other highest paid officers in 2007 was as follows:

| Name | Title | 2007 Salary | Bonus | Total Cash Compensation |
|------|-------|--------|-------|-------------------------|
| Cyril S. Spiro | Chairman and CEO | $300,000 | $63,119 | $363,119 |
| Neill LeCorgne | President and COO | 200,000 | 16,601 | 216,601 |
| Richard Gray | Senior Executive Vice President | 162,000 | 14,040 | 176,040 |
| Jim Afflerback | Executive Vice President | 127,500 | 11,050 | 138,550 |
| David R. Mazza | Executive Vice President | 143,000 | 11,266 | 154,266 |
| Pamela Joy Owens | Executive Vice President and Chief Financial Officer | 140,000 | 11,742 | 151,742 |

The Company adopted a nonqualified stock option plan in 1986 (the "Option Plan"). The Option Plan was amended and restated in 2007 and was further amended in 2008. The Option Plan, as amended, provides that the number of shares sold pursuant to options may not, at any time, exceed twenty percent (20%) of the outstanding shares of common stock of the Company. As of December 31, 2007, there were 93,225 options outstanding.

The Company anticipates issuing additional options to individuals who are selected to serve as directors and executive officers of the New Bank.

## Employment Agreements

In connection with the organization of the Bank in 1986, the Bank entered into an employment agreement with Cyril S. Spiro to serve as Chairman and Chief Executive Officer of the Bank with a base salary of $110,000 and an annual bonus equivalent to one percent (1%) of the pre-tax income of the Bank. Mr. Spiro is also entitled to insurance benefits comparable to other financial institutions operating in Broward County. If the Bank terminates Mr. Spiro's employment, other than for cause, unless he is permanently disabled, he will be entitled to receive full compensation and benefits for three years or until his death, whichever is sooner.

In March 2008, the Company, on behalf of the New Bank, entered into an employment agreement with R. Charles Eldridge, Jr., whereby, subject to the approval of the OTS and the FDIC for the New Bank to commence operations, Mr. Eldridge will serve as a director and President and Chief Executive Officer of the New Bank and as a director of the Company. The agreement provides for a salary of $190,000 for the first 12 months and a one-time guaranteed payment of $45,000 to be paid in March 2009. Salary for the second 12 months shall be $195,000, with a

bonus to be determined based on performance. The Company guarantees the first 12 months of compensation, provided Mr. Eldridge is not terminated based on certain OTS regulations, even if the application for the New Bank is not approved or the New Bank does not open. Mr. Eldridge shall be granted options to purchase 4,000 shares of the Company's common stock to vest over three years. He shall also be entitled to use of a Company-owned automobile, club memberships, vacation and insurance benefits provided to employees of the Bank generally.

The New Bank can terminate Mr. Eldridge's employment upon 90 days' written notice, subject to the guarantee of the first 12 months by the Company as described above. The Company may terminate Mr. Eldridge immediately for cause as defined in § 563.39 of the OTS regulations.

In the event of termination of Mr. Eldridge's employment, upon notice from the New Bank, Mr. Eldridge agrees not to compete with the New Bank for a period of 12 months within a radius of 25 miles from the headquarters of the New Bank in Greenville, South Carolina. In order to enforce the non-compete agreement, the New Bank must pay Mr. Eldridge's base salary in monthly installments. On notice, the New Bank can extend the non-compete agreement for an additional 12 months and, upon such extension, pay to Mr. Eldridge the base salary in monthly installments for the additional 12 months.

**Business Strategy**

The Company's strategic plan is focused on strong asset quality, growth, controlled overhead and investments in top quality people and technology to achieve productivity gains. The Bank's goal is to be a one-stop financial services provider by offering a full range of traditional banking services, mortgage services, nondeposit products and other appropriate nonbanking products and services. The strategy for the New Bank will be substantially the same.

**New Bank Business Strategy**

The New Bank plans to target small business owners, professionals and wealth management clients in the downtown Greenville market. Target clients include accountants, attorneys, title companies, physicians and other professional business segments The New Bank also plans to market its services to local consumers offering retail banking products and services, as well as residential mortgages. The New Bank plans to offer the same broad array of deposit products and services as offered by its sister bank in Florida utilizing many of the existing back office departments and services of the Florida bank. The Florida bank has negotiated favorable contract terms with vendors the benefits of which, therefore, will be extended on to the New Bank.

**Markets And Competition**

The Company's market area is substantially Broward and Palm Beach counties, Florida, of which Ft. Lauderdale and West Palm Beach are the county seats. The Ft. Lauderdale-Pompano Beach-Deerfield Beach Metropolitan Statistical Area ("MSA") has total population of approximately 1.76 million. The West Palm Beach-Boca Raton-Boynton Beach Metropolitan Statistical Area ("MSA") has total population of approximately 1.27 million.

As of December 31, 2007, there were 62 commercial banks and thrifts operating in Broward County, all but 20 of which were headquartered in Florida. As of June 30, 2007, these banks and thrifts operated 458 offices with a total of $35.4 billion in deposits. The Bank's deposit share is 0.54% of the total deposits in Broward County, the 20th highest market share. Competition for deposits, loans and nondeposit products is intense in this banking market.

As of December 31, 2007, there were 66 commercial banks and thrifts operating in Palm Beach County, all but 27 of which were headquartered in Florida. As of June 30, 2007, these banks and thrifts operated 499 offices with a total of $37.9 billion in deposits. The Bank's deposit share is 0.12% of the total deposits in Palm Beach County, the 52nd highest market share. Competition for deposits, loans and nondeposit products is intense in this banking market.

The New Bank market area to be served includes the City of Greenville and surrounding areas. The City of Greenville has a population of 56,353 and Greenville County has a population of 420,579 which is expected to grow to 451,398 by 2012 (Source: Demographic data is provided by ESRI based primarily on US Census data).

As of December 31, 2007, there were 26 Commercial banks and thrifts operating in Greenville County, all but 7 of which were headquartered in South Carolina. As of June 30, 2007, those banks and thrifts operated 104 offices

with a total of $7.4 billion in deposits in Greenville County. Deposit growth for banks, thrifts and credit unions for the period 2003 to 2007 was 45% versus a 28% increase in the number of financial depository institution branches. The New Bank will experience strong competition for deposits, loans and nondeposit products in this banking market.

**Employees**

As of December 31, 2007, the Company employed 90 full-time equivalent employees. Relations with employees are believed to be good.

**Properties**

The Bank owns seven facilities containing a total of approximately 28,000 square feet, approximately 6,800 square feet of which is leased to others. The Bank also owns an approximately one-acre vacant lot being developed as the Bank's new Pompano Beach office.

The Bank leases four facilities containing a total of approximately 9,000 square feet.

**Legal Proceedings**

There are no legal proceedings pending or threatened against the Company or its subsidiaries, which management expects, after consultation with legal counsel, to have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

**PRINCIPAL SECURITYHOLDERS**

The following information is provided regarding the common stock beneficially owned, directly or indirectly by principal shareholders of 5% of more of the Company's common stock, directors and executive officers of the Company and by directors and executive officers of the Company, as a group, as of December 31, 2007.

The Company has outstanding 555,822 shares of common stock owned by approximately 250 shareholders.

**[ REMAINDER OF PAGE INTENTIONALLY LEFT BLANK ]**

| Name | Relationship with Company | Amount Beneficially Owned[*][†] | Percent of Class Beneficially Owned[‡] |
|---|---|---|---|
| Thomasina Caporella | Director | 15,950 | 2.44 |
| G. Jean Cerra | Director | 9,000 | 1.38 |
| John C. Csapo | Director | 3,800 | 0.58 |
| Alfred D. Griffin, Jr. | Director | 29,800 | 4.56 |
| Olin M. Hill | Director | 4,325 | 0.66 |
| Irving Rosenbaum | Director | 5,300 | 0.81 |
| Cyril S. Spiro | Chairman of the Board, Chief Executive Officer and Director | 89,106 | 13.63 |
| George D. Town | Director | 8,600 | 1.32 |
| Barry Webber | Director | 5,233 | 0.80 |
| Neill LeCorgne | President | 18,138 | 2.77 |
| Richard J. Gray | Senior Executive Vice President, Senior Lender | 5,100 | 0.78 |
| Jim Afflerback | Executive Vice President | 4,200 | 0.64 |
| David R. Mazza | Executive Vice President, Construction Lending | 3,400 | 0.52 |
| Pamela Joy Owens | Executive Vice President/Chief Financial Officer | 6,180 | 0.95 |
| Directors and Executive Officers of the Company as a Group (14) | | 208,132 | 31.84 |

Except Director and Chairman Spiro and Dr. Richard Ullrich, no shareholder of the Company owns, as of December 31, 2007, beneficially, directly or indirectly, 5% or more of the Company's common stock.

---

[*] In accordance with Rule 13d-3 under the federal Securities Exchange Act of 1934, a person is deemed to be the beneficial owner, for purposes of this table, of any share of Company Common Stock if he or she has voting and/or investment power with respect to such security. The table includes shares owned by spouses, other immediate family members in trust, shares held in retirement accounts or funds for the benefit of the named individuals and other forms of ownership, over which shares the persons named in the table possess voting and/or investment power.
[†]Beneficial ownership includes the following options: 18,500 for Mr. Spiro; 8,000 for Mr. LeCorgne; 4,900 for Ms. Owens; 4,500 for Mr. Gray; 3,600 for Mr. Afflerback; 3,400 for Messrs. Caporella, Griffin, Town, Webber, Mazza and Ms. Cerra; 2,900 for Messrs. Csapo and Rosenbaum; and 900 for Mr. Hill. Not included in this table are 24,795 options held by employees who are not executive officers of the Company.
[‡] Percentages are based on 653,576 total shares outstanding, assuming all options held by the listed directors and executive officers are exercised.

## SELECTED HISTORICAL FINANCIAL DATA

The consolidated audited financial data below summarizes historical consolidated financial information of the Company for the periods indicated. The summarized financial data was obtained from the Regent Bancorp, Inc. and Subsidiary Consolidated Financial Statements for the years 2003 through 2007.

**(Dollars in Thousands)**
**Years Ended December 31,**

|  | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| **Earnings Summary:** |  |  |  |  |  |
| Total Interest Income | $21,840 | $18,993 | 13,301 | $8,996 | $7,689 |
| Total Interest Expense | 8,475 | 5,145 | 2,175 | 1,225 | 1,304 |
| Net Interest Income | 13,365 | 13,848 | 11,126 | 7,771 | 6,385 |
| Provision for Credit Losses | 1,016 | 276 | 633 | 314 | 269 |
| Net Interest Income after Provision for Credit Losses | 12,349 | 13,572 | 10,493 | 7,457 | 6,116 |
| Other Revenue | 2,648 | 2,498 | 2,700 | 2,469 | 2,641 |
| Other Expense | 10,749 | 10,069 | 8,808 | 7,664 | 7,220 |
| Income Before Income Taxes | 4,246 | 6,001 | 4,386 | 2,263 | 1,537 |
| Income Tax Expense | 1,445 | 2,218 | 1,535 | 820 | 536 |
| Net Income | 2,801 | 3,783 | 2,851 | 1,443 | 1,001 |
| Preferred Dividend | 424 | 424 | 143 | - | - |
| Net Income Applicable to Common Shareholders | $ 2,377 | $ 3,359 | $ 2,708 | $ 1,443 | $ 1,001 |
|  |  |  |  |  |  |
| **Balance Sheet-Period End:** |  |  |  |  |  |
| Total Assets | $310,401 | $279,468 | $226,412 | $174,929 | $151,577 |
| Held-to-Maturity Securities | - | - | - | - | - |
| Available-for-Sale Securities | 2,684 | 2,112 | 2,143 | 2,351 | 2,041 |
| Loans, net | 268,928 | 243,355 | 195,595 | 149,918 | 124,599 |
| Total Deposits | 245,996 | 223,641 | 193,849 | 156,103 | 137,553 |
| Total Stockholders' Equity | 22,596 | 20,262 | 16,924 | 9,451 | 8,154 |
| Preferred Stock | 5,000 | 5,000 | 5,000 | - | - |
| Stockholders' Equity Attributable To Common Shareholders | $ 17,596 | $ 15,261 | $ 11,924 | $ 9,451 | $ 8,154 |
|  |  |  |  |  |  |
| **Selected Ratios: **** |  |  |  |  |  |
| Return on Average Assets | 0.99% | 1.54% | 1.31% | 0.89% | 0.81% |
| Return on Average Equity Attributable to Common Shareholders' Equity | 14.4% | 24.7% | 25.4% | 16.4% | 12.9% |

**After-tax basis

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## THE COMPANY'S FINANCIAL STATEMENTS
## AND RESULTS OF OPERATIONS

The discussion presented below analyzes major factors and trends regarding the consolidated financial condition and results of the Company's operations for the years ended December 31, 2007, December 31, 2006, and December 31, 2005. For a complete understanding of this discussion, reference should be made to the Company's financial statements and the related notes included in the Regent Bancorp, Inc. 2007 Annual Report.

**General**

The Company is a bank holding company whose primary asset and principal activity are its ownership of 100% of the outstanding shares of Regent Bank. The Company conducts a commercial banking business which consists of attracting deposits from small and medium sized businesses, professionals and individuals and applying those funds to the origination of commercial, real estate and consumer loans (including commercial loans secured by real estate). The Company's profitability depends upon net interest income, which is the difference between interest income generated from interest-earning assets (such as loans and investments) less the interest expense incurred on interest-bearing liabilities (such as customer deposits and other borrowed funds). Net interest income is affected by the relative amounts and rates paid on interest-earning assets and interest-bearing liabilities plus the generation of non-interest bearing deposits. Net interest income is dependent upon the Company's interest rate spread, which is the difference between the average yield earned on its interest-earning assets and the average rate paid on interest-bearing liabilities. When the interest-earning assets approximate or exceed interest-bearing liabilities, any positive interest rate spread will generate net interest income. The interest rate spread is impacted by interest rates, deposit flows, and loan demand. Additionally, the Company's profitability is affected by such factors as the level of non-interest income and expenses, the provision for loan losses, and the effective tax rate paid by the Company on its income. Non-interest income consists primarily of fees and income from various deposit account products, residential mortgage fees and other services offered to customers. Non-interest expense consists of compensation and benefits, occupancy related expenses, and other operating expenses.

**Results of Operations**

*Net Income*

Net income applicable to common shareholders of the Company was $2,377,386 for the year ended December 31, 2007, compared with $3,358,494 for the year ended December 31, 2006, a decrease of $981,108 or 29.2%. The primary factors contributing to the decrease in the net income were; a) decline in core deposits reflecting the slowdown in the South Florida economy resulting in an increased dependence on higher rate wholesale funding and; b) an increase of $740,030 over 2006 in the amount of addition to provision for loan losses.

Net income applicable to common shareholders of the Company was $3,358,494 for the year ended December 31, 2006, compared with net income applicable to common shareholders of $2,707,947 for the year ended December 31, 2005, an increase of $650,547 or 24.0%. The primary factor contributing to the increase in the net income for the period was an increase in net interest income.

*Net Interest Income*

Net interest income was $13,364,562 for the year 2007, a decrease of $482,929 or 3.5%, compared with net interest income of $13,847,491 for the year 2006, resulting primarily from a 64.7% increase in interest expense due to a change in the mix of core and wholesale funding

Net interest income was $13,847,491 for 2006, an increase of $2,721,123 or 24.5%, compared with net interest income of $11,126,368 for 2005, resulting primarily from a 5,691,633 or 42.8% increase in interest income.

*Provision for Loan Losses*

The amount of the provision for loan losses is based on periodic evaluations of the loan portfolio, with particular attention directed toward non-performing and other potential problem loans.  During these evaluations, consideration is given to such factors as management's evaluation of specific loans, the level and composition of non-performing loans, historical loss experience, results of examinations by regulatory agencies, the market value of collateral, the strength and availability of guaranties, concentrations of credits, and other judgmental factors.

The Company recorded an additional provision for loan losses of $1,016,244 during the year ended December 31, 2007, and increased the provision for loan losses by $276,214 during the year ended December 31, 2006.  The Company's management believed the provision in 2007 was adequate to maintain an allowance for loan losses given the size and risk inherent in the loan portfolio.

The Company's 2007 allowance for loan losses was $2,864,407 compared with $2,073,420 in 2006.  The increase in the 2007 provision occurred to adjust the allowance to a level considered adequate by management.

*Non-Interest Income*

Non-interest income is generated primarily from service charges on deposit accounts and residential mortgage fees.  Non-interest income for the year 2007 was $2,647,707, an increase of $149,707, or 5.9% compared with non-interest income of $2,498,000 for the year 2006.  The increase in 2007 is primarily attributable to an increase in service charges and fees.

Non-interest income of the Company for 2006 was $2,498,000, a decrease of $201,851, or 7.5%, compared with non-interest income of $2,699,851 for 2005.  The decrease in 2006 is primarily attributable to the decline in residential mortgage fees.

*Non-Interest Expense*

Non-interest expense was $10,749,309 for the year 2007, an increase of $680,556 or 6.7% compared with non-interest expense in the amount of $10,068,753 for the year 2006.  The increase in non-interest expense is due primarily to an increase in salaries and employee benefits.

Non-interest expense was $10,068,753 for 2006, an increase of $1,260,608 or 14.3% compared with non-interest expense of $8,808,145 for 2005.  The increase in non-interest expense is due primarily to an increase in salaries and employee benefits and occupancy and equipment expense.

The Company's Florida subsidiary plans to provide a significant portion of the back office duties for the New Bank.

## Analysis of Financial Condition

*Loans and Asset Quality*

The Company's loans are diversified by borrower and industry group.  Loan growth has continued to increase over the last few years despite a slowdown in the local economy.

As of December 31, 2007, the Company's loan portfolio, net of allowance for loan losses, was $268,928,209, compared to loans, net of allowance for loan losses, totaling $243,354,998 as of December 31, 2006.

As of December 31, 2006, the Company's loan portfolio, net of allowance for loan losses, consisted of loans totaling $243,354,998, as compared to loans, net of allowance for loan losses, totaling $195,595,207 as of December 31, 2005.

*Non-Performing Loans*

The Company's financial statements are prepared on the accrual basis of accounting, including the recognition of interest income on its loan portfolio, unless a loan is placed on a non-accrual basis. Loans are placed on non-accrual when there are serious doubts regarding the collectability of all principal and interest due under the terms of the loan. Amounts received on non-accrual loans generally are applied first to principal and then to interest after all principal has been collected. The classification of a loan on non-accrual status does not necessarily indicate that the principal is uncollectible, in whole or in part. A determination as to collectability is made by the Company on a case-by-case basis. The Company considers both the adequacy of the collateral and the other resources of the borrower in determining the steps to be taken to collect non-accrual loans. The final determination as to these steps is made on a case-by-case basis. Alternatives that are considered are foreclosure, collecting on guaranties, restructuring the loan, or initiating collection lawsuits.

As of December 31, 2007, the Company had $210,021 in loans accounted for as non-accruing as compared to $194,437 in loans accounted for as non-accruing on December 31, 2006.

As of December 31, 2006, the Company had $194,437 in loans accounted for as non-accruing as compared to $32,517 in loans accounted for as non-accruing on December 31, 2005.

*Allowance for Loan Losses*

In originating loans, management of the Company recognizes that credit losses will be experienced and the risk of loss will vary with, among other things, general economic conditions, the type of loan being made, the creditworthiness of the borrower over the term of the loan and, in the case of a secured loan, the quality of the collateral for such loan. The allowance for loan losses represents the Company's estimate of the allowance necessary to provide for potential loan loss exposure. In making this determination, the Company analyzes the ultimate collectability of its loan portfolio, incorporating feedback provided by internal loan staff, external auditors and examinations performed by regulatory agencies. The Company makes ongoing evaluations as to the adequacy of the allowance for loan losses.

The determination by the Company of the appropriate level of the allowance amount was $2,864,407 at December 31, 2007. The allowance for loan losses is based on estimates, and ultimate losses will vary from current estimates. These estimates are reviewed periodically and adjustments are reported as provision expense if it becomes necessary to increase or decrease the allowance to ensure the balance is adequate given the risk in the loan portfolio.

*Investment Activities*

The investment portfolio of the Company was 0.86% of the Company's asset base as of December 31, 2007. Management of the Company has structured the investment portfolio to minimize interest rate risk, maintain sufficient liquidity, and maximize return. The Company's financial planning anticipates income streams based on normal maturity and reinvestment. The Company has adopted SFAS No. 115, and classified investments as held-to-maturity or available-for-sale. Currently, 100% of the Company's investments are classified as available-for-sale.

*Deposit Activities*

Deposits are attracted through the offering of a broad variety of deposit instruments, including checking accounts, money market accounts, regular savings accounts, term certificate accounts (including "Jumbo" certificates in denominations of $100,000 or more), as well as health and retirement savings plans. The Company's total deposits equaled $245,996,123 as of December 31, 2007, representing an increase of $22,355,269 or 9.9% of total deposits in the amount of $223,640,854 on December 31, 2006. The Company's total deposits equaled $223,640,854 as of December 31, 2006, representing an increase of $29,792,085 or 15.4% compared with the balance of total deposits as of December 31, 2005, of $193,848,769.

*Liquidity*

Liquidity measures the ability of the Company to meet maturing obligations and its existing commitments, to withstand fluctuations in deposit levels, to fund its operations, and to provide for customers' credit needs. The liquidity of

the Company principally depends on cash flows from operating activities, investment in and maturity of assets, changes in balances of deposits and borrowings, and its ability to borrow funds.

The Company's core deposits, investment securities portfolio, federal funds sold, cash due from other bank deposit balances, and lines of credit serve as the primary sources of liquidity. Core deposit transaction accounts including non-interest and interest bearing transaction balances provide a low cost source of liquidity for the Company. At December 31, 2007, core deposit transaction accounts comprised 48% of the Company's total deposits. At December 31, 2007, 20.4% of the Company's deposit liabilities were in the form of time deposits of $100,000 or more. At December 31, 2006, 19.2% of the Company's deposit liabilities were in the form of time deposits of $100,000 and over. Occasionally the Company funds itself using wholesale funding sources including Federal Home Loan Bank of Atlanta borrowings, Qwick Rate time deposits and brokered certificates of deposit where rates and terms are more favorable than retail deposit alternatives. The Company has a line of credit with the Federal Home Loan Bank of Atlanta collateralized by residential mortgage loans and other loan and investment collateral. As of December 31, 2007, the Company's line with the Federal Home Loan Bank of Atlanta was $47,409,000 with $23,829,000 outstanding and $23,580,000 available subject to meeting the Federal Home Loan Bank of Atlanta's collateral pledge guidelines. Additionally, the Company has an $8 million unsecured line of credit with the Independent Bankers Bank of Florida for overnight borrowing needs. Management believes these wholesale funding markets are a stable source of funds.

*Capital Resources*

The Company's equity at December 31, 2007, was $22,596,175 of which $17,596,175 was in the form of common stock, compared with $20,261,126 of which $15,261,126 was in the form of common stock at December 31, 2006. As of December 31, 2007, the Company's Tier 1 leverage ratio was 9.99%, which exceeds minimum federal regulatory capital maintenance requirements.

*Stockholdings in Regent Bancorp, Inc. by Proposed Regent Bank/SC Board of Directors.:*

The Company anticipates that the New Bank Board of Directors propose to purchase 38,000 shares of Regent Bancorp, Inc. stock.

## DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK

***Common Stock***

The Company has authorized common stock consisting of 3,000,000 Shares with a par value of $.01 per share, of which 555,822 Shares were issued and outstanding at December 31, 2007, all of which are validly issued, fully paid and nonassessable. The Company has no shares held in the treasury.

If all Shares offered pursuant to this Offering are sold, the Company will have 705,822 Shares of common stock issued and outstanding and options to purchase an additional 93,225 Shares.

The holders of common stock are entitled to one (1) vote per share. Holdings of common stock do not have preemptive rights to purchase securities subsequently issued by the Company. Cumulative voting for directors is not allowed.

The holders of common stock are entitled to receive dividends as may be declared by the Board of Directors of the Company with respect to the common stock out of funds legally available therefor. In the event of a liquidation, dissolution or winding up of the affairs of the Company, the holders of outstanding shares of common stock will be entitled to share *pro rata* according to their respective interests in the Company's assets and funds remaining after payment or provision for payment of all debts and other liabilities of the Company.

*Preferred Stock*

        In addition to the authorized common stock, the Company also has authorized preferred stock consisting of 1,000,000 Shares with a par value of $.01 per share. The Board of Directors is expressly authorized at any time, and from time to time, to provide for the issuance of shares of preferred stock in one or more series, with such voting powers, full or limited (including, by way of illustration and not limitation, in excess of one (1) vote per share), or without voting powers, and with such designations, preferences and relative participating, option or other rights, qualifications, limitations or restrictions, as shall be fixed and determined in the resolution or resolutions providing for the issuance thereof adopted by the Board of Directors. The Articles of Incorporation of the Company provide that dividends on the outstanding shares of preferred stock shall be declared and paid or set apart for payment before any dividend shall be declared and paid or set apart for payment on the outstanding shares of common stock with respect to the same quarterly period. Dividends on any shares of preferred stock shall be cumulative only if and to the extent determined by the resolution of the Board of Directors, as provided above. In the event of any liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, the outstanding shares of preferred stock shall have preference in priority over the outstanding shares of common stock for payment of the amount, if any, to which shares of each outstanding series of preferred stock may be entitled in accordance with the terms and rights thereof and each holder of preferred stock shall be entitled to be paid in full such amount, or have a sum sufficient for the payment in full set aside, before any such payments shall be made to the holders of common stock.

        In 2005, the Company issued 5,000 Shares of Non Convertible MultiMode Noncumulative Redeemable Series A Preferred Stock. The Series A Preferred Stock ranks senior, with respect to dividend and liquidation rights, to the Company's common stock. The preferred stock is not convertible into or exchangeable for any other securities of the Company. Holders of Series A Preferred Stock do not have any voting rights, except as stipulated in the amended Articles of Incorporation of the Company which provide that, in the event of certain default in the payment of preferred dividends, the holders of record of the Series A Preferred Stock shall be entitled to elect two (2) additional directors to the Board of Directors at a special meeting called for that purpose.

        The starting dividend rate on the Series A Preferred Stock is equal to 8.481% of the liquidation preference of the preferred shares. Dividends are payable quarterly in arrears on February 1, May 1, August 1 and December 1 of each year commencing on November 1, 2005. The rate is subject to change every five (5) years, on November 1, at the election of the Company at a floating rate or a fixed rate based on a formula provided in the amended Articles of Incorporation. The shares of Series A Preferred Stock are redeemable at the option of the Company on or after November 1, 2010, at a redemption price ranging from $1,050 per share on that date, to $1,000 per shares after November 1, 2020.

## SUPERVISION AND REGULATION

**Introduction**

        The banking industry is extensively regulated under both federal and applicable state laws. The following discussion is a summary of certain statues and regulations applicable to bank and financial holding companies and their subsidiaries and provides specific information relevant to the Company and its subsidiaries. Regulation of financial institutions is intended primarily for the protection of depositors, deposit insurance funds and the banking system, and generally is not intended for the protection of shareholders.

        Proposals are frequently introduced to change federal and state laws and regulations applicable to the Company and its subsidiaries. The likelihood and timing of any such changes and the impact such changes might have on the Company and its subsidiaries are impossible to determine with any certainty.

*General*

        As a bank holding company and a financial holding company under federal law, the Company is subject to regulation under the Bank Holding Company Act of 1956, as amended (the "BHCA"), and the examination and reporting requirements of the Board of Governors of the Federal Reserve System (the "FRB"). As a Florida-chartered commercial bank, Regent Bank is subject to regulation, supervision and examination by the Florida Department of Financial Services (the "FDFS"), Regent Bank's chartering authority. As a federal savings association, the New Bank

will be subject to regulation, supervision and examination by the Office of Thrift Supervision (the "OTS"), the New Bank's chartering authority. Regent Bank and the New Bank are collectively referred to herein as the "Banks." Each of the Banks is also subject to regulation, supervision and examination by the Federal Deposit Insurance Corporation (the "FDIC"). The FDIC insures the deposits of the Banks to the maximum extent permitted by law.

State and federal law govern the activities in which the Banks may engage, the investments they may make and the aggregate amount of loans that may be granted to one borrower. Various consumer and compliance laws and regulations also affect the Banks' operations.

The banking industry is affected by the monetary and fiscal policies of the FRB. An important function of the FRB is to regulate the national supply of bank credit to moderate recessions and to curb inflation. Among the instruments of monetary policy used by the FRB to implement its objectives are: open-market operations in U.S. Government securities, changes in the discount rate and the federal funds rate (which is the rate banks charge each other for overnight borrowings) and changes in reserve requirements on bank deposits.

### Financial Holding Company Regulation

Under current federal law, as amended by the Gramm-Leach-Bliley Act of 1999 (the "GLB Act"), a bank holding company, such as the Company, may elect to become a financial services holding company. Such an election allows a holding company to offer customers virtually any type of service that is financial in nature or incidental thereto, including banking and activities closely related thereto, securities underwriting, insurance (both underwriting and agency) and merchant banking. In order to become and maintain its status, a financial holding company and all of its affiliated depository institutions must be well-capitalized, well-managed, and have at least a satisfactory Community Reinvestment Act of 1977 ("CRA") rating. If the FRB determines that a financial services holding company is not well-capitalized or well-managed, the company has a period of time to come into compliance. During the period of noncompliance, the FRB can place any limitation on the financial services holding company that it believes to be appropriate. Furthermore, if the FRB determines that a financial services holding company has not maintained a satisfactory CRA rating, the company will not be able to commence any new financial activities or acquire a company that engages in such activities, although the company will still be allowed to engage in activities closely related to banking and make investments in the ordinary course of conducting merchant banking activities. The Company has elected financial services holding company status and currently satisfies the requirements to maintain its status as a financial services holding company.

Most of the financial activities that are permissible for the Company as a financial services holding company are also permissible for a "financial subsidiary" of one or more of the Banks, except for insurance underwriting, insurance company portfolio investments, real estate investments and development, and merchant banking, which must be conducted in a financial services holding company. Subsidiary banks of a financial services holding company with financial subsidiaries must continue to be well-capitalized and well-managed in order to continue to engage in activities that are financial in nature without regulatory actions or restrictions, which could include divestiture of the financial subsidiary or subsidiaries.

Current federal law also establishes a system of functional regulation under which the FRB is the umbrella regulator for bank holding companies, but bank holding company affiliates are to be principally regulated by functional regulators, such as the SEC for securities affiliates and state insurance regulators for insurance affiliates. Certain specific activities, including traditional bank trust and fiduciary activities, may be conducted in the bank without the bank being deemed a "broker" or a "dealer" in securities for purposes of functional regulation. Although the states generally must regulate bank insurance activities in a nondiscriminatory manner, the states may continue to adopt and enforce rules that specifically regulate bank insurance activities in certain identifiable areas.

### Acquisitions

Under the BHCA, a bank holding company may not directly or indirectly acquire ownership or control of more than 5% of the voting shares or substantially all of the assets of any bank holding company or bank or merge or consolidate with another bank holding company without the prior approval of the FRB. Current Federal law authorizes interstate acquisitions of banks and bank holding companies without geographic limitation. Furthermore, a bank headquartered in one state is authorized to merge with a bank headquartered in another state, as long as neither of the states have opted out of such interstate merger authority, and subject to any state requirement that the target bank shall have been in existence and operating for a minimum period of time, not to exceed five years; and subject to certain

20

deposit market-share limitations. After a bank has established branches in a state through an interstate merger transaction, the bank may establish and acquire additional branches at any location in the state where a bank headquartered in that state could have established or acquired branches under applicable federal or state law.

### Other Safety and Soundness Regulations

The FRB has enforcement powers over bank holding companies and their non-banking subsidiaries. The FRB has authority to prohibit activities that represent unsafe or unsound practices or constitute violations of law, rule, regulation, administrative order or written agreement with a federal regulator. These powers may be exercised through the issuance of cease and desist orders, civil money penalties or other actions.

There also are a number of obligations and restrictions imposed on bank holding companies and their depository institution subsidiaries by federal law and regulatory policy that are designed to reduce potential loss exposure to the depositors of such depository institutions and to the FDIC insurance funds in the event the depository institution is insolvent or is in danger of becoming insolvent. For example, under requirements of the FRB with respect to bank holding company operations, a bank holding company is required to serve as a source of financial strength to its subsidiary depository institutions and to commit financial resources to support such institutions in circumstances where it might not do so otherwise. In addition, the "cross-guarantee" provisions of federal law require insured depository institutions under common control to reimburse the FDIC for any loss suffered or reasonably anticipated by the Deposit Insurance Fund ("DIF") as a result of the insolvency of commonly controlled insured depository institutions or for any assistance provided by the FDIC to commonly controlled insured depository institutions in danger of failure. The FDIC may decline to enforce the cross-guarantee provision if it determines that a waiver is in the best interests of the DIF. The FDIC's claim for reimbursement under the cross guarantee provisions is superior to claims of shareholders of the insured depository institution or its holding company, but is subordinate to claims of depositors, secured creditors and nonaffiliated holders of subordinated debt of the commonly controlled insured depository institution.

Banking regulators also have broad enforcement powers over the Banks, including the power to impose civil money penalties and other civil and criminal penalties, and to appoint a conservator in order to conserve the assets of any such institution for the benefit of depositors and other creditors.

### Dividends

The Company is a legal entity separate and distinct from its subsidiaries. The majority of the Company's revenue is from dividends paid to the Company by Regent Bank. The Banks are subject to laws and regulations that limit the amount of dividends they can pay. In addition, the Company and the Banks are subject to various regulatory restrictions relating to the payment of dividends, including requirements to maintain capital at or above regulatory minimums, and to remain "well-capitalized" under the prompt corrective action rules. The FRB has indicated generally that it may be an unsafe or unsound practice for a bank holding company to pay dividends unless the bank holding company's net income over the preceding year is sufficient to fund the dividends and the expected rate of earnings retention is consistent with the organization's capital needs, asset quality and overall financial condition.

In addition to the limitations placed on the payment of dividends at the holding company level, there are various legal and regulatory limits on the extent to which the Banks may pay dividends or otherwise supply funds to the Company. The Banks are subject to laws and regulations of Florida and the OTS, as applicable, which place certain restrictions on the payment of dividends.

Regent Bank currently pays dividends to the Company to provide funds to service the Company's debts and to pay dividends on the Company's outstanding preferred stock. Information about Regent Bank's ability to pay dividends is included in the Regent Bancorp, Inc. 2007 Annual Report. As a newly-chartered federal savings bank, the New Bank will be unable to pay dividends in the foreseeable future.

### Regulatory Capital Requirements

The Banks must comply with capital adequacy standards established by the FDFS, OTS and FDIC, as applicable. Failure to meet capital adequacy standards could subject the Banks to a variety of enforcement remedies, including the issuance of a capital directive, the termination of deposit insurance by the FDIC and certain other restrictions on their business. The federal banking agencies have broad powers under current federal law to take prompt corrective action to resolve problems of insured depository institutions. The extent of these powers depends

upon whether the institutions in question are "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized" or "critically undercapitalized," as such terms are defined under regulations issued by each of the federal banking agencies. In general, the agencies measure capital adequacy within a framework that makes capital requirements sensitive to the risk profiles of individual banking companies. The guidelines define capital as either Tier 1 (primarily common shareholders' equity) or Tier 2 (certain debt instruments and a portion of the allowance for loan losses). The Banks are subject to a minimum Tier 1 capital ratio (Tier 1 capital to risk-weighted assets) of 4%, a total capital ratio (Tier 1 plus Tier 2 to risk-weighted assets) of 8% and a Tier 1 leverage ratio (Tier 1 to average quarterly assets) of 4%. To be considered a "well capitalized" institution, the Tier 1 capital ratio, the total capital ratio and the Tier 1 leverage ratio must equal or exceed 6%, 10% and 5%, respectively.

### *Affiliate Transactions*

The Banks are subject to Regulation W, which comprehensively implemented statutory restrictions on transactions between a bank and its affiliates. Regulation W combines the FRB's interpretations and exemptions relating to Sections 23A and 23B of the Federal Reserve Act. Regulation W and Section 23A place limits on the amount of loans or extensions of credit to, investments in, or certain other transactions with affiliates, and on the amount of advances to third parties collateralized by the securities or obligations of affiliates. In general, the Banks' "affiliates" are the Company and the Company's non-bank subsidiaries.

Regulation W and Section 23B prohibit, among other things, a bank from engaging in certain transactions with affiliates unless the transactions are on terms substantially the same, or at least as favorable to the bank, as those prevailing at the time for comparable transactions with non-affiliated companies.

The Banks are also subject to certain restrictions on extensions of credit to executive officers, directors, certain principal shareholders and their related interests. Such extensions of credit must be made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with third parties and must not involve more than the normal risk of repayment or present other unfavorable features.

### *Deposit Insurance*

The Banks' deposits are insured to applicable limits by DIF of the FDIC. The DIF is the successor to the Bank Insurance Fund and the Savings Association Insurance Fund, which were merged in 2006 by the Federal Deposit Insurance Reform Act of 2005 (the "Reform Act"). In addition to merging the insurance funds, the Reform Act made the following major changes to the federal deposit insurance system:

- the current $100,000 deposit insurance coverage will be indexed for inflation (with adjustments every five years, commencing January 1, 2011);

- deposit insurance coverage for retirement accounts was increased to $250,000 per participant subject to adjustment for inflation; and

- the FDIC was given the authority to adjust the DIF's reserve ratio annually at between 1.15% and 1.5% of insured deposits, in contrast to the prior statutory ratio of 1.25%.

The FDIC has set the DIF's reserve ratio for 2008 at 1.25%.

The FDIC maintains a risk-based deposit insurance assessment system, under which the amount of each bank's insurance assessment is based on the balance of insured deposits and the degree of risk the institution poses to the DIF. Under the revised assessment system adopted by the FDIC following enactment of the Reform Act, insured institutions are assigned to one of four risk categories based on supervisory evaluations, capital levels and certain other factors. Deposit insurance assessment rates, which are set semiannually by the FDIC, currently range from 0.05% to 0.07% of insured deposits for Risk Category I institutions (i.e., well-capitalized and with one of the two highest safety and soundness examination ratings) to 0.43% for Risk Category IV institutions (i.e., undercapitalized and with substantial supervisory concerns).

In addition, all insured institutions are required to pay assessments to the FDIC to fund interest payments on bonds issued by the Financing Corporation, an agency of the federal government established to recapitalize the predecessor to the Savings Association Insurance Fund. This payment is established quarterly, and during the calendar year ending December 31, 2007, averaged 4.6 basis points of assessable deposits for Regent Bank.

*Consumer Protection Laws*

In connection with their lending and leasing activities, each of the Banks is subject to a number of federal and state laws designed to protect borrowers and promote lending to various sectors of the economy and population. These laws include the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Truth in Lending Act, the Home Mortgage Disclosure Act, the Real Estate Settlement Procedures Act, and their respective state law counterparts.

Federal law currently contains extensive customer privacy protection provisions. Under these provisions, a financial institution must provide to its customers, at the inception of the customer relationship and annually thereafter, the institution's policies and procedures regarding the handling of customers' nonpublic personal financial information. These provisions also provide that, except for certain limited exceptions, an institution may not provide such personal information to unaffiliated third parties unless the institution discloses to the customer that such information may be so provided and the customer is given the opportunity to opt out of such disclosure. Federal law makes it a criminal offense, except in limited circumstances, to obtain or attempt to obtain customer information of a financial nature by fraudulent or deceptive means.

The Community Reinvestment Act (the "CRA") requires the Banks' primary federal bank regulatory agencies to assess the Banks' records in meeting the credit needs of the communities they serve, including low- and moderate-income neighborhoods and persons. Institutions are assigned one of four ratings: "Outstanding," "Satisfactory," "Needs to Improve" or "Substantial Noncompliance." This assessment is reviewed for any bank that applies to merge or consolidate with or acquire the assets or assume the liabilities of an insured depository institution, or to open or relocate a branch office. The CRA record of each subsidiary bank of a financial holding company, such as the Company, also is assessed by the FRB in connection with any acquisition or merger application.

*USA Patriot Act*

The USA Patriot Act of 2001 (the "Patriot Act") contains anti-money laundering measures affecting insured depository institutions, broker-dealers and certain other financial institutions. The Patriot Act requires such financial institutions to implement policies and procedures to combat money laundering and the financing of terrorism, and grants the Secretary of the Treasury broad authority to establish regulations and to impose requirements and restrictions on financial institutions' operations. In addition, the Patriot Act requires the federal bank regulatory agencies to consider the effectiveness of a financial institution's anti-money laundering activities when reviewing bank mergers and bank holding company acquisitions.

## GOVERNING LAW

The Company is governed by the provisions of the Florida Business Corporation Act, as amended. The Bank is governed by the provisions of the Florida Financial Institutions Codes. The New Bank will be governed by the Federal Home Owners' Loan Act.

## LEGAL MATTERS

Certain legal matters in connection with the validity of the Shares offered hereby are being passed upon for the Company by Gerrish McCreary Smith, PC, Attorneys, Memphis/Nashville, Tennessee.

**APPENDIX A**

**SUBSCRIPTION MATERIALS**

# REGENT BANCORP, INC.

## SUBSCRIPTION MATERIALS

PLEASE COMPLETE AND EXECUTE THE FOLLOWING DOCUMENTS:

I.      PURCHASER QUESTIONNAIRE (Pages A-2 to A-3)

II.     SUBSCRIPTION AGREEMENT (Pages A-4 to A-10)

III.    ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE (IF
        APPLICABLE) (Pages A-11 to A-13)

IV.     PURCHASER REPRESENTATIVE QUESTIONNAIRE (IF APPLICABLE) (Pages A-14
        to A-16)

PLEASE DELIVER ALL COMPLETED AND EXECUTED DOCUMENTS TO:

Regent Bancorp, Inc.
1200 Woodruff Road, A-3, Suite 144
Greenville, SC 29607
Attn:  Pamela Joy Owens
Executive Vice President

ALL QUESTIONS MUST BE ANSWERED COMPLETELY.  IF THE ANSWER TO ANY QUESTION IS "NONE"
OR "NOT APPLICABLE," PLEASE SO STATE.  ALL INFORMATION WILL BE KEPT CONFIDENTIAL.

# I. PURCHASER QUESTIONNAIRE

## REGENT BANCORP, INC.
### (PLEASE TYPE OR PRINT)

**NAME:** _____

**ADDRESS:** _____
_____

      This questionnaire elicits information relating to the proposed offer and sale to you, the offeree, of Shares ("Shares") in a private placement, of the common stock, $.01 par value per share, of Regent Bancorp, Inc. (the "Company"), as described in the confidential Private Placement Memorandum of the Company dated May 13, 2008. The purpose of this questionnaire, in part, is to determine whether you are an "accredited investor" as defined under Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), which is relevant in determining whether the Shares are exempt from registration under the Securities Act and applicable state securities laws. The Company's reliance on one or more exemptions from registration under federal and applicable state securities laws is based on this information.

      All information which you provide to the Company will be kept confidential and will not be disclosed (except to the limited extent necessary to establish the availability of one or more exemptions from registration of the offer and sale of the Shares under federal and applicable state law).

      Please complete, sign, date and return to the Company one copy of this questionnaire, along with a signed copy of the Subscription Agreement.

      Thank you for your cooperation.

      Please mark each applicable box:

1. ☐   The undersigned is an individual (not a partnership, corporation, etc.) whose individual net worth, or joint net worth with his or her spouse, presently exceeds $1,000,000.

             <u>Explanation</u>. In calculating net worth, you may include equity in personal property and real estate, including your principal residence, cash, short-term investments, stocks and securities. Equity in personal property and real estate should be based on the appraised fair market value of such property less debt secured by such property.

2. ☐   The undersigned is an individual (not a partnership, corporation, etc.) who had an income in excess of $200,000 in each of the two most recent years, or joint income with their spouse in excess of $300,000 in each of those years (in each case including foreign income, tax-exempt income and full amount of capital gains and losses, but excluding any income of either family members and any unrealized capital appreciation) and has a reasonable expectation of reaching the same income level in the current year.

3. ☐   The undersigned is not within either of the categories above and is, therefore, a non-accredited investor.

4.        PLEASE INITIAL the proper alternative in the space provided:

_____          **Alternative One**.  The undersigned has such knowledge and
                         experience in financial and business matters that the
_____          undersigned is capable of evaluating the merits and risks of an
(co-tenant, if           investment in the Shares, and does not desire to utilize a
applicable)              Purchaser Representative in connection with evaluating such
                         merits and risks.

_____          **Alternative Two**.  The undersigned intends to use the services of
                         the person(s) named below as Purchaser Representative(s) in
                         connection with evaluating the merits
_____          and risks of an investment in the Shares.  PLEASE
(co-tenant, if           COMPLETE "ACKNOWLEDGMENT OF USE OF
applicable)              PURCHASER REPRESENTATIVE" - SECTION III AND HAVE
                         PURCHASER REPRESENTATIVE COMPLETE AND SIGN
                         "PURCHASER REPRESENTATIVE QUESTIONNAIRE" –
                         SECTION IV.

Name(s) of Purchaser Representative(s):

_____

_____

IF ALTERNATIVE TWO IS INITIALED, A COMPLETED AND SIGNED PURCHASER
REPRESENTATIVE QUESTIONNAIRE AND ACKNOWLEDGEMENT OF USE OF PURCHASER
REPRESENTATIVE MUST ACCOMPANY THIS PURCHASER QUESTIONNAIRE.

* * * * *

The undersigned represents that the foregoing information is true and correct, in all material
respects, and agrees that such information may be relied upon by the Company and others in connection
with an investment by the undersigned in Shares of the Company.  The undersigned agrees to furnish such
additional information as is reasonably necessary in order to verify the answers set forth above.

NOTE:  Signatures should conform with those used on Subscription Agreement.)

_____          _____
Please Print Name of Individual or        Please Print Name of Second Joint or
Joint Co-Tenant                           Co-Tenant

_____          _____
Signature                                 Signature

Date: _____, 2008              Date: _____, 2008

A-3

## II. SUBSCRIPTION AGREEMENT

INSTRUCTIONS FOR COMPLETING THE SUBSCRIPTION AGREEMENT

1.    **All Subscribers**.  On the appropriate Subscription Agreement Signature Page, insert the date of your subscription, the number of Shares for which you are subscribing, and the total amount of your subscription.

2.    **Joint Tenants and Co-Tenants**.

(a)    Married Couples.

    (i)    Both spouses must sign.

    (ii)    Both social security numbers are required.

    (iii)    Indicate form of ownership by checking the appropriate line of the "SUBSCRIPTION AGREEMENT SIGNATURE PAGE FOR INDIVIDUAL INVESTORS."

(b)    Other Joint Tenants and Co-Tenants.

    (i)    All joint tenants and co-tenants must sign.

    (ii)    All joint tenants and co-tenants must indicate social security numbers.

    (iii)    Indicate form of ownership by checking the appropriate line on "SUBSCRIPTION AGREEMENT SIGNATURE PAGE FOR INDIVIDUAL INVESTORS."

**TO:    REGENT BANCORP, INC.**

Ladies and Gentlemen:

You have informed me that **REGENT BANCORP, INC.** is a Florida corporation (the "Company"). The Company is a registered bank holding company pursuant to the Bank Holding Company Act of 1956. The Company is to be operated in accordance with its Articles of Incorporation and By-Laws. Common Stock of the Company is to be issued in the number of Shares and at a price per Share, as described in and offered pursuant to the Private Placement Memorandum dated May 13, 2008, and all supplements thereto, if any ("Memorandum"), and the minimum investment is one Share.

1.    **Subscription**. Subject to the terms and conditions hereof, the undersigned hereby tenders this subscription, together with cash or check totaling the full purchase price of $50.00 per Share, the Purchaser Questionnaire ("Questionnaire"), other subscription documents, all in the form submitted to the undersigned simultaneously with the delivery of the Memorandum (collectively, the "Subscription Documents"). Tender shall have been by delivery of same to the Company, 1200 Woodruff Road, A-3, Ste. 144, Greenville, SC 29607, Attention: Pamela Joy Owens, Executive Vice President, who shall hold these documents for the benefit of the undersigned according to the terms of the Memorandum. The Purchase Price shall be payable to: REGENT BANCORP, INC. to be paid over to the Company as capital contributions as soon as practicable after each interim closing of the Offering or the Closing of the Offering on September 30, 2008, or an extended date set by the Company.

2.    **Acceptance of Subscription; Adoption and Appointment**. It is understood and agreed that this Agreement is made subject to the following terms and conditions:

(a)    The Company shall have the right to accept subscribers in any order it shall determine or reject this subscription, in whole or in part, for any reason.

(b)    The undersigned hereby intends that his signature hereon shall constitute an irrevocable subscription for the number of Shares specified on the signature page of this Agreement.

3.    **Representations and Warranties of the Undersigned**. The undersigned hereby represents and warrants to the Company as follows:

(a)    The undersigned (i) has adequate means of providing for his current needs and possible personal contingencies, and he has no need for liquidity of his investment in the Company, (ii) has a net worth sufficient to bear the risk of losing his entire investment in the Company, (iii) is able to bear the economic risks of this investment for an indefinite period, and (iv) has, alone or together with his Purchaser Representative (as hereinafter defined), such knowledge and experience in financial matters that the undersigned is capable of evaluating the relative merits and risks of this investment.

(b)    The address set forth in his Purchaser Questionnaire is his true and correct residence, and he has no present intention of becoming a resident of any other state or jurisdiction.

(c)    The undersigned acknowledges that if a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act of 1933, as amended) (the "Securities Act"), has been utilized by the undersigned, (i) the undersigned has completed and executed the Acknowledgment of Use of Purchaser Representative, (ii) in evaluating his investment as

contemplated hereby, the undersigned has been advised by his Purchaser Representative as to the merits and risks of the investment in the Company in general and the suitability of the investment in the Company for the undersigned in particular, and (iii) the undersigned's Purchaser Representative has completed and executed the Purchaser Representative Questionnaire.

(d)    **The undersigned has received and read and reviewed with his Purchaser Representative, if any, and is familiar with the Memorandum, the Regent Bancorp, Inc. 2007 Annual Report, this Agreement, and the other Subscription Documents**, and the undersigned confirms that all documents records and books pertaining to the investment in the Company and requested in writing by the undersigned or Purchaser Representative have been made available or delivered to the undersigned and/or the undersigned's Purchaser Representative.

(e)    The undersigned and/or his Purchaser Representative have had an opportunity to ask questions of and receive answers from the Company, or a person or persons acting on its behalf, concerning the terms and conditions of this investment.

(f)    The undersigned understands that the Shares have not been registered under the Securities Act or any state securities acts and are instead being offered and sold in reliance upon exemptions for private offerings.

(g)    INVESTMENT INTENT:  The Shares for which the undersigned hereby subscribes are being acquired solely for his own account for investment and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; he has no present plans to enter into any such contract, undertaking, agreement or arrangement. In order to induce the Company to issue and sell the Shares subscribed for hereby to the undersigned, it is agreed that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of such Shares by anyone but the undersigned.

(h)    The undersigned has received, completed and returned to the Company the Purchaser Questionnaire relating to his general ability to bear the risks of an investment in the Company and his suitability as an investor in a private offering, and the undersigned hereby affirms the correctness of his answers to such Questionnaire and all other written or oral information concerning the undersigned's suitability provided to the Company by, or on behalf of, the undersigned.

(i)  The person, if any, executing the Purchaser Representative Questionnaire, a copy of which has been received by the undersigned, is acting and is hereby designated to act as the undersigned's Purchaser Representative in connection with the offer and sale of the Shares to the undersigned.  This designation of a Purchaser Representative was made with the knowledge of the representations and disclosures made in such Purchaser Representative Questionnaire and materials.

(j)  The undersigned acknowledges and is aware of the following:

(i)    The Shares are highly speculative and involve a risk of loss by the undersigned of his entire investment in the Company.

(ii)    There are substantial restrictions on the transferability of the Shares, including a restriction against transfer without registration under federal and state securities laws or an exemption therefrom; the Shares will not be, and the

investors in the Company have no rights to require that the Shares be, registered under the Securities Act or any state securities laws; there will be no public market for the Shares; and the undersigned may have to hold the Shares indefinitely and it may not be possible for the undersigned to liquidate his or her investment in the Company.  The stock certificate(s) issued to me will bear substantially the following legend:

> THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAVE ANY OF THE FOREGOING AUTHORITIES REVIEWED OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  IN MAKING AN INVESTMENT DECISION, YOU MUST RELY ON YOUR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND SUBSTANTIAL RISKS INVOLVED.

> THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAW OF ANY STATE.  THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD, EXCEPT PURSUANT TO REGISTRATION OR PURSUANT TO AN OPINION FROM LEGAL COUNSEL ACCEPTABLE TO THE COMPANY THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

(iii)    That no federal or state agency has made any finding or determination as to the fairness of this Offering of Shares for investment or any recommendation or endorsement of the Shares.

(iv)    That none of the following have been guaranteed or warranted to him by any broker, the Company, its agents, or employees or any other person, expressly or by implication:

(1)    The approximate or exact length of time that he will be required to remain as owner of his Shares.

(2)    The percentage of profit and/or amount of or type of consideration, profit or loss to be realized, if any, as a result of ownership of Shares of the Company.

(3)    That the prior performance on the part of the Company or any Affiliates (as defined in Rule 405 under the Securities Act), any securities broker or finder, their partners, salesmen, associates, agents, or employees or of any other person, will in any way indicate the predictable results of the ownership of Shares or of the Company.

(4)    That subscriptions will necessarily be accepted in the order in which they are received.

(v)    That the Company shall incur certain costs and expenses and undertake other actions in reliance upon the irrevocability of the representations and subscription for Shares made hereunder.

(k)  The undersigned, if a natural person, is at least 21 years of age and is a bona fide resident and domiciliary of the state set forth in the Purchaser Questionnaire and has no present intention to become a resident of any other state or jurisdiction.

(l)  The undersigned was not induced to invest by any form of general solicitation or general advertising, including but not limited to the following:

(i)    Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over the television or radio; and

(ii)    Any seminar or meeting whose attendees had been invited by any general solicitation or general advertising.

The foregoing representations and warranties are true and accurate as of the date hereof and shall be true and accurate as of the date of delivery of the Subscription Documents to the Company and shall survive delivery of the Subscription Documents to the Company.  If in any respect such representations and warranties shall not be true and accurate prior to or after delivery of the Subscription Documents pursuant to Paragraph 1 hereof, the undersigned shall give written notice of such fact to the Company, specifying which representations and warranties are not true and accurate and the reasons therefor.

4.    **Indemnification**.  The undersigned acknowledges that he understands the meaning and legal consequences of the representations and warranties contained in Paragraph 3 hereof, and he hereby indemnifies and holds harmless the Company from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of the undersigned contained in this Agreement.

5.    **No Waiver**.  Notwithstanding any of the representations, warranties, acknowledgments or agreements made herein by the undersigned, the undersigned does not hereby or in any other manner waive any rights granted to him under Federal or state securities laws.

6.    **Transferability**.  The undersigned understands and agrees that the shares acquired pursuant to this Agreement and the Offering may not be transferred without the prior written consent of the Company which may be arbitrarily withheld, and receipt by the Company of an opinion of its counsel that such transfer does not violate federal and applicable state securities laws.  Such an

opinion will not be obtainable unless the Company's stock is registered under such laws or there exists an exemption from the registration requirements thereof. The Company has not agreed to have any of the Company's securities registered.

7. **Revocation**. The undersigned acknowledges and agrees that his subscription for Shares, made by the execution and delivery of this Agreement by the undersigned, is irrevocable and that such subscription shall survive the death or disability of the undersigned.

8. **Miscellaneous**.

(a) All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at its address set forth below and to Regent Bancorp, Inc., 1200 Woodruff Road, A-3, Ste. 144, Greenville, SC 29607, Attention: Pamela Joy Owens, Executive Vice President.

(b) Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of Florida.

(c) This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(d) This Agreement shall be binding upon the heirs, estates, legal representatives, successors and assigns of the parties hereto.

(e) The terms used in this Agreement, if not defined herein, shall have the meanings attributed to such terms in the Memorandum. All terms used herein shall be deemed to include the masculine and the feminine and the singular and the plural as the context requires.

(f) Subscription funds will be deposited by the Company into a non-interest bearing account at the Company's Florida subsidiary bank, Regent Bank, until such time as Company shares are issued or the offering is terminated.

(g) In the event the Company is not successful gaining regulatory approval to open the New Bank or the offering is not successful or for any other reason the Company deems it necessary to terminate the offering, the subscription funds shall be returned, without interest, to the subscriber.

9. **NOTICE TO ALL INVESTORS**. THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED OF BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS

OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM.    ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

DATED: _____, 2008.

Number of Shares or Fraction Thereof Subscribed for: _____ Shares at $_____ per Share.

(**NOTE**:  The sale of Shares is solely in the discretion of the Company.)

_____
(Signature of Subscriber)

_____
(Printed Name of Subscriber)

_____
(Social Security Number of Subscriber)

_____
(Signature of Spouse or other Tenant, if any)

_____
(Printed Name of Spouse or other Tenant, if any)

_____
(Social Security Number of Spouse or other Tenant, if any)

_____

_____

_____
(Address of Subscriber)

_____
(Email Address of Subscriber)

_____
(Telephone Number of Subscriber)

Check Appropriate Space:

_____ Individual Ownership

_____ Joint Tenants with Right of Survivorship

_____ Tenants in Common

_____ Other: _____

Approved and accepted in accordance with the terms of the Private Placement Memorandum.

**REGENT BANCORP, INC.**

a Florida Corporation

By: _____
        Authorized Signature

Date: _____

A-10

## III. ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE
### (IF APPLICABLE)

### INSTRUCTIONS FOR COMPLETING ACKNOWLEDGMENT
### OF USE OF PURCHASER REPRESENTATIVE

1.  **All Subscribers**. This acknowledgment of use of Purchaser Representative is to be completed and executed and dated if you initialed Alternative Two in response to Question 4 on the Purchaser Questionnaire.

2.  **Joint Tenants (Married Couples)**. Only one signature required.

3.  **Joint Tenants and Co-Tenants (All Others)**. Each investor who initials Alternative Two must complete and sign.

4.  **Partnerships**. Unless otherwise advised each partner who initials Alternative Two must complete and sign.

5.  **Trusts**. If the trust itself is a taxable entity with respect to this investment (and initialed Alternative Two) then the trust must complete and it must be signed by its trustee(s). If the trust is not a taxable entity with respect to this investment then such person(s) who initialed Alternative Two must complete and sign.

6.  **Corporations**. An authorized officer should complete and sign on behalf of corporation.

## REGENT BANCORP, INC.
### ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE

I acknowledge that _____ (has/have) served as my purchaser representative(s), in connection with evaluating the merits and risks of my prospective investment as a shareholder in Regent Bancorp, Inc. (the "Company"). I represent to you that in my opinion he (they) has (have) such knowledge and experience in financial and business matters such that he (they) is (are) capable of evaluating the merits and risks of my prospective investment and that he (they) has (have) represented to me in writing as follows:

1.  He (they) is (are) not an Affiliate (as defined in Rule 405 under the Securities Act of 1933, as amended), director, officer or other employee of the Company or any of their Affiliates or a beneficial owner of 10% or more of the equity interest in the Company;

2.  Except for the following relationships which have previously been disclosed by him (them) in writing to me, neither he (they) nor his (their) Affiliates have any material relationship with the Company or any of its Affiliates, no such material relationship has existed at any time during the previous two years and no such material relationship is mutually understood to be contemplated. Any compensation received as a result of such relationship(s) should also be provided below:

I hereby acknowledge receipt of a copy of the Purchaser Representative Questionnaire furnished by my purchaser representative(s) to the Company in connection with this offering.

I request that copies of all material distributed to me in connection with the offering be sent to my purchaser representative(s).

DATED:_____, 2008.

IF AN INDIVIDUAL OR JOINTLY TENANCY
OR CO-TENANCY, complete the following:

_____          _____
Print name of individual or                 Print name of second joint or
co-tenant                                    co-tenant


_____          _____
Signature of individual or                   Signature of second joint or
joint or co-tenant                           co-tenant

A-12

IF A CORPORATION, PARTNERSHIP,
TRUST OR OTHER ENTITY, complete
the following:

_____
Print name of partnership,
corporation, trust or entity


By:_____
    Signature of authorized
    signatory


_____
Print name of authorized signatory


_____
Capacity of authorized signatory

A-13

## IV. PURCHASER REPRESENTATIVE QUESTIONNAIRE
### (IF APPLICABLE)

INSTRUCTION FOR COMPLETING
PURCHASER REPRESENTATIVE QUESTIONNAIRE

If you have completed the previous document, "Acknowledgment of Use of Purchaser Representative," this document must be completed, signed and dated by your Purchaser Representative.

### REGENT BANCORP, INC.

PURCHASER REPRESENTATIVE QUESTIONNAIRE

Name of Purchaser:

1.      Name of Purchaser Representative: _____

Business Address: _____

Telephone (with area code): _____

2.      Present occupation or position, indicating period of such practice or employment and field of professional specialization, if any:

3.      Business or professional educational background, indicating degrees, if any:

4.      Have you had prior experience in advising clients with respect to speculative investments of this type, such as common stock, real estate, agricultural, oil, gas, cattle feeding or other syndications?

_____ Yes                    _____ No

5.      List any professional licenses or registrations, including bar admissions, accounting certificates, real estate brokerage licenses, and SEC or state broker-dealer registrations, held and the year in which any such license or registration was issued:

6.      Describe generally any business, financial, or investment experience that would help you to evaluate the merits and risks of this investment:

7.      State how long you have known the Purchaser and in what capacity:

8.      Do you or any of your Affiliates (as defined in Rule 405 under the Securities Act of 1933, as amended), have, or do you or any of your Affiliates contemplate having, any material relationship with the Company or any of its Affiliates (including fees payable in relation to this Offering); or have such material relationships existed at any time during the previous two years?

_____ Yes                    _____ No

        If your answer to Question No. 8 is "yes", indicate the nature of such relationship including the amount of compensation received or to be received as a result of such relationship:

9.      In advising the Purchaser in connection with the Purchaser's prospective investment in the Company, will you be relying in part on the Purchaser's own expertise in certain areas?

_____ Yes                    _____ No

10.     In advising the Purchaser in connection with the Purchaser's prospective investment in the Company, will you be relying in part on the expertise of an additional purchaser representative or other representative (i.e., the Purchaser's attorney _____, accountant _____, or (specify).

_____ Yes                    _____ No

        If your answers to either Question 9 or Question 10 above are "yes", give the areas of such expertise or the name and address of such additional representative(s):

*****************************

        I understand that the Company will be relying on the accuracy and completeness of my responses to the foregoing questions and I represent and warrant to the Company as follows:

(i)     I am acting as Purchaser Representative for the Purchaser in connection with the Purchaser's prospective investment in the Company;

(ii)    The answers to the above questions are complete and correct and may be relied upon by the Company in determining whether the Offering in connection with which I have executed this Questionnaire is exempt from registration under the Securities Act of 1933, as amended, and applicable state securities laws;

(iii)   I will notify the Company immediately of any material change in any statement made herein occurring prior to the closing of any purchase by the Purchaser of a Share in the Company;

(iv)    I am not an Affiliate, director, officer or other employee of the Company or any of its Affiliates, or otherwise disqualified from serving as a Purchaser Representative in conformity with Regulation D;

A-15

(v)     I have disclosed to the Purchaser in writing, prior to the Purchaser's acknowledgment of me as his Purchaser Representative, all material relationships with the Company or its Affiliates (and the compensation received or to be received as a result of such relationships) disclosed in the answer to Question No. 8 above;

(vi)     I personally (or, if I have answered "yes" in Questions 9 or 10 above, I together with the Purchaser or the additional Purchaser representative or representatives indicated above) have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of the Purchaser's prospective investment in the Company;

(vii)     I have received the Memorandum describing the offering and the Regent Bancorp, Inc. 2007 Annual Report; and

(viii)     The Company has made available to me any document relating to an investment in the Company that I have requested and has provided answers to all of my questions concerning the offering and the Company necessary to verify the information contained in the Memorandum.

DATED:_____, 2008.

**PURCHASER REPRESENTATIVE**

_____
Signature

_____
Signature

**RECEIVED AND ACCEPTED:**

**REGENT BANCORP, INC.,**
A Florida Corporation

By:_____

Title:_____