**9-24-12 Non-Resident Defendants' Motion to Dismiss Amended Complaint Pursuant to S.C.R.C.P. Rules 12(b)(2), 12(b)(6) and 9(b), With Supporting Affidavits and Attachments**

STATE OF SOUTH CAROLINA )
)
COUNTY OF GREENVILLE )

Michael E. Munafo, J. Edward Mixon,
Fred B. Johnston, II, Raymond E.
Burns and Susan E. Burns JTWROS,
Estate of C. Dan Joyner, James E.
Pittman, Jr., John. A. Hagins, Jr.,
Crawley Enterprises, Thomas R.
Strange, Sr., Dwayne M. Bell and
Carly D. Bell JTWROS, NFS LLC
FBO: Thomas G. Carswell, NFS LLC
FBO: Susan T. Carswell, Richard A.
Lackey, Lawrence R. Fischer Trustee
under Elfie Living Trust, NFS LLC
FBO: Dan A. Collins, NFS
LLC/FMTC: FBO R. Charles
Eldridge, Jr., Nicholas Franchina, RBS
Capital Markets Corp. Custodian FBO
Nicholas Franchina IRA, RBC Capital
Markets Corp Custodian for Peter C.
Kapetanokos, TC Ameritrade Clearing
Inc. Custodian Timothy Borsum IRA,
Thomas D. Bigby, Larry Blackwell,
W. Howard Boyd, Jr., Danny W.
Cisson, Carolyn A. Cisson, CP
Enterprises, Gerald W. Lenz and Alice
R. Lenz JTWROS, Adam Pittman,
Gerry Womack, Steven Charles
Francis, Frances D. Johnson, B.L.
Johnson, James D. Miller, FCC
Custodian FBO James D. Miller,
Charles Schwab and Co. Inc.
Custodian for Terry R. Weaver IRA,
Martha Sutherland-Wright, E. Michael
Howard and Billie B. Howard
JTWROS, Billie Howard, William R.
Martin, G. Bruce McPherson, Jr., UBS
Financial Custodian for C. Vincent
Brown, NFS LLC FBO: Malinda
Coleman/Fern Moore, John T. Pazdan,
Emilie R. Pazdan, Lewis E. Martin,
William E. Martin, Michael Burns,
Glenn R. Oxner, Charles Schwab and
Co. Inc. Custodian for John E. Katilius
IRA, John N. Walker, Frank Washick
Interior Trust Agreement, B. Brett
Blevins, C. Joyce Alexander, Heather

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

**NON-RESIDENT DEFENDANTS' MOTION
TO DISMISS AMENDED COMPLAINT
PURSUANT TO S.C.R.C.P. RULES 12(b)(2),
12(b)(6) and 9(b)**

PPAB 2002044v1

Shirley Smith Custodian for Graham )
Steven Smith under the UGMA, )
Stephanie Shirley Plumley Custodian )
for Luke Cameron Lumley under the )
UGMA, Lynn C. Faust, Sara E. Foster, )
Thomas M. Goforth,II, Joseph E. )
Mixon Trustee under Trust and Will of )
Jan H. Mixon, Robert S. Latham, Jr., )
Sage Mill, LLC, Sam B. Phillips, Jr., )
Donald A. Pihl, James Steven Shirley )
and Mildred G. Shirty JTWROS, )
TCG, LLC, Peter B. Waldschmidt, G. )
Herman Walker, III, Douglas M. )
Wilson, Alan C. Singleton, Jason M. )
Smith and Brittnay B. Smith, )
                                                          )
                          Plaintiffs,            )
           vs.                                     )
                                                          )
Cyril S. Spiro, Pamela Joy Owens, )
Regent Bank, Regent Bancorp, Inc., )
Thomasina Caporella, G. Jean Cerra, )
John C. Csapo, Alfred D. Griffin, Jr., )
Olin M. Hill, Irving Rosenbaum, )
George D. Town, Barry Webber, Neill )
LeCorgne, Richard J. Gray, James )
Afflerback, and David. R. Mazza, )
                                                          )
                          Defendants.          )

TO:    JOHN A. HAGINS, JR., ESQUIRE, ATTORNEY FOR PLAINTIFFS

        PLEASE TAKE NOTICE that the Defendants Thomasina Caporella, G. Jean Cerra, John

C. Csapo, Alfred D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, Barry Webber, George D.

Town, James Afflerback, Richard J. Gray and David R. Mazza (hereinafter, the "Non-Resident

Defendants"), by and through their undersigned counsel, hereby move the Court, pursuant to

Rule 12(b)(2), Rule 12(b)(6) and Rule 9(b) of the South Carolina Rules of Civil Procedure, for

an Order dismissing Plaintiffs' Amended Complaint with prejudice.  The specific grounds for

this Motion include, without limitation, as follows:

2

1.    As to the Motion to Dismiss under Rule 12(b)(2), S.C.R.C.P., this Court lacks specific or general personal jurisdiction as to the Non-Resident Defendants because these individuals lack the requisite minimum contacts with the State of South Carolina to allow jurisdiction to be asserted against them under the South Carolina Long Arm Statute, S.C. Code Ann. §§ 36-2-802 and 36-2-803; and the exercise of personal jurisdiction over the Non-Resident Defendants would offend traditional notions of fair play and substantial justice and would be inconsistent with Due Process.

2.    As to the Motion to Dismiss under Rule 12(b)(6) and Rule 9(b), S.C.R.C.P., the Amended Complaint should be dismissed *in its entirety* as to the Non-Resident Defendants because Plaintiffs have not alleged, and cannot allege, the requisite elements of their purported claims against the Non-Resident Defendants for equitable rescission, breach of contract, constructive fraud, fraud and misrepresentation, breach of fiduciary duty and unfair trade practices.  In particular:

A.    The Amended Complaint contains no well-pleaded factual allegations against the Non-Resident Defendants, and therefore cannot state any valid cause of action against them.

B.    All of Plaintiffs' claims are barred as a matter of law by the applicable statutes of limitation.

C.    Plaintiffs' cause of action for Equitable Rescission fails because Plaintiffs have pled no valid cause of action that would entitle them to receive the remedy of rescission.

D.    Plaintiffs' cause of action for breach of contract fails because (i) Plaintiffs have alleged no contract with any Defendant other than Regent Bancorp, Inc.; and (ii) Plaintiffs have not alleged any conduct that constitutes a breach of contract.

E.  Plaintiffs' causes of action for constructive fraud and fraud fail for each of the following reasons:  (i) Plaintiffs have not pled these claims with the requisite degree of particularity as required by Rule 9(b) of the South Carolina Rules of Civil Procedure; (ii) Plaintiffs had no right to rely on any statement or omission of Defendants; (iii) Defendants had no duty to disclose to Plaintiffs any additional or supplemental information; (iv) the allegedly undisclosed information was not material; (v) the alleged non-disclosure concerning events that occurred after the alleged representations cannot, as a matter of law, state a claim for fraud; (vi) the alleged representations were accompanied by ample cautionary language and disclosure of the matters that Plaintiffs claim were misrepresented; and (vii) an alleged non-disclosure cannot support a claim for constructive fraud.

F.  To the extent Plaintiffs attempt to assert a cause of action for negligent misrepresentation, that claim fails because Plaintiffs could not justifiably rely on any alleged statement of omission of Defendants and Plaintiffs have not alleged any misstatement of a present or pre-existing fact.

G.  Plaintiffs' cause of action for breach of fiduciary duty fails because Plaintiffs' allegations establish that the parties did not have a fiduciary or confidential relationship.

H.  Plaintiffs' cause of action for unfair trade practices fails because (i) securities transactions are exempt from the South Carolina Unfair Trade Practices Act; and (ii) Plaintiffs have alleged only a private wrong that does not affect the public interest.

This Motion to Dismiss is based upon the pleadings, the controlling law, the supporting affidavits filed herewith in support of the Motion to Dismiss under Rule 12(b)(2), a Private

Placement Memorandum attached hereto as Exhibit 1,[1] a Memorandum of Law to be filed with the Court, arguments of counsel, and such other and further materials as may be presented to the Court at or before the hearing on this matter.

Respectfully submitted,

T. Alexander Evins, III, Esq.
alexevins@parkerpoe.com
Kristina Young, Esq.
kristinayoung@parkerpoe.com
Parker Poe Adams & Bernstein LLP
100 Dunbar Street, Suite 206
Spartanburg, SC  29306
Phone:  (864) 591-2030
Fax:  (864) 591-2050

OF COUNSEL:

Charles E. Raynal, Esq.
charlesraynal@parkerpoe.com
Matthew H. Mall
matthewmall@parkerpoe.com
Parker Poe Adams & Bernstein, LLP
Wachovia Capitol Center
150 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Phone: (919) 828-0564
Fax: (919) 834-4564

ATTORNEYS FOR DEFENDANTS

September 2_9_, 2012

Spartanburg, South Carolina

---

[1] Plaintiffs refer to, quote from, and invite the Court to "see" the Private Placement Memorandum throughout the Amended Complaint. *See* Amended Complaint, ¶¶2 at fn. 2, 11(c), 12, and 25(a).  Either inadvertently or intentionally, Plaintiffs did not attach the Private Placement Memorandum to the Amended Complaint.  As will be discussed in detail in Defendants' Memorandum of Law, this Court may consider the Private Placement Memorandum without converting this Motion into a Motion for Summary Judgment.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **NON-RESIDENT DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO S.C.R.C.P. RULES 12(b)(2), 12(b)(6) and 9(b)** was served on all parties to this action by depositing a copy of the same in the United States mail, postage prepaid, addressed as follows:

John A. Hagins, Jr.
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC  29602
(864) 242-9000

This the 24ᵗʰ day of September, 2012.

Felix F. Fricks, Paralegal
Parker Poe Adams & Bernstein LLP
100 Dunbar Street, Ste. 206
Spartanburg, South Carolina  29306

CONFIDENTIAL
COPY NO.:_____

NAME:_____

PRIVATE PLACEMENT MEMORANDUM

**REGENT BANCORP, INC.**
**2205 S. University Drive**
**Davie, Florida 33324**

**UP TO 150,000 SHARES OF COMMON STOCK OFFERED**
**AT $50.00 PER SHARE**
**(PAR VALUE $.01 PER SHARE)**

Regent Bancorp, Inc. (the "Company") is hereby offering for sale (the "Offering") up to 150,000 shares of Common Stock, $.01 par value per share, (the "Shares" or "Securities") of the Company at an Offering price of $50.00 per share. This Offering requires the sale of a minimum of 120,000 Shares and a maximum of 150,000 Shares may be sold. See "THE OFFERING" and "DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK." The Company is the parent bank holding company of Regent Bank, Davie, Florida.

**THE SECURITIES OFFERED HEREBY ARE NOT DEPOSITS AND,**
**THEREFORE, ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION**
**OR ANY OTHER AGENCY, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING**
**THE POSSIBLE LOSS OF PRINCIPAL**

**THIS OFFERING IS HIGHLY SPECULATIVE AND INVOLVES A DEGREE OF RISK. THE PURCHASE OF THE SHARES IS SUITABLE ONLY FOR INVESTORS WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT AND ARE ABLE TO AFFORD A LOSS OF THEIR ENTIRE INVESTMENT. SEE "RISK FACTORS."**

**IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.**

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED OF BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, THE FEDERAL DEPOSIT INSURANCE CORPORATION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

| Common Stock | Price | Proceeds to Company[1][2] |
|---|---|---|
| **120,000 Shares (Minimum)** | **$ 50.00** | **$ 6,000,000** |
| **150,000 Shares (Maximum)** | **$ 50.00** | **$ 7,500,000** |

[1]Prior to payment of estimated expenses of this Offering of $40,000, which includes legal, printing and accounting costs, but does not include commissions to brokers, if any.
[2]There is no underwriter for this offering. Officers and directors of the Company will sell shares to the public without commissions, but the Company may, in its discretion, retain commission-paid brokers in connection with this offering. Such commissions will not exceed 6%. Expense figures are an estimate only. Actual commission expenses may be higher or lower. All expenses of the offering, including commissions, will be paid by the Company. Actual proceeds to the Company will be net of estimated expenses.

**The date of this Memorandum is May 13, 2008**

## QUESTIONS AND ANSWERS ABOUT THIS DOCUMENT AND THE OFFERING

**WHAT IS THE PURPOSE OF THE OFFERING?**

The Company has applied for regulatory approval to organize a new federal savings bank in Greenville, South Carolina (the "New Bank"). The proceeds of this Offering will be used to capitalize the New Bank which will be operated as a wholly-owned subsidiary of the Company. The shares being offered are shares of the Company. Purchasers of the shares will not have a direct ownership interest in the New Bank, but will have ownership in the Company.

**WHO CAN SUBSCRIBE TO THE OFFERING?**

The offering of the Company's stock is being made to individuals and entities who are "accredited investors" and to a limited number of nonaccredited investors.

**HOW MANY SHARES CAN I BUY?**

There is no predetermined limit on the number of shares you can buy. However, the Board of Directors of the Company, in its sole discretion, can reject or reduce any subscription for any reason.

**WHEN DO I HAVE TO PAY FOR MY SHARES?**

Payment must be made no later than 9:00 a.m. on September 30, 2008. This date may be extended by the Board of Directors.

**CAN I SELL THE STOCK I PURCHASE IN THIS OFFERING?**

You must purchase the shares with investment intent. This means that the shares are being purchased solely for your own account for investment and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and you have no present plans to enter into any such contract, undertaking, agreement or arrangement. The shares will be restricted shares and cannot be sold in any event within the first year from date of issue. Your stock certificate will have a legend stating this restriction.

**IS THERE A MARKET FOR THE STOCK?**

No. There is not a recognized market for the Company's stock. The stock is not listed on any exchange. In order to sell your shares of the Company's stock, you would have to find a purchaser,

and the shares would have to be either registered under the securities laws or exempt from registration.

**WHAT RISKS SHOULD I CONSIDER?**

You should consider carefully the "Risk Factors" beginning on page 4. Also, you should seek any independent investment advice you might need.

**AFTER I SUBSCRIBE CAN I CHANGE MY MIND?**

No. The subscription is your contractual agreement to purchase the Shares.

**ARE THE COMPANY'S SHARES I PURCHASE INSURED BY THE FDIC?**

No. The Shares of stock are not deposits, so they are not insured by the FDIC or any other government agency or in any other way.

**WILL THERE BE CASH DIVIDENDS ON MY STOCK?**

There is no assurance any dividends will be paid in the future.

**WHO CAN HELP ANSWER MY QUESTIONS?**

You can call or write Pamela Joy Owens, Executive Vice President and CFO, Regent Bancorp, Inc., 1200 Woodruff Road, A-3, Suite 144, Greenville, South Carolina 29607 (Telephone: 864/678-4735).

**HOW DO I SUBSCRIBE?**

You may subscribe by completing in full the Purchaser Questionnaire and Subscription Agreement. These are included in Appendix A to the Private Placement Memorandum. You should complete the copy of these documents given to you separately with the Memorandum. The execution copy is on blue paper. Then mail or deliver them to:

Regent Bancorp, Inc.
1200 Woodruff Road, A-3, Suite 144
Greenville, SC 29607
Attn: Pamela Joy Owens
Executive Vice President

# TABLE OF CONTENTS

THE OFFERING ...................................................................................................................... 1

RISK FACTORS ...................................................................................................................... 4

ACCESS TO INFORMATION ................................................................................................ 6

STEPS TO SUBSCRIBE FOR THE SHARES ....................................................................... 6

PURPOSE OF OFFERING AND USE OF PROCEEDS ........................................................ 6

MARKET FOR COMMON STOCK........................................................................................ 7

CAPITALIZATION ................................................................................................................. 7

DILUTION ............................................................................................................................... 7

DESCRIPTION OF BUSINESS .............................................................................................. 8

PRINCIPAL SECURITYHOLDERS ..................................................................................... 12

SELECTED HISTORICAL FINANCIAL DATA .................................................................. 14

MANAGEMENT'S DISCUSSION AND ANALYSIS OF THE COMPANY'S

    FINANCIAL STATEMENTS AND RESULTS OF OPERATIONS ................................ 15

DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK ................................ 18

SUPERVISION AND REGULATION ................................................................................... 19

GOVERNING LAW ............................................................................................................... 23

LEGAL MATTERS................................................................................................................ 23

**Appendix A**     Subscription Materials

**IMPORTANT INFORMATION FOR INVESTORS**

THE PURCHASE OF SHARES IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY OF THEIR INVESTMENT AND UNDERSTAND AND CAN AFFORD THE HIGH FINANCIAL AND OTHER RISKS OF INVESTMENT IN THE COMPANY, INCLUDING THE RISK OF LOSING THEIR ENTIRE INVESTMENT.

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON EXEMPTIONS FROM SUCH FILING AND RELATED REGISTRATION AS SET FORTH IN THE SECURITIES ACT OF 1933, AS AMENDED, NOR HAS IT BEEN REGISTERED WITH OR REVIEWED BY ANY OTHER FEDERAL OR STATE REGULATORY AGENCY.

NO OFFERING LITERATURE IN WHATEVER FORM WILL BE EMPLOYED IN THIS OFFERING EXCEPT FOR THIS PRIVATE PLACEMENT MEMORANDUM. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF.

NO PERSON OTHER THAN THOSE SO DESIGNATED BY THE COMPANY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMPANY AND ITS OPERATIONS NOT CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM. ANY INFORMATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. TO REQUEST ADDITIONAL INFORMATION, CONTACT MS. PAMELA JOY OWENS, EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, REGENT BANCORP, INC., 1200 WOODRUFF ROAD, A-3, SUITE 144, GREENVILLE, SC 29607 (TELEPHONE NO. 864/678-4735).

———————

THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF A NAME APPEARS IN THE APPROPRIATE SPACE PROVIDED ON THE FRONT PAGE OF THIS PRIVATE PLACEMENT MEMORANDUM AND IS AN OFFER ONLY TO THE PERSON WHOSE NAME APPEARS ON THAT PAGE. DELIVERY TO ANY OTHER PERSON IS UNAUTHORIZED, AND ANY REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

———————

ALL PAYMENTS FROM INVESTORS WILL BE DEPOSITED AND HELD BY THE COMPANY PENDING CLOSING OF THE OFFERING. THE COMPANY MAY HAVE INTERIM CLOSINGS DURING THE OFFERING FOR SUBSCRIPTIONS PROPERLY COMPLETED AND ACCEPTED WITH THE RELATED PAYMENTS RECEIVED. FINAL CLOSING WILL BE ON SEPTEMBER 30, 2008, UNLESS THE OFFERING IS EXTENDED BY THE COMPANY IN ITS SOLE DISCRETION.

INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY COMMUNICATION FROM THE COMPANY, WHETHER WRITTEN OR ORAL, AS LEGAL, TAX, ACCOUNTING OR OTHER EXPERT ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL, ACCOUNTANT AND OTHER PROFESSIONAL ADVISORS AS TO ALL MATTERS CONCERNING THIS INVESTMENT.

THIS MEMORANDUM CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF DOCUMENTS RELATING TO THE COMPANY. SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE ORIGINAL DOCUMENTS, SOME OF WHICH ARE INCLUDED HEREIN BY EXHIBITS OR WHICH CAN BE EXAMINED AT THE OFFICE OF THE COMPANY.

THE SHARES ARE BEING OFFERED SUBJECT TO THE CONDITIONS SET FORTH HEREIN.

———————

AN OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM AND ALL ENCLOSED DOCUMENTS TO THE COMPANY IF THE OFFEREE CHOOSES NOT TO PURCHASE ANY OF THE SHARES OFFERED HEREBY.

THE COMPANY HAS SOLE DISCRETION IN DETERMINING WHETHER TO ACCEPT ANY SUBSCRIPTION.

<h1 style="text-align:center">THE OFFERING</h1>

**General**

Regent Bancorp, Inc. (the "Company"), a Florida corporation, is offering to sell, subject to acceptance or rejection of Subscription Agreements in whole or in part by the Company in its sole discretion, up to 150,000 Shares of Common Stock of the Company at an offering price of $50.00 per Share. When a Subscription Agreement is accepted in whole or in part, the purchase price is payable in cash. In the event of the successful sale of all Shares offered hereby, the amount to be received by the Company before payment of issuance expenses shall be $7,500,000. This Offering requires the sale of a minimum of 120,000 Shares. The Company is the parent bank holding company of Regent Bank, Davie, Florida (the "Bank").

This Offering of the Shares is a private placement by the Company in reliance upon exemptions from the federal registration provisions of the Securities Act of 1933, as amended, as regulated by the Securities and Exchange Commission ("SEC"). There will be no public or general dissemination of this Memorandum or advertising of the Offering.

This Offering is limited to potential investors who are believed to be capable of evaluating the merits and risks of the information contained herein, and the Company may reject any offer on the basis of the unsuitability of the prospective purchaser. This Offering involves certain risks. (See "RISK FACTORS" on page 4.)

In the event that any Shares are not sold pursuant to this Offering, such shares will remain as authorized, unissued shares and may be sold by the Company at its discretion in the future upon such terms and conditions as the Board may deem to be in the best interests of the Company.

The Company through its officers and directors will offer the Shares on a "best efforts" basis, but they will receive no special compensation for their efforts in connection with this Memorandum or the Offering.

**Purpose of the Offering**

The Company has applied for regulatory approval to organize a new federal savings bank in Greenville, South Carolina (the "New Bank"). An application to organize the New Bank was filed with the Office of Thrift Supervision on March 21, 2008, and an application for deposit insurance was filed with the Federal Deposit Insurance Corporation on March 21, 2008. We are unable to predict when final action will be taken on these applications, but it could be as long as six to nine months. The proceeds of this Offering will be used to capitalize the New Bank which will be operated as a wholly-owned subsidiary of the Company. The shares being offered are shares of the Company. Purchasers of the shares will not have a direct ownership interest in the New Bank, but will have ownership in the Company.

The initial capitalization of the New Bank will be $10 million. The Company has obtained a letter of commitment from the Independent Bankers Bank of Florida pursuant to which the Company can borrow up to $4 million, representing the difference between the amount raised by this offering and the $10 million needed to capitalize the New Bank. The loan will be secured by 100% of the stock of Regent Bank and the New Bank. The loan will be at a floating rate equal to the prime rate minus 1%, with a floor rate of 4.5%. Interest only will be payable monthly for the first two years. Then, monthly principal and interest payments will be based on a 10-year fully amortized loan.

The Company's Board of Directors has long considered opening a new financial institution in the Greenville market. There have been several reasons why this market has been attractive to the Company. Currently, the Company and the Bank have their CFO residing in Greenville. Second, the Bank owns and operates in Greenville a mortgage subsidiary, Sterling Lending Group Inc. Third, the Greenville market has seemed attractive given the health and steady growth of this market and the Company has seen a number of the Bank's clients move to and/or invest in the Greenville marketplace. The ability to open the New Bank in the Greenville marketplace should benefit the Company and capture earnings opportunities through the sharing of clients with the Bank.

Further, the two financial institutions, the New Bank and the Bank, plan to provide economic benefits to each other as loans can be participated and sold between the institutions (subject to independent underwriting and approval by each institution). Clients can be referred between organizations. Back office operational costs can be shared.

1

Contracts can be negotiated with dual purchasing power and wholesale funding costs can be reduced through economies of scale.

The New Bank will be managed locally by an independent Board and management team. The New Bank plans to have a ten to fifteen member Board and a local advisory board comprised of approximately forty local business owners, professionals and community leaders. The Board will be chaired by Mr. C. Vincent Brown, a local attorney, who has served as a Director of one independent commercial banking institution and Chairman of the Board of a second in Greenville. Both institutions were successfully managed with the latest institution, Summit National Bank, having been sold in 2005. The New Bank's management team is being led by Mr. R. Charles Eldridge Jr., who will also be a director of the New Bank. Mr. Eldridge's last employment position was Upstate President and Private Banking Executive for Bank of America in Greenville South Carolina. He held this position for four years. Prior to this position, Mr. Eldridge was employed by Wachovia Bank for thirty four years in Greenville. In addition to Mr. Eldridge, the Chief Financial Officer position is to be held by Ms. Pamela Joy Owens. Ms. Owens is currently the Chief Financial Officer of the Company, the Bank and Sterling Lending Group Inc. Ms. Owens has been employed by the Company for eighteen years and has been Chief Financial Officer of the Company since its inception in 2000. Ms. Owens has worked in Greenville for the Company and the Bank for seven years.

The New Bank plans to target small business owners, professionals and wealth management clients. It also plans to market its services to local consumers offering retail banking products and services, as well as residential mortgages.

The delineated market area served will be the City of Greenville. Some loans including residential mortgages will be originated by the Bank.

One of the keys to the New Bank's future success will be the ability to deliver quality products and services to market efficiently. In order to accomplish this, the New Bank plans to utilize many of the existing back office departments and services of the Bank which will be billed to the New Bank at cost. The Bank has negotiated favorable contract terms with vendors the benefits of which, therefore, would be extended on to the New Bank.

The New Bank's loan underwriting and approval will be managed locally and independent of the Company and the Bank. The New Bank plans to have its own Loan Committee of the Board. Plans are to have all residential mortgage loans originated by the New Bank and sold into the secondary market managed by the Bank's underwriting and secondary market team.

Another key to success for the New Bank will be its ability to fund itself with core deposits. As with the Bank, the earnings success for the New Bank is directly connected to its ability to develop operating accounts. The New Bank plans to expect its borrowing clients to maintain primary operating accounts with it. Additionally, the New Bank plans to have its commercial lenders, residential mortgage originators and office managers market the New Bank's depository services.

Plans are for shortfalls to be managed through Fed funds purchased, FHLBA borrowings, brokered deposits and Qwick Rate, as well as the sale of loans to the Bank and into the secondary market.

Finally, the New Bank's plan is predicated on its local Board of Directors, advisory board members, investors and management team providing it a local brand and contacts in the local market to a relatively greater degree than financial institutions not headquartered in the Greenville market.

The following individuals are expected to serve as initial directors of the New Bank. Discussions are being held with other potential directors.

| Name | Title | Company |
|---|---|---|
| C. Vincent Brown, Esq. | Senior Member | Brown, Massey, Evans, McLeod & Haynsworth, LLC |
| R. Charles Eldridge, Jr. | President and Chief Executive Officer | Regent Bank |
| James D. Miller | President | Miller/Player Architects |
| J. Edward Mixon | Chairman | Mixon Enterprises, Inc. |
| Thomas R. Strange | Chief Executive Officer | Strange Brothers Grading Co., Inc. |
| B. Brett Blevins | Managing Partner | Old Mill Realty |
| Michael E. Munafo | Vice President of Finance, Chief Financial Officer and CPA | Carolinas Recycling Group, LLC |
| James E. Pittman, Jr. | Owner/Partner | MaintainIt, Ltd, DeWhit, Inc. and Install, Incorporated |
| Boyd Anderson | Chief Executive Officer | Wilbert Vault Company |
| Stephen T. Mack | President | STM Acquisition & Development, Inc. |

## Terms of the Offering

The Shares of the Company are being offered at a price of $50.00 per Share and there is no minimum subscription.  The price of the Shares offered was determined by the Board of Directors.

This Offering will terminate no later than September 30, 2008, unless extended in the sole discretion of the management and Directors of the Company, with notice of such extension to all subscribers.  Subscriptions will be accepted until 9:00 a.m. on  September 30, 2008, which is the Termination Date.

**THIS OFFERING IS CONTINGENT UPON THE SUBSCRIPTION OF A MINIMUM NUMBER OF SHARES.**

The Company shall have the right to accept subscriptions in any order it shall determine or reject any subscription in whole or in part for any reason.  Funds for any rejected subscription will be returned to the subscriber within 30 days of the termination of this Offering.  If for any other reason funds are returned to a subscriber, all the cash paid for the Shares will be returned to, or for the account of, the subscriber.  Under such circumstances, costs or expenses of this Offering will be borne by the Company.  No subscriber will suffer a loss of subscription funds if subscription funds are otherwise returned.

**THE OFFERING WILL BE TERMINATED AND ALL SUBSCRIPTION FUNDS WILL BE RETURNED TO THE SUBSCRIBERS IF LESS THAN 120,000 SHARES ARE SUBSCRIBED FOR.**

Subscription funds will be deposited by the Company into a non-interest bearing account at the Company's Florida subsidiary bank, Regent Bank, until such time as Company shares are issued or the offering is terminated.

## RISK FACTORS

Prospective investors should carefully consider the risk factors below, along with the other information in this Offering Memorandum before purchasing the Securities. This Offering Memorandum contains forward-looking statements, within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. When used in this Offering Memorandum, the words "anticipate," "believe," "estimate," "expect," "intend," and words of similar import identify certain of such forward-looking statements. Actual results, performance or achievements could differ materially from those contemplated, expressed or implied by the forward-looking statements contained herein. The considerations listed below represent certain factors the Company believes could cause results to differ. The risk factors listed below are not intended to represent a complete list of the general or specific risks that may affect the Securities or the Company. There may be other significant risks and there may be other risks in the future that will affect the Securities or the Company to a greater extent than indicated. The factors below are not listed in any particular order.

### Interest Rates/Asset Liability Management

The Company's activities generally involve uncertainties and risks, including those associated with changing interest rates. The Company's assets and liabilities will not necessarily re-price at the same time as interest rates change. Although the Company believes its existing balance sheet structure will allow it to maintain acceptable interest margins in various rate environments, there can be no assurance that fluctuations in interest rates will not negatively impact the financial condition or the results of operations of the Company. In addition, competitive conditions may impact the Company's primary sources of funds requiring access to secondary sources and a commensurate negative impact on the Company's net interest margin.

### Asset Quality/Allowance For Loan And Lease Losses

While the Company strives to maintain a quality loan portfolio, there is no assurance that the quality of the Company's loan and lease portfolio will not deteriorate requiring a higher allowance for losses and resulting in more charge-offs. Regardless of the underwriting criteria of the Company, losses may occur as a result of factors not within the control of the Company, such as general economic conditions, factors affecting specific borrowers or specific industries, fraud by borrowers, a decline in the value of properties and other collateral securing loans and various other factors which could occur from time to time. There can be no assurance that the Company's allowance for loan and lease losses will be adequate to cover losses or that the Company will not experience significant losses which may require significant increases in allowances in the future.

### Loan Concentrations/Real Estate Loans

As of December 31, 2007, the Company's loan portfolio contained residential real estate loans of $55.6 million or 20.4% of total loans and commercial real estate loans of $159.5 million or 58.7% of total loans, which together accounted for approximately 79% of total loans. The substantial downturn in the real estate market currently being experienced could have a significant impact on the quality of those loans.

### Impact Of Monetary Policies

The banking business is that of a financial intermediary which is greatly affected by the level of interest rates paid for deposits and other sources of funds and the rates earned on loans, securities and other assets. The level of interest rates and their fluctuation are subject to influence by factors beyond the control of the Company, such as the monetary and fiscal policy of the United States and actions by the Federal Reserve. The nature and timing of actions of the Federal Reserve and their specific impact on the Company cannot be predicted.

### Competition

The banking business is highly competitive. The Financial Services Modernization Act enacted in 1999 has opened the field to additional competitors and expanded activities. Interstate banking laws have allowed additional competition in the Company's primary market, and the proposed primary market of the New Bank.

Many competitors and potential competitors have greater resources and capital than the Company and, in some cases, less stringent regulatory requirements than the Company and may be better able to attract and maintain customers.

### Holding Company Structure

As a bank holding company, the Company is dependent upon funds in the form of dividends from its subsidiary banks to meet its obligations for the payment of principal and interest on indebtedness for borrowed money and other corporate obligations and expenses. The ability of a bank to pay dividends to the Company is limited by statutory and regulatory requirements applicable to the bank, and the bank may not be able to pay dividends when the Company needs them to meet its obligations on indebtedness for borrowed money and other obligations and expenses.

Under Federal Reserve policy, the Company is expected to act as a source of financial strength to its subsidiary banks and to commit resources to support the banks. Such support may be required at a time when the Company may not be inclined to provide it. Any loans made by the Company to its subsidiary banks are subordinate in right of payment to deposits and certain other indebtedness of the bank. In the event of bankruptcy, any commitment by the Company to a federal bank regulatory agency to maintain capital of a subsidiary bank, will be assumed by the trustee in bankruptcy and entitled to priority of payments.

### Regulatory Oversight

The Company and the Bank are subject to extensive laws and regulations concerning their operations. While the Company believes it and the Bank are and that the New Bank will be in substantial compliance with various federal and state laws and regulations, changes in the Company's, the Bank's and the New Bank's operations and in the laws and regulations applicable thereto, create risks of noncompliance and could lead to regulatory scrutiny and/or formal or informal enforcement actions.

### Minimum Investment Requirement

This Offering is contingent upon the subscription for at least 120,000 Shares and there is no assurance that the minimum proceeds of approximately $6,000,000, before deducting expenses of the Offering, will be received. Therefore, the Offering may be terminated by the Board of Directors.

### Determination Of Offering Price

The Offering Price for the Shares was determined by the Board of Directors of the Company. While the Board considered independent valuation advice, no assurance can be given that the Offering Price is commensurate with the value of the Shares. The price should not be deemed to reflect the actual market value of the Shares.

### Lack Of Market For Common Stock

The Company does not have and it is not expected to have in the foreseeable future a market for its Common Stock. There will be no market for the Shares or other Common Stock as a result of this Offering. An investor may not be able to liquidate his investment in the event of an emergency. The certificates evidencing the Shares will contain a legend referring to restrictions on transfer.

### Shares Are Not Insured Deposits

**The Shares offered hereby are securities, not deposits, and therefore are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other agency, and are subject to investment risk, including the possible loss of principal.**

### Dilution

Because the Offering price of the Shares offered hereby is above the book value of the Shares at December 31, 2007, purchasers of the Shares will experience immediate book value dilution. (See "DILUTION" on page 7.) The

book value of Shares offered hereby may be diluted if additional shares of authorized but unissued Common Stock are later issued pursuant to stock options or otherwise.

## ACCESS TO INFORMATION

The purpose of this Memorandum is to provide a prospective purchaser with the information which the Company believes is pertinent in making an informed investment decision. It is recognized that additional information may be needed by the prospective purchaser to make such an investment decision; therefore, each person to whom an offer is made is encouraged to make further inquiry in an effort to answer satisfactorily any questions he or she may have. The request for further information may be made to the Company and such information should only be relied upon when furnished in written form and signed by an officer of the Company.

Additional information about the Company and the Bank may be obtained at www.frb.gov and www.fdic.gov, respectively. The Company's application to organize the New Bank which has been filed with the Office of Thrift Supervision may be inspected by appointment by contacting: Kathryn Haney, Applications Manager Southeast Region, 1475 Peachtree Street NE, Atlanta, GA 30309.

EACH PROSPECTIVE PURCHASER IS ENCOURAGED TO SEEK INDEPENDENT LEGAL, TAX AND ACCOUNTING ADVICE REGARDING HIS OR HER PARTICULAR INVESTMENT SITUATION, AND MORE SPECIFICALLY, ANY INVESTMENT IN THE SHARES OFFERED HEREBY. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE EFFECT OF THE PURCHASE OF THE SHARES DESCRIBED HEREIN ON A PARTICULAR INVESTMENT SITUATION OF ANY PROSPECTIVE PURCHASER.

## STEPS TO SUBSCRIBE FOR THE SHARES

A prospective purchaser desiring to purchase Shares should properly complete and execute the Subscription Materials, a copy of which accompanies this Memorandum. The Subscription Agreement and subscription funds in the form of a check made payable to "Regent Bancorp, Inc. Offering" must be received by the Company at its principal location, no later than 9:00 a.m. on September 30, 2008.

Certificates representing the Shares duly subscribed, accepted and paid for will be issued to the subscribers as soon as practicable after the closing of the Offering on September 30, 2008, or an earlier or extended date set by the Company.

## PURPOSE OF OFFERING AND USE OF PROCEEDS

The purpose of the Offering is to capitalize the New Bank, a newly chartered federal savings bank (in organization) to be headquartered in Greenville, South Carolina. The New Bank will be a wholly-owned subsidiary of the Company.

Total proceeds to be received by the Company if all the Shares offered hereby are sold will be $7,500,000. The expenses of this Offering are estimated to be approximately $40,000 and include legal, printing and accounting costs. After payment of expenses, approximately $7,460,000 will be available for the purpose of the Offering, if all Shares are sold.

The initial capitalization of the New Bank will be $10 million. The Company has obtained a letter of commitment from the Independent Bankers Bank of Florida pursuant to which the Company can borrow up to $4 million, representing the difference between the amount raised by this offering and the $10 million needed to capitalize the New Bank. The loan will be secured by 100% of the stock of Regent Bank and the New Bank. The loan will be at a floating rate equal to the prime rate minus 1%, with a floor rate of 4.5%. Interest only will be payable monthly for the first two years. Then, monthly principal and interest payments will be based on a 10-year fully amortized loan.

## MARKET FOR COMMON STOCK

There is currently no public market for the Shares of the Company's Common Stock and no such market is expected to develop as a result of this Offering or for any other reason in the foreseeable future.

## CAPITALIZATION

The following table sets forth the consolidated capitalization of the Company as of December 31, 2007, and as adjusted to give effect to the Offering and use of proceeds as if such transaction had occurred on December 31, 2007. (See "PURPOSE OF OFFERING AND USE OF PROCEEDS" on page 6.) The table should be read in conjunction with the detailed information and consolidated financial statements of the Company included in the Regent Bancorp, Inc. 2007 Annual Report and does not take into account the costs of the Offering which are estimated to be approximately $40,000. The capitalization, as adjusted, is presented for informational purposes only and is not necessarily indicative of the capitalization that would have occurred if the Shares had been subscribed on December 31, 2007, nor is it indicative of the future capitalization of the Company.

| | December 31, 2007 Actual Historical | As of December 31, 2007 As Adjusted for the Minimum Offering (Dollars in Thousands) | As of December 31, 2007 As Adjusted for the Maximum Offering |
|---|---|---|---|
| Liabilities: | | | |
| Deposits | $245,996 | $245,996 | $245,996 |
| Federal Home Loan Bank Advances | 23,618 | 23,618 | 23,618 |
| Junior Subordinated Debentures | 12,475 | 12,475 | 12,475 |
| Other Liabilities | 5,505 | 5,505 | 5,505 |
| Total Liabilities: | $287,804 | $287,804 | $287,804 |
| Shareholders' Equity: | | | |
| Preferred Stock | 5,000 | 5,000 | 5,000 |
| Common Stock | 6 | 7 | 7 |
| Capital Surplus | 4,290 | 10,289 | 11,789 |
| Retained Earnings | 13,307 | 13,307 | 13,307 |
| Accumulated Other Comprehensive Loss | (6) | (6) | (6) |
| Total Shareholders' Equity | $ 22,597 | $ 28,598 | $ 30,097 |
| Preferred Stock | 5,000 | 5,000 | 5,000 |
| Stockholders' Equity Attributable to Common Shareholders | $ 17,597 | $ 23,598 | $ 25,097 |
| Total Liabilities and Shareholders' Equity | $310,401 | $316,401 | $317,901 |

## DILUTION

Purchasers in the Offering will experience an immediate dilution of their equity interest in the Company's Common Stock. At December 31, 2007, the Company had a net tangible book value attributable to common shareholders of $17,596,175 or $31.66 per common share. If all Shares offered hereby were purchased at the purchase

price of $50.00 per share, the Company would have a *pro forma* net tangible book value at December 31, 2007, of $35.55 per common share. This represents an immediate dilution of $14.45 per common share to purchasers in the Offering. "Dilution" means the difference between the Offering price per share and the pro forma net tangible book value per share after giving effect to the Offering and the application of the net proceeds therefrom. The following table illustrates this per share dilution:

|  | Minimum Offering | Maximum Offering |
|---|---|---|
| Offering price per common share | $ 50.00 | $ 50.00 |
| Net tangible book value per common share at December 31, 2007 | 31.66 | 31.66 |
| Increase attributable to new investors | 3.25 | 3.89 |
| Net tangible book value per common share after giving effect to the sale of all shares offered hereby | 34.91 | 35.55 |
| Dilution per common share to purchasers of the shares offered hereby | 15.09 | 14.45 |

## DESCRIPTION OF BUSINESS

**General**

Regent Bancorp, Inc. (the "Company") is a bank holding company, incorporated in Florida and headquartered in Davie, Broward County, Florida. The Company's primary subsidiary is Regent Bank (the "Bank"), a Florida-chartered commercial bank, which is owned 100% by the Company. The Company also owns 100% of the common stock of Regent Capital Trust II, and Regent Capital Trust III, both of which are financing subsidiaries of the Company, organized under Delaware law. The Bank has three wholly-owned subsidiaries: Sterling Lending Group, Inc.; Regent Bank Insurance Services, Inc; and Regent Bank Project Finance, Inc.

Sterling Lending Group, Inc. provides commercial and residential mortgage lending services in South and North Carolina.

Regent Bank Insurance Services, Inc. has had minimal activity in the last two years.

Regent Project Finance, Inc. is inactive.

The Company was formed in July 2000 to become the parent holding company of Regent Bank, which was organized in July 1986.

At December 31, 2007, the Company, on a consolidated basis, had total assets of $310.4 million, net loans of $268.9 million, total deposits of $246.0 million and shareholders' equity of $22.6 million comprised of $5 million in non-convertible preferred stock and $17.6 million in common stock.

The Company had net income applicable to common shareholders of $2,377,386 and $3,358,494 for the years ending December 31, 2007, and 2006, respectively, and net income applicable to common shareholders of $2,707,947 for the year ended December 31, 2005.

The Bank offers a full range of commercial banking services through three full-service banking offices in Broward County and two full-service plus two boutique offices in Palm Beach County, Florida. These services include checking accounts, money market accounts, NOW accounts, savings accounts, health savings accounts and certificates of deposit. Additional deposit products and services include, CDARS, IDC Money Market accounts, lockbox services,

couriers, coin and currency, wire transfer, merchant credit card processing, remote office capture (merchant capture), office capture (branch capture), bank by phone, online bill pay, internet banking and safe deposit boxes. Loan programs offered through the banking offices include commercial loans and lines of credit, small business loans, equipment lease financing, letters of credit, consumer installment loans and lines of credit, home equity loans and lines of credit, commercial and residential mortgages as well as residential and commercial construction loans. Investment advisory services are also offered to wealth management clients.  Four of the five full-service banking offices provide drive-through banking facilities and 24-hour automated teller machines, which are integrated into multi-state ATM networks.

The Bank provides internet banking services through its web page at www.regentbank.com.

The Company and the Bank are subject to comprehensive regulation by the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Federal Deposit Insurance corporation (the "FDIC") and the Florida Department of Banking and Finance (the "Florida Department").

The principal executive offices of the Company are located at 2205. S. University Drive, Davie Florida 33324-5813.  The Company's telephone number is (954) 474-5000.

**Management**.

The Company's Board of Directors presently consists of nine (9) individuals.  The name, age and principal occupation, business and directorships are listed below:

| Name/Year First Elected | Age | Principal Occupation |
|---|---|---|
| Thomasina Caporella 1989 | 70 | Owner, University Centre |
| G. Jean Cerra, Ph.D. 1988 | 62 | Dean of the School of Human Performance & Leisure Science, Barry University |
| John C. Csapo 1999 | 58 | Senior Vice President, Kolter Property Company |
| Alfred D. Griffin, Jr. 1989 | 60 | President, Grifs Western, Inc. |
| Olin M. Hill 1992 | 58 | President, In-Con Construction Consultants, Inc. |
| Irving Rosenbaum 1995 | 59 | Vice Chancellor and Provost for the Health Professions Division, Nova Southeastern University |
| Cyril S. Spiro 1986 | 65 | Chairman and Chief Executive Officer of the Company |
| George D. Town, D.P.A. 1986 | 66 | Vice President, Advanced Insurance Underwriters |
| Barry Webber, Esq. 1992 | 64 | President, Webber, Hinden, McLean & Arbeiter, P.A. |

*The following additional directors will be added to the Company's Board upon completion of the organization of the New Bank:*

| C. Vincent Brown, Esq. | 68 | Attorney – Brown, Massey, Evans, McLeod & Haynsworth, LLC |
|---|---|---|
| R. Charles Eldridge, Jr. | 59 | Employee of the Company and proposed Chief Executive Officer of the New Bank |

In addition to the nine (9) current directors listed above, the Company's executive management team also includes the following:

| Name | Age | Office(s) Held |
|------|-----|----------------|
| Neill LeCorgne | 47 | President and Chief Operating Officer |
| Richard J. Gray | 76 | Senior Executive Vice President, Senior Lender |
| Jim Afflerback | 44 | Executive Vice President, Banking Operations |
| David R. Mazza | 61 | Executive Vice President, Construction Lending |
| Pamela Joy Owens | 47 | Executive Vice President, Chief Financial Officer |

## Compensation

Directors of the Company, except Chairman Spiro, receive $500 per Board meeting attended. Members of the Board of Directors are also compensated for attending Audit, Compensation, Loan and Marketing committee meetings. Members of the Board of Directors receive $200 for Audit, $200 for Compensation, $100 for Loan and $200 for Marketing Committee meetings. In 2007, total fees paid to directors was $39,100.

The compensation of the Company's Chief Executive Officer, Chief Financial Officer and the four other highest paid officers in 2007 was as follows:

| | | 2007 | | |
|------|-------|--------|-------|----------|
| Name | Title | Salary | Bonus | Total Cash Compensation |
| Cyril S. Spiro | Chairman and CEO | $300,000 | $63,119 | $363,119 |
| Neill LeCorgne | President and COO | 200,000 | 16,601 | 216,601 |
| Richard Gray | Senior Executive Vice President | 162,000 | 14,040 | 176,040 |
| Jim Afflerback | Executive Vice President | 127,500 | 11,050 | 138,550 |
| David R. Mazza | Executive Vice President | 143,000 | 11,266 | 154,266 |
| Pamela Joy Owens | Executive Vice President and Chief Financial Officer | 140,000 | 11,742 | 151,742 |

The Company adopted a nonqualified stock option plan in 1986 (the "Option Plan"). The Option Plan was amended and restated in 2007 and was further amended in 2008. The Option Plan, as amended, provides that the number of shares sold pursuant to options may not, at any time, exceed twenty percent (20%) of the outstanding shares of common stock of the Company. As of December 31, 2007, there were 93,225 options outstanding.

The Company anticipates issuing additional options to individuals who are selected to serve as directors and executive officers of the New Bank.

## Employment Agreements

In connection with the organization of the Bank in 1986, the Bank entered into an employment agreement with Cyril S. Spiro to serve as Chairman and Chief Executive Officer of the Bank with a base salary of $110,000 and an annual bonus equivalent to one percent (1%) of the pre-tax income of the Bank. Mr. Spiro is also entitled to insurance benefits comparable to other financial institutions operating in Broward County. If the Bank terminates Mr. Spiro's employment, other than for cause, unless he is permanently disabled, he will be entitled to receive full compensation and benefits for three years or until his death, whichever is sooner.

In March 2008, the Company, on behalf of the New Bank, entered into an employment agreement with R. Charles Eldridge, Jr., whereby, subject to the approval of the OTS and the FDIC for the New Bank to commence operations, Mr. Eldridge will serve as a director and President and Chief Executive Officer of the New Bank and as a director of the Company. The agreement provides for a salary of $190,000 for the first 12 months and a one-time guaranteed payment of $45,000 to be paid in March 2009. Salary for the second 12 months shall be $195,000, with a

bonus to be determined based on performance. The Company guarantees the first 12 months of compensation, provided Mr. Eldridge is not terminated based on certain OTS regulations, even if the application for the New Bank is not approved or the New Bank does not open. Mr. Eldridge shall be granted options to purchase 4,000 shares of the Company's common stock to vest over three years. He shall also be entitled to use of a Company-owned automobile, club memberships, vacation and insurance benefits provided to employees of the Bank generally.

The New Bank can terminate Mr. Eldridge's employment upon 90 days' written notice, subject to the guarantee of the first 12 months by the Company as described above. The Company may terminate Mr. Eldridge immediately for cause as defined in § 563.39 of the OTS regulations.

In the event of termination of Mr. Eldridge's employment, upon notice from the New Bank, Mr. Eldridge agrees not to compete with the New Bank for a period of 12 months within a radius of 25 miles from the headquarters of the New Bank in Greenville, South Carolina. In order to enforce the non-compete agreement, the New Bank must pay Mr. Eldridge's base salary in monthly installments. On notice, the New Bank can extend the non-compete agreement for an additional 12 months and, upon such extension, pay to Mr. Eldridge the base salary in monthly installments for the additional 12 months.

**Business Strategy**

The Company's strategic plan is focused on strong asset quality, growth, controlled overhead and investments in top quality people and technology to achieve productivity gains. The Bank's goal is to be a one-stop financial services provider by offering a full range of traditional banking services, mortgage services, nondeposit products and other appropriate nonbanking products and services. The strategy for the New Bank will be substantially the same.

**New Bank Business Strategy**

The New Bank plans to target small business owners, professionals and wealth management clients in the downtown Greenville market. Target clients include accountants, attorneys, title companies, physicians and other professional business segments The New Bank also plans to market its services to local consumers offering retail banking products and services, as well as residential mortgages. The New Bank plans to offer the same broad array of deposit products and services as offered by its sister bank in Florida utilizing many of the existing back office departments and services of the Florida bank. The Florida bank has negotiated favorable contract terms with vendors the benefits of which, therefore, will be extended on to the New Bank.

**Markets And Competition**

The Company's market area is substantially Broward and Palm Beach counties, Florida, of which Ft. Lauderdale and West Palm Beach are the county seats. The Ft. Lauderdale-Pompano Beach-Deerfield Beach Metropolitan Statistical Area ("MSA") has total population of approximately 1.76 million. The West Palm Beach-Boca Raton-Boynton Beach Metropolitan Statistical Area ("MSA") has total population of approximately 1.27 million.

As of December 31, 2007, there were 62 commercial banks and thrifts operating in Broward County, all but 20 of which were headquartered in Florida. As of June 30, 2007, these banks and thrifts operated 458 offices with a total of $35.4 billion in deposits. The Bank's deposit share is 0.54% of the total deposits in Broward County, the 20th highest market share. Competition for deposits, loans and nondeposit products is intense in this banking market.

As of December 31, 2007, there were 66 commercial banks and thrifts operating in Palm Beach County, all but 27 of which were headquartered in Florida. As of June 30, 2007, these banks and thrifts operated 499 offices with a total of $37.9 billion in deposits. The Bank's deposit share is 0.12% of the total deposits in Palm Beach County, the 52nd highest market share. Competition for deposits, loans and nondeposit products is intense in this banking market.

The New Bank market area to be served includes the City of Greenville and surrounding areas. The City of Greenville has a population of 56,353 and Greenville County has a population of 420,579 which is expected to grow to 451,398 by 2012 (Source: Demographic data is provided by ESRI based primarily on US Census data).

As of December 31, 2007, there were 26 Commercial banks and thrifts operating in Greenville County, all but 7 of which were headquartered in South Carolina. As of June 30, 2007, those banks and thrifts operated 104 offices

with a total of $7.4 billion in deposits in Greenville County. Deposit growth for banks, thrifts and credit unions for the period 2003 to 2007 was 45% versus a 28% increase in the number of financial depository institution branches. The New Bank will experience strong competition for deposits, loans and nondeposit products in this banking market.

**Employees**

As of December 31, 2007, the Company employed 90 full-time equivalent employees. Relations with employees are believed to be good.

**Properties**

The Bank owns seven facilities containing a total of approximately 28,000 square feet, approximately 6,800 square feet of which is leased to others. The Bank also owns an approximately one-acre vacant lot being developed as the Bank's new Pompano Beach office.

The Bank leases four facilities containing a total of approximately 9,000 square feet.

**Legal Proceedings**

There are no legal proceedings pending or threatened against the Company or its subsidiaries, which management expects, after consultation with legal counsel, to have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

## PRINCIPAL SECURITYHOLDERS

The following information is provided regarding the common stock beneficially owned, directly or indirectly by principal shareholders of 5% of more of the Company's common stock, directors and executive officers of the Company and by directors and executive officers of the Company, as a group, as of December 31, 2007.

The Company has outstanding 555,822 shares of common stock owned by approximately 250 shareholders.

## [ REMAINDER OF PAGE INTENTIONALLY LEFT BLANK ]

| Name | Relationship with Company | Amount Beneficially Owned[*][†] | Percent of Class Beneficially Owned[‡] |
|---|---|---|---|
| Thomasina Caporella | Director | 15,950 | 2.44 |
| G. Jean Cerra | Director | 9,000 | 1.38 |
| John C. Csapo | Director | 3,800 | 0.58 |
| Alfred D. Griffin, Jr. | Director | 29,800 | 4.56 |
| Olin M. Hill | Director | 4,325 | 0.66 |
| Irving Rosenbaum | Director | 5,300 | 0.81 |
| Cyril S. Spiro | Chairman of the Board, Chief Executive Officer and Director | 89,106 | 13.63 |
| George D. Town | Director | 8,600 | 1.32 |
| Barry Webber | Director | 5,233 | 0.80 |
| Neill LeCorgne | President | 18,138 | 2.77 |
| Richard J. Gray | Senior Executive Vice President, Senior Lender | 5,100 | 0.78 |
| Jim Afflerback | Executive Vice President | 4,200 | 0.64 |
| David R. Mazza | Executive Vice President, Construction Lending | 3,400 | 0.52 |
| Pamela Joy Owens | Executive Vice President/Chief Financial Officer | 6,180 | 0.95 |
| Directors and Executive Officers of the Company as a Group (14) | | 208,132 | 31.84 |

Except Director and Chairman Spiro and Dr. Richard Ullrich, no shareholder of the Company owns, as of December 31, 2007, beneficially, directly or indirectly, 5% or more of the Company's common stock.

---

[*] In accordance with Rule 13d-3 under the federal Securities Exchange Act of 1934, a person is deemed to be the beneficial owner, for purposes of this table, of any share of Company Common Stock if he or she has voting and/or investment power with respect to such security. The table includes shares owned by spouses, other immediate family members in trust, shares held in retirement accounts or funds for the benefit of the named individuals and other forms of ownership, over which shares the persons named in the table possess voting and/or investment power.

[†] Beneficial ownership includes the following options: 18,500 for Mr. Spiro; 8,000 for Mr. LeCorgne; 4,900 for Ms. Owens; 4,500 for Mr. Gray; 3,600 for Mr. Afflerback; 3,400 for Messrs. Caporella, Griffin, Town, Webber, Mazza and Ms. Cerra; 2,900 for Messrs. Csapo and Rosenbaum; and 900 for Mr. Hill. Not included in this table are 24,795 options held by employees who are not executive officers of the Company.

[‡] Percentages are based on 653,576 total shares outstanding, assuming all options held by the listed directors and executive officers are exercised.

## SELECTED HISTORICAL FINANCIAL DATA

The consolidated audited financial data below summarizes historical consolidated financial information of the Company for the periods indicated.  The summarized financial data was obtained from the Regent Bancorp, Inc. and Subsidiary Consolidated Financial Statements for the years 2003 through 2007.

**(Dollars in Thousands)**
**Years Ended December 31,**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| **Earnings Summary:** | | | | | |
| Total Interest Income | $21,840 | $18,993 | 13,301 | $8,996 | $7,689 |
| Total Interest Expense | 8,475 | 5,145 | 2,175 | 1,225 | 1,304 |
| Net Interest Income | 13,365 | 13,848 | 11,126 | 7,771 | 6,385 |
| Provision for Credit Losses | 1,016 | 276 | 633 | 314 | 269 |
| Net Interest Income after Provision for Credit Losses | 12,349 | 13,572 | 10,493 | 7,457 | 6,116 |
| Other Revenue | 2,648 | 2,498 | 2,700 | 2,469 | 2,641 |
| Other Expense | 10,749 | 10,069 | 8,808 | 7,664 | 7,220 |
| Income Before Income Taxes | 4,246 | 6,001 | 4,386 | 2,263 | 1,537 |
| Income Tax Expense | 1,445 | 2,218 | 1,535 | 820 | 536 |
| Net Income | 2,801 | 3,783 | 2,851 | 1,443 | 1,001 |
| Preferred Dividend | 424 | 424 | 143 | - | - |
| Net Income Applicable to Common Shareholders | $ 2,377 | $ 3,359 | $ 2,708 | $ 1,443 | $ 1,001 |
| **Balance Sheet-Period End:** | | | | | |
| Total Assets | $310,401 | $279,468 | $226,412 | $174,929 | $151,577 |
| Held-to-Maturity Securities | - | - | - | - | - |
| Available-for-Sale Securities | 2,684 | 2,112 | 2,143 | 2,351 | 2,041 |
| Loans, net | 268,928 | 243,355 | 195,595 | 149,918 | 124,599 |
| Total Deposits | 245,996 | 223,641 | 193,849 | 156,103 | 137,553 |
| Total Stockholders' Equity | 22,596 | 20,262 | 16,924 | 9,451 | 8,154 |
| Preferred Stock | 5,000 | 5,000 | 5,000 | - | - |
| Stockholders Equity Attributable To Common Shareholders | $ 17,596 | $ 15,261 | $ 11,924 | $ 9,451 | $ 8,154 |
| **Selected Ratios: \*\*** | | | | | |
| Return on Average Assets | 0.99% | 1.54% | 1.31% | 0.89% | 0.81% |
| Return on Average Equity Attributable to Common Shareholders' Equity | 14.4% | 24.7% | 25.4% | 16.4% | 12.9% |

\*\*After-tax basis

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
THE COMPANY'S FINANCIAL STATEMENTS
AND RESULTS OF OPERATIONS

The discussion presented below analyzes major factors and trends regarding the consolidated financial condition and results of the Company's operations for the years ended December 31, 2007, December 31, 2006, and December 31, 2005. For a complete understanding of this discussion, reference should be made to the Company's financial statements and the related notes included in the Regent Bancorp, Inc. 2007 Annual Report.

**General**

The Company is a bank holding company whose primary asset and principal activity are its ownership of 100% of the outstanding shares of Regent Bank. The Company conducts a commercial banking business which consists of attracting deposits from small and medium sized businesses, professionals and individuals and applying those funds to the origination of commercial, real estate and consumer loans (including commercial loans secured by real estate). The Company's profitability depends upon net interest income, which is the difference between interest income generated from interest-earning assets (such as loans and investments) less the interest expense incurred on interest-bearing liabilities (such as customer deposits and other borrowed funds). Net interest income is affected by the relative amounts and rates paid on interest-earning assets and interest-bearing liabilities plus the generation of non-interest bearing deposits. Net interest income is dependent upon the Company's interest rate spread, which is the difference between the average yield earned on its interest-earning assets and the average rate paid on interest-bearing liabilities. When the interest-earning assets approximate or exceed interest-bearing liabilities, any positive interest rate spread will generate net interest income. The interest rate spread is impacted by interest rates, deposit flows, and loan demand. Additionally, the Company's profitability is affected by such factors as the level of non-interest income and expenses, the provision for loan losses, and the effective tax rate paid by the Company on its income. Non-interest income consists primarily of fees and income from various deposit account products, residential mortgage fees and other services offered to customers. Non-interest expense consists of compensation and benefits, occupancy related expenses, and other operating expenses.

**Results of Operations**

*Net Income*

Net income applicable to common shareholders of the Company was $2,377,386 for the year ended December 31, 2007, compared with $3,358,494 for the year ended December 31, 2006, a decrease of $981,108 or 29.2%. The primary factors contributing to the decrease in the net income were; a) decline in core deposits reflecting the slowdown in the South Florida economy resulting in an increased dependence on higher rate wholesale funding and; b) an increase of $740,030 over 2006 in the amount of addition to provision for loan losses.

Net income applicable to common shareholders of the Company was $3,358,494 for the year ended December 31, 2006, compared with net income applicable to common shareholders of $2,707,947 for the year ended December 31, 2005, an increase of $650,547 or 24.0%. The primary factor contributing to the increase in the net income for the period was an increase in net interest income.

*Net Interest Income*

Net interest income was $13,364,562 for the year 2007, a decrease of $482,929 or 3.5%, compared with net interest income of $13,847,491 for the year 2006, resulting primarily from a 64.7% increase in interest expense due to a change in the mix of core and wholesale funding

Net interest income was $13,847,491 for 2006, an increase of $2,721,123 or 24.5%, compared with net interest income of $11,126,368 for 2005, resulting primarily from a $5,691,633 or 42.8% increase in interest income.

*Provision for Loan Losses*

The amount of the provision for loan losses is based on periodic evaluations of the loan portfolio, with particular attention directed toward non-performing and other potential problem loans. During these evaluations, consideration is given to such factors as management's evaluation of specific loans, the level and composition of non-performing loans, historical loss experience, results of examinations by regulatory agencies, the market value of collateral, the strength and availability of guaranties, concentrations of credits, and other judgmental factors.

The Company recorded an additional provision for loan losses of $1,016,244 during the year ended December 31, 2007, and increased the provision for loan losses by $276,214 during the year ended December 31, 2006. The Company's management believed the provision in 2007 was adequate to maintain an allowance for loan losses given the size and risk inherent in the loan portfolio.

The Company's 2007 allowance for loan losses was $2,864,407 compared with $2,073,420 in 2006. The increase in the 2007 provision occurred to adjust the allowance to a level considered adequate by management.

*Non-Interest Income*

Non-interest income is generated primarily from service charges on deposit accounts and residential mortgage fees. Non-interest income for the year 2007 was $2,647,707, an increase of $149,707, or 5.9% compared with non-interest income of $2,498,000 for the year 2006. The increase in 2007 is primarily attributable to an increase in service charges and fees.

Non-interest income of the Company for 2006 was $2,498,000, a decrease of $201,851, or 7.5%, compared with non-interest income of $2,699,851 for 2005. The decrease in 2006 is primarily attributable to the decline in residential mortgage fees.

*Non-Interest Expense*

Non-interest expense was $10,749,309 for the year 2007, an increase of $680,556 or 6.7% compared with non-interest expense in the amount of $10,068,753 for the year 2006. The increase in non-interest expense is due primarily to an increase in salaries and employee benefits.

Non-interest expense was $10,068,753 for 2006, an increase of $1,260,608 or 14.3% compared with non-interest expense of $8,808,145 for 2005. The increase in non-interest expense is due primarily to an increase in salaries and employee benefits and occupancy and equipment expense.

The Company's Florida subsidiary plans to provide a significant portion of the back office duties for the New Bank.

## Analysis of Financial Condition

*Loans and Asset Quality*

The Company's loans are diversified by borrower and industry group. Loan growth has continued to increase over the last few years despite a slowdown in the local economy.

As of December 31, 2007, the Company's loan portfolio, net of allowance for loan losses, was $268,928,209, compared to loans, net of allowance for loan losses, totaling $243,354,998 as of December 31, 2006.

As of December 31, 2006, the Company's loan portfolio, net of allowance for loan losses, consisted of loans totaling $243,354,998, as compared to loans, net of allowance for loan losses, totaling $195,595,207 as of December 31, 2005.

*Non-Performing Loans*

The Company's financial statements are prepared on the accrual basis of accounting, including the recognition of interest income on its loan portfolio, unless a loan is placed on a non-accrual basis. Loans are placed on non-accrual when there are serious doubts regarding the collectability of all principal and interest due under the terms of the loan. Amounts received on non-accrual loans generally are applied first to principal and then to interest after all principal has been collected. The classification of a loan on non-accrual status does not necessarily indicate that the principal is uncollectible, in whole or in part. A determination as to collectability is made by the Company on a case-by-case basis. The Company considers both the adequacy of the collateral and the other resources of the borrower in determining the steps to be taken to collect non-accrual loans. The final determination as to these steps is made on a case-by-case basis. Alternatives that are considered are foreclosure, collecting on guaranties, restructuring the loan, or initiating collection lawsuits.

As of December 31, 2007, the Company had $210,021 in loans accounted for as non-accruing as compared to $194,437 in loans accounted for as non-accruing on December 31, 2006.

As of December 31, 2006, the Company had $194,437 in loans accounted for as non-accruing as compared to $32,517 in loans accounted for as non-accruing on December 31, 2005.

*Allowance for Loan Losses*

In originating loans, management of the Company recognizes that credit losses will be experienced and the risk of loss will vary with, among other things, general economic conditions, the type of loan being made, the creditworthiness of the borrower over the term of the loan and, in the case of a secured loan, the quality of the collateral for such loan. The allowance for loan losses represents the Company's estimate of the allowance necessary to provide for potential loan loss exposure. In making this determination, the Company analyzes the ultimate collectability of its loan portfolio, incorporating feedback provided by internal loan staff, external auditors and examinations performed by regulatory agencies. The Company makes ongoing evaluations as to the adequacy of the allowance for loan losses.

The determination by the Company of the appropriate level of the allowance amount was $2,864,407 at December 31, 2007. The allowance for loan losses is based on estimates, and ultimate losses will vary from current estimates. These estimates are reviewed periodically and adjustments are reported as provision expense if it becomes necessary to increase or decrease the allowance to ensure the balance is adequate given the risk in the loan portfolio.

*Investment Activities*

The investment portfolio of the Company was 0.86% of the Company's asset base as of December 31, 2007. Management of the Company has structured the investment portfolio to minimize interest rate risk, maintain sufficient liquidity, and maximize return. The Company's financial planning anticipates income streams based on normal maturity and reinvestment. The Company has adopted SFAS No. 115, and classified investments as held-to-maturity or available-for-sale. Currently, 100% of the Company's investments are classified as available-for-sale.

*Deposit Activities*

Deposits are attracted through the offering of a broad variety of deposit instruments, including checking accounts, money market accounts, regular savings accounts, term certificate accounts (including "Jumbo" certificates in denominations of $100,000 or more), as well as health and retirement savings plans. The Company's total deposits equaled $245,996,123 as of December 31, 2007, representing an increase of $22,355,269 or 9.9% of total deposits in the amount of $223,640,854 on December 31, 2006. The Company's total deposits equaled $223,640,854 as of December 31, 2006, representing an increase of $29,792,085 or 15.4% compared with the balance of total deposits as of December 31, 2005, of $193,848,769.

*Liquidity*

Liquidity measures the ability of the Company to meet maturing obligations and its existing commitments, to withstand fluctuations in deposit levels, to fund its operations, and to provide for customers' credit needs. The liquidity of

the Company principally depends on cash flows from operating activities, investment in and maturity of assets, changes in balances of deposits and borrowings, and its ability to borrow funds.

The Company's core deposits, investment securities portfolio, federal funds sold, cash due from other bank deposit balances, and lines of credit serve as the primary sources of liquidity. Core deposit transaction accounts including non-interest and interest bearing transaction balances provide a low cost source of liquidity for the Company. At December 31, 2007, core deposit transaction accounts comprised 48% of the Company's total deposits. At December 31, 2007, 20.4% of the Company's deposit liabilities were in the form of time deposits of $100,000 or more.  At December 31, 2006, 19.2% of the Company's deposit liabilities were in the form of time deposits of $100,000 and over. Occasionally the Company funds itself using wholesale funding sources including Federal Home Loan Bank of Atlanta borrowings, Qwick Rate time deposits and brokered certificates of deposit where rates and terms are more favorable than retail deposit alternatives. The Company has a  line of credit with the Federal Home Loan Bank of Atlanta collateralized by residential mortgage loans and other loan and investment collateral. As of December 31, 2007, the Company's line with the Federal Home Loan Bank of Atlanta was $47,409,000 with $23,829,000 outstanding and $23,580,000 available subject to meeting the Federal Home Loan Bank of Atlanta's collateral pledge guidelines. Additionally, the Company has an $8 million unsecured line of credit with the Independent Bankers Bank of Florida for overnight borrowing needs. Management believes these wholesale funding markets are a stable source of funds.

*Capital Resources*

The Company's equity at December 31, 2007, was $22,596,175 of which $17,596,175 was in the form of common stock, compared with $20,261,126 of which $15,261,126 was in the form of common stock at December 31, 2006.  As of December 31, 2007, the Company's Tier 1 leverage ratio was 9.99%, which exceeds minimum federal regulatory capital maintenance requirements.

*Stockholdings in Regent Bancorp, Inc. by Proposed  Regent Bank/SC Board of Directors.:*

The Company anticipates that the New Bank Board of Directors propose to purchase 38,000 shares of Regent Bancorp, Inc. stock.

## DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK

*Common Stock*

The Company has authorized common stock consisting of 3,000,000 Shares with a par value of $.01 per share, of which 555,822 Shares were issued and outstanding at December 31, 2007, all of which are validly issued, fully paid and nonassessable.  The Company has no shares held in the treasury.

If all Shares offered pursuant to this Offering are sold, the Company will have 705,822 Shares of common stock issued and outstanding and options to purchase an additional 93,225 Shares.

The holders of common stock are entitled to one (1) vote per share.  Holdings of common stock do not have preemptive rights to purchase securities subsequently issued by the Company.  Cumulative voting for directors is not allowed.

The holders of common stock are entitled to receive dividends as may be declared by the Board of Directors of the Company with respect to the common stock out of funds legally available therefor.  In the event of a liquidation, dissolution or winding up of the affairs of the Company, the holders of outstanding shares of common stock will be entitled to share *pro rata* according to their respective interests in the Company's assets and funds remaining after payment or provision for payment of all debts and other liabilities of the Company.

*Preferred Stock*

In addition to the authorized common stock, the Company also has authorized preferred stock consisting of 1,000,000 Shares with a par value of $.01 per share. The Board of Directors is expressly authorized at any time, and from time to time, to provide for the issuance of shares of preferred stock in one or more series, with such voting powers, full or limited (including, by way of illustration and not limitation, in excess of one (1) vote per share), or without voting powers, and with such designations, preferences and relative participating, option or other rights, qualifications, limitations or restrictions, as shall be fixed and determined in the resolution or resolutions providing for the issuance thereof adopted by the Board of Directors. The Articles of Incorporation of the Company provide that dividends on the outstanding shares of preferred stock shall be declared and paid or set apart for payment before any dividend shall be declared and paid or set apart for payment on the outstanding shares of common stock with respect to the same quarterly period. Dividends on any shares of preferred stock shall be cumulative only if and to the extent determined by the resolution of the Board of Directors, as provided above. In the event of any liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, the outstanding shares of preferred stock shall have preference in priority over the outstanding shares of common stock for payment of the amount, if any, to which shares of each outstanding series of preferred stock may be entitled in accordance with the terms and rights thereof and each holder of preferred stock shall be entitled to be paid in full such amount, or have a sum sufficient for the payment in full set aside, before any such payments shall be made to the holders of common stock.

In 2005, the Company issued 5,000 Shares of Non Convertible MultiMode Noncumulative Redeemable Series A Preferred Stock. The Series A Preferred Stock ranks senior, with respect to dividend and liquidation rights, to the Company's common stock. The preferred stock is not convertible into or exchangeable for any other securities of the Company. Holders of Series A Preferred Stock do not have any voting rights, except as stipulated in the amended Articles of Incorporation of the Company which provide that, in the event of certain default in the payment of preferred dividends, the holders of record of the Series A Preferred Stock shall be entitled to elect two (2) additional directors to the Board of Directors at a special meeting called for that purpose.

The starting dividend rate on the Series A Preferred Stock is equal to 8.481% of the liquidation preference of the preferred shares. Dividends are payable quarterly in arrears on February 1, May 1, August 1 and December 1 of each year commencing on November 1, 2005. The rate is subject to change every five (5) years, on November 1, at the election of the Company at a floating rate or a fixed rate based on a formula provided in the amended Articles of Incorporation. The shares of Series A Preferred Stock are redeemable at the option of the Company on or after November 1, 2010, at a redemption price ranging from $1,050 per share on that date, to $1,000 per shares after November 1, 2020.

## SUPERVISION AND REGULATION

**Introduction**

The banking industry is extensively regulated under both federal and applicable state laws. The following discussion is a summary of certain statues and regulations applicable to bank and financial holding companies and their subsidiaries and provides specific information relevant to the Company and its subsidiaries. Regulation of financial institutions is intended primarily for the protection of depositors, deposit insurance funds and the banking system, and generally is not intended for the protection of shareholders.

Proposals are frequently introduced to change federal and state laws and regulations applicable to the Company and its subsidiaries. The likelihood and timing of any such changes and the impact such changes might have on the Company and its subsidiaries are impossible to determine with any certainty.

*General*

As a bank holding company and a financial holding company under federal law, the Company is subject to regulation under the Bank Holding Company Act of 1956, as amended (the "BHCA"), and the examination and reporting requirements of the Board of Governors of the Federal Reserve System (the "FRB"). As a Florida-chartered commercial bank, Regent Bank is subject to regulation, supervision and examination by the Florida Department of Financial Services (the "FDFS"), Regent Bank's chartering authority. As a federal savings association, the New Bank

will be subject to regulation, supervision and examination by the Office of Thrift Supervision (the "OTS"), the New Bank's chartering authority. Regent Bank and the New Bank are collectively referred to herein as the "Banks." Each of the Banks is also subject to regulation, supervision and examination by the Federal Deposit Insurance Corporation (the "FDIC"). The FDIC insures the deposits of the Banks to the maximum extent permitted by law.

State and federal law govern the activities in which the Banks may engage, the investments they may make and the aggregate amount of loans that may be granted to one borrower. Various consumer and compliance laws and regulations also affect the Banks' operations.

The banking industry is affected by the monetary and fiscal policies of the FRB. An important function of the FRB is to regulate the national supply of bank credit to moderate recessions and to curb inflation. Among the instruments of monetary policy used by the FRB to implement its objectives are: open-market operations in U.S. Government securities, changes in the discount rate and the federal funds rate (which is the rate banks charge each other for overnight borrowings) and changes in reserve requirements on bank deposits.

### Financial Holding Company Regulation

Under current federal law, as amended by the Gramm-Leach-Bliley Act of 1999 (the "GLB Act"), a bank holding company, such as the Company, may elect to become a financial services holding company. Such an election allows a holding company to offer customers virtually any type of service that is financial in nature or incidental thereto, including banking and activities closely related thereto, securities underwriting, insurance (both underwriting and agency) and merchant banking. In order to become and maintain its status, a financial holding company and all of its affiliated depository institutions must be well-capitalized, well-managed, and have at least a satisfactory Community Reinvestment Act of 1977 ("CRA") rating. If the FRB determines that a financial services holding company is not well-capitalized or well-managed, the company has a period of time to come into compliance. During the period of noncompliance, the FRB can place any limitation on the financial services holding company that it believes to be appropriate. Furthermore, if the FRB determines that a financial services holding company has not maintained a satisfactory CRA rating, the company will not be able to commence any new financial activities or acquire a company that engages in such activities, although the company will still be allowed to engage in activities closely related to banking and make investments in the ordinary course of conducting merchant banking activities. The Company has elected financial services holding company status and currently satisfies the requirements to maintain its status as a financial services holding company.

Most of the financial activities that are permissible for the Company as a financial services holding company are also permissible for a "financial subsidiary" of one or more of the Banks, except for insurance underwriting, insurance company portfolio investments, real estate investments and development, and merchant banking, which must be conducted in a financial services holding company. Subsidiary banks of a financial services holding company with financial subsidiaries must continue to be well-capitalized and well-managed in order to continue to engage in activities that are financial in nature without regulatory actions or restrictions, which could include divestiture of the financial subsidiary or subsidiaries.

Current federal law also establishes a system of functional regulation under which the FRB is the umbrella regulator for bank holding companies, but bank holding company affiliates are to be principally regulated by functional regulators, such as the SEC for securities affiliates and state insurance regulators for insurance affiliates. Certain specific activities, including traditional bank trust and fiduciary activities, may be conducted in the bank without the bank being deemed a "broker" or a "dealer" in securities for purposes of functional regulation. Although the states generally must regulate bank insurance activities in a nondiscriminatory manner, the states may continue to adopt and enforce rules that specifically regulate bank insurance activities in certain identifiable areas.

### Acquisitions

Under the BHCA, a bank holding company may not directly or indirectly acquire ownership or control of more than 5% of the voting shares or substantially all of the assets of any bank holding company or bank or merge or consolidate with another bank holding company without the prior approval of the FRB. Current Federal law authorizes interstate acquisitions of banks and bank holding companies without geographic limitation. Furthermore, a bank headquartered in one state is authorized to merge with a bank headquartered in another state, as long as neither of the states have opted out of such interstate merger authority, and subject to any state requirement that the target bank shall have been in existence and operating for a minimum period of time, not to exceed five years; and subject to certain

deposit market-share limitations. After a bank has established branches in a state through an interstate merger transaction, the bank may establish and acquire additional branches at any location in the state where a bank headquartered in that state could have established or acquired branches under applicable federal or state law.

## Other Safety and Soundness Regulations

The FRB has enforcement powers over bank holding companies and their non-banking subsidiaries. The FRB has authority to prohibit activities that represent unsafe or unsound practices or constitute violations of law, rule, regulation, administrative order or written agreement with a federal regulator. These powers may be exercised through the issuance of cease and desist orders, civil money penalties or other actions.

There also are a number of obligations and restrictions imposed on bank holding companies and their depository institution subsidiaries by federal law and regulatory policy that are designed to reduce potential loss exposure to the depositors of such depository institutions and to the FDIC insurance funds in the event the depository institution is insolvent or is in danger of becoming insolvent. For example, under requirements of the FRB with respect to bank holding company operations, a bank holding company is required to serve as a source of financial strength to its subsidiary depository institutions and to commit financial resources to support such institutions in circumstances where it might not do so otherwise. In addition, the "cross-guarantee" provisions of federal law require insured depository institutions under common control to reimburse the FDIC for any loss suffered or reasonably anticipated by the Deposit Insurance Fund ("DIF") as a result of the insolvency of commonly controlled insured depository institutions or for any assistance provided by the FDIC to commonly controlled insured depository institutions in danger of failure. The FDIC may decline to enforce the cross-guarantee provision if it determines that a waiver is in the best interests of the DIF. The FDIC's claim for reimbursement under the cross guarantee provisions is superior to claims of shareholders of the insured depository institution or its holding company, but is subordinate to claims of depositors, secured creditors and nonaffiliated holders of subordinated debt of the commonly controlled insured depository institution.

Banking regulators also have broad enforcement powers over the Banks, including the power to impose civil money penalties and other civil and criminal penalties, and to appoint a conservator in order to conserve the assets of any such institution for the benefit of depositors and other creditors.

## Dividends

The Company is a legal entity separate and distinct from its subsidiaries. The majority of the Company's revenue is from dividends paid to the Company by Regent Bank. The Banks are subject to laws and regulations that limit the amount of dividends they can pay. In addition, the Company and the Banks are subject to various regulatory restrictions relating to the payment of dividends, including requirements to maintain capital at or above regulatory minimums, and to remain "well-capitalized" under the prompt corrective action rules. The FRB has indicated generally that it may be an unsafe or unsound practice for a bank holding company to pay dividends unless the bank holding company's net income over the preceding year is sufficient to fund the dividends and the expected rate of earnings retention is consistent with the organization's capital needs, asset quality and overall financial condition.

In addition to the limitations placed on the payment of dividends at the holding company level, there are various legal and regulatory limits on the extent to which the Banks may pay dividends or otherwise supply funds to the Company. The Banks are subject to laws and regulations of Florida and the OTS, as applicable, which place certain restrictions on the payment of dividends.

Regent Bank currently pays dividends to the Company to provide funds to service the Company's debts and to pay dividends on the Company's outstanding preferred stock. Information about Regent Bank's ability to pay dividends is included in the Regent Bancorp, Inc. 2007 Annual Report. As a newly-chartered federal savings bank, the New Bank will be unable to pay dividends in the foreseeable future.

## Regulatory Capital Requirements

The Banks must comply with capital adequacy standards established by the FDFS, OTS and FDIC, as applicable. Failure to meet capital adequacy standards could subject the Banks to a variety of enforcement remedies, including the issuance of a capital directive, the termination of deposit insurance by the FDIC and certain other restrictions on their business. The federal banking agencies have broad powers under current federal law to take prompt corrective action to resolve problems of insured depository institutions. The extent of these powers depends

upon whether the institutions in question are "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized" or "critically undercapitalized," as such terms are defined under regulations issued by each of the federal banking agencies. In general, the agencies measure capital adequacy within a framework that makes capital requirements sensitive to the risk profiles of individual banking companies. The guidelines define capital as either Tier 1 (primarily common shareholders' equity) or Tier 2 (certain debt instruments and a portion of the allowance for loan losses). The Banks are subject to a minimum Tier 1 capital ratio (Tier 1 capital to risk-weighted assets) of 4%, a total capital ratio (Tier 1 plus Tier 2 to risk-weighted assets) of 8% and a Tier 1 leverage ratio (Tier 1 to average quarterly assets) of 4%. To be considered a "well capitalized" institution, the Tier 1 capital ratio, the total capital ratio and the Tier 1 leverage ratio must equal or exceed 6%, 10% and 5%, respectively.

*Affiliate Transactions*

The Banks are subject to Regulation W, which comprehensively implemented statutory restrictions on transactions between a bank and its affiliates. Regulation W combines the FRB's interpretations and exemptions relating to Sections 23A and 23B of the Federal Reserve Act. Regulation W and Section 23A place limits on the amount of loans or extensions of credit to, investments in, or certain other transactions with affiliates, and on the amount of advances to third parties collateralized by the securities or obligations of affiliates. In general, the Banks' "affiliates" are the Company and the Company's non-bank subsidiaries.

Regulation W and Section 23B prohibit, among other things, a bank from engaging in certain transactions with affiliates unless the transactions are on terms substantially the same, or at least as favorable to the bank, as those prevailing at the time for comparable transactions with non-affiliated companies.

The Banks are also subject to certain restrictions on extensions of credit to executive officers, directors, certain principal shareholders and their related interests. Such extensions of credit must be made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with third parties and must not involve more than the normal risk of repayment or present other unfavorable features.

*Deposit Insurance*

The Banks' deposits are insured to applicable limits by DIF of the FDIC. The DIF is the successor to the Bank Insurance Fund and the Savings Association Insurance Fund, which were merged in 2006 by the Federal Deposit Insurance Reform Act of 2005 (the "Reform Act"). In addition to merging the insurance funds, the Reform Act made the following major changes to the federal deposit insurance system:

- the current $100,000 deposit insurance coverage will be indexed for inflation (with adjustments every five years, commencing January 1, 2011);

- deposit insurance coverage for retirement accounts was increased to $250,000 per participant subject to adjustment for inflation; and

- the FDIC was given the authority to adjust the DIF's reserve ratio annually at between 1.15% and 1.5% of insured deposits, in contrast to the prior statutory ratio of 1.25%.

The FDIC has set the DIF's reserve ratio for 2008 at 1.25%.

The FDIC maintains a risk-based deposit insurance assessment system, under which the amount of each bank's insurance assessment is based on the balance of insured deposits and the degree of risk the institution poses to the DIF. Under the revised assessment system adopted by the FDIC following enactment of the Reform Act, insured institutions are assigned to one of four risk categories based on supervisory evaluations, capital levels and certain other factors. Deposit insurance assessment rates, which are set semiannually by the FDIC, currently range from 0.05% to 0.07% of insured deposits for Risk Category I institutions (i.e., well-capitalized and with one of the two highest safety and soundness examination ratings) to 0.43% for Risk Category IV institutions (i.e., undercapitalized and with substantial supervisory concerns).

In addition, all insured institutions are required to pay assessments to the FDIC to fund interest payments on bonds issued by the Financing Corporation, an agency of the federal government established to recapitalize the predecessor to the Savings Association Insurance Fund. This payment is established quarterly, and during the calendar year ending December 31, 2007, averaged 4.6 basis points of assessable deposits for Regent Bank.

*Consumer Protection Laws*

In connection with their lending and leasing activities, each of the Banks is subject to a number of federal and state laws designed to protect borrowers and promote lending to various sectors of the economy and population. These laws include the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Truth in Lending Act, the Home Mortgage Disclosure Act, the Real Estate Settlement Procedures Act, and their respective state law counterparts.

Federal law currently contains extensive customer privacy protection provisions. Under these provisions, a financial institution must provide to its customers, at the inception of the customer relationship and annually thereafter, the institution's policies and procedures regarding the handling of customers' nonpublic personal financial information. These provisions also provide that, except for certain limited exceptions, an institution may not provide such personal information to unaffiliated third parties unless the institution discloses to the customer that such information may be so provided and the customer is given the opportunity to opt out of such disclosure. Federal law makes it a criminal offense, except in limited circumstances, to obtain or attempt to obtain customer information of a financial nature by fraudulent or deceptive means.

The Community Reinvestment Act (the "CRA") requires the Banks' primary federal bank regulatory agencies to assess the Banks' records in meeting the credit needs of the communities they serve, including low- and moderate-income neighborhoods and persons. Institutions are assigned one of four ratings: "Outstanding," "Satisfactory," "Needs to Improve" or "Substantial Noncompliance." This assessment is reviewed for any bank that applies to merge or consolidate with or acquire the assets or assume the liabilities of an insured depository institution, or to open or relocate a branch office. The CRA record of each subsidiary bank of a financial holding company, such as the Company, also is assessed by the FRB in connection with any acquisition or merger application.

*USA Patriot Act*

The USA Patriot Act of 2001 (the "Patriot Act") contains anti-money laundering measures affecting insured depository institutions, broker-dealers and certain other financial institutions. The Patriot Act requires such financial institutions to implement policies and procedures to combat money laundering and the financing of terrorism, and grants the Secretary of the Treasury broad authority to establish regulations and to impose requirements and restrictions on financial institutions' operations. In addition, the Patriot Act requires the federal bank regulatory agencies to consider the effectiveness of a financial institution's anti-money laundering activities when reviewing bank mergers and bank holding company acquisitions.

## GOVERNING LAW

The Company is governed by the provisions of the Florida Business Corporation Act, as amended. The Bank is governed by the provisions of the Florida Financial Institutions Codes. The New Bank will be governed by the Federal Home Owners' Loan Act.

## LEGAL MATTERS

Certain legal matters in connection with the validity of the Shares offered hereby are being passed upon for the Company by Gerrish McCreary Smith, PC, Attorneys, Memphis/Nashville, Tennessee.

**APPENDIX A**

**SUBSCRIPTION MATERIALS**

# REGENT BANCORP, INC.

## SUBSCRIPTION MATERIALS

PLEASE COMPLETE AND EXECUTE THE FOLLOWING DOCUMENTS:

I.     PURCHASER QUESTIONNAIRE (Pages A-2 to A-3)

II.    SUBSCRIPTION AGREEMENT (Pages A-4 to A-10)

III.   ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE (IF
       APPLICABLE) (Pages A-11 to A-13)

IV.    PURCHASER REPRESENTATIVE QUESTIONNAIRE (IF APPLICABLE) (Pages A-14
       to A-16)

PLEASE DELIVER ALL COMPLETED AND EXECUTED DOCUMENTS TO:

Regent Bancorp, Inc.
1200 Woodruff Road, A-3, Suite 144
Greenville, SC 29607
Attn:  Pamela Joy Owens
Executive Vice President

ALL QUESTIONS MUST BE ANSWERED COMPLETELY.  IF THE ANSWER TO ANY QUESTION IS "NONE"
OR "NOT APPLICABLE," PLEASE SO STATE.  ALL INFORMATION WILL BE KEPT CONFIDENTIAL.

# I. PURCHASER QUESTIONNAIRE

## REGENT BANCORP, INC.
## (PLEASE TYPE OR PRINT)

**NAME:** _____
**ADDRESS:** _____
_____

This questionnaire elicits information relating to the proposed offer and sale to you, the offeree, of Shares ("Shares") in a private placement, of the common stock, $.01 par value per share, of Regent Bancorp, Inc. (the "Company"), as described in the confidential Private Placement Memorandum of the Company dated May 13, 2008. The purpose of this questionnaire, in part, is to determine whether you are an "accredited investor" as defined under Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), which is relevant in determining whether the Shares are exempt from registration under the Securities Act and applicable state securities laws. The Company's reliance on one or more exemptions from registration under federal and applicable state securities laws is based on this information.

All information which you provide to the Company will be kept confidential and will not be disclosed (except to the limited extent necessary to establish the availability of one or more exemptions from registration of the offer and sale of the Shares under federal and applicable state law).

Please complete, sign, date and return to the Company one copy of this questionnaire, along with a signed copy of the Subscription Agreement.

Thank you for your cooperation.

Please mark each applicable box:

1. ☐ The undersigned is an individual (not a partnership, corporation, etc.) whose individual net worth, or joint net worth with his or her spouse, presently exceeds $1,000,000.

   <u>Explanation</u>. In calculating net worth, you may include equity in personal property and real estate, including your principal residence, cash, short-term investments, stocks and securities. Equity in personal property and real estate should be based on the appraised fair market value of such property less debt secured by such property.

2. ☐ The undersigned is an individual (not a partnership, corporation, etc.) who had an income in excess of $200,000 in each of the two most recent years, or joint income with their spouse in excess of $300,000 in each of those years (in each case including foreign income, tax-exempt income and full amount of capital gains and losses, but excluding any income of either family members and any unrealized capital appreciation) and has a reasonable expectation of reaching the same income level in the current year.

3. ☐ The undersigned is not within either of the categories above and is, therefore, a non-accredited investor.

A-2

4.        PLEASE INITIAL the proper alternative in the space provided:

_____          **Alternative One**.  The undersigned has such knowledge and
                        experience in financial and business matters that the
_____          undersigned is capable of evaluating the merits and risks of an
(co-tenant, if          investment in the Shares, and does not desire to utilize a
applicable)             Purchaser Representative in connection with evaluating such
                        merits and risks.

_____          **Alternative Two**.  The undersigned intends to use the services of
                        the person(s) named below as Purchaser Representative(s) in
                        connection with evaluating the merits
_____          and risks of an investment in the Shares.  PLEASE
(co-tenant, if          COMPLETE "ACKNOWLEDGMENT OF USE OF
applicable)             PURCHASER REPRESENTATIVE" - SECTION III AND HAVE
                        PURCHASER  REPRESENTATIVE  COMPLETE  AND  SIGN
                        "PURCHASER    REPRESENTATIVE    QUESTIONNAIRE"   –
                        SECTION IV.

Name(s) of Purchaser Representative(s):

_____

_____

IF   ALTERNATIVE   TWO   IS   INITIALED,   A   COMPLETED   AND   SIGNED   PURCHASER
REPRESENTATIVE  QUESTIONNAIRE  AND  ACKNOWLEDGEMENT  OF  USE  OF  PURCHASER
REPRESENTATIVE MUST ACCOMPANY THIS PURCHASER QUESTIONNAIRE.

* * * * *

The undersigned represents that the foregoing information is true and correct, in all material
respects, and agrees that such information may be relied upon by the Company and others in connection
with an investment by the undersigned in Shares of the Company.  The undersigned agrees to furnish such
additional information as is reasonably necessary in order to verify the answers set forth above.

NOTE:  Signatures should conform with those used on Subscription Agreement.)

_____          _____
Please Print Name of Individual or        Please Print Name of Second Joint or
Joint Co-Tenant                           Co-Tenant

_____          _____
Signature                                 Signature

Date: _____, 2008               Date: _____, 2008

A-3

## II. SUBSCRIPTION AGREEMENT

### INSTRUCTIONS FOR COMPLETING THE SUBSCRIPTION AGREEMENT

1.   **All Subscribers**.  On the appropriate Subscription Agreement Signature Page, insert the date of your subscription, the number of Shares for which you are subscribing, and the total amount of your subscription.

2.   **Joint Tenants and Co-Tenants**.

(a)   Married Couples.

    (i)   Both spouses must sign.

    (ii)   Both social security numbers are required.

    (iii)   Indicate form of ownership by checking the appropriate line of the "SUBSCRIPTION AGREEMENT SIGNATURE PAGE FOR INDIVIDUAL INVESTORS."

(b)   Other Joint Tenants and Co-Tenants.

    (i)   All joint tenants and co-tenants must sign.

    (ii)   All joint tenants and co-tenants must indicate social security numbers.

    (iii)   Indicate form of ownership by checking the appropriate line on "SUBSCRIPTION AGREEMENT SIGNATURE PAGE FOR INDIVIDUAL INVESTORS."

**TO:     REGENT BANCORP, INC.**

Ladies and Gentlemen:

You have informed me that **REGENT BANCORP, INC.** is a Florida corporation (the "Company"). The Company is a registered bank holding company pursuant to the Bank Holding Company Act of 1956. The Company is to be operated in accordance with its Articles of Incorporation and By-Laws. Common Stock of the Company is to be issued in the number of Shares and at a price per Share, as described in and offered pursuant to the Private Placement Memorandum dated May 13, 2008, and all supplements thereto, if any ("Memorandum"), and the minimum investment is one Share.

1.     **Subscription**. Subject to the terms and conditions hereof, the undersigned hereby tenders this subscription, together with cash or check totaling the full purchase price of $50.00 per Share, the Purchaser Questionnaire ("Questionnaire"), other subscription documents, all in the form submitted to the undersigned simultaneously with the delivery of the Memorandum (collectively, the "Subscription Documents"). Tender shall have been by delivery of same to the Company, 1200 Woodruff Road, A-3, Ste. 144, Greenville, SC 29607, Attention: Pamela Joy Owens, Executive Vice President, who shall hold these documents for the benefit of the undersigned according to the terms of the Memorandum. The Purchase Price shall be payable to: REGENT BANCORP, INC. to be paid over to the Company as capital contributions as soon as practicable after each interim closing of the Offering or the Closing of the Offering on September 30, 2008, or an extended date set by the Company.

2.     **Acceptance of Subscription; Adoption and Appointment**. It is understood and agreed that this Agreement is made subject to the following terms and conditions:

(a)     The Company shall have the right to accept subscribers in any order it shall determine or reject this subscription, in whole or in part, for any reason.

(b)     The undersigned hereby intends that his signature hereon shall constitute an irrevocable subscription for the number of Shares specified on the signature page of this Agreement.

3.     **Representations and Warranties of the Undersigned**.  The undersigned hereby represents and warrants to the Company as follows:

(a)     The undersigned (i) has adequate means of providing for his current needs and possible personal contingencies, and he has no need for liquidity of his investment in the Company, (ii) has a net worth sufficient to bear the risk of losing his entire investment in the Company, (iii) is able to bear the economic risks of this investment for an indefinite period, and (iv) has, alone or together with his Purchaser Representative (as hereinafter defined), such knowledge and experience in financial matters that the undersigned is capable of evaluating the relative merits and risks of this investment.

(b)     The address set forth in his Purchaser Questionnaire is his true and correct residence, and he has no present intention of becoming a resident of any other state or jurisdiction.

(c)     The undersigned acknowledges that if a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act of 1933, as amended) (the "Securities Act"), has been utilized by the undersigned, (i) the undersigned has completed and executed the Acknowledgment of Use of Purchaser Representative, (ii) in evaluating his investment as

contemplated hereby, the undersigned has been advised by his Purchaser Representative as to the merits and risks of the investment in the Company in general and the suitability of the investment in the Company for the undersigned in particular, and (iii) the undersigned's Purchaser Representative has completed and executed the Purchaser Representative Questionnaire.

(d)    **The undersigned has received and read and reviewed with his Purchaser Representative, if any, and is familiar with the Memorandum, the Regent Bancorp, Inc. 2007 Annual Report, this Agreement, and the other Subscription Documents**, and the undersigned confirms that all documents records and books pertaining to the investment in the Company and requested in writing by the undersigned or Purchaser Representative have been made available or delivered to the undersigned and/or the undersigned's Purchaser Representative.

(e)   The undersigned and/or his Purchaser Representative have had an opportunity to ask questions of and receive answers from the Company, or a person or persons acting on its behalf, concerning the terms and conditions of this investment.

(f)   The undersigned understands that the Shares have not been registered under the Securities Act or any state securities acts and are instead being offered and sold in reliance upon exemptions for private offerings.

(g)    INVESTMENT INTENT:   The Shares for which the undersigned hereby subscribes are being acquired solely for his own account for investment and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; he has no present plans to enter into any such contract, undertaking, agreement or arrangement. In order to induce the Company to issue and sell the Shares subscribed for hereby to the undersigned, it is agreed that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of such Shares by anyone but the undersigned.

(h)   The undersigned has received, completed and returned to the Company the Purchaser Questionnaire relating to his general ability to bear the risks of an investment in the Company and his suitability as an investor in a private offering, and the undersigned hereby affirms the correctness of his answers to such Questionnaire and all other written or oral information concerning the undersigned's suitability provided to the Company by, or on behalf of, the undersigned.

(i)  The person, if any, executing the Purchaser Representative Questionnaire, a copy of which has been received by the undersigned, is acting and is hereby designated to act as the undersigned's Purchaser Representative in connection with the offer and sale of the Shares to the undersigned.   This designation of a Purchaser Representative was made with the knowledge of the representations and disclosures made in such Purchaser Representative Questionnaire and materials.

(j)  The undersigned acknowledges and is aware of the following:

(i)    The Shares are highly speculative and involve a risk of loss by the undersigned of his entire investment in the Company.

(ii)    There are substantial restrictions on the transferability of the Shares, including a restriction against transfer without registration under federal and state securities laws or an exemption therefrom; the Shares will not be, and the

investors in the Company have no rights to require that the Shares be, registered under the Securities Act or any state securities laws; there will be no public market for the Shares; and the undersigned may have to hold the Shares indefinitely and it may not be possible for the undersigned to liquidate his or her investment in the Company. The stock certificate(s) issued to me will bear substantially the following legend:

> THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAVE ANY OF THE FOREGOING AUTHORITIES REVIEWED OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. IN MAKING AN INVESTMENT DECISION, YOU MUST RELY ON YOUR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND SUBSTANTIAL RISKS INVOLVED.

> THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAW OF ANY STATE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD, EXCEPT PURSUANT TO REGISTRATION OR PURSUANT TO AN OPINION FROM LEGAL COUNSEL ACCEPTABLE TO THE COMPANY THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

(iii)    That no federal or state agency has made any finding or determination as to the fairness of this Offering of Shares for investment or any recommendation or endorsement of the Shares.

(iv)    That none of the following have been guaranteed or warranted to him by any broker, the Company, its agents, or employees or any other person, expressly or by implication:

(1)    The approximate or exact length of time that he will be required to remain as owner of his Shares.

(2)    The percentage of profit and/or amount of or type of consideration, profit or loss to be realized, if any, as a result of ownership of Shares of the Company.

(3)     That the prior performance on the part of the Company or any Affiliates (as defined in Rule 405 under the Securities Act), any securities broker or finder, their partners, salesmen, associates, agents, or employees or of any other person, will in any way indicate the predictable results of the ownership of Shares or of the Company.

(4)     That subscriptions will necessarily be accepted in the order in which they are received.

(v)     That the Company shall incur certain costs and expenses and undertake other actions in reliance upon the irrevocability of the representations and subscription for Shares made hereunder.

(k)  The undersigned, if a natural person, is at least 21 years of age and is a bona fide resident and domiciliary of the state set forth in the Purchaser Questionnaire and has no present intention to become a resident of any other state or jurisdiction.

(l)  The undersigned was not induced to invest by any form of general solicitation or general advertising, including but not limited to the following:

(i)     Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over the television or radio; and

(ii)     Any seminar or meeting whose attendees had been invited by any general solicitation or general advertising.

The foregoing representations and warranties are true and accurate as of the date hereof and shall be true and accurate as of the date of delivery of the Subscription Documents to the Company and shall survive delivery of the Subscription Documents to the Company.  If in any respect such representations and warranties shall not be true and accurate prior to or after delivery of the Subscription Documents pursuant to Paragraph 1 hereof, the undersigned shall give written notice of such fact to the Company, specifying which representations and warranties are not true and accurate and the reasons therefor.

4.     **Indemnification**.  The undersigned acknowledges that he understands the meaning and legal consequences of the representations and warranties contained in Paragraph 3 hereof, and he hereby indemnifies and holds harmless the Company from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of the undersigned contained in this Agreement.

5.     **No Waiver**.  Notwithstanding any of the representations, warranties, acknowledgments or agreements made herein by the undersigned, the undersigned does not hereby or in any other manner waive any rights granted to him under Federal or state securities laws.

6.     **Transferability**.  The undersigned understands and agrees that the shares acquired pursuant to this Agreement and the Offering may not be transferred without the prior written consent of the Company which may be arbitrarily withheld, and receipt by the Company of an opinion of its counsel that such transfer does not violate federal and applicable state securities laws.  Such an

A-8

opinion will not be obtainable unless the Company's stock is registered under such laws or there exists an exemption from the registration requirements thereof. The Company has not agreed to have any of the Company's securities registered.

7.    **Revocation**.    The undersigned acknowledges and agrees that his subscription for Shares, made by the execution and delivery of this Agreement by the undersigned, is irrevocable and that such subscription shall survive the death or disability of the undersigned.

8.    **Miscellaneous**.

(a)  All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at its address set forth below and to Regent Bancorp, Inc., 1200 Woodruff Road, A-3, Ste. 144, Greenville, SC 29607, Attention: Pamela Joy Owens, Executive Vice President.

(b)  Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of Florida.

(c)  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(d)  This Agreement shall be binding upon the heirs, estates, legal representatives, successors and assigns of the parties hereto.

(e)  The terms used in this Agreement, if not defined herein, shall have the meanings attributed to such terms in the Memorandum. All terms used herein shall be deemed to include the masculine and the feminine and the singular and the plural as the context requires.

(f)  Subscription funds will be deposited by the Company into a non-interest bearing account at the Company's Florida subsidiary bank, Regent Bank, until such time as Company shares are issued or the offering is terminated.

(g)  In the event the Company is not successful gaining regulatory approval to open the New Bank or the offering is not successful or for any other reason the Company deems it necessary to terminate the offering, the subscription funds shall be returned, without interest, to the subscriber.

9.    **NOTICE TO ALL INVESTORS**.  THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS.  THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED OF BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS

OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

DATED: _____, 2008.

Number of Shares or Fraction Thereof Subscribed for: _____ Shares at $_____ per Share.

(**NOTE**:  The sale of Shares is solely in the discretion of the Company.)

_____
(Signature of Subscriber)

_____
(Printed Name of Subscriber)

_____
(Social Security Number of Subscriber)

_____
(Signature of Spouse or other Tenant, if any)

_____
(Printed Name of Spouse or other Tenant, if any)

_____
(Social Security Number of Spouse or other Tenant, if any)

_____

_____

_____
(Address of Subscriber)

_____
(Email Address of Subscriber)

_____
(Telephone Number of Subscriber)

Check Appropriate Space:

_____ Individual Ownership

_____ Joint Tenants with Right of Survivorship

_____ Tenants in Common

_____ Other: _____

Approved and accepted in accordance with the terms of the Private Placement Memorandum.

**REGENT BANCORP, INC.**

a Florida Corporation

By: _____
         Authorized Signature

Date: _____

### III. ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE
### (IF APPLICABLE)

#### INSTRUCTIONS FOR COMPLETING ACKNOWLEDGMENT
#### OF USE OF PURCHASER REPRESENTATIVE

1.   **All Subscribers**. This acknowledgment of use of Purchaser Representative is to be completed and executed and dated if you initialed Alternative Two in response to Question 4 on the Purchaser Questionnaire.

2.   **Joint Tenants (Married Couples)**.  Only one signature required.

3.   **Joint Tenants and Co-Tenants (All Others)**.  Each investor who initials Alternative Two must complete and sign.

4.   **Partnerships**.  Unless otherwise advised each partner who initials Alternative Two must complete and sign.

5.   **Trusts**.  If the trust itself is a taxable entity with respect to this investment (and initialed Alternative Two) then the trust must complete and it must be signed by its trustee(s).  If the trust is not a taxable entity with respect to this investment then such person(s) who initialed Alternative Two must complete and sign.

6.   **Corporations**.  An authorized officer should complete and sign on behalf of corporation.

## REGENT BANCORP, INC.
## ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE

I acknowledge that _____ (has/have) served as my purchaser representative(s), in connection with evaluating the merits and risks of my prospective investment as a shareholder in Regent Bancorp, Inc. (the "Company").  I represent to you that in my opinion he (they) has (have) such knowledge and experience in financial and business matters such that he (they) is (are) capable of evaluating the merits and risks of my prospective investment and that he (they) has (have) represented to me in writing as follows:

1.      He (they) is (are) not an Affiliate (as defined in Rule 405 under the Securities Act of 1933, as amended), director, officer or other employee of the Company or any of their Affiliates or a beneficial owner of 10% or more of the equity interest in the Company;

2.      Except for the following relationships which have previously been disclosed by him (them) in writing to me, neither he (they) nor his (their) Affiliates have any material relationship with the Company or any of its Affiliates, no such material relationship has existed at any time during the previous two years and no such material relationship is mutually understood to be contemplated.  Any compensation received as a result of such relationship(s) should also be provided below:

I hereby acknowledge receipt of a copy of the Purchaser Representative Questionnaire furnished by my purchaser representative(s) to the Company in connection with this offering.

I request that copies of all material distributed to me in connection with the offering be sent to my purchaser representative(s).

DATED:_____, 2008.

IF AN INDIVIDUAL OR JOINTLY TENANCY
OR CO-TENANCY, complete the following:

_____          _____
Print name of individual or                                Print name of second joint or
co-tenant                                                              co-tenant

_____          _____
Signature of individual or                                 Signature of second joint or
joint or co-tenant                                             co-tenant

IF A CORPORATION, PARTNERSHIP,
TRUST OR OTHER ENTITY, complete
the following:

_____

Print name of partnership,
corporation, trust or entity


By:_____
     Signature of authorized
     signatory


_____

Print name of authorized signatory


_____

Capacity of authorized signatory

## IV.  PURCHASER REPRESENTATIVE QUESTIONNAIRE
### (IF APPLICABLE)

INSTRUCTION FOR COMPLETING
PURCHASER REPRESENTATIVE QUESTIONNAIRE

     If you have completed the previous document, "Acknowledgment of Use of Purchaser Representative," this document must be completed, signed and dated by your Purchaser Representative.

### REGENT BANCORP, INC.

PURCHASER REPRESENTATIVE QUESTIONNAIRE

Name of Purchaser:

1.     Name of Purchaser Representative: _____

     Business Address: _____

     Telephone (with area code): _____

2.     Present occupation or position, indicating period of such practice or employment and field of professional specialization, if any:

3.     Business or professional educational background, indicating degrees, if any:

4.     Have you had prior experience in advising clients with respect to speculative investments of this type, such as common stock, real estate, agricultural, oil, gas, cattle feeding or other syndications?

     _____ Yes                 _____ No

5.     List any professional licenses or registrations, including bar admissions, accounting certificates, real estate brokerage licenses, and SEC or state broker-dealer registrations, held and the year in which any such license or registration was issued:

6.     Describe generally any business, financial, or investment experience that would help you to evaluate the merits and risks of this investment:

A-14

7.      State how long you have known the Purchaser and in what capacity:

8.      Do you or any of your Affiliates (as defined in Rule 405 under the Securities Act of 1933, as amended), have, or do you or any of your Affiliates contemplate having, any material relationship with the Company or any of its Affiliates (including fees payable in relation to this Offering); or have such material relationships existed at any time during the previous two years?

_____ Yes                    _____ No

If your answer to Question No. 8 is "yes", indicate the nature of such relationship including the amount of compensation received or to be received as a result of such relationship:

9.      In advising the Purchaser in connection with the Purchaser's prospective investment in the Company, will you be relying in part on the Purchaser's own expertise in certain areas?

_____ Yes                    _____ No

10.     In advising the Purchaser in connection with the Purchaser's prospective investment in the Company, will you be relying in part on the expertise of an additional purchaser representative or other representative (i.e., the Purchaser's attorney _____, accountant _____, or (specify).

_____ Yes                    _____ No

If your answers to either Question 9 or Question 10 above are "yes", give the areas of such expertise or the name and address of such additional representative(s):

*****************************

I understand that the Company will be relying on the accuracy and completeness of my responses to the foregoing questions and I represent and warrant to the Company as follows:

(i)     I am acting as Purchaser Representative for the Purchaser in connection with the Purchaser's prospective investment in the Company;

(ii)    The answers to the above questions are complete and correct and may be relied upon by the Company in determining whether the Offering in connection with which I have executed this Questionnaire is exempt from registration under the Securities Act of 1933, as amended, and applicable state securities laws;

(iii)   I will notify the Company immediately of any material change in any statement made herein occurring prior to the closing of any purchase by the Purchaser of a Share in the Company;

(iv)    I am not an Affiliate, director, officer or other employee of the Company or any of its Affiliates, or otherwise disqualified from serving as a Purchaser Representative in conformity with Regulation D;

(v)      I have disclosed to the Purchaser in writing, prior to the Purchaser's acknowledgment of me as his Purchaser Representative, all material relationships with the Company or its Affiliates (and the compensation received or to be received as a result of such relationships) disclosed in the answer to Question No. 8 above;

(vi)     I personally (or, if I have answered "yes" in Questions 9 or 10 above, I together with the Purchaser or the additional Purchaser representative or representatives indicated above) have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of the Purchaser's prospective investment in the Company;

(vii)    I have received the Memorandum describing the offering and the Regent Bancorp, Inc. 2007 Annual Report; and

(viii)   The Company has made available to me any document relating to an investment in the Company that I have requested and has provided answers to all of my questions concerning the offering and the Company necessary to verify the information contained in the Memorandum.

DATED:_____, 2008.

**PURCHASER REPRESENTATIVE**

_____
Signature

_____
Signature

**RECEIVED AND ACCEPTED:**

**REGENT BANCORP, INC.,**
A Florida Corporation

By:_____

Title:_____

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

C. Vincent Brown, et. al.,

               Plaintiffs,

v.

Regent Bank, et. al.,

               Defendants.

)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF
THOMASINA CAPORELLA**

I, THOMASINA CAPORELLA, being duly sworn, hereby depose and say:

1.     My name is Thomasina Caporella. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.     I live in Plantation, Florida. I reside at 6120 S.W. 14th Street, Plantation, Florida.

3.     I own and operate a company called University Center, Inc. The business of this company is limited to operating a small office building in Florida. I am also a partner in a Florida partnership known as The Big C Farm, which is a horse farm. Neither of these entities do business in South Carolina.

4.     I have never lived, worked or maintained an office in South Carolina.

5.     I have never held any license, including a driver's license, issued by South Carolina.

6.     I have never owned any real or personal property in South Carolina.

7.     I have never held any bank accounts or other assets in South Carolina.

8.     I have never had any employees in South Carolina.

9.     I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

PPAB 1998154v1

10.    I have never conducted or operated any business in South Carolina or engaged in any business venture there.

11.    I was last in the State of South Carolina over 20 years ago.  I have no family members in South Carolina.

12.    I am on the Regent Bancorp., Inc. ("Regent") Board of Directors, but I have conducted no Regent business in the State of South Carolina.

13.    I have never met with any of the Plaintiffs in South Carolina.  Plaintiffs Charles Eldridge and Vince Brown have attended a couple of meetings in south Florida, which I also attended.  Otherwise, I do not recall meeting any of the other Plaintiffs or talking with any of them.  I have not had any other communications by telephone, email, fax, letter or otherwise with any of the Plaintiffs in this lawsuit.

14.    I did not solicit any of the Plaintiffs to purchase shares of Regent stock.  I did not make any representations to them in connection with their investments in Regent.  I did not prepare the Private Placement Memorandum that is at issue in this case.

Further the Affiant sayeth not.

This the 20 day of September, 2012.

_Thomasina Caporella_(SEAL)
Thomasina Caporella

PPAB 1998154v1

State of Florida

County of Broward County

      Sworn to (or affirmed) and subscribed before me this the _20_ day of September, 2012 by Thomasina Caporella.

(NOTARY SEAL)

> JENNIFER A. MOODY
> MY COMMISSION # DD 893043
> EXPIRES: September 26, 2013
> Bonded Thru Notary Public Underwriters

      Name of Notary Typed or Printed    _Jennifer A. Moody_

Personally Known _✓_ OR Produced Identification _____
Type of Identification Produced_____

3

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

C. Vincent Brown, et. al.,

                Plaintiffs,

    v.

Regent Bank, et. al.,

                Defendants.

)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF
GEORGE D. TOWN**

FILED-CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER
2012 SEP 24  A 11: 40

I, GEORGE D. TOWN, being duly sworn, hereby depose and say:

1.     My name is George D. Town. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.     I live in Hollywood, Florida.

3.     I am President and owner of Jamestown, Inc., which sells property and casualty insurance.  My company serves the south Florida market.  I sell no insurance to South Carolina companies or citizens.

4.     I have never lived, worked or maintained an office in South Carolina.

5.     I have never held any license, including a driver's license, issued by South Carolina.

6.     I have never owned any real or personal property in South Carolina.

7.     I have never held any bank accounts or other assets in South Carolina.

8.     I have never had any employees in South Carolina.

9.     I have never filed a lawsuit in South Carolina.  I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

10.    I have never conducted or operated any business in South Carolina or engaged in any business venture there.

11.    I am a member of Regent Bancorp, Inc.'s ("Regent") Board of Directors, but I have never traveled to South Carolina on Regent business.

12.    I have been to South Carolina only one time in the last 10 years.  I did not meet with any of the Plaintiffs while I was in South Carolina.  I have never been to South Carolina for any other purpose.

13.    I did not solicit any of the Plaintiffs to purchase shares in Regent.  I did not talk to any of them about their investments in Regent securities.  My only meetings with any of the Plaintiffs in this lawsuit have occurred in south Florida.   I have not had any other communications by telephone, email, fax, letter or otherwise with any of the Plaintiffs in this lawsuit.

14.    I had no role in preparing the Private Placement Memorandum that is at issue in this lawsuit.

Further the Affiant sayeth not.

This the 21 day of September, 2012.

_____ (SEAL)
George D. Town

PPAB 1997507v1

State of Florida

County of Broward County

       Sworn to (or affirmed) and subscribed before me this the 21 day of September, 2012 by George D. Town.

(NOTARY SEAL)

Name of Notary Typed or Printed    NANCY IVETTE DENNIS

Personally Known ___✓___ OR Produced Identification _____
Type of Identification Produced_____

NOTARY PUBLIC
NANCY IVETTE
DENNIS
My Commission
Exp. Sept. 25, 2013
DD913976
STATE OF FLORIDA

3

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

C. Vincent Brown, et al,
           Plaintiffs,

    v.

Regent Bank, et al,

           Defendants.

)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF
IRVING ROSENBAUM**

I, IRVING ROSENBAUM, being duly sworn, hereby depose and say:

1.      My name is Irving Rosenbaum. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.      I currently reside at 608 N.W. 102nd Way, Plantation, Florida.

3.      I currently serve as the Executive Dean for Administration, Health Professions Division, for Nova Southeastern University in Fort Lauderdale, Florida.

4.      I have lived in Florida since 1974. Before moving to Florida, I lived in New York, Rhode Island and Washington, D.C. I have never lived in South Carolina.

5.      I have never worked or maintained an office in South Carolina.

6.      I have never held any license, including a driver's license, issued by South Carolina.

7.      I have never owned any real or personal property in South Carolina.

8.      I have never held any bank accounts or other assets in South Carolina.

9.      I have never had any employees in South Carolina.

10.     I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

11.    I have never conducted or operated any business in South Carolina or engaged in any business venture there.

12.    I was last in the State of South Carolina over 20 years ago. I have no family members in South Carolina.

13.    I am on the Regent Bancorp., Inc. ("Regent") Board of Directors, but I have conducted no Regent business in the State of South Carolina.

14.    I have never met with any of the Plaintiffs in South Carolina. Plaintiffs Charles Eldridge and Vince Brown have attended a couple of meetings in south Florida, which I also attended. I also met and spoke briefly with one of the other Plaintiffs at a 2012 Regent Shareholder meeting in Florida. Otherwise, I do not recall meeting any of the other Plaintiffs or talking with any of them. I have not had any other communications by telephone, email, fax, letter or otherwise with any of the Plaintiffs in this lawsuit.

15.    I did not solicit any of the Plaintiffs to purchase shares of Regent stock. I did not make any representations to them in connection with their investments in Regent. I did not prepare the Private Placement Memorandum that is at issue in this case.

Further the Affiant sayeth not.

This the 20 day of September, 2012.

_____ (SEAL)
Irving Rosenbaum

VILMA L. APONTE
Notary Public - State of Florida
My Comm. Expires Oct 28, 2012
Commission # DD 804656
Bonded Through National Notary Assn.

PPAB 1996887v1

State of Florida
County of Broward County

  Sworn to (or affirmed) and subscribed before me this the 30th day of September, 2012
by Irving Rosenbaum.

(NOTARY SEAL)

                  _____

   Name of Notary Typed or Printed  _Vilma L. Aponte_____

Personally Known _√____ OR Produced Identification _____
Type of Identification Produced_____



VILMA L. APONTE
Notary Public - State of Florida
My Comm. Expires Oct 28, 2012
Commission # DD 804656
Bonded Through National Notary Assn.

PPAB 1996887v1

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS

C.A. No. 2012-CP-23-2664

C. Vincent Brown, et al,

           Plaintiffs,

v.

Regent Bank, et al,

           Defendants.

)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF**
**G. JEAN CERRA, Ph.D.**

I, G. JEAN CERRA, Ph.D., being duly sworn, hereby depose and say:

1.    My name is G. Jean Cerra, Ph.D. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.    I live in Pompano Beach, Florida, and I am a Florida native, born and raised in Tampa, Florida.

3.    I have never lived, worked or maintained an office in South Carolina.

4.    I have never held any license, including a driver's license, issued by South Carolina.

5.    I have never owned any real or personal property in South Carolina.

6.    I have never held any bank accounts or other assets in South Carolina.

7.    I have never had any employees in South Carolina.

8.    I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

9.    I have never conducted or operated any business in South Carolina or engaged in any business venture there.

PPAB 1998245v1

10.    I retired in June 2008 from Barry University, which is located in Miami Shores, Florida.    At the time of my retirement, I was Academic Dean of the School of Human Performance and Leisure Sciences.

11.    I am a member of the Regent Bancorp, Inc. ("Regent") Board of Directors.    All meetings of the Regent Board have occurred in Florida.

12.    I did not solicit any of the Plaintiffs to purchase Regent securities.    I did not make any representations to any of the Plaintiffs regarding a potential investment in the Bank.    I did not prepare or revise the Private Placement Memorandum that is at issue in this lawsuit.

13.    The only meetings I have ever attended which any of the Plaintiffs also attended have occurred in Florida.    There have only been two or three of them.    We did not discuss at any of those meetings the Plaintiffs' potential investments in Regent.    I have not had any other communications by telephone, email, fax, letter or otherwise with any of the Plaintiffs in this lawsuit.

Further the Affiant sayeth not.

This the 18 day of September, 2012.

_____ (SEAL)
G. Jean Cerra, Ph.D.

PPAB 1998245v1

State of Florida

County of Broward County

    Sworn to (or affirmed) and subscribed before me this the 18TH day of September, 2012 by G. Jean Cerra, Ph.D.

(NOTARY SEAL)

    Name of Notary Typed or Printed     DUlce WALKeR

Personally Known ✓ OR Produced Identification _____
Type of Identification Produced _____

Notary Public State of Florida
Dulce J Walker
My Commission DD924735
Expires 09/13/2013

3

STATE OF SOUTH CAROLINA       IN THE COURT OF COMMON PLEAS
                                   C.A. No. 2012-CP-23-2664

COUNTY OF GREENVILLE

|  |  |  |
|---|---|---|
| C. Vincent Brown, et al, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **AFFIDAVIT OF** |
| | ) | **ALFRED D. GRIFFIN, JR.** |
| Regent Bank, et al, | ) | |
| | ) | |
| Defendants. | ) | |

2012 SEP 24  A 11: 39

FILED CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

I, ALFRED D. GRIFFIN, JR., being duly sworn, hereby depose and say:

1.      My name is Alfred D. Griffin, Jr. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.      I live in Davie, Florida. I currently reside at 7571 Southwest 42nd Court, Davie, Florida.

3.      I am President of Grifs Western, Inc., which does business only in south Florida. Grifs Western, Inc. does not buy any products from the State of South Carolina, and it does not sell any products in South Carolina.

4.      I have never lived, worked or maintained an office in South Carolina.

5.      I have never held any license, including a driver's license, issued by South Carolina.

6.      I have never owned any real or personal property in South Carolina.

7.      I have never held any bank accounts or other assets in South Carolina.

8.      I have never had any employees in South Carolina.

9.      I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

PPAB 1997375v1

10.    I have never conducted or operated any business in South Carolina or engaged in any business venture there.

11.    I have been to South Carolina only one time in my life, approximately twenty years ago when I took a trip to Hilton Head for personal reasons. I have never been to South Carolina for any other purpose.

12.    I have never knowingly communicated with anyone in South Carolina by telephone, email, fax, letter or otherwise, other than during my lone visit to South Carolina (and with my attorneys in this case).

13.    I am a current Board member of the Regent Bancorp., Inc. ("Regent") Board of Directors.

14.    I did not travel to South Carolina in connection with the securities offering that is at issue in this lawsuit.

15.    I did not communicate with any of the Plaintiffs by telephone, email, fax, letter or otherwise about the offering.

16.    I attended a luncheon in Fort Lauderdale, Florida with two or three of the Plaintiffs who later joined the Regent Board. All meetings that I have ever attended that relate to Regent have occurred in Florida. I have never attended any meetings in South Carolina.

17.    The only conversation I recall having with any of the Plaintiffs was a conversation roughly six months ago in Florida with Mr. Fisher, who attended the annual shareholder meeting of Regent in Florida.

18.    I did not communicate with any of the Plaintiffs in this lawsuit about their decision to invest in Regent securities.

Further the Affiant sayeth not.

2

This the _18_ day of September, 2012.

_____ (SEAL)
Alfred D. Griffin, Jr.

State of Florida

County of Broward County

Sworn to (or affirmed) and subscribed before me this the _18_ day of September, 2012
by Alfred D. Griffin, Jr.

JENNIFER LATHAM BUTLER
MY COMMISSION # DD 948968
EXPIRES: December 28, 2013
Bonded Thru Notary Public Underwriters

(NOTARY SEAL)

Name of Notary Typed or Printed    Jennifer Latham Butler

Personally Known _X_ OR Produced Identification _____
Type of Identification Produced_____

3

PPAB 1997375v1

STATE OF SOUTH CAROLINA       IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

COUNTY OF GREENVILLE

| | | |
|---|---|---|
| C. Vincent Brown, et al, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **AFFIDAVIT OF** |
| | ) | **JAMES AFFLERBACK** |
| Regent Bank, et al, | ) | |
| | ) | |
| Defendants. | ) | |

I, JAMES AFFLERBACK, being duly sworn, hereby depose and say:

1.     My name is James Afflerback. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.     I currently reside at 4955 N.W. 10th Street, Coconut Creek, Florida.

3.     I have never lived, worked or maintained an office in South Carolina.

4.     I have never held any license, including a driver's license, issued by South Carolina.

5.     I have never owned any real or personal property in South Carolina.

6.     I have never held any bank accounts or other assets in South Carolina.

7.     I have never had any employees in South Carolina.

8.     I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

9.     I have never conducted any personal business in South Carolina, and I have never traveled to South Carolina on business.

10.    I am Executive Vice President of Operations for Regent Bank, a commercial bank that is headquartered in Broward County, Florida. Regent Bank is a subsidiary of Regent

Bancorp, Inc. I have worked for Regent Bank for 17 years. I am in charge of information technology, operations, facilities and security for Regent Bank.

11.     Over the course of my lifetime, I have passed through the State of South Carolina on the Interstate Highway a few times, but not since 2007. I have never been to South Carolina for any other purpose.

12.     I met Plaintiff Vince Brown once in connection with a Regent lunch meeting in Fort Lauderdale, Florida. I met Plaintiff Charles Eldridge at that same lunch and several times since. These meetings occurred in Fort Lauderdale, Florida.

13.     I do not attend Regent Bancorp, Inc.'s Board of Directors meetings, and I am not a Board member of Regent Bancorp, Inc..

14.     I did not participate in the decision to offer shares to South Carolina investors. I did not prepare the Private Placement Memorandum that is at issue in this lawsuit. I did not communicate with any of the Plaintiffs in this case about their decision to buy Regent Bancorp, Inc. securities.

Further the Affiant sayeth not.

This the 18TH day of September, 2012.

_____ (SEAL)
James Afflerback

PPAB 1996909v1

State of Florida

County of Broward County

     Sworn to (or affirmed) and subscribed before me this the ___18___ day of September, 2012 by James Afflerback.

(NOTARY SEAL)

     Name of Notary Typed or Printed   Linda Castellanos

Personally Known ___✓___ OR Produced Identification _____
Type of Identification Produced_____



LINDA CASTELLANOS
Notary Public - State of Florida
My Comm. Expires Feb 7, 2014
Commission # DD 959002

3

PPAB 1996909v1

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

FILED-CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER
2012 SEP 24 A 11: 39

C. Vincent Brown, et al,

Plaintiffs,

v.

Regent Bank, et al,

Defendants.

)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF
JOHN CSAPO**

---

I, JOHN CSAPO, being duly sworn, hereby depose and say:

1.    My name is John Csapo. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.    I currently live at 2711 N.E. 36th Street, Lighthouse Point, Florida.

3.    I am employed by Kolter Group, LLC, a Florida limited liability company. I am neither a member nor manager of this company. My role with Kolter Group, LLC is to oversee property acquisitions for residential and hotel developments, primarily in Florida.

4.    I have never lived or maintained an office in South Carolina.

5.    I have never held any license, including a driver's license, issued by South Carolina.

6.    I have never owned any real or personal property in South Carolina.

7.    I have never held any bank accounts or other assets in South Carolina.

8.    I have never had any employees in South Carolina.

9.    I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

PPAB 1998103v1

10.    I have been to South Carolina only a few times in my life.  The last time I traveled to South Carolina was in February, 2007.

11.    I am a member of the Regent Bancorp., Inc. ("Regent") Board of Directors, but I have never traveled to South Carolina on Regent business.

12.    I do not know any of the Plaintiffs.  I attended a Regent Board of Directors lunch in Fort Lauderdale, Florida which was also attended by a couple of the Plaintiffs.  I do not recall having a conversation with any of the Plaintiffs at that time.

13.    I regularly attend Regent Board meetings.  On a couple of occasions, Plaintiffs Vince Brown and Charles Eldridge have attended these meetings.  All of these meetings took place in Florida.  I have not had any other communications by telephone, email, fax, letter or otherwise with any of the Plaintiffs in this lawsuit.

14.    I did not solicit any of the Plaintiffs to purchase shares in Regent.  I did not discuss with any of the Plaintiffs the possibility of their investing in Regent.  I also did not make representations to any of the Plaintiffs regarding the securities offering that is at issue in the pending lawsuit.

15.    I did not prepare or revise the Private Placement Memorandum that is at issue in this lawsuit.

Further the Affiant sayeth not.

This the 18th day of September, 2012.

_____ (SEAL)
John Csapo

PPAB 1998103v1

State of Florida

County of Broward County

Sworn to (or affirmed) and subscribed before me this the _18th_ day of September, 2012 by John Csapo.

(NOTARY SEAL)

**JUDITH SCORDINO**
Notary Public - State of Florida
My Comm. Expires Aug 12, 2014
Commission # EE 16910

Name of Notary Typed or Printed _Judith Scordino_

Personally Known __X__ OR Produced Identification _____
Type of Identification Produced_____

3

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

C. Vincent Brown, et al,

      Plaintiffs,

  v.

Regent Bank, et al,

      Defendants.

)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF**
**RICHARD J. GRAY**

I, RICHARD J. GRAY, being duly sworn, hereby depose and say:

1.  My name is Richard J. Gray. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.  I am 81 years old, and I am retired.

3.  I live in Blowing Rock, North Carolina. I currently reside at 125 Grassy Knoll Way, Blowing Rock, North Carolina. I moved to North Carolina in February 2012. Prior to February 2012, I lived in West Palm Beach and Fort Lauderdale, Florida.

4.  I have never lived, worked or maintained an office in South Carolina.

5.  I have never held any license, including a driver's license, issued by South Carolina.

6.  I have never owned any real or personal property in South Carolina.

7.  I have never held any bank accounts or other assets in South Carolina.

8.  I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

PPAB 1996623v1

9. Within the last five years, I have not visited South Carolina for the purpose of doing business. The only time I have spent in South Carolina since 2007 has been traveling along the Interstate Highway and briefly visiting a cemetery in Columbia.

10. I joined Regent Bancorp, Inc. ("Regent") in 1997 as Executive Vice President and Senior Lending Officer.

11. While employed with Regent, I traveled to South Carolina two or three times to explore the possibility of Regent merging with or acquiring another existing bank. These trips occurred in 2005 or earlier and were unrelated to the securities offering involving the Plaintiffs in the pending shareholder lawsuit.

12. I had no involvement in the Regent securities offering. I did not prepare the Private Placement Memorandum that was provided to the South Carolina investors in Regent. I did not visit or meet with any of the South Carolina investors prior to the offering. I made no representations to any of the Plaintiffs in connection with the offering.

13. Although I have attended some meetings of the Regent Board of Directors, I have never been a Regent Board member, and I have never voted at any Board meeting.

14. My only introduction to or interaction with any of the Plaintiffs was in brief meetings in Florida with Mr. Eldridge, who briefly served as President of the former South Carolina subsidiary of Regent, and Vince Brown, who briefly served as Chairman of the South Carolina bank. I do not recall ever meeting any of the other Plaintiffs.

Further the Affiant sayeth not.

This the 18th day of September, 2012.

_____ (SEAL)
RICHARD J. GRAY

PPAB 1996623v1

State of North Carolina

County of Watauga

I, _Amber McGuire_, a Notary Public of said county and state, do hereby certify that Richard J. Gray (the Signatory), personally appeared before me this day and acknowledged the execution of the foregoing instrument.

Sworn to (or affirmed) and subscribed before me this the _18_ day of September, 2012.

_Amber McGuire_

_Amber E. McGuire_, Notary Public

My commission expires: _11|6|16_

[SEAL]

PPAB 1996623v1

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

C. Vincent Brown, et al,

                Plaintiffs,

v.

Regent Bank, et al,

                Defendants.

)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF
BARRY WEBBER**

2012 SEP 24  A 11: 38
FILED CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

I, BARRY WEBBER, being duly sworn, hereby depose and say:

1.     My name is Barry Webber. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.     I live in Hallandale Beach, Florida.  I currently reside at 525 Palm Drive, Hallandale Beach, Florida.

3.     I am an attorney and I practice with a law firm in Davie, Florida.  My law practice primarily serves clients that are located in south Florida.  Occasionally, I provide professional legal services to clients from other states who have business in Florida, but I do not have any clients in South Carolina.

4.     I have never lived, worked or maintained an office in South Carolina.

5.     I have never held any license, including a driver's license, issued by South Carolina.

6.     I have never owned any real or personal property in South Carolina.

7.     I have never held any bank accounts or other assets in South Carolina.

8.     I have never had any employees in South Carolina.

PPAB 1997435v1

9.      I have never filed a lawsuit in South Carolina.  I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

10.     I have never conducted or operated any business in South Carolina or engaged in any business venture there.

11.     I am not admitted to practice law in the State of South Carolina, and I have never handled any legal matters in South Carolina.

12.     I have never traveled to South Carolina on Regent Bancorp., Inc. ("Regent") business.

13.     I have never traveled to the State of South Carolina for business purposes.  I vacationed once in South Carolina many years ago.  Other than that visit, I have only traveled through the state three or four times over the course of my lifetime to reach another destination.

14.     I am a current member of Regent's Board of Directors, but I have never traveled to South Carolina on Regent business.

15.     I did not solicit any of the Plaintiffs to invest in Regent.  The only time I recall meeting any of the Plaintiffs was at a luncheon I attended in Florida which Plaintiffs Vince Brown and Charles Eldridge also attended.  Any communications I have had with any of the Plaintiffs have occurred while I was in Florida.

16.     I did not prepare the Private Placement Memorandum, which is at issue in this lawsuit.  I made no representations to any of the Plaintiffs about Regent's financial condition or an investment in Regent securities.

Further the Affiant sayeth not.

This the _18_ day of September, 2012.

_____ (SEAL)
Barry Webber

2

State of Florida

County of Broward

     Sworn to (or affirmed) and subscribed before me this the *18* day of September, 2012 by Barry Webber.

(NOTARY SEAL)

                                    _Georgia Isaac_

     Name of Notary Typed or Printed      _Georgia Isaac_

Personally Known ___✓___ OR Produced Identification _____
Type of Identification Produced_____



GEORGIA ISAAC
Commission # DD 907019
Expires August 24, 2013
Bonded Thru Troy Fain Insurance 800-385-7019

3

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

FILED CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER
2012 SEP 24  A 11:38

C. Vincent Brown, et al,

            Plaintiffs,

v.

Regent Bank, et al,

            Defendants.

)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF
DAVID MAZZA**

---

I, DAVID MAZZA, being duly sworn, hereby depose and say:

1.      My name is David Mazza. I am over the age of 18, suffer no legal disabilities, and have personal knowledge of the facts set forth below.

2.      I live in Davie Florida. I currently reside at 4260 Pine Island Road, Davie, Florida.

3.      I am 65 years old, and I am retired.

4.      I have never lived, worked or maintained an office in South Carolina.

5.      I have never held any license, including a driver's license, issued by South Carolina.

6.      I have never owned any real or personal property in South Carolina.

7.      I have never held any bank accounts or other assets in South Carolina.

8.      I have never had any employees in South Carolina.

9.      I have never filed a lawsuit in South Carolina. I have never been named as a defendant in a lawsuit filed in South Carolina until this case.

10.     I have never conducted or operated any business in South Carolina or engaged in any business venture there.

PPAB 1996714v1

11.     I joined Regent Bancorp., Inc. ("Regent") as Senior Vice President of Residential Lending in 1998.  Around 2006, I took on the title of Executive Vice President of Lending.  My responsibilities included commercial and real estate lending.  I retired from Regent in March 2012.

12.     While employed at Regent, I did not attend meetings of Regent's Board of Directors.  I was not involved in the securities offering that is at issue in this lawsuit.  I made no representations to any of the Plaintiffs in connection with the securities offering.

13.     I have never lived in South Carolina and have never traveled to South Carolina on business, as a Regent employee or otherwise.

14.     I have never vacationed in South Carolina.  I have no family members who are residents of South Carolina and I have no regular communications or contacts with South Carolina residents.

15.     I have on occasion traveled through the State of South Carolina on the Interstate Highway, but I have never spent the night in South Carolina or conducted business there.

16.     I have met with Plaintiffs Vince Brown and Charles Eldridge in south Florida on two or three occasions.  In addition, I spoke with Mr. Eldridge by telephone several times after he was named President of the South Carolina subsidiary of Regent.  Those conversations did not concern the Plaintiffs' investment in Regent or the decisions alleged to be at issue in the Amended Complaint in this case.  Other than these meetings and discussions with Mr. Brown and Mr. Eldridge, I do not recall having any other communications by telephone, email, fax, letter or otherwise with any of the Plaintiffs.

PPAB 1996714v1

Further the Affiant sayeth not.

This the 18th day of September, 2012.

_____ (SEAL)
David Mazza

PPAB 1996714v1

State of Florida

County of Broward

   Sworn to (or affirmed) and subscribed before me this the _18_ day of September, 2012
by David Mazza.

(NOTARY SEAL)

   Name of Notary Typed or Printed   KATHLEEN A. DURHAM

Personally Known _____ OR Produced Identification _____
Type of Identification Produced_____

> KATHLEEN A. DURHAM
> MY COMMISSION # DD 903538
> EXPIRES: October 6, 2013
> Bonded Thru Budget Notary Services

4

**12-3-12 Consent Order to Amend Complaint, Notice of Transfer Within Firm, Motion to Amend Complaint, Amended Summons, Proposed Amended Complaint <u>and</u> 2-27-13 Order to Amend Complaint**

STATE OF SOUTH CAROLINA    )    IN THE COURT OF COMMON PLEAS
                           )         C.A. No.  2012-CP-23-2664
COUNTY OF GREENVILLE       )
                           )
                           )
Michael E. Munafo, J. Edward Mixon, Fred B.    )
Johnston, II, Raymond E. Burns and Susan E.    )    CONSENT ORDER TO AMEND
Burns JTWROS, Estate of C. Dan Joyner,         )         COMPLAINT
James E. Pittman, Jr., John A. Hagins, Jr.,    )
Crawley Enterprises, Thomas R. Strange, Sr.,   )
Dwayne M. Bell and Cathy D. Bell JTWROS,       )
NFS LLC FBO: Thomas S. Carswell, NFS LLC       )
FBO:  Susan T. Carswell, Richard A. Lackey,    )
Lawrence R. Fischer Trustee under Elfie Living )
Trust, NFS LLC FBO:  Dan A. Collins, NFS       )
LLC/FMTC:  FBO R. Charles Eldridge, Jr.,       )
Nicholas Franchina, RBS Capital Markets        )
Corp. Custodian FBO Nicholas Franchina         )
IRA, RBC Capital Markets Corp Custodian for    )
Peter C. Kapetanokos, TC Ameritrade Clearing   )
Inc. Custodian Timothy Borsum IRA, Thomas      )
D. Bigby, Larry Blackwell, W. Howard Boyd,     )
Jr., Danny W. Cisson, Carolyn A. Cisson, CP    )
Enterprises, Gerald W. Lenz and Alice R. Lenz  )
JTWROS, Adam Pittman, Gerry Womack,            )
Steven Charles Francis, Frances D. Johnson,    )
B.L. Johnson, James D. Miller, FCC Custodian   )
FBO James D. Miller, Charles Schwab and Co.    )
Inc. Custodian for Terry R. Weaver IRA,        )
Martha Sutherland-Wright, E. Michael Howard    )
and Billie B. Howard JTWROS, William R.        )
Martin, G. Bruce McPherson, Jr., UBS           )
Financial Custodian for C. Vincent Brown,      )
NFS LLC FBO:  Malinda Coleman/Fern             )
Moore, John T. Pazdan, Emilie R. Pazdan,       )
Lewis E. Martin, William E. Martin, Michael    )
Burns, Glenn R. Oxner, Charles Schwab and      )
Co. Inc. Custodian for John E. Katilius IRA,   )
John N. Walker, Frank Washick Intervivor       )
Trust Agreement, B. Brett Blevins, C. Joyce    )
Alexander, Heather Shirley Smith Custodian     )
for Graham Steven Smith under the UGMA,        )
Stephanie Shirley Plumley Custodian for Luke   )
Cameron Plumley under the UGMA, Lynn C.        )
Faust,  Sara E. Foster, Thomas M. Goforth, II, )
Joseph E. Mixon Trustee under Trust and Will   )
of Jan H. Mixon, Robert S. Latham, Jr., Sage   )
Mill, LLC, Sam B. Phillips, Jr., Donald A. Pihl, )

James Steven Shirley and Mildred G. Shirty ⟩
JTWROS, TCG, LLC, Peter B. Waldschmidt, ⟩
G. Herman Walker, III, Douglas M. Wilson, ⟩
Alan C. Singleton, and Duncan A. Carmichael, ⟩

              Plaintiffs, ⟩

vs. ⟩

Cyril S. Spiro, Pamela Joy Owens, Regent ⟩
Bank, Regent Bancorp, Inc., Thomasina ⟩
Caporella, G. Jean Cerra, John C. Csapo, Alfred ⟩
D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, ⟩
George D. Town, Barry Webber, Neil ⟩
LeCorgne, Richard J. Gray, Jim Afflerback, ⟩
David R. Mazza, and Hopkins & Howard, P.C., ⟩

              Defendants. ⟩

---

This matter came before me on motion of Douglas F. Patrick, attorney for the Plaintiffs, seeking an order permitting amendment of the Complaint in the above-captioned case. It appears that the Proposed Amended Complaint has been reviewed by all Defendants and they have consented to this amendment. A copy of the Amended Complaint has been submitted with this Order and, under the circumstances, the Court finds the amendment to be appropriate.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the Plaintiffs be permitted to amend their pleadings by filing the Amended Complaint which has been submitted to all Defendants and this Court.

IT IS SO ORDERED.

                         _____
                         Presiding Judge

December _____, 2012

Greenville, South Carolina

I SO MOVE:

Douglas F. Patrick
Attorney for the Plaintiffs


WE CONSENT:

Parker, Poe, Adams & Bernstein, LLP

BY: _____
Attorney for the Defendants

STATE OF SOUTH CAROLINA                )        IN THE COURT OF COMMON PLEAS
                                       )           C.A. No.  2012-CP-23-2664
COUNTY OF GREENVILLE                    )
                                       )
                                       )
Michael E. Munafo, J. Edward Mixon, Fred B.      )
Johnston, II, Raymond E. Burns and Susan E.      )
Burns JTWROS, Estate of C. Dan Joyner,           )
James E. Pittman, Jr., John A. Hagins, Jr.,      )
Crawley Enterprises, Thomas R. Strange, Sr.,     )        NOTICE OF TRANSFER WITHIN
Dwayne M. Bell and Cathy D. Bell JTWROS,         )               FIRM
NFS LLC FBO: Thomas G. Carswell, NFS             )
LLC FBO:  Susan T. Carswell, Richard A.          )
Lackey, Lawrence R. Fischer Trustee under        )
Elfie Living Trust, NFS LLC FBO:  Dan A.         )
Collins, NFS LLC/FMTC:  FBO R. Charles           )
Eldridge, Jr., Nicholas Franchina, RBS Capital   )
Markets Corp. Custodian FBO Nicholas             )
Franchina IRA, RBC Capital Markets Corp          )
Custodian for Peter C. Kapetanokos, TC           )
Ameritrade Clearing Inc. Custodian Timothy       )
Borsum IRA, Thomas D. Bigby, Larry               )
Blackwell, W. Howard Boyd, Jr., Danny W.         )
Cisson, Carolyn A. Cisson, CP Enterprises,       )
Gerald W. Lenz and Alice R. Lenz JTWROS,         )
Adam Pittman, Gerry Womack, Steven               )
Charles Francis, Frances D. Johnson, B.L.        )
Johnson, James D. Miller, FCC Custodian          )
FBO James D. Miller, Charles Schwab and Co.      )
Inc. Custodian for Terry R. Weaver IRA,          )
Martha Sutherland-Wright, E. Michael Howard      )
and Billie B. Howard JTWROS, Billie Howard,      )
William R. Martin, G. Bruce McPherson, Jr.,      )
UBS Financial Custodian for C. Vincent           )
Brown, NFS LLC FBO:  Malinda                     )
Coleman/Fern Moore, John T. Pazdan, Emilie       )
R. Pazdan, Lewis E. Martin, William E. Martin,   )
Michael Burns, Glenn R. Oxner, Charles           )
Schwab and Co. Inc. Custodian for John E.        )
Katilius IRA, John N. Walker, Frank Washick      )
Interior Trust Agreement, B. Brett Blevins, C.   )
Joyce Alexander, Heather Shirley Smith           )
Custodian for Graham Steven Smith under the      )
UGMA, Stephanie Shirley Plumley Custodian        )
for Luke Cameron Lumley under the UGMA,          )
Lynn C. Faust,  Sara E. Foster, Thomas M.        )
Goforth, II, Joseph E. Mixon Trustee under       )
Trust and Will of Jan H. Mixon, Robert S.        )

Latham, Jr., Sage Mill, LLC, Sam B. Phillips,       )
Jr., Donald A. Pihl, James Steven Shirley an;d     )
Mildred G. Shirty JTWROS, TCG, LLC, Peter      )
B. Waldschmidt, G. Herman Walker, III,               )
Douglas M. Wilson, Alan C. Singleton, Jason       )
M. Smith and Brittnay B. Smith,                            )
                                                                              )
                                        Plaintiffs,                      )
                                                                              )
vs.                                                                          )
                                                                              )
Cyril S. Spiro, Pamela Joy Owens, Regent          )
Bank, Regent Bancorp, Inc., Thomasina             )
Caporella, G. Jean Cerra, John C. Csapo,          )
Alfred D. Griffin, Jr., Olin M. Hill, Irving          )
Rosenbaum, George D. Town, Barry Webber,      )
Neil LeCorgne, Richard J. Gray, Jim                  )
Afflerback, and David R. Mazza.                        )
                                                                              )
                                        Defendants.                   )

PLEASE TAKE notice that the responsibility for the representation of the Plaintiffs in the

within action has been transferred within the firm of Covington, Patrick, Hagins, Stern & Lewis,

P.A. from John A. Hagins, Jr. to Douglas F. Patrick, and all future pleadings, motions, notices,

correspondence, and other communication herein should be directed to the undersigned.

Respectfully submitted,

_____
Douglas F. Patrick, S.C. Bar # 4358
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC  29602
(864) 242-9000
Attorney for Plaintiffs

December _____, 2012

Greenville, South Carolina

STATE OF SOUTH CAROLINA           )    IN THE COURT OF COMMON PLEAS
                                  )         C.A. No. 2012-CP-23-2664
COUNTY OF GREENVILLE              )
                                  )
                                  )
Michael E. Munafo, J. Edward Mixon, Fred B.    )
Johnston, II, Raymond E. Burns and Susan E.    )         MOTION TO AMEND
Burns JTWROS, Estate of C. Dan Joyner,         )         COMPLAINT
James E. Pittman, Jr., John A. Hagins, Jr.,    )
Crawley Enterprises, Thomas R. Strange, Sr.,   )
Dwayne M. Bell and Cathy D. Bell JTWROS,       )
NFS LLC FBO: Thomas S. Carswell, NFS LLC       )
FBO:  Susan T. Carswell, Richard A. Lackey,    )
Lawrence R. Fischer Trustee under Elfie Living )
Trust, NFS LLC FBO:  Dan A. Collins, NFS       )
LLC/FMTC:  FBO R. Charles Eldridge, Jr.,       )
Nicholas Franchina, RBS Capital Markets        )
Corp. Custodian FBO Nicholas Franchina         )
IRA, RBC Capital Markets Corp Custodian for    )
Peter C. Kapetanokos, TC Ameritrade Clearing   )
Inc. Custodian Timothy Borsum IRA, Thomas      )
D. Bigby, Larry Blackwell, W. Howard Boyd,     )
Jr., Danny W. Cisson, Carolyn A. Cisson, CP    )
Enterprises, Gerald W. Lenz and Alice R. Lenz  )
JTWROS, Adam Pittman, Gerry Womack,            )
Steven Charles Francis, Frances D. Johnson,    )
B.L. Johnson, James D. Miller, FCC Custodian   )
FBO James D. Miller, Charles Schwab and Co.    )
Inc. Custodian for Terry R. Weaver IRA,        )
Martha Sutherland-Wright, E. Michael Howard    )
and Billie B. Howard JTWROS, William R.        )
Martin, G. Bruce McPherson, Jr., UBS           )
Financial Custodian for C. Vincent Brown,      )
NFS LLC FBO:  Malinda Coleman/Fern             )
Moore, John T. Pazdan, Emilie R. Pazdan,       )
Lewis E. Martin, William E. Martin, Michael    )
Burns, Glenn R. Oxner, Charles Schwab and      )
Co. Inc. Custodian for John E. Katilius IRA,   )
John N. Walker, Frank Washick Intervivor       )
Trust Agreement, B. Brett Blevins, C. Joyce    )
Alexander, Heather Shirley Smith Custodian     )
for Graham Steven Smith under the UGMA,        )
Stephanie Shirley Plumley Custodian for Luke   )
Cameron Plumley under the UGMA, Lynn C.        )
Faust,  Sara E. Foster, Thomas M. Goforth, II, )
Joseph E. Mixon Trustee under Trust and Will   )
of Jan H. Mixon, Robert S. Latham, Jr., Sage   )
Mill, LLC, Sam B. Phillips, Jr., Donald A. Pihl, )

James Steven Shirley and Mildred G. Shirty          )
JTWROS, TCG, LLC, Peter B. Waldschmidt,             )
G. Herman Walker, III, Douglas M. Wilson,           )
Alan C. Singleton, and Duncan A. Carmichael,        )
                                                    )
                        Plaintiffs,                 )
                                                    )
vs.                                                 )
                                                    )
Cyril S. Spiro, Pamela Joy Owens, Regent            )
Bank, Regent Bancorp, Inc., Thomasina               )
Caporella, G. Jean Cerra, John C. Csapo, Alfred     )
D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum,    )
George D. Town, Barry Webber, Neil                  )
LeCorgne, Richard J. Gray, Jim Afflerback,          )
David R. Mazza, and Hopkins & Howard, P.C.,         )
                                                    )
                        Defendants.                 )
                                                    )
_____        )

        PLEASE TAKE NOTICE that the undersigned attorney for Plaintiff will move, as soon

hereafter as it may be heard, for an order granting the Motion to Amend the Complaint in the

above-captioned matter.  This Motion is made on the basis of Rule 15(a0 of the South Carolina

Rules of Civil Procedure.  The proposed Amended Complaint is attached as **Exhibit 1**.

                                        Respectfully Submitted,

                                        _____
                                        Douglas F. Patrick, Esq., Bar # 4358
                                        *Covington, Patrick, Hagins, Stern & Lewis, PA*
                                        P.O. Box 2343, Greenville, SC 29602
                                        (864) 240-5508

                                        Attorney for Plaintiffs

December _____, 2012

Greenville, South Carolina

STATE OF SOUTH CAROLINA      )     IN THE COURT OF COMMON PLEAS
                                       )       C.A. No.  2012-CP-23-2664

COUNTY OF GREENVILLE           )

                                        )

Craig Carver, Individually and on Behalf of a   )
Class of South Carolina Investors (Legal or   )
Beneficial Owners) of Shares in Regent      )
Bancorp, Inc., as Defined Herein,         )

                            Plaintiffs,     )

vs.                                    )         **AMENDED**
                                   )        **SUMMONS**

Cyril S. Spiro, Pamela Joy Owens, Regent   )
Bank, Regent Bancorp, Inc., Thomasina    )      (Jury Trial Demanded)
Caporella, G. Jean Cerra, John C. Csapo,    )
Alfred D. Griffin, Jr., Olin M. Hill, Irving   )
Rosenbaum, George D. Town, Barry Webber,  )
Neil LeCorgne, Richard J. Gray, Jim       )
Afflerback, and David R. Mazza.         )
                                   )
                    Defendants.   )

YOU ARE HEREBY summoned and required to answer the Complaint in this action, of

which a copy is herewith served upon you, and to serve a copy of your answer to the said Complaint

on the subscribers at their offices, 211 Pettigru Street, P.O. Box 2343, Greenville, South Carolina,

within thirty (30) days after the service hereof, exclusive of the day of such service; and if you fail to

answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court

and judgment by default will be rendered against you for the relief demanded in the Complaint.

                                Respectfully submitted,

                                   Douglas F. Patrick, Esq., S.C. Bar # 4358
                                   Covington, Patrick, Hagins, Stern & Lewis, PA
                                   P.O. Box 2343

December ___, 2012                     Greenville, SC  29602
                                   (864) 242-9000

Greenville, South Carolina              Attorney for Plaintiff

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
                                                      ) C.A. No.  2012-CP-23-2664
COUNTY OF GREENVILLE )
                                                      )
                                                      )
Craig Carver, Individually and on Behalf of a )
Class of South Carolina Investors (Legal or )
Beneficial Owners) of Shares in Regent )
Bancorp, Inc., as Defined Herein, )
                                                      )
                         Plaintiffs, )
                                                      )
vs. )                                                 PROPOSED
                                                      ) AMENDED COMPLAINT
Cyril S. Spiro, Pamela Joy Owens, Regent )
Bank, Regent Bancorp, Inc., Thomasina )               (Jury Trial Demanded)
Caporella, G. Jean Cerra, John C. Csapo, )
Alfred D. Griffin, Jr., Olin M. Hill, Irving )
Rosenbaum, George D. Town, Barry Webber, )
Neil LeCorgne, Richard J. Gray, Jim )
Afflerback, and David R. Mazza. )
                                                      )
                         Defendants. )

Plaintiffs above-named respectfully present to this Court the following:

## PARTIES BEFORE THE COURT

1.      For organization and simplification, the entities discussed are referred to as these:

a)      Plaintiffs:  Craig Carver as a class representative under S.C.R. Civ. P. 23, and a class

described below consisting of those persons who invested as a result of securities solicitation

that was the subject of a Regent Bancorp. Private Placement Memorandum dated May 13,

2008, and which was principally directed into South Carolina, including the Blevins/Smith

family[1] of Canton, Georgia and all other investors to whose shares in Regent Bancorp. Inc.

---

[1] Brett Blevins, Jason M. Smith, and Brittnay B. Smith reside in Canton, Georgia (Blevins-Smith held by Blevins).

1

shares were sold as alleged herein, including but not limited to persons named individually Plaintiffs in previously filed complaints in this matter.

b)      Defendant Regent Bancorp, Inc. a/k/a The Holding Company is a bank holding company headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware.

c)      Defendant Regent Bank, Davie, Florida ("the Bank" or "Florida Bank") is headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware. The Bank is engaged in retail and commercial banking. It is a wholly owned subsidiary of the Holding Company.

d)      Regent Bank of Greenville, South Carolina ("New Bank" or "S.C. Bank") was located in Greenville, South Carolina and was a subsidiary of Holding Company. Plaintiffs served as founding investors of New Bank and were prevailed upon by Defendants to be instrumental in establishing New Bank according to the wrongful capital raising scheme devised, approved and executed by Defendants as alleged herein. New Bank was chartered, opened, and began operating in South Carolina in April 2009.

e)      Defendants Cyril S. Spiro, Thomasina Caporella, G. Jean Cerra, John C. Csapo, Alfred D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, George D. Town, Barry Webber served on the Board of Directors of "the Holding Company" in connection with the offering and sale to Plaintiffs of the investments which are the subject of this lawsuit. They are referred to herein as "the Company Board" and recovery is sought against them by Plaintiffs, both individually and in their corporate capacities. The Company Board devised, originated, authorized, approved and ratified the capital raising scheme which was wrongful and which is the subject of this lawsuit.

f)    Defendants Cyril S. Spiro, Neil LeCorgne, Richard J. Gray, James D. Afflerback, David R. Mazza, and Pamela Joy Owens served as officers and the principal management of the Florida Bank and were involved in and promoted the offering and sale to Plaintiffs of the investments which were part of the wrongful capital raising scheme and are the subject of this lawsuit.

g)    Defendants Neil LeCorgne, Richard J. Gray, Jim Afflerback, and David R. Mazza served as Officers and "the executive management team" of "the Holding Company" in connection with the offering and sale to Plaintiffs of the investments which are the subject of this lawsuit. With the other Defendants, the executive management team devised, approved and effectuated the investment plan and capital raising scheme which was wrongful and which is the subject of this lawsuit.

h)    Defendant Pamela Joy Owens (CFO and Executive Vice President of Regent Bank, Florida who performed financial accounting services in South Carolina, and participated (with Cyril Spiro) in devising, proposing, presenting, and selling the fraudulent investment plan and capital raising scheme to Plaintiffs in South Carolina, making her employer, Regent Bank of Florida, responsible for her misconduct.

## JURISDICTION AND VENUE

2.    Venue is proper in this Judicial Circuit where many of the acts and transactions pertinent to this case were originated and consummated. Plaintiffs are almost all citizens and residents of Greenville County, South Carolina. They were solicited in this Circuit to invest money at the insistence of, and with the knowledge and approval and authorization of Defendants. In many instances, these solicitations were brought about by meetings which occurred in Greenville County attended by some of the Defendants and during which materials, including the Private

3

Placement Memorandum which were authorized and prepared by all Defendants, were distributed. The solicitation was done pursuant to a capital raising plan originated, authorized, approved, effectuated, ratified, and adopted by each of the Defendants. That plan directly and expressly targeted investors in the Greenville South Carolina area, including Plaintiffs. Plaintiffs were solicited to transfer money from Greenville South Carolina to Florida for the purpose of organizing a New Bank, in the form of an entirely new federal savings bank in Greenville, South Carolina. All Defendants knew in advance that the proceeds of this offering of stock ownership by South Carolina Plaintiffs would be used to capitalize the New Bank as a wholly-owned subsidiary of Company, Defendants' Florida Holding Company.

3.    From the start, the end and aim of the individual Defendants' capital raising strategy was to accumulate capital originating from Greenville, South Carolina that would be owned by and inure to the benefit of Regent Bancorp, and Regent Bank, the Florida-based bank companies for which they served as directors and/or officers. To this end, they originated, approved, authorized, and ratified offering documents and disclosures and nondisclosures made in South Carolina which are the subject of this case, all for the purpose of raising capital by selling investments in their Florida bank and/or bank holding company to Greenville area investors.

4.    All individual defendants were control persons of Regent Bancorp (the Holding Company) or its Florida-based affiliate, Regent Bank (the Florida Bank), who targeted, directed, authorized and approved the sale of securities to Greenville-based investors. The end and aim of the individual Defendants' capital-raising efforts for the Holding Company and the Florida bank was to gather cash from Greenville, South Carolina-based investors. All Defendants targeted Greenville South Carolina-based investors as part of their capital-raising scheme. Dozens of such investors, including Plaintiffs were solicited, and many, including Plaintiffs made investments as a result of Defendants' wrongful activities. Plaintiffs' claims arise out of or are related to Defendants' contacts

4

within the forum state, including their decision to solicit investments in their Florida-based bank holding company from the Greenville area. Defendants have purposefully availed themselves of the privileges of conducting activities within the forum state, inclusive of meetings and the purposeful disbursement of investment materials, thus invoking the benefits and protections of that South Carolina's laws and making Defendants' presence before the state's courts foreseeable; and this Court's exercise of jurisdiction over the Defendants is reasonable because the alleged end and aim of Defendants' capital raising efforts was to establish a multi-million dollar wholly owned subsidiary located in Greenville. As stated in the second page of Defendants' May 13, 2008 Private Placement Memorandum describing their capital-raising intentions:

> The Company has applied for regulatory approval to organize a new federal savings bank in Greenville, South Carolina (the "New Bank"). The proceeds of this Offering will be used to capitalize the New Bank which will be operated as a wholly-owned subsidiary of the Company. The shares being offered are shares of the Company. Purchasers of the shares will not have a direct ownership interest in the New Bank, but will have ownership in the Company.

5.    By enlisting Plaintiffs in their capital-raising efforts, and by causing Plaintiffs to become investors in their Florida-based financial enterprise, Defendants deliberately availed themselves of the privilege of conducting activities in the forum state, in such a way that being required to defend their actions in South Carolina was entirely foreseeable, in the sense that Defendants, having extracted millions of dollars of cash from Greenville based investors, could reasonably anticipate being required to answer for the actions and delicts in court in Greenville County South Carolina.

6.    When counterbalanced against the burdens placed on Plaintiffs should they have to litigate against Defendants in Florida, the defendant's burden of appearing in Greenville is slight. South Carolina has a keen interest in adjudicating disputes arising where out-of-state persons use South Carolina capital and investors to capitalize out-of-state entities. The Plaintiff's here have a keen interest in obtaining convenient and effective relief. The judicial system's interest in obtaining

5

the most effective resolution of the controversy will be best served by proceeding with adjudication of this case in South Carolina, as will the common interests of all sovereigns in promoting substantive social policies. South Carolina has a strong interest in enforcing its securities laws and protecting its investors. A single suit in Plaintiff's home state provides Plaintiffs with the opportunity for convenient and effective relief. Finally, the judicial system has an interest in avoiding piecemeal litigation in multiple forums and allowing Plaintiff to bring all of these cases in one forum would further this interest.

7.    In accordance with the allegations above, proper venue for action is in the State of South Carolina, to-wit, Greenville County, South Carolina and in the state courts of that county and state. There is no complete diversity of citizenship of this action as the Plaintiffs who invested money to start the New Bank are residents of the State of South Carolina, for the most part, and Blevins/Smith Group who are residents of the State of Georgia. Defendant Owens is employed by the "the Holding Company" and the Bank. However, she is now, and has been, a legal resident of the State of South Carolina. Two principal subsidiaries at the time of the occurrences alleged herein were part of the Company, all of which are Delaware corporations.

## ALLEGATIONS AS TO CLASS

8.    This action is brought by the named Plaintiffs as a class action on behalf of themselves and all others similarly situated under the provisions of South Carolina Rule of Civil Procedure #23. The class consists of all persons, their heirs, successors or assigns who purchased shares in Regent Bancorp in the offering that was the subject of Defendants' May 13, 2008 Private Placement Memorandum.

9.    Upon information and belief, the class consists of more than 100 persons and is so numerous that joinder of individual members is impractical.

6

10.    There are common questions of law and fact in this action that relate to and affect the rights of each member and the relief sought is common to the entire class. The common questions of law and fact include whether:

a)    facts were concealed or misrepresented by Defendants in connection with the investment offering;

b)    any facts that were concealed or misrepresented were material;

c)    the Individual Defendants are control persons;

d)    the Defendants are subject to personal jurisdiction for the wrongs they committed in South Carolina;

e)    Defendants were in a fiduciary relationship with Plaintiffs as co-promoters of the New Bank in Greenville, South Carolina;

f)    Various Defendants' responsibility for representations and concealments attributable to Regent Bancorp and Cyril Spiro; and

g)    The Holding Company and the Florida bank were insolvent or on the verge of insolvency at the time Plaintiffs were induced to make their investments.

11.    The claims and defenses of the named Plaintiffs are typical of the claims and defenses of the class.

12.    The named Plaintiffs will fairly and adequately represent and protect the interests of the class, and the financial interest of each class member exceeds $100.

13.    Pursuant to S.C.R.C.P 23 this action is properly maintained as a class action in that the prosecution of several actions by individual members of the class would create the risk of varying adjudications with respect to members of the class as well as create inconsistent standard of conduct for those opposing the class. Further, individual actions by members of the

7

class may be dispositive of the interests of other members who are not parties to the adjudication of the claim, which would impair or impede the ability of those individuals to protect their interests.

14.    The class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## NATURE OF DEFENDANTS' WRONGFUL SCHEME

15.    The corporate Defendants and the individual Defendants  individually and as directors, officers, agents, and/or control persons of the entity Defendants  devised and executed a bait-and-switch investment scheme to deprive Plaintiffs of the legal rights owed them as investors and also as reliant, trusting, co-promoters (and co-fiduciaries) in a new business enterprise.  As discussed in more detail below, Defendants' bait-and-switch scheme held out to Plaintiffs the promise of becoming indirect owners and customers of a Greenville-based local bank attentive to their banking needs.  This promise was a ruse.  As a result of Defendants' fraud, Plaintiffs hold illiquid investments in an insolvent southern Florida-based bank holding company and have not ownership ties whatever to the Greenville bank whose launching they promoted and capitalized.

16.    Basically, Plaintiffs were induced, based on representations made on behalf of Defendants, to become investors in a Regent Bancorp, Inc., a Florida Bank Holding Company, for the sole purpose of capitalizing its Greenville-based wholly owned subsidiary.  As the individual Defendants well knew, none of the Plaintiffs had any interest in owning shares in Regent Bancorp per se.  Based more than 600 miles away from Greenville, South Carolina, Regent Bancorp and its Florida-based affiliates and their operations held no investment allure for Greenville investors, especially since Regent Bancorp's shares were not publicly traded, i.e.,

8

there was no market for the stock. What made an investment in Regent Bancorp attractive to South Carolina investors was the business plan Defendants devised, calling for Regent Bancorp to establish a Greenville-based entity that would function as a true local community bank in the Greenville business community, while enjoying significant economies of scale based on utilizing many of the existing back office departments and services of the Bank which will be billed to the New Bank at cost. In essence, the investment plan for the Greenville based community bank offered and sold by Defendants held out the promise of a local bank with which Greenville-based investors could affiliate for their banking needs, with ready access to excellent established back office services provided at cost by Regent Bancorp, thereby creating large savings for New Bank over what would be paid by a start-up for similar services. Further, Defendants specifically targeted Greenville business people whose investments as a core group of investors and would-be bank patrons and customers were alleged to be essential to the success of the "New Bank". The use of this core group to raise capital was attractive because of the good reputations of the local investors and due to the ability of the initial investors to attract local depositors and local business for the New Bank. Unbeknownst to Plaintiffs, this very appealing idyllic business plan which was sold to them by Defendants was doomed from the outset. Unbeknownst to Plaintiffs, both prior to and after issuance of the Plaintiffs' share of stock which occurred on or about February 10, 2009, the Defendants embarked on a materially different plan and scheme which was designed to infuse capital into its Florida operations at the expense of and to the detriment of the South Carolina bank. As a consequence, Plaintiffs have gone from being co-promoters/business partners with Regent Bancorp, and through that nexus participants in Regent Bank of Greenville (New Bank) to being investors holding illiquid stock in an insolvent Florida holding company that has no ties whatever with Regent Bank of Greenville (New Bank) which is

9

now owned by a North Carolina bank holding company with which Plaintiffs have no ownership affiliation.

17.    The investment program sold to Plaintiffs was due to the existence of material facts that were withheld, making the facts stated false and misleading.  Among the key facts known to Defendants that were not told to the South Carolina investors were these:

a.    During the time that the shares were being marketed to Plaintiffs, up to the time that the shares were actually sold/issued to Plaintiffs and thereafter,  the Florida real estate market, which was crucial to Regent Bancorp's financial well-being, was collapsing at an accelerating pace.  Unbeknownst to Plaintiffs, the quality of the Regent's loans was imploding. Consequently, Regent Bancorp was sliding into insolvency, making it exactly the kind of corporate investment opportunity that no sensible investor would buy stock in.  From and after the closing of the stock sale to Plaintiffs, though Regent Bancorp was experiencing dire financial results, it covered up the true facts, including by presenting its receipt of TARP money as a feather in its cap, being a sign of great positive distinction, and confidence on the part of the Federal government in its solidity and prospects.

b.    The offering price for shares to Plaintiffs were grossly overpriced.  Indeed, as alleged herein, had all the true facts concerning Regent Bancorp, its prospects and the foreseeable sale of the Greenville operation been -disclosed, there was no market for  Regent Bancorp's shares at all since, as alleged above, it would have been the kind of investment opportunity that no sensible investor based in or around the Greenville area would buy stock in at any price.

c.      Regent Bancorp's technological abilities were presented by Spiro to investors as a huge plus. Supposedly, the Regent Bancorp infrastructure would be able to generate operational savings of some $1 million annually compared to the shouldering those costs on a de novo basis in Greenville. But the purported benefit of relying on Regent Bancorp's back office prowess was not a plus for the New Bank or the investors capitalizing it; it was a negative. Contrary to affirmations made to investors by Cyril Spiro, the Regent Bancorp technology was inefficient and behind the times. The New Bank would have been significantly better off outsourcing its operational dealings rather than having to rely on Regent Bancorp for the back office services and technology.

d.      The Holding Company and Florida Bank represented that quality business opportunities, inclusive of existing loans held by the Florida bank, could be transferred to the New Bank thereby creating a strong and positive base that would not exist if the New Bank was a stand-alone operation. In reality and, unknown to Plaintiffs, the New Bank was destined to become and did in fact serve as a dumping ground for loans made by the Florida Bank. Plaintiffs were not informed that the plan/scheme of the Defendants could, would, and did include the transfer of multiple loans to improve the financial position of the Florida bank to the detriment of the New Bank.

e.      Though it billed itself as being in compliance with Federal Regulations, Regent Bancorp was in poor financial health; it was struggling financially, to the point that it needed federal bailout funds to sustain its operations at the time the investment offering of shares to Plaintiffs closed and the stock was delivered. Indeed, at the very time it was selling common

11

stock to Plaintiffs it was planning to issue senior securities that would dilute Plaintiffs common; worse, the senior securities had dividend requirements that Regent Bancorp could not meet.

      f.      Because of Regent Bancorp's failing financial health, the prompt sale of New Bank, the very entity that prompted Plaintiffs' investments, was foreseeable to Defendants. The sale was in fact consummated in late summer of 2011, with Regent Bancorp selling the New Bank, to Bank of North Carolina. This gutted the business plan that had been held out to Plaintiffs as an inducement for their investments. The viable entity that Plaintiffs had been induced to capitalize was gone, sold to raise cash to be used by Regent Bancorp to finance its hand-to-mouth existence. The demise of the business plan sold to Plaintiffs was foreseen by Defendants at the time of the offering of investments to Plaintiffs, or would have been foreseen but for Defendants' reckless indifference to the truth. No disclosures were ever made by Defendants that Plaintiffs and their investments could be used like pawns to capitalize Regent Bancorp and the Florida Bank, with New Bank being swiftly sold off to a new owner, leaving Plaintiffs with no ownership ties to New Bank. The collapse of the promised investment plan left Plaintiffs in the position of being merely shareholders in a Florida-based bank holding company that was in hock to the Federal government and was insolvent in the sense it could not pay back timely to the Federal government money it had borrowed to stay afloat. In essence, Plaintiffs were induced to capitalize a viable bank that was swiftly sold off, leaving them as shareholders in a bankrupt Florida bank holding company with no ties to South Carolina and dismal prospects for financial success. No Plaintiff would have invested in the Regent Bancorp offering if an outcome such as has occurred had been described in offering literature or personal sales pitches as likely or even remotely possible.

12

g.    The culmination of the Defendants' wrongful and fraudulent scheme occurred in 2011 when the Defendants sold the New Bank and used the proceeds to support the Holding Company and Florida Bank whose financial health was in jeopardy.  That further, until the sale was disclosed to the Plaintiffs' investor, the Plaintiff could not have reasonably discovered the fraudulent and wrongful scheme of the Defendants.

18.    All of the misrepresentations and omissions mentioned above tainted Regent Bancorp's written disclosures in its Private Placement Memorandum, and likewise were the subject of misleading sales pitches made by Defendants' agent, Cyril S. Spiro ("Spiro") who published the falsehoods at meetings with investors in Greenville, South Carolina over the course of several months in 2008 when he made trips to Greenville to meet with investors.   There were a number of such meetings, including one meeting on July 28, 2008, at the Poinsett Club (a private club located in Greenville, South Carolina) in which an invitation was issued for a presentation by Regent Bancorp and New Bank.  The major presentation was by the Defendant Spiro with questions and answers by Defendants Spiro and Pamela Joy Owens, CFO of Greenville, South Carolina (only on financial matters).  Further, another and similar presentation was made by those same people at a meeting on September 18, 2008, at the Poinsett Club in Greenville, South Carolina for the same purpose.  Further, private conversations and other communications were engaged in by these Defendants for the purpose of soliciting for the funds in order to organize "New Bank" named Regent Bank in Greenville, South Carolina, by providing capital to Regent Bancorp for that purpose only, i.e., to own and operate a bank in Greenville County, South Carolina.

13

## ALLEGATIONS AS TO FRAUDULENT CONCEALMENT

19.    The facts concealed described in paragraphs 15 through 18 above were known to Defendants but were never disclosed to Plaintiffs within 3 years of the date this class action lawsuit suit was filed.  Such facts were not discoverable by Plaintiffs through the exercise of due diligence because those facts related to information proprietary to those in the banking industry; and in control positions with the Holding Company and Florida bank.

20.    Plaintiffs affirmatively allege (1) Through their statements in the Private Placement Memorandum and/or their acts, including their silence, Defendants concealed or suppressed material fact as alleged above; (2) Defendants were under a duty to disclose the facts in question to the Plaintiffs based on statutory law, including S.C. Code 35-1-509, and based on the law of fiduciary duty, since Plaintiffs were co-promoters of New Bank, and hence in a fiduciary relationship with Defendants; (3) Defendants intentionally concealed or suppressed the facts in question with the intent to defraud Plaintiff and to deprive them of their rights as investors; (4) Plaintiffs were unaware of the facts in question and would not have acted as they did if they had known of the concealed or suppressed fact ("reliance"); and (5) as a result of the concealment or suppression of the fact, Plaintiffs have sustained damage.

21.    In addition to tolling of applicable statute of limitations due to fraudulent concealment, Plaintiffs further claim the benefit of any applicable tolling agreement .

## FOR A FIRST CAUSE OF ACTION
### Section 552 of the Restatement (Second) of Torts

22.    The preceding allegations are realleged.

14

23.     Under section 552 of the Restatement Second of Torts, one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transaction, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

24.     The Defendants and each of them, in the course of their business, profession or employment, or in a transaction in which they had a pecuniary interest, to wit, the promotion and capitalization of New Bank by Regent Bancorp, breached their duty to supply Plaintiffs with honest and compete material disclosures concerning the capitalization of New Bank, with Defendants failing to exercise reasonable care or competence in obtaining or communicating the information.  Instead Defendants, functioning as control persons of Regent Bancorp and otherwise, supplied false information for the guidance of Plaintiffs in their business transaction, by authorizing, approving or ratifying a false and misleading Private Placement Memorandum, and false and misleading disclosures made in South Carolina by Cyril Spiro, with the result that each Defendant is subject to liability for pecuniary loss caused to Plaintiffs by their justifiable reliance upon the information,

25.     Defendants' misconduct was negligent, reckless or intentional.

26.     By reason of Defendants' misconduct, jointly and severally, Plaintiffs are entitled to actual and punitive damages for the injuries they have suffered.

15

## FOR A SECOND CAUSE OF ACTION
### South Carolina Code Section 35-1-509

27.    The preceding allegations are realleged.

28.    Defendants' stock investment sales scheme succeeded due to material omissions of fact detailed above which are actionable under S.C. Code § 35-1-509.  Additionally, the sales to plaintiffs are actionable because they were part of a scheme to defraud and a fraudulent course of business devised and executed by Defendants.

29.    Defendants are liable for the violations of § 509 as sellers, control persons of sellers, aiders and abettors of wrongdoers, officers of sellers or directors of sellers.  They were negligent or reckless in their breaches of duty to provide Plaintiffs with full and fair disclosure of material facts.

30.    By reason of Defendants' violations, jointly and severally, Plaintiffs have suffered injury.  To the extent that any tender of investments are required, Plaintiffs hereby tender such securities, contingent only on Defendants fully paying Plaintiffs everything to which Plaintiffs are entitled under South Carolina law.

## FOR A THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty

31.    The preceding allegations are realleged.

32.    In Duncan v. Brookview House, Inc., 262 S.C. 449, 205 S.E.2d 707 (1974), South Carolina's Supreme Court held that the promoters of a corporation are fiduciaries to each other and to the corporation they are creating.

16

33.    Defendants, jointly and severally, owe Plaintiffs a fiduciary duty because they were co-promoters with Plaintiffs in the promotion of New Bank, an entity being created through their joint efforts.

34.    Notwithstanding their fiduciary relationship with Plaintiffs, Defendants took advantage of Plaintiffs and cheated Plaintiffs by concealing material facts, causing Plaintiffs to be tricked into making an investment that never would have been made in the face of honest disclosure.

35.    Defendants' misconduct amounts to breaches of fiduciary duty, and has caused Plaintiffs injury.

36.    By reason of Defendants' misconduct, jointly and severally, constituting breaches of fiduciary Plaintiffs are entitled to actual and punitive damages.

## FOR A FOURTH CAUSE OF ACTION
### Aiding and Abetting

37.    The preceding allegations are realleged.

38.    To the extent that any Defendant is not directly liable under the preceding allegations, Plaintiffs allege the Defendant is liable indirectly for the wrongs alleged as an aider and abettor based on having had knowledge of the misconduct in question and having substantially assisted the misconduct by participating in a cover-up of the misconduct or otherwise.

39.    Plaintiffs allege the aider and abettor Defendants are liable to Plaintiffs for actual and punitive damages.

17

WHEREFORE, Plaintiffs pray as follows:

1.    For actual damages;

2.    For damages, prejudgment interest, costs, and legal fees under S.C. Code § 35-1-509;

3.    For punitive damages and prejudgment interest to the extent allowed by law;

4.    For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Douglas F. Patrick, S.C. Bar #04358
*Covington, Patrick, Hagins, Stern & Lewis, PA*
P.O. Box 2343
Greenville, SC  29602
(864) 240-5508
Attorney for Plaintiff and the Class Members

December _____, 2012
Greenville, South Carolina

18

STATE OF SOUTH CAROLI⬤                    JUDGME⬤ IN A CIVIL CASE

COUNTY OF GREENVILLE                       CASE NO: 2012CP2302664

IN THE COURT OF COMMON PLEAS               FILED-CLERK OF COURT
                                           GREENVILLE CO. S.C.
                                           PAUL B. WICKENSIMER

### C Vincent Brown *vs.* Cyril S Spiro

                                           2013 FEB 27  P 1: 55

*CHECK ONE:*

☐  **JURY VERDICT.**  This action came before the court for a trial by jury. The issues have been tried and a verdict rendered.

☐  **DECISION BY THE COURT.**  This action came to trial or hearing before the court. The issues have been tried or heard and a decision rendered.

☐  **ACTION DISMISSED (*CHECK REASON*):**      ☐ Rule 12(b), SCRCP;      ☐ Rule 41(a),
    SCRCP (Vol. Nonsuit);      ☐ Rule 43(k), SCRCP (Settled);      ☐ Other: _____

☐  **ACTION STRICKEN (*CHECK REASON*):**      ☐ Rule 40(j) SCRCP;      ☐ Bankruptcy:
    ☐ Binding arbitration, subject to right to restore to confirm, vacate or modify arbitration award;
    ☐ Other: _____

☐  **DISPOSITION OF APPEAL TO THE CIRCUIT COURT (CHECK APPLICABLE BOX):**
    ☐ Affirmed;      ☐ Reversed;      ☐ Remanded;
    ☐ Other: _____

NOTE: ATTORNEYS ARE RESPONSIBLE FOR NOTIFYING LOWER COURT, TRIBUNAL, OR ADMINISTRATIVE AGENCY OF THE CIRCUIT COURT RULING IN THIS APPEAL.

**IT IS ORDERED AND ADJUDGED:**      ☒ See attached order;      ☐ Statement of Judgment by the Court:

Dated at Greenville, South Carolina, this .

*Court Reporter:*

_____

                                           PRESIDING JUDGE -

This judgment was entered on the 27th day of February, 2013, and a copy mailed first class this 27th day of February, 2013, to attorneys of record or to parties (when appearing pro se) as follows:

                                           **Probate Court** Estate Division 301 University Ridge,
                                           Suite 1200 Greenville. SC 29601
                                           **T. Alexander Evins** Parker Poe Adams & Bernstein
                                           LLP 100 Dunbar Street, Suite 206 Spartanburg, SC
                                           29306
**John A. Hagins Jr.** Covington Patrick Hagins Stern    **Kristina Ann Young** Parker Poe Adams & Bernstein
& Lewis P.O. Box 2343 Greenville, SC 29602    LLP 200 Meeting Street, Suite 301 Charleston, SC
                                           29401
                                           **Charles E Raynal IV** Parker Poe Adams & Bernstein
                                           LLP P.O. Box 389 Raleigh, NC 276020389

_____          _____
**ATTORNEY(S) FOR THE PLAINTIFF(S)**         **ATTORNEY(S) FOR THE DEFENDANT(S)**

CPFORM4M
SCCA SCRCP Form 4 Revised 06/2008

_____

Paul B. Wickensimer    Greenville County Clerk Of Court
- Clerk of Court

BUS

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

FILED-CLERK OF COURT
GREENVILLE
PAUL B. WICKENSIMER

2013 FEB 2 P 1:55

)    IN THE COURT OF COMMON PLEAS
)    C.A. No.  2012-CP-23-2664
)

Michael E. Munafo, J. Edward Mixon, Fred B.
Johnston, II, Raymond E. Burns and Susan E.
Burns JTWROS, Estate of C. Dan Joyner,
James E. Pittman, Jr., John A. Hagins, Jr.,
Crawley Enterprises, Thomas R. Strange, Sr.,
Dwayne M. Bell and Cathy D. Bell JTWROS,
NFS LLC FBO: Thomas S. Carswell, NFS LLC
FBO: Susan T. Carswell, Richard A. Lackey,
Lawrence R. Fischer Trustee under Elfie Living
Trust, NFS LLC FBO:  Dan A. Collins, NFS
LLC/FMTC:  FBO R. Charles Eldridge, Jr.,
Nicholas Franchina, RBS Capital Markets
Corp. Custodian FBO Nicholas Franchina
IRA, RBC Capital Markets Corp Custodian for
Peter C. Kapetanokos, TC Ameritrade Clearing
Inc. Custodian Timothy Borsum IRA, Thomas
D. Bigby, Larry Blackwell, W. Howard Boyd,
Jr., Danny W. Cisson, Carolyn A. Cisson, CP
Enterprises, Gerald W. Lenz and Alice R. Lenz
JTWROS, Adam Pittman, Gerry Womack,
Steven Charles Francis, Frances D. Johnson,
B.L. Johnson, James D. Miller, FCC Custodian
FBO James D. Miller, Charles Schwab and Co.
Inc. Custodian for Terry R. Weaver IRA,
Martha Sutherland-Wright, E. Michael Howard
and Billie B. Howard JTWROS, William R.
Martin, G. Bruce McPherson, Jr., UBS
Financial Custodian for C. Vincent Brown,
NFS LLC FBO:  Malinda Coleman/Fern
Moore, John T. Pazdan, Emilie R. Pazdan,
Lewis E. Martin, William E. Martin, Michael
Burns, Glenn R. Oxner, Charles Schwab and
Co. Inc. Custodian for John E. Katilius IRA,
John N. Walker, Frank Washick Intervivor
Trust Agreement, B. Brett Blevins, C. Joyce
Alexander, Heather Shirley Smith Custodian
for Graham Steven Smith under the UGMA,
Stephanie Shirley Plumley Custodian for Luke
Cameron Plumley under the UGMA, Lynn C.
Faust,  Sara E. Foster, Thomas M. Goforth, II,
Joseph E. Mixon Trustee under Trust and Will
of Jan H. Mixon, Robert S. Latham, Jr., Sage
Mill, LLC, Sam B. Phillips, Jr., Donald A. Pihl,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER TO AMEND
COMPLAINT**

1

James Steven Shirley and Mildred G. Shirty )
JTWROS, TCG, LLC, Peter B. Waldschmidt, )
G. Herman Walker, III, Douglas M. Wilson, )
Alan C. Singleton, and Duncan A. Carmichael, )
                                             )
                    Plaintiffs,              )
                                             )
vs.                                          )
                                             )
Cyril S. Spiro, Pamela Joy Owens, Regent     )
Bank, Regent Bancorp, Inc., Thomasina        )
Caporella, G. Jean Cerra, John C. Csapo, Alfred )
D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, )
George D. Town, Barry Webber, Neil           )
LeCorgne, Richard J. Gray, Jim Afflerback,   )
David R. Mazza,                              )
                                             )
                    Defendants.              )
                                             )
                                             )
_____     )

This matter came before the Court during a telephone status conference. On July 24, 2012, an Amended Complaint was filed. All Defendants filed Motions to Dismiss pursuant to Rule 12, SCRCP. Some of the individual Defendants in their Motions raised Rule 12b2 grounds for lack of personal jurisdiction. The matter was referred to Business Court on January 8, 2013. In the interim, Douglas Patrick assumed the handling of the case on behalf of the Plaintiffs and submitted a Proposed Second Amended Complaint to the Defendants. Those Defendants who have not interposed personal jurisdiction arguments do not oppose amendment. The other Defendants take no position and maintain their position that the Court lacks personal jurisdiction over them. There has been no discovery taken. In accordance with Rule 15(a), SCRCP, an amendment to the Complaint should be freely given when justice so requires and when the proposed amendment would not unduly prejudice the other parties . The Court therefore grants the Plaintiffs' Motion. This Order will not affect the rights of the parties who have contested personal jurisdiction and is not a waiver to those positions.

2





IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, Plaintiffs may file and serve the second amended Complaint.

IT IS SO ORDERED.

The Honorable Edward W. Miller

February 26, 2013

Greenville, South Carolina

3

**3-7-13 Second Amended Complaint**

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

)
)
)

IN THE COURT OF COMMON PLEAS
C.A. No.  2012-CP-23-2664

Craig Carver, Individually and on Behalf of a
Class of South Carolina Investors (Legal or
Beneficial Owners) of Shares in Regent
Bancorp, Inc., as Defined Herein,

Plaintiffs,

vs.

Cyril S. Spiro, Pamela Joy Owens, Regent
Bank, Regent Bancorp, Inc., Thomasina
Caporella, G. Jean Cerra, John C. Csapo,
Alfred D. Griffin, Jr., Olin M. Hill, Irving
Rosenbaum, George D. Town, Barry Webber,
Neil LeCorgne, Richard J. Gray, Jim
Afflerback, and David R. Mazza.

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

AMENDED
SUMMONS

(Jury Trial Demanded)

    YOU ARE HEREBY summoned and required to answer the Complaint in this action, of

which a copy is herewith served upon you, and to serve a copy of your answer to the said Complaint

on the subscribers at their offices, 211 Pettigru Street, P.O. Box 2343, Greenville, South Carolina,

within thirty (30) days after the service hereof, exclusive of the day of such service; and if you fail to

answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court

and judgment by default will be rendered against you for the relief demanded in the Complaint.

Respectfully submitted,

Douglas F. Patrick, Esq., S.C. Bar # 4358
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC 29602
(864) 242-9000
Attorney for Plaintiff

March 7 , 2013

Greenville, South Carolina

STATE OF SOUTH CAROLINA )    IN THE COURT OF COMMON PLEAS
                         )         C.A. No.  2012-CP-23-2664
COUNTY OF GREENVILLE     )

                                      )
Craig Carver, Individually and on Behalf of a  )
Class of South Carolina Investors (Legal or    )
Beneficial Owners) of Shares in Regent         )
Bancorp, Inc., as Defined Herein,              )
                                               )
                              Plaintiffs,      )
                                               )
vs.                                            )
                                               )          AMENDED COMPLAINT
Cyril S. Spiro, Pamela Joy Owens, Regent       )
Bank, Regent Bancorp, Inc., Thomasina          )          (Jury Trial Demanded)
Caporella, G. Jean Cerra, John C. Csapo,       )
Alfred D. Griffin, Jr., Olin M. Hill, Irving   )
Rosenbaum, George D. Town, Barry Webber,       )
Neil LeCorgne, Richard J. Gray, Jim            )
Afflerback, and David R. Mazza.                )
                                               )
                              Defendants.      )

Plaintiffs above-named respectfully present to this Court the following:

## PARTIES BEFORE THE COURT

1.      For organization and simplification, the entities discussed are referred to as these:

a)      Plaintiffs:  Craig Carver as a class representative under S.C.R. Civ. P. 23, and a class

described below consisting of those persons who invested as a result of securities solicitation

that was the subject of a Regent Bancorp. Private Placement Memorandum dated May 13,

2008, and which was principally directed into South Carolina, including the Blevins/Smith

family[1] of Canton, Georgia and all other investors to whose shares in Regent Bancorp. Inc.

---

[1] Brett Blevins, Jason M. Smith, and Brittnay B. Smith reside in Canton, Georgia (Blevins-Smith held by Blevins).

1

shares were sold as alleged herein, including but not limited to persons named individually Plaintiffs in previously filed complaints in this matter.

b)     Defendant Regent Bancorp, Inc. a/k/a The Holding Company is a bank holding company headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware.

c)     Defendant Regent Bank, Davie, Florida ("the Bank" or "Florida Bank") is headquartered in Davie, Broward County, Florida and incorporated in the State of Delaware. The Bank is engaged in retail and commercial banking. It is a wholly owned subsidiary of the Holding Company.

d)    Regent Bank of Greenville, South Carolina ("New Bank" or "S.C. Bank") was located in Greenville, South Carolina and was a subsidiary of Holding Company. Plaintiffs served as founding investors of New Bank and were prevailed upon by Defendants to be instrumental in establishing New Bank according to the wrongful capital raising scheme devised, approved and executed by Defendants as alleged herein. New Bank was chartered, opened, and began operating in South Carolina in April 2009.

e)     Defendants Cyril S. Spiro, Thomasina Caporella, G. Jean Cerra, John C. Csapo, Alfred D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, George D. Town, Barry Webber served on the Board of Directors of "the Holding Company" in connection with the offering and sale to Plaintiffs of the investments which are the subject of this lawsuit. They are referred to herein as "the Company Board" and recovery is sought against them by Plaintiffs, both individually and in their corporate capacities. The Company Board devised, originated, authorized, approved and ratified the capital raising scheme which was wrongful and which is the subject of this lawsuit.

f)      Defendants Cyril S. Spiro, Neil LeCorgne, Richard J. Gray, James D. Afflerback, David R. Mazza, and Pamela Joy Owens served as officers and the principal management of the Florida Bank and were involved in and promoted the offering and sale to Plaintiffs of the investments which were part of the wrongful capital raising scheme and are the subject of this lawsuit.

g)      Defendants Neil LeCorgne, Richard J. Gray, Jim Afflerback, and David R. Mazza served as Officers and "the executive management team" of "the Holding Company" in connection with the offering and sale to Plaintiffs of the investments which are the subject of this lawsuit.  With the other Defendants, the executive management team devised, approved and effectuated the investment plan and capital raising scheme which was wrongful and which is the subject of this lawsuit.

h)      Defendant Pamela Joy Owens (CFO and Executive Vice President of Regent Bank, Florida who performed financial accounting services in South Carolina, and participated (with Cyril Spiro) in  devising, proposing, presenting, and selling the fraudulent investment plan and capital raising scheme to Plaintiffs in South Carolina, making her employer, Regent Bank of Florida, responsible for her misconduct.

## JURISDICTION AND VENUE

2.      Venue is proper in this Judicial Circuit where many of the acts and transactions pertinent to this case were originated and consummated.  Plaintiffs are almost all citizens and residents of Greenville County, South Carolina.  They were solicited in this Circuit to invest money at the insistence of, and with the knowledge and approval and authorization of Defendants.  In many instances, these solicitations were brought about by meetings which occurred in Greenville County attended by some of the Defendants and during which materials, including the Private

3

Placement Memorandum which were authorized and prepared by all Defendants, were distributed. The solicitation was done pursuant to a capital raising plan originated, authorized, approved, effectuated, ratified, and adopted by each of the Defendants. That plan directly and expressly targeted investors in the Greenville South Carolina area, including Plaintiffs. Plaintiffs were solicited to transfer money from Greenville South Carolina to Florida for the purpose of organizing a New Bank, in the form of an entirely new federal savings bank in Greenville, South Carolina. All Defendants knew in advance that the proceeds of this offering of stock ownership by South Carolina Plaintiffs would be used to capitalize the New Bank as a wholly-owned subsidiary of Company, Defendants' Florida Holding Company.

3.    From the start, the end and aim of the individual Defendants' capital raising strategy was to accumulate capital originating from Greenville, South Carolina that would be owned by and inure to the benefit of Regent Bancorp, and Regent Bank, the Florida-based bank companies for which they served as directors and/or officers. To this end, they originated, approved, authorized, and ratified offering documents and disclosures and nondisclosures made in South Carolina which are the subject of this case, all for the purpose of raising capital by selling investments in their Florida bank and/or bank holding company to Greenville area investors.

4.    All individual defendants were control persons of Regent Bancorp (the Holding Company) or its Florida-based affiliate, Regent Bank (the Florida Bank), who targeted, directed, authorized and approved the sale of securities to Greenville-based investors. The end and aim of the individual Defendants' capital-raising efforts for the Holding Company and the Florida bank was to gather cash from Greenville, South Carolina-based investors. All Defendants targeted Greenville South Carolina-based investors as part of their capital-raising scheme. Dozens of such investors, including Plaintiffs were solicited, and many, including Plaintiffs made investments as a result of Defendants' wrongful activities. Plaintiffs' claims arise out of or are related to Defendants' contacts

4

within the forum state, including their decision to solicit investments in their Florida-based bank

holding company from the Greenville area. Defendants have purposefully availed themselves of the

privileges of conducting activities within the forum state, inclusive of meetings and the purposeful

disbursement of investment materials, thus invoking the benefits and protections of that South

Carolina's laws and making Defendants' presence before the state's courts foreseeable; and this

Court's exercise of jurisdiction over the Defendants is reasonable because the alleged end and aim

of Defendants' capital raising efforts was to establish a multi-million dollar wholly owned subsidiary

located in Greenville. As stated in the second page of Defendants' May 13, 2008 Private Placement

Memorandum describing their capital-raising intentions:

> The Company has applied for regulatory approval to organize a new federal
> savings bank in Greenville, South Carolina (the "New Bank"). The proceeds of this
> Offering will be used to capitalize the New Bank which will be operated as a wholly-
> owned subsidiary of the Company. The shares being offered are shares of the
> Company. Purchasers of the shares will not have a direct ownership interest in the
> New Bank, but will have ownership in the Company.

5.    By enlisting Plaintiffs in their capital-raising efforts, and by causing Plaintiffs to

become investors in their Florida-based financial enterprise, Defendants deliberately availed

themselves of the privilege of conducting activities in the forum state, in such a way that being

required to defend their actions in South Carolina was entirely foreseeable, in the sense that

Defendants, having extracted millions of dollars of cash from Greenville based investors, could

reasonably anticipate being required to answer for the actions and delicts in court in Greenville

County South Carolina.

6.    When counterbalanced against the burdens placed on Plaintiffs should they have to

litigate against Defendants in Florida, the defendant's burden of appearing in Greenville is slight.

South Carolina has a keen interest in adjudicating disputes arising where out-of-state persons use

South Carolina capital and investors to capitalize out-of-state entities. The Plaintiff's here have a

keen interest in obtaining convenient and effective relief. The judicial system's interest in obtaining

5

the most effective resolution of the controversy will be best served by proceeding with adjudication of this case in South Carolina, as will the common interests of all sovereigns in promoting substantive social policies. South Carolina has a strong interest in enforcing its securities laws and protecting its investors. A single suit in Plaintiff's home state provides Plaintiffs with the opportunity for convenient and effective relief. Finally, the judicial system has an interest in avoiding piecemeal litigation in multiple forums and allowing Plaintiff to bring all of these cases in one forum would further this interest.

7.     In accordance with the allegations above, proper venue for action is in the State of South Carolina, to-wit, Greenville County, South Carolina and in the state courts of that county and state. There is no complete diversity of citizenship of this action as the Plaintiffs who invested money to start the New Bank are residents of the State of South Carolina, for the most part, and Blevins/Smith Group who are residents of the State of Georgia. Defendant Owens is employed by the "the Holding Company" and the Bank. However, she is now, and has been, a legal resident of the State of South Carolina. Two principal subsidiaries at the time of the occurrences alleged herein were part of the Company, all of which are Delaware corporations.

## ALLEGATIONS AS TO CLASS

8.     This action is brought by the named Plaintiffs as a class action on behalf of themselves and all others similarly situated under the provisions of South Carolina Rule of Civil Procedure #23. The class consists of all persons, their heirs, successors or assigns who purchased shares in Regent Bancorp in the offering that was the subject of Defendants' May 13, 2008 Private Placement Memorandum.

9.     Upon information and belief, the class consists of more than 100 persons and is so numerous that joinder of individual members is impractical.

6

10.    There are common questions of law and fact in this action that relate to and affect the rights of each member and the relief sought is common to the entire class.  The common questions of law and fact include whether:

a)    facts were concealed or misrepresented by Defendants in connection with the investment offering;

b)    any facts that were concealed or misrepresented were material;

c)    the Individual Defendants are control persons;

d)    the Defendants are subject to personal jurisdiction for the wrongs they committed in South Carolina;

e)    Defendants were in a fiduciary relationship with Plaintiffs as co-promoters of the New Bank in Greenville, South Carolina;

f)    Various Defendants' responsibility for representations and concealments attributable to Regent Bancorp and Cyril Spiro; and

g)    The Holding Company and the Florida bank were insolvent or on the verge of insolvency at the time Plaintiffs were induced to make their investments.

11.    The claims and defenses of the named Plaintiffs are typical of the claims and defenses of the class.

12.    The named Plaintiffs will fairly and adequately represent and protect the interests of the class, and the financial interest of each class member exceeds $100.

13.    Pursuant to S.C.R.C.P 23 this action is properly maintained as a class action in that the prosecution of several actions by individual members of the class would create the risk of varying adjudications with respect to members of the class as well as create inconsistent standard of conduct for those opposing the class.  Further, individual actions by members of the

7

class may be dispositive of the interests of other members who are not parties to the adjudication of the claim, which would impair or impede the ability of those individuals to protect their interests.

14.     The class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## NATURE OF DEFENDANTS' WRONGFUL SCHEME

15.     The corporate Defendants and the individual Defendants individually and as directors, officers, agents, and/or control persons of the entity Defendants devised and executed a bait-and-switch investment scheme to deprive Plaintiffs of the legal rights owed them as investors and also as reliant, trusting, co-promoters (and co-fiduciaries) in a new business enterprise. As discussed in more detail below, Defendants' bait-and-switch scheme held out to Plaintiffs the promise of becoming indirect owners and customers of a Greenville-based local bank attentive to their banking needs. This promise was a ruse. As a result of Defendants' fraud, Plaintiffs hold illiquid investments in an insolvent southern Florida-based bank holding company and have not ownership ties whatever to the Greenville bank whose launching they promoted and capitalized.

16.     Basically, Plaintiffs were induced, based on representations made on behalf of Defendants, to become investors in a Regent Bancorp, Inc., a Florida Bank Holding Company, for the sole purpose of capitalizing its Greenville-based wholly owned subsidiary. As the individual Defendants well knew, none of the Plaintiffs had any interest in owning shares in Regent Bancorp per se. Based more than 600 miles away from Greenville, South Carolina, Regent Bancorp and its Florida-based affiliates and their operations held no investment allure for Greenville investors, especially since Regent Bancorp's shares were not publicly traded, i.e.,

8

there was no market for the stock. What made an investment in Regent Bancorp attractive to South Carolina investors was the business plan Defendants devised, calling for Regent Bancorp to establish a Greenville-based entity that would function as a true local community bank in the Greenville business community, while enjoying significant economies of scale based on utilizing many of the existing back office departments and services of the Bank which will be billed to the New Bank at cost. In essence, the investment plan for the Greenville based community bank offered and sold by Defendants held out the promise of a local bank with which Greenville-based investors could affiliate for their banking needs, with ready access to excellent established back office services provided at cost by Regent Bancorp, thereby creating large savings for New Bank over what would be paid by a start-up for similar services. Further, Defendants specifically targeted Greenville business people whose investments as a core group of investors and would-be bank patrons and customers were alleged to be essential to the success of the "New Bank". The use of this core group to raise capital was attractive because of the good reputations of the local investors and due to the ability of the initial investors to attract local depositors and local business for the New Bank. Unbeknownst to Plaintiffs, this very appealing idyllic business plan which was sold to them by Defendants was doomed from the outset. Unbeknownst to Plaintiffs, both prior to and after issuance of the Plaintiffs' share of stock which occurred on or about February 10, 2009, the Defendants embarked on a materially different plan and scheme which was designed to infuse capital into its Florida operations at the expense of and to the detriment of the South Carolina bank. As a consequence, Plaintiffs have gone from being co-promoters/business partners with Regent Bancorp, and through that nexus participants in Regent Bank of Greenville (New Bank) to being investors holding illiquid stock in an insolvent Florida holding company that has no ties whatever with Regent Bank of Greenville (New Bank) which is

9

now owned by a North Carolina bank holding company with which Plaintiffs have no ownership affiliation.

17.    The investment program sold to Plaintiffs was due to the existence of material facts that were withheld, making the facts stated false and misleading.  Among the key facts known to Defendants that were not told to the South Carolina investors were these:

a.    During the time that the shares were being marketed to Plaintiffs, up to the time that the shares were actually sold/issued to Plaintiffs and thereafter,  the Florida real estate market, which was crucial to Regent Bancorp's financial well-being, was collapsing at an accelerating pace.  Unbeknownst to Plaintiffs, the quality of the Regent's loans was imploding.  Consequently, Regent Bancorp was sliding into insolvency, making it exactly the kind of corporate investment opportunity that no sensible investor would buy stock in.  From and after the closing of the stock sale to Plaintiffs, though Regent Bancorp was experiencing dire financial results, it covered up the true facts, including by presenting its receipt of TARP money as a feather in its cap, being a sign of great positive distinction, and confidence on the part of the Federal government in its solidity and prospects.

b.    The offering price for shares to Plaintiffs were grossly overpriced.  Indeed, as alleged herein, had all the true facts concerning Regent Bancorp, its prospects and the foreseeable sale of the Greenville operation been -disclosed, there was no market for  Regent Bancorp's shares at all since, as alleged above, it would have been the kind of investment opportunity that no sensible investor based in or around the Greenville area would buy stock in at any price.

10

c.     Regent Bancorp's technological abilities were presented by Spiro to investors as a huge plus. Supposedly, the Regent Bancorp infrastructure would be able to generate operational savings of some $1 million annually compared to the shouldering those costs on a de novo basis in Greenville. But the purported benefit of relying on Regent Bancorp's back office prowess was not a plus for the New Bank or the investors capitalizing it; it was a negative. Contrary to affirmations made to investors by Cyril Spiro, the Regent Bancorp technology was inefficient and behind the times. The New Bank would have been significantly better off outsourcing its operational dealings rather than having to rely on Regent Bancorp for the back office services and technology.

d.     The Holding Company and Florida Bank represented that quality business opportunities, inclusive of existing loans held by the Florida bank, could be transferred to the New Bank thereby creating a strong and positive base that would not exist if the New Bank was a stand-alone operation. In reality and, unknown to Plaintiffs, the New Bank was destined to become and did in fact serve as a dumping ground for loans made by the Florida Bank. Plaintiffs were not informed that the plan/scheme of the Defendants could, would, and did include the transfer of multiple loans to improve the financial position of the Florida bank to the detriment of the New Bank.

e.     Though it billed itself as being in compliance with Federal Regulations, Regent Bancorp was in poor financial health; it was struggling financially, to the point that it needed federal bailout funds to sustain its operations at the time the investment offering of shares to Plaintiffs closed and the stock was delivered. Indeed, at the very time it was selling common

11

stock to Plaintiffs it was planning to issue senior securities that would dilute Plaintiffs common; worse, the senior securities had dividend requirements that Regent Bancorp could not meet.

      f.     Because of Regent Bancorp's failing financial health, the prompt sale of New Bank, the very entity that prompted Plaintiffs' investments, was foreseeable to Defendants. The sale was in fact consummated in late summer of 2011, with Regent Bancorp selling the New Bank, to Bank of North Carolina. This gutted the business plan that had been held out to Plaintiffs as an inducement for their investments. The viable entity that Plaintiffs had been induced to capitalize was gone, sold to raise cash to be used by Regent Bancorp to finance its hand-to-mouth existence. The demise of the business plan sold to Plaintiffs was foreseen by Defendants at the time of the offering of investments to Plaintiffs, or would have been foreseen but for Defendants' reckless indifference to the truth. No disclosures were ever made by Defendants that Plaintiffs and their investments could be used like pawns to capitalize Regent Bancorp and the Florida Bank, with New Bank being swiftly sold off to a new owner, leaving Plaintiffs with no ownership ties to New Bank. The collapse of the promised investment plan left Plaintiffs in the position of being merely shareholders in a Florida-based bank holding company that was in hock to the Federal government and was insolvent in the sense it could not pay back timely to the Federal government money it had borrowed to stay afloat. In essence, Plaintiffs were induced to capitalize a viable bank that was swiftly sold off, leaving them as shareholders in a bankrupt Florida bank holding company with no ties to South Carolina and dismal prospects for financial success. No Plaintiff would have invested in the Regent Bancorp offering if an outcome such as has occurred had been described in offering literature or personal sales pitches as likely or even remotely possible.

g.      The culmination of the Defendants' wrongful and fraudulent scheme occurred in 2011 when the Defendants sold the New Bank and used the proceeds to support the Holding Company and Florida Bank whose financial health was in jeopardy.  That further, until the sale was disclosed to the Plaintiffs' investor, the Plaintiff could not have reasonably discovered the fraudulent and wrongful scheme of the Defendants.

18.     All of the misrepresentations and omissions mentioned above tainted Regent Bancorp's written disclosures in its Private Placement Memorandum, and likewise were the subject of misleading sales pitches made by Defendants' agent, Cyril S. Spiro ("Spiro") who published the falsehoods at meetings with investors in Greenville, South Carolina over the course of several months in 2008 when he made trips to Greenville to meet with investors.   There were a number of such meetings, including one meeting on July 28, 2008, at the Poinsett Club (a private club located in Greenville, South Carolina) in which an invitation was issued for a presentation by Regent Bancorp and New Bank.  The major presentation was by the Defendant Spiro with questions and answers by Defendants Spiro and Pamela Joy Owens, CFO of Greenville, South Carolina (only on financial matters).  Further, another and similar presentation was made by those same people at a meeting on September 18, 2008, at the Poinsett Club in Greenville, South Carolina for the same purpose.  Further, private conversations and other communications were engaged in by these Defendants for the purpose of soliciting for the funds in order to organize "New Bank" named Regent Bank in Greenville, South Carolina, by providing capital to Regent Bancorp for that purpose only, i.e., to own and operate a bank in Greenville County, South Carolina.

## ALLEGATIONS AS TO FRAUDULENT CONCEALMENT

19.     The facts concealed described in paragraphs 15 through 18 above were known to Defendants but were never disclosed to Plaintiffs within 3 years of the date this class action lawsuit suit was filed.  Such facts were not discoverable by Plaintiffs through the exercise of due diligence because those facts related to information proprietary to those in the banking industry; and in control positions with the Holding Company and Florida bank.

20.     Plaintiffs affirmatively allege (1) Through their statements in the Private Placement Memorandum and/or their acts, including their silence, Defendants concealed or suppressed material fact as alleged above; (2) Defendants were under a duty to disclose the facts in question to the Plaintiffs based on statutory law, including S.C. Code 35-1-509, and based on the law of fiduciary duty, since Plaintiffs were co-promoters of New Bank, and hence in a fiduciary relationship with Defendants; (3) Defendants intentionally concealed or suppressed the facts in question with the intent to defraud Plaintiff and to deprive them of their rights as investors; (4) Plaintiffs were unaware of the facts in question and would not have acted as they did if they had known of the concealed or suppressed fact ("reliance"); and (5) as a result of the concealment or suppression of the fact, Plaintiffs have sustained damage.

21.     In addition to tolling of applicable statute of limitations due to fraudulent concealment, Plaintiffs further claim the benefit of any applicable tolling agreement .

### FOR A FIRST CAUSE OF ACTION
### Section 552 of the Restatement (Second) of Torts

22.     The preceding allegations are realleged.

14

23.     Under section 552 of the Restatement Second of Torts, one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transaction, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

24.     The Defendants and each of them, in the course of their business, profession or employment, or in a transaction in which they had a pecuniary interest, to wit, the promotion and capitalization of New Bank by Regent Bancorp, breached their duty to supply Plaintiffs with honest and compete material disclosures concerning the capitalization of New Bank, with Defendants failing to exercise reasonable care or competence in obtaining or communicating the information.  Instead Defendants, functioning as control persons of Regent Bancorp and otherwise, supplied false information for the guidance of Plaintiffs in their business transaction, by authorizing, approving or ratifying a false and misleading Private Placement Memorandum, and false and misleading disclosures made in South Carolina by Cyril Spiro, with the result that each Defendant is subject to liability for pecuniary loss caused to Plaintiffs by their justifiable reliance upon the information,

25.     Defendants' misconduct was negligent, reckless or intentional.

26.     By reason of Defendants' misconduct, jointly and severally, Plaintiffs are entitled to actual and punitive damages for the injuries they have suffered.

15

## FOR A SECOND CAUSE OF ACTION
### South Carolina Code Section 35-1-509

27.     The preceding allegations are realleged.

28.     Defendants' stock investment sales scheme succeeded due to material omissions of fact detailed above which are actionable under S.C. Code § 35-1-509.  Additionally, the sales to plaintiffs are actionable because they were part of a scheme to defraud and a fraudulent course of business devised and executed by Defendants.

29.     Defendants are liable for the violations of § 509 as sellers, control persons of sellers, aiders and abettors of wrongdoers, officers of sellers or directors of sellers.  They were negligent or reckless in their breaches of duty to provide Plaintiffs with full and fair disclosure of material facts.

30.     By reason of Defendants' violations, jointly and severally, Plaintiffs have suffered injury.  To the extent that any tender of investments are required, Plaintiffs hereby tender such securities, contingent only on Defendants fully paying Plaintiffs everything to which Plaintiffs are entitled under South Carolina law.

## FOR A THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty

31.     The preceding allegations are realleged.

32.     In Duncan v. Brookview House, Inc., 262 S.C. 449, 205 S.E.2d 707 (1974), South Carolina's Supreme Court held that the promoters of a corporation are fiduciaries to each other and to the corporation they are creating.

16

33.     Defendants, jointly and severally, owe Plaintiffs a fiduciary duty because they were co-promoters with Plaintiffs in the promotion of New Bank, an entity being created through their joint efforts.

34.     Notwithstanding their fiduciary relationship with Plaintiffs, Defendants took advantage of Plaintiffs and cheated Plaintiffs by concealing material facts, causing Plaintiffs to be tricked into making an investment that never would have been made in the face of honest disclosure.

35.     Defendants' misconduct amounts to breaches of fiduciary duty, and has caused Plaintiffs injury.

36.     By reason of Defendants' misconduct, jointly and severally, constituting breaches of fiduciary Plaintiffs are entitled to actual and punitive damages.

### FOR A FOURTH CAUSE OF ACTION
#### Aiding and Abetting

37.     The preceding allegations are realleged.

38.     To the extent that any Defendant is not directly liable under the preceding allegations, Plaintiffs allege the Defendant is liable indirectly for the wrongs alleged as an aider and abettor based on having had knowledge of the misconduct in question and having substantially assisted the misconduct by participating in a cover-up of the misconduct or otherwise.

39.     Plaintiffs allege the aider and abettor Defendants are liable to Plaintiffs for actual and punitive damages.

17

WHEREFORE, Plaintiffs pray as follows:

1.    For actual damages;

2.    For damages, prejudgment interest, costs, and legal fees under S.C. Code § 35-1-509;

3.    For punitive damages and prejudgment interest to the extent allowed by law;

4.    For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Douglas E. Patrick, S.C. Bar #04358
*Covington, Patrick, Hagins, Stern & Lewis, PA*
P.O. Box 2343
Greenville, SC  29602
(864) 240-5508
Attorney for Plaintiff and the Class Members

March 7, 2013
Greenville, South Carolina

18

BUS

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

)
)
)
)

IN THE COURT OF COMMON PLEAS
C.A. No. 2012-CP-23-2664

Michael E. Munafo, J. Edward Mixon, Fred B.
Johnston, II, Raymond E. Burns and Susan E.
Burns JTWROS, Estate of C. Dan Joyner,
James E. Pittman, Jr., John A. Hagins, Jr.,
Crawley Enterprises, Thomas R. Strange, Sr.,
Dwayne M. Bell and Cathy D. Bell JTWROS,
NFS LLC FBO: Thomas S. Carswell, NFS LLC
FBO: Susan T. Carswell, Richard A. Lackey,
Lawrence R. Fischer Trustee under Elfie Living
Trust, NFS LLC FBO: Dan A. Collins, NFS
LLC/FMTC: FBO R. Charles Eldridge, Jr.,
Nicholas Franchina, RBS Capital Markets
Corp. Custodian FBO Nicholas Franchina
IRA, RBC Capital Markets Corp Custodian for
Peter C. Kapetanokos, TC Ameritrade Clearing
Inc. Custodian Timothy Borsum IRA, Thomas
D. Bigby, Larry Blackwell, W. Howard Boyd,
Jr., Danny W. Cisson, Carolyn A. Cisson, CP
Enterprises, Gerald W. Lenz and Alice R. Lenz
JTWROS, Adam Pittman, Gerry Womack,
Steven Charles Francis, Frances D. Johnson,
B.L. Johnson, James D. Miller, FCC Custodian
FBO James D. Miller, Charles Schwab and Co.
Inc. Custodian for Terry R. Weaver IRA,
Martha Sutherland-Wright, E. Michael Howard
and Billie B. Howard JTWROS, William R.
Martin, G. Bruce McPherson, Jr., UBS
Financial Custodian for C. Vincent Brown,
NFS LLC FBO: Malinda Coleman/Fern
Moore, John T. Pazdan, Emilie R. Pazdan,
Lewis E. Martin, William E. Martin, Michael
Burns, Glenn R. Oxner, Charles Schwab and
Co. Inc. Custodian for John E. Katilius IRA,
John N. Walker, Frank Washick Intervivor
Trust Agreement, B. Brett Blevins, C. Joyce
Alexander, Heather Shirley Smith Custodian
for Graham Steven Smith under the UGMA,
Stephanie Shirley Plumley Custodian for Luke
Cameron Plumley under the UGMA, Lynn C.
Faust, Sara E. Foster, Thomas M. Goforth, II,
Joseph E. Mixon Trustee under Trust and Will
of Jan H. Mixon, Robert S. Latham, Jr., Sage
Mill, LLC, Sam B. Phillips, Jr., Donald A. Pihl,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER TO AMEND
COMPLAINT**

FILED-CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

2013 FEB 27 P 1: 55

1

ENTERED COMPUTER

James Steven Shirley and Mildred G. Shirly     )
JTWROS, TCG, LLC, Peter B. Waldschmidt,         )
G. Herman Walker, III, Douglas M. Wilson,       )
Alan C. Singleton, and Duncan A. Carmichael,    )
                                                 )
                        Plaintiffs,              )
                                                 )
vs.                                              )
                                                 )
Cyril S. Spiro, Pamela Joy Owens, Regent        )
Bank, Regent Bancorp, Inc., Thomasina           )
Caporella, G. Jean Cerra, John C. Csapo, Alfred )
D. Griffin, Jr., Olin M. Hill, Irving Rosenbaum, )
George D. Town, Barry Webber, Neil              )
LeCorgne, Richard J. Gray, Jim Afflerback,      )
David R. Mazza,                                  )
                                                 )
                        Defendants.              )
                                                 )
                                                 )
_____ )

This matter came before the Court during a telephone status conference.  On July

24, 2012, an Amended Complaint was filed.  All Defendants filed Motions to Dismiss pursuant to

Rule 12, SCRCP.  Some of the individual Defendants in their Motions raised Rule 12b2 grounds for

lack of personal jurisdiction.  The matter was referred to Business Court on January 8, 2013.  In the

interim, Douglas Patrick assumed the handling of the case on behalf of the Plaintiffs and submitted

a Proposed Second Amended Complaint to the Defendants.  Those Defendants who have not

interposed personal jurisdiction arguments do not oppose amendment.  The other Defendants take

no position and maintain their position that the Court lacks personal jurisdiction over them.  There

has been no discovery taken.  In accordance with Rule 15(a), SCRCP, an amendment to the

Complaint should be freely given when justice so requires and when the proposed amendment

would not unduly prejudice the other parties .  The Court therefore grants the Plaintiffs' Motion.

This Order will not affect the rights of the parties who have contested personal jurisdiction and is

not a waiver to those positions.

2



IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, Plaintiffs may file and serve the second amended Complaint.

IT IS SO ORDERED.

The Honorable Edward W. Miller

February 26, 2013

Greenville, South Carolina

3

STATE OF SOUTH CAROLI⬤    JUDGME⬤ IN A CIVIL CASE

COUNTY OF GREENVILLE    CASE NO: 2012CP2302664

IN THE COURT OF COMMON PLEAS

FILED CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

**C Vincent Brown** *vs.* **Cyril S Spiro**

2013 FEB 27 P 1: 55

_CHECK ONE:_

☐ **JURY VERDICT.**    This action came before the court for a trial by jury. The issues have been tried and a verdict rendered.

☐ **DECISION BY THE COURT.**    This action came to trial or hearing before the court. The issues have been tried or heard and a decision rendered.

☐ **ACTION DISMISSED (_CHECK REASON_):**    ☐ Rule 12(b), SCRCP;    ☐ Rule 41(a),
SCRCP (Vol. Nonsuit);    ☐ Rule 43(k), SCRCP (Settled);    ☐ Other: _____

☐ **ACTION STRICKEN (_CHECK REASON_):**    ☐ Rule 40(j) SCRCP;    ☐ Bankruptcy:
☐ Binding arbitration, subject to right to restore to confirm, vacate or modify arbitration award;
☐ Other: _____

☐ **DISPOSITION OF APPEAL TO THE CIRCUIT COURT (CHECK APPLICABLE BOX):**
☐ Affirmed;    ☐ Reversed;    ☐ Remanded;
☐ Other: _____

NOTE: ATTORNEYS ARE RESPONSIBLE FOR NOTIFYING LOWER COURT, TRIBUNAL, OR ADMINISTRATIVE AGENCY OF THE CIRCUIT COURT RULING IN THIS APPEAL.

**IT IS ORDERED AND ADJUDGED:**    ☒ See attached order;    ☐ Statement of Judgment by the Court:

Dated at Greenville, South Carolina, this .

*Court Reporter:*

_____

PRESIDING JUDGE -

This judgment was entered on the 27th day of February, 2013, and a copy mailed first class this 27th day of February, 2013, to attorneys of record or to parties (when appearing pro se) as follows:

Probate Court Estate Division 301 University Ridge, Suite 1200 Greenville, SC 29601
T. Alexander Evins Parker Poe Adams & Bernstein LLP 100 Dunbar Street, Suite 206 Spartanburg, SC 29306
Kristina Ann Young Parker Poe Adams & Bernstein LLP 200 Meeting Street, Suite 301 Charleston, SC 29401
Charles E Raynal IV Parker Poe Adams & Bernstein LLP P.O. Box 389 Raleigh, NC 276020389

**John A. Hagins Jr.** Covington Patrick Hagins Stern & Lewis P.O. Box 2343 Greenville, SC 29602

_____

**ATTORNEY(S) FOR THE PLAINTIFF(S)**    **ATTORNEY(S) FOR THE DEFENDANT(S)**

CPFORM4M
SCCA SCRCP Form 4 Revised 06/2008

Paul B. Wickensimer    Greenville County Clerk Of Court
- Clerk of Court

CPFORM4M
SCCA SCRCP Form 4 Revised 06/2008

**9-28-12 Motion and Order for Case Assignment to the Business Court Pilot Program <u>and</u> 1-8-13 Order Assigning Case to the Business Court Pilot Program**

| STATE OF SOUTH CAROLINA, | ) | IN THE CIRCUIT COURT |
|---|---|---|
| COUNTY OF GREENVILLE | ) | **MOTION AND ORDER FOR CASE ASSIGNMENT** |
| C. VINCENT BROWN, ET AL, | ) | **TO THE BUSINESS COURT** |
| Plaintiff | ) | **PILOT PROGRAM** |
| vs. | ) | |
| REGENT BANCORP, INC., ET AL., | ) | |
| Defendant. | ) | CASE NO. 2012-CP-23-2664 |

1. As counsel for a party who has appeared in this action, we move for an order of the Chief Justice assigning this case to the Business Court Pilot Program of the South Carolina Circuit Courts. We certify that as of the date of this Motion, no more than 180 days have passed since the commencement of this action. In addition, we certify that all parties have been notified of this request.

2. The principal claim or claims made in the above-referenced matter are made under the following Titles of the South Carolina Code and the matter is appropriate for assignment to the Business Court Pilot Program. (Note: Please check all that are applicable, and attach a description of the claims made in the above-referenced lawsuit.).

- ☐ Title 33—South Carolina Business Corporation Act of 1988;
- ☒ Title 35—South Carolina Uniform Securities Act of 2005;
- ☐ Title 36, Chapter 8—South Carolina Uniform Commercial Code: Investment Securities;
- ☐ Title 39, Chapter 3—Trade and Commerce: Trusts, Monopolies, and Restraints of Trade;
- ☐ Title 39, Chapter 8—Trade and Commerce: The South Carolina Trade Secrets Act;
- ☐ Title 39, Chapter 15—Trade and Commerce: Labels and Trademarks; or
- ☐ Other Appropriate Matter determined by the Chief Justice.

3. Insert name and contact information of moving party or parties:

| Party: | Defendant Regent Bancorp, Inc. | Party: | Plaintiff C. Vincent Brown, et al |
|---|---|---|---|
| Name: | T. Alexander Evins, III | Name: | John A. Hagins, Jr |
| Address: | 100 Dunbar Street, Suite 206 | Address: | PO Box 2343 |
| | Spartanburg, SC 29306 | | Greenville, SC 29602 |
| Phone: 864-591-2030  Fax:  864-591-2050 | | Phone: 864-242-9000  Fax: (864) 233-9777 | |
| Email: | alexevins@parkerpoe.com | Email: | jhagins@covpatlaw.com |
| Signature: | | Signature: | |
| Date: | 9-28-2012 | Date: | |

4. Indicate whether the non-moving party or parties ☒ consents, ☐ does not oppose, ☐ opposes; ☐ position on assignment is unknown.

**Recommendation of the Business Court Judge:**     ☐ **Recommends**     ☐ **Declines to Recommend**

_____     _____
**Signature of Business Court Judge**                        **Date**

Assignment to the Business Court Pilot Program for Greenville County is hereby ☐ **ORDERED** ☐ **DENIED.**

It is further ☐ **ORDERED** ☐ **DENIED** that exclusive jurisdiction over this case be assigned to the Honorable _____ to hear and handle all pretrial motions and other matters pertaining to this case.

And it is SO ORDERED.

_____
Jean Hoefer Toal, Chief Justice

This _____ day of _____
Columbia, South Carolina

SCCA BC Form 101 (Rev. 4/2012)

**Exhibit A to Motion and Order for Case Assignment to the Business Court Assignment
Pilot Program**

This lawsuit concerns a 2008 securities offering in which the Plaintiffs acquired shares of stock in Regent Bancorp, Inc. ("Regent"), a Delaware Corporation with its principal place of business in Florida. The Amended Complaint lists more than seventy Plaintiffs and sixteen defendants.

The Plaintiffs have asserted claims against Regent, its Florida subsidiary Regent Bank, and its current and former officers and directors. The claims alleged include equitable rescission, breach of contract, breach of fiduciary duty, constructive fraud, fraud and misrepresentation and unfair and deceptive trade practices. The Amended Complaint also refers to alleged violations of the South Carolina Uniform Securities Act, S.C. Code 35-1-101 *et seq.*

The Plaintiffs claim the Defendants misrepresented or omitted material facts in connection with the securities offering. The Plaintiffs further contend that the individual defendants breached their responsibilities as officers and directors of Regent. The Plaintiffs claim the investors in the securities offering suffered losses exceeding $6 million. The resolution of the claims will turn on corporate and securities law matters that are complex and are properly addressed by the South Carolina Business Court.

Regent Bancorp, Inc. brings this Motion with the consent of the Plaintiffs and Defendants Regent Bank, Cyril S. Spiro, Pamela Joy Owens and Neill LeCorgne. The remaining defendants have filed motions to dismiss the Amended Complaint, based on, among other grounds, the South Carolina Courts' lack of personal jurisdiction over them, and therefore have not consented to personal jurisdiction in South Carolina.

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

IN THE COURT OF COMMON PLEAS

**JUDGMENT IN A CIVIL CASE**

CASE NO:  **2012CP2302664**

SCCA SCRCP Form 4 Revised 06/2008
CPFORM4M

FILED-CLERK OF COURT
GREENVILLE CO. S.C.
PAUL B. WICKENSIMER

**C Vincent Brown** *vs.* **Cyril S Spiro**    2013 JAN -8 P 1: 18

---

***CHECK ONE:***

☐ **JURY VERDICT.**    This action came before the court for a trial by jury.  The issues have been tried and a verdict rendered.

☐ **DECISION BY THE COURT.**    This action came to trial or hearing before the court.  The issues have been tried or heard and a decision rendered.

☐ **ACTION DISMISSED (*CHECK REASON*):**    ☐ Rule 12(b), SCRCP;    ☐ Rule 41(a),

SCRCP (Vol. Nonsuit);    ☐ Rule 43(k), SCRCP (Settled);    ☐ Other: _____

☐ **ACTION STRICKEN (*CHECK REASON*):**    ☐ Rule 40(j) SCRCP;    ☐ Bankruptcy:

☐ Binding arbitration, subject to right to restore to confirm, vacate or modify arbitration award;
☒ Other: _____

☐ **DISPOSITION OF APPEAL TO THE CIRCUIT COURT (CHECK APPLICABLE BOX):**
☐ Affirmed;    ☐ Reversed;    ☐ Remanded;

☒ Other: _____

NOTE: ATTORNEYS ARE RESPONSIBLE FOR NOTIFYING LOWER COURT, TRIBUNAL, OR ADMINISTRATIVE AGENCY OF THE CIRCUIT COURT RULING IN THIS APPEAL.

**IT IS ORDERED AND ADJUDGED:**    ☐ See attached order;    ☐ Statement of Judgment by the Court:

Dated at Greenville, South Carolina, this .

*Court Reporter:*

---

**PRESIDING JUDGE -**

This judgment was entered on the 9th day of January, 2013, and a copy mailed first class this 9th day of January, 2013, to attorneys of record or to parties (when appearing pro se) as follows:

John A. Hagins Jr. PO Box 2343  Greenville, SC 29602

**Probate Court** Estate Division 301 University Ridge, Suite 1200 Greenville, SC 29601
**T. Alexander Evins** 100 Dunbar St., Ste.206 Spartanburg, SC 29306
**Kristina Ann Young** Parker Poe Adams & Bernstein LLP 200 Meeting Street, Suite 301 Charleston, SC 29401

---

**ATTORNEY(S) FOR THE PLAINTIFF(S)**

**ATTORNEY(S) FOR THE DEFENDANT(S)**

Paul B. Wickensimer    Greenville County Clerk Of Court
- Clerk of Court

CPFORM4M
SCCA SCRCP Form 4 Revised 06/2008

STATE OF SOUTH CAROL.    .,                )      IN THE CIRCUIT CO    T
                                            )
COUNTY OF        GREENVILLE                 )      **MOTION AND ORDER  FOR CASE ASSIGNMENT**
C. VINCENT BROWN, ET AL,                    )      **TO THE BUSINESS COURT**
                           Plaintiff   )           **PILOT PROGRAM**
            vs.                             )
REGENT BANCORP, INC., ET AL.,               )
                           Defendant.  )           CASE NO. 2012-CP-23-2664

1. As counsel for a party who has appeared in this action, we move for an order of the Chief Justice assigning this case to the Business Court Pilot Program of the South Carolina Circuit Courts. We certify that as of the date of this Motion, no more than 180 days have passed since the commencement of this action. In addition, we certify that all parties have been notified of this request.

2. The principal claim or claims made in the above-referenced matter are made under the following Titles of the South Carolina Code and the matter is appropriate for assignment to the Business Court Pilot Program. (Note: Please check all that are applicable, and attach a description of the claims made in the above-referenced lawsuit.).

☐ Title 33—South Carolina Business Corporation Act of 1988;
☒ Title 35—South Carolina Uniform Securities Act of 2005;
☐ Title 36, Chapter 8—South Carolina Uniform Commercial Code: Investment Securities;
☐ Title 39, Chapter 3—Trade and Commerce: Trusts, Monopolies, and Restraints of Trade;
☐ Title 39, Chapter 8—Trade and Commerce: The South Carolina Trade Secrets Act;
☐ Title 39, Chapter 15—Trade and Commerce: Labels and Trademarks; or
☐ Other Appropriate Matter determined by the Chief Justice.

3. Insert name and contact information of moving party or parties:

| Party: | Defendant Regent Bancorp, Inc. | Party: | Plaintiff C. Vincent Brown, et al |
|---|---|---|---|
| Name: | T. Alexander Evins, III | Name: | John A. Hagins, Jr |
| Address: | 100 Dunbar Street, Suite 206 Spartanburg, SC 29306 | Address: | PO Box 2343 Greenville, SC 29602 |
| Phone: | 864-591-2030  Fax:  864-591-2050 | Phone: | (864) 242-9000 Fax: (864) 233-9777 |
| Email: | alexevins@parkerpoe.com | Email: | jhagins@covpatlaw.com |
| Signature: |  | Signature: |  |
| Date: | 9-28-2012 | Date: | 9/26/12 |

4. Indicate whether the non-moving party or parties ☒ consents, ☐ does not oppose, ☐ opposes; ☐ position on assignment is unknown.

**Recommendation of the Business Court Judge:**      ☒ **Recommends**      ☐ **Declines to Recommend**

_____                              11/29/12
**Signature of Business Court Judge**                                    **Date**

Assignment to the Business Court Pilot Program for Greenville County is hereby ☒ **ORDERED** ☐ **DENIED.**

It is further ☒ **ORDERED** ☐ **DENIED** that exclusive jurisdiction over this case be assigned to the Honorable        to hear and handle all pretrial motions and other matters pertaining to this case.
*Ned Miller*
And it is SO ORDERED.

This 14th day of Dec, 2012                    _____
Columbia, South Carolina                       Jean Hoefer Toal, Chief Justice

SCCA BC Form 101 (Rev. 4/2012)

**ENTERED COMPUTER**

**12-13-12 Motion for Admission Pro Hac Vice of Charles E. Raynal, IV <u>and</u>**
**1-18-13 Order Granting Motion for Admission Pro Hac Vice of**
**Charles E. Raynal, IV**

STATE OF SOUTH CAROLINA

COUNTY OF <u>GREENVILLE</u>

IN THE COURT OF COMMON PLEAS

CASE NO.

<u>2012</u>-<u>CP</u>-<u>23</u>-<u>2664</u>

Michael E. Munafo, et al.,
☐ Plaintiff

v.

Cyril S. Spiro, et al.
☒ Defendant.

**MOTION AND ORDER INFORMATION**
**FORM AND COVER SHEET**

| Plaintiff's Attorney: | Defendant's Attorney: Kristina Young |
|---|---|
| Bar No. | Bar No.  73962 |
| Address: | Address:  200 Meeting St., Suite 301, Charleston, SC 29401 |
| phone:                      fax: | phone:  (843) 727-2663          fax: |
| email:                     other: | email: kristinayoung@parkerpoe.com    other: |

☒ **MOTION HEARING REQUESTED (attach written motion and complete SECTIONS 1 and III)**
☐ **FORM MOTION, NO HEARING REQUESTED (complete SECTIONS II and III)**
☐ **PROPOSED ORDER/CONSENT ORDER (complete SECTIONS II AND III)**

**SECTION I:  Hearing Information**

Nature of Motion:  Motion For Admission Pro Hac Vice of Charles E. Raynal, IV

Estimated Time Needed:                              Court Reporter Needed:  ☐ YES    ☒ NO

**SECTION II:  Motion/Order Type**

☒ Written motion attached
☐ Form Motion/Order

I hereby move for relief or action by the court as set forth in the attached proposed order.

_Kristina Young_                                      12/13/12
Signature of Attorney for ☐ Plaintiff / ☒ Defendant          Date Submitted

**SECTION III:  Motion Fee**

☒ PAID – AMOUNT: <u>$25.00</u>
☐ EXEMPT:
(check reason)
    ☐ Rule to Show Cause in Child or Spousal Support
    ☐ Domestic Abuse or Abuse and Neglect
    ☐ Indigent Status        ☐ State Agency v. Indigent Party
    ☐ Sexually Violent Predator Act          ☐ Post-Conviction Relief
    ☐ Motion for Stay in Bankruptcy
    ☐ Motion for Publication      ☐ Motion for Execution (Rule 69, SCRCP)
    ☐ Proposed order submitted at request of the court; or,
       reduced to writing from motion made in open court per judge's instructions
       Name of Court Reporter:
    ☐ Other:

| **JUDGE'S SECTION** | |
|---|---|
| ☐ Motion Fee to be paid upon filing of the attached order. | _____ |
| ☐ Other: | JUDGE |
| | CODE: _____    Date: _____ |

**CLERK'S VERIFICATION**

Collected by: _____              Date Filed: _____

☐ MOTION FEE COLLECTED: _____
☐ CONTESTED – AMOUNT DUE: _____

SCCA/233 (11-03)

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
) C.A. No. 2012-CP-23-2664
COUNTY OF GREENVILLE )
)
MICHAEL E. MUNAFO, ET AL., )
)
        Plaintiffs, )
)
vs. ) **MOTION FOR ADMISSION *PRO HAC VICE***
) **OF CHARLES E. RAYNAL, IV**
CYRIL S. SPIRO, ET AL., )
)
        Defendants. )
_____ )

       T. Alexander Evins, III, Esquire and Kristina A. Young, Esquire, counsel for Defendants, and members in good standing of the bar of the State of South Carolina admitted to practice before this Court, hereby move for the admission and appearance in the above-captioned case of Charles E. Raynal, IV, an attorney admitted and authorized to practice law in the highest court of the State of North Carolina, as verified in the attached application, which is incorporated herein by reference. This motion is made upon and is supported by the Verified Application for Admission *Pro Hac Vice* in the State of South Carolina of Charles E. Raynal, IV, which has been filed with the South Carolina Supreme Court Office of Bar Admissions along with the $250.00 filing fee pursuant to Rule 404, SCACR.

       [SIGNATURE BLOCK APPEARS ON FOLLOWING PAGE]

RESPECTFULLY SUBMITTED,

_____
T. Alexander Evins, III, Esq.
alexevins@parkerpoe.com
Kristina Young, Esq.
kristinayoung@parkerpoe.com
Parker Poe Adams & Bernstein LLP
100 Dunbar Street, Suite 206
Spartanburg, SC  29306
Phone:  (864) 591-2030
Fax:  (864) 591-2050

OF COUNSEL:
Charles E. Raynal, Esq.
charlesraynal@parkerpoe.com
Matthew H. Mall, Esq.
matthewmall@parkerpoe.com
Parker Poe Adams & Bernstein, LLP
Wells Fargo Capitol Center
150 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Phone: (919) 828-0564
Fax: (919) 834-4564

ATTORNEYS FOR DEFENDANTS

December 6, 2012

Charleston, South Carolina

PPAB 2014713v1

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*

## IN THE STATE OF SOUTH CAROLINA

MICHAEL E. MUNAFO, ET AL.,

      Plaintiffs,

vs.

CYRIL S. SPIRO, ET AL.,

      Defendants.

Case No.:  2012-CP-23-2664

Court:
Common Pleas, Thirteenth

Mailing Address of Court:
305 E. North Street
Greenville, SC  29601-2121

---

Comes now Charles E. Raynal, IV, applicant herein, and respectfully represents the following:

1.      Applicant resides at 202 Duncan Street, Raleigh, Wake County, North Carolina 27608, (919) 264-2710 (telephone).

2.      Applicant is an attorney and a member of the law firm (or practices law under the name of) Parker Poe Adams & Bernstein LLP, with offices at Wells Fargo Capitol Center, 150 Fayetteville Street, Suite 1400, Post Office Box 389, Raleigh, NC  27602-0389, (919) 828-0564 (telephone), (919) 834-4564 (fax) and also in Spartanburg, Columbia and Charleston, South Carolina.

3.      Applicant has been retained personally or as a member of the above named law firm by Defendants to provide legal representation in connection with the above case now pending before the above named court of the State of South Carolina.

4.      Since August of 2004, Applicant has been, and presently is, a member in good standing of the bar of the highest court of North Carolina where Applicant regularly practices law.  Attached is a certificate of good standing.

5.      Applicant has been admitted to practice before the following courts:

| Court: | Date Admitted: |
| --- | --- |
| Georgia | September, 2000 |

Applicant is presently a member in good standing of the bars of those courts listed above, except as listed below: (List any court named in the preceding paragraph that applicant is no longer admitted to practice before.)

<u>Applicant is an active member of the North Carolina Bar; applicant is currently an inactive member of the Georgia Bar.</u>

3

PPAB 2014713v1

6.      Applicant presently is not subject to any suspension or disbarment proceedings, and has not been formally notified of any complaints pending before a disciplinary agency, except as provided below (give particulars, e.g., jurisdiction, court, date):

None.

7.      Applicant never has had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked, except as provided below (give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation):

None.

8.      Applicant never has had any certificate or privilege to appear and practice before any administrative body suspended or revoked, except as provided below (give particulars, e.g., date, administrative body, date of suspension and reinstatement):

None.

9.      Local counsel of record associated with applicant in this case are T. Alexander Evins, III and Kristina A. Young, of the law firm, Parker Poe Adams & Bernstein LLP, which has offices at: 100 Dunbar Street, Suite 206, Spartanburg, South Carolina, 29306, 864-591-2030 (telephone) and 864-591-2050 (fax) and 200 Meeting Street, Suite 301, Charleston County, Charleston, South Carolina, 29401, 843-727-2650 (telephone) and 843-727-2680 (fax).

If applicable list all other firms/attorneys you are associated with in this matter:

None.

10.     Applicant has previously filed an application to appear *pro hac vice* in the following South Carolina cases (give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted).

| Case Name | Status of Litigation | Date of Application | Local Counsel of Record | Application Pending or Granted |
|---|---|---|---|---|
| *Emmanuel U. Sarmiento, Individually and on Behalf of Ground Industries, Inc. v. Ground Industries, Inc., et al* (Shareholder Derivative Action) (Case No. CA # 2010-CP-23-6860) | Resolved by Settlement | 11/18/10 | L. Dwight Floyd, Parker Poe Adams & Bernstein LLP | Granted 11/19/10 |

11.     Applicant agrees to comply with the applicable statutes, laws and rules of the State of South Carolina and will familiarize himself with and comply with the South Carolina

4

Rules of Professional Conduct. Applicant consents to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

   12.    Applicant respectfully requests to be admitted to practice in the above named court for this case only.

DATED this the _____ day of November, 2012.

_____
APPLICANT

PPAB 2014713v1

**VERIFICATION**

STATE OF NORTH CAROLINA    )
    )
COUNTY OF WAKE    )

I, Charles E. Raynal, IV, do hereby swear or affirm under penalty of perjury that I am the applicant in the above styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.

Charles E. Raynal, IV

Subscribed and sworn to before me this the 30th day of November, 2012.

Notary Public for the State of North Carolina

Printed Name: Amanda C. Turner

My Commission Expires: 6/26/2015

**LOCAL COUNSEL CONSENT**

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this the 6th day of December, 2012.

Kristina A. Young
LOCAL COUNSEL OF RECORD

6

# Supreme Court
## OF THE STATE OF NORTH CAROLINA



I, Christie S. Cameron Roeder, Clerk of the Supreme Court of North Carolina, do hereby certify that on March 20, 2004, license to practice as an Attorney and Counselor at Law in all the Courts of this State was issued by the North Carolina Board of Law Examiners to

## CHARLES E. RAYNAL, IV

according to the certified list of licentiates reported by the Secretary of said Board and filed in my office as required by statute.

To the date of this certificate, no order revoking said license has been filed with this Court and no order suspending same is in effect.

WITNESS my hand and the Seal of the Supreme Court of North Carolina at office in Raleigh, this November 14, 2012.

*Christie S Cameron Roeder*

Christie S. Cameron Roeder
Clerk of the Supreme Court
of the State of North Carolina

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | **C.A. No. 2012-CP-23-2664** |
| **COUNTY OF GREENVILLE** | ) | |
| | ) | |
| MICHAEL E. MUNAFO, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | **AFFIDAVIT OF CHARLES E. RAYNAL, IV** |
| | ) | **IN SUPPORT OF MOTION FOR ADMISSION** |
| CYRIL S. SPIRO, ET AL., | ) | ***PRO HAC VICE*** |
| | ) | |
| Defendants. | ) | |
| | ) | |

PERSONALLY APPEARED BEFORE ME Charles E. Raynal, IV, who being first duly sworn, deposes and states as follows:

1.    I am one of the attorneys for Defendants in the above-captioned action.

2.    I am not a South Carolina resident.

3.    I am not regularly employed in South Carolina.

4.    I am not regularly engaged in the practice of law or professional activities in South Carolina.

FURTHER AFFIANT SAYETH NOT.

Charles E. Raynal, Esq.
charlesraynal@parkerpoe.com
Parker Poe Adams & Bernstein, LLP
Wells Fargo Capitol Center
150 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Phone: (919) 828-0564
Fax: (919) 834-4564

SWORN to before me this
_____ day of December, 2012.


Lindsey H. Payne
Notary Public for North Carolina
My Commission Expires: 12/16/2015

PPAB 2029134v1

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC  29211, accompanied by payment of the $250.00 filing fee payable to the South Carolina Supreme Court on this the ___13th___ day of December, 2012, and that a copy was also delivered to the below-listed attorneys of record this date, December 13th, 2012, by placing the same, enclosed in a first-class, postage-prepaid envelope, in an official depository under the exclusive care and custody of the United States Postal Service, addressed as follows:

John A. Hagins, Jr.
Covington, Patrick, Hagins, Stern & Lewis, PA
P.O. Box 2343
Greenville, SC  29602

Douglas F. Patrick
Covington, Patrick, Hagins, Stern & Lewis, P.A.
P.O. Box 2343
Greenville, SC 29602

Kristina A. Young
LOCAL COUNSEL OF RECORD

PPAB 2014713v1

STATE OF SOUTH CAROLINA )   IN THE COURT OF COMMON PLEAS
                         )       C.A. No. 2012-CP-23-2664
COUNTY OF GREENVILLE     )
                         )
MICHAEL E. MUNAFO, ET AL.,  )
                         )
              Plaintiffs,   )
vs.                      )
                         )   **ORDER FOR ADMISSION *PRO HAC VICE***
CYRIL S. SPIRO, ET AL.,  )       **OF CHARLES E. RAYNAL, IV**
                         )
              Defendants. )
                         )

Upon Petition of T. Alexander Evins, III, Esquire and Kristina A. Young, Esquire, for the admission of Charles E. Raynal, IV to practice before this Court *Pro Hac Vice* in the above-captioned action,

IT IS ORDERED that Charles E. Raynal, IV is admitted to practice before this Court *Pro Hac Vice* in this action.  The Clerk of Court is directed to add Charles E. Raynal, IV as counsel of record for Defendants in the above-captioned action.

**AND IT IS SO ORDERED.**

_____
Presiding Judge
Thirteenth Judicial Circuit

December _____, 2012

Greenville, South Carolina

PPAB 2014713v1

STATE OF SOUTH CAROLINA          )          IN THE COURT OF COMMON PLEAS
                                 )               C.A. No. 2012-CP-23-2664
COUNTY OF GREENVILLE             )
                                 )
MICHAEL E. MUNAFO, ET AL.,       )
                                 )
                Plaintiffs,      )
vs.                              )
                                 )          ORDER FOR ADMISSION *PRO HAC VICE*
CYRIL S. SPIRO, ET AL.,          )             OF CHARLES E. RAYNAL, IV
                                 )
                Defendants.      )
                                 )

        Upon Petition of T. Alexander Evins, III, Esquire and Kristina A. Young, Esquire, for the

admission of Charles E. Raynal, IV to practice before this Court *Pro Hac Vice* in the above-

captioned action,

        IT IS ORDERED that Charles E. Raynal, IV is admitted to practice before this Court *Pro

Hac Vice* in this action. The Clerk of Court is directed to add Charles E. Raynal, IV as counsel

of record for Defendants in the above-captioned action.

        **AND IT IS SO ORDERED.**

                                        _____
                                        Presiding Judge
                                        Thirteenth Judicial Circuit

        1/18/13

~~December ____, 2012~~

Greenville, South Carolina